UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re CISCO SYSTEMS, INC. SECURITIES ) LITIGATION )<br>)<br>_____ )<br>)<br>This Document Relates To: )<br> )<br>ALL ACTIONS. )<br>)<br>_____ ) | No. $O5-mC-1026l-RW2$<br><br>CLASS ACTION<br><br>AFFIDAVIT OF LESLEY E. WEAVER IN SUPPORT OF PENSION FUND PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS PURSUANT TO SUBPOENA BY THIRD PARTY MASSACHUSETTS FINANCIAL SERVICES INVESTMENT MANAGEMENT |

I, LESLEY E. WEAVER, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California. I am an associate with the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, one of the counsel of record for plaintiffs in the above-entitled action. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      Attached are true and correct copies of the following exhibits:

Exhibit 1:      Pertinent excerpts from the First Amended Consolidated Complaint for Violation of the Federal Securities Laws;

Exhibit 2:      Subpoena in a Civil Case to MFS Investment Management;

Exhibit 3:      April 27, 2005 letter from William H. Paine to Daniel S. Drosman;

Exhibit 4:      April 9, 2005 letter from Sharon Simpson Jones to Daniel S. Drosman;

Exhibit 5:      E-mail from Daniel S. Drosman to Sharon Simpson Jones;

Exhibit 6:      June 15, 2005 letter from Lesley E. Weaver to Sharon Simpson Jones;

Exhibit 7:      June 16, 2005 letter from Sharon Simpson Jones to Lesley E. Weaver;

Exhibit 8:      The June 17, 2005 deposition transcript of David Sette-Ducati; and

- 1 -

Exhibit 9:   Protective Order Governing Confidential Material.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed this 30th day of June, 2005, at San Francisco, California.

LESLEY E. WEAVER

State of California          )
                             )
County of California         )

Subscribed and sworn to (or affirmed) before me, this 30th day of June, 2005, by Lesley E. Weaver.
personally known to me or proved to me on the basis of satisfactory evidence to be the person who
appeared before me.

(Seal)



CAROLINE A. WILEY
COMM. #1317640
NOTARY PUBLIC - CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires Aug. 12, 2005

Caroline a Wiley
Signature

S:\CasesSD\Cisco\DEC00022357.doc

- 2 -

COPY

1   MILBERG WEISS BERSHAD
      HYNES & LERACH LLP
2   WILLIAM S. LERACH (68581)
    DARREN J. ROBBINS (168593)
3   SPENCER A. BURKHOLZ (147029)
    DANIEL S. DROSMAN (200643)
4   401 B Street, Suite 1700
    San Diego, CA  92101
5   Telephone:  619/231-1058
    619/231-7423 (fax)
6          - and -
    PATRICK J. COUGHLIN (111070)
7   CONNIE M. CHEUNG (215381)
    100 Pine Street, Suite 2600
8   San Francisco, CA  94111
    Telephone: 415/288-4545
9   415/288-4534 (fax)

10  LEVIN, PAPANTONIO, THOMAS, MITCHELL,
      ECHSNER & PROCTOR, P.A.
11  FREDRIC G. LEVIN (*pro hac vice*)
    J. MICHAEL PAPANTONIO (*pro hac vice*)
12  JOE SCARBOROUGH (*pro hac vice*)
    TIMOTHY M. O'BRIEN (*pro hac vice*)
13  316 South Baylen Street, Suite 600
    Pensacola, FL  32501
14  Telephone: 850/435-7000
    850/436-6084 (fax)
15
    Co-Lead Counsel for Plaintiffs
16
    [Additional counsel appear on signature page.]
17

18              UNITED STATES DISTRICT COURT

19            NORTHERN DISTRICT OF CALIFORNIA

20                   SAN JOSE DIVISION

21
    In re CISCO SYSTEMS, INC. SECURITIES     )  Master File No. C-01-20418-JW(HRL)
22  LITIGATION                               )
                                             )  CLASS ACTION
23  —————————————————————                    )
    This Document Relates To:                )  FIRST AMENDED CONSOLIDATED
24                                           )  COMPLAINT FOR VIOLATION OF THE
        ALL ACTIONS.                         )  FEDERAL SECURITIES LAWS
25  —————————————————————                    )
                                                DEMAND FOR JURY TRIAL
26

27

28

ORIGINAL FILED
DEC 0 6 2002
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

1  accepting orders for the product and would be shipping the product for revenue in late F00, the truth
2  was that this product was far behind schedule in its development and was suffering from such serious
3  and persistent technical and quality problems that Cisco would never be able to complete the
4  development of the product for commercial sale and *would ultimately have to completely abandon*
5  *it*.

6      23.   By late 00, as Cisco's stock continued to fall and industry insiders increasingly
7  suspected Cisco's business might be in trouble, Cisco's executives knew its acquisition program was
8  in grave danger, as Cisco found itself unable to get companies it had been pursuing to agree to be
9  acquired for Cisco stock. Thus, contrary to Cisco's assurances that the acquisition program would
10 continue unabated and that the decline in Cisco's stock price would not interfere with its ability to
11 make acquisitions, by 10/00-11/00, Cisco's acquisition program was in very serious trouble as, due
12 to the decline in the price of Cisco's stock, Cisco was finding it impossible to continue its pace of
13 acquisitions, which Cisco's executives knew would badly damage Cisco's competitive position and
14 hurt its revenue and EPS growth in F01-F02.

15     24.   In late 00, Cisco's top executives knew that the fundamentals of Cisco's business had
16 deteriorated badly, including their access to the Worldwide Summary Report which showed reduced
17 demand and lower revenue and EPS expectations for F01 than defendants told analysts to expect.
18 As rumors of excessive inventories, softening demand and slowing growth circulated, Cisco's stock
19 came under increasing pressure, falling as low as $45 on 12/4/00, just as Cisco was to hold its
20 annual analyst conference in Santa Clara, California – *a hugely important event attended by*
21 *hundreds of securities analysts*. Under these circumstances (which included rumors Cisco would
22 "pre-announce" poor 1stQ F01 results and lower its forecasted growth rates), analysts were highly
23 focused on Cisco's statements *for any hint of deterioration in Cisco's business or slowing of its*
24 *growth*. Cisco's top executives were determined to cover up the serious deterioration of Cisco's
25 business and thus support Cisco's stock price in an attempt to allow Cisco to continue its vitally
26 important acquisition program, as well as preserve the value of Cisco's executives' and employees'
27 stock options. So, Cisco's top executives lied to analysts at the 12/4-5/00 analyst conference –
28 making an extremely upbeat and bullish presentation – telling the investment community that:

1

• *Cisco was making no change in its forecasts; Cisco had never been more optimistic.*

2

3

• *An economic downturn and tough markets would be good for Cisco, as it would force companies to cut costs and upgrade computer networks, leading to increased sales for Cisco.*

4

• *Cisco was still experiencing tremendous demand for its products.*

5

• *Cisco was going to continue, if not accelerate, its acquisition program.*

6

7

• *Cisco expected its inventory situation to normalize in two quarters.*

• *Cisco was not seeing any pricing pressure on its products.*

8

As a result of these false and misleading reassurances, Cisco's stock rallied, reaching $55-3/4 on

9

12/11/00 – an increase of more than 20% in the stock price in just a few trading days. Yet, according

10

to a later published *Wall Street Journal* article, that *very day Chambers had reviewed Cisco's*

11

*company-wide orders on his computer which showed that they were already 10% below plan for*

12

*the quarter.*

13

25.    But then, in mid-12/00, *without any publicity*, Cisco buried in an SEC filing that it

14

had taken *over $275 million in increased loan loss and inventory reserves, much larger reserves*

15

*than Cisco had previously suggested would occur*! When these write-offs were publicized a few

16

days later by the financial press, investors and analysts realized that these much larger-than-expected

17

reserves indicated that Cisco's vendor financing activities were incurring significant losses and that

18

Cisco had accumulated excessive inventories – *information quite inconsistent with Cisco's prior*

19

*assurances. The markets were stunned and shocked by this information. As a result, Cisco stock*

20

*collapsed from $55-1/8 on 12/12/00 to $35-5/32 on 12/21/00, losing over $150 billion in market*

21

*capitalization in just six trading days on trading volume of over 650 million shares*! Desperate

22

to halt the fall of Cisco stock, Cisco executives continued to falsely assure investors and analysts that

23

demand for the Company's products remained strong and that Cisco's revenues and EPS would

24

continue to show the previously forecasted levels of growth during the balance of F01 and F02.

25

Thus, despite its sharp decline, Cisco's stock continued to trade at artificially inflated levels during

26

the balance of the Class Period.

27

28

1    26.    In 12/00, Chambers knew that Cisco's business was imploding due to evaporating

2    demand and soaring inventories. He had, in fact, attended a board meeting of Digital Broadband in

3    which it was decided that this Cisco customer, which owed Cisco $70 million, should file for

4    bankruptcy. Thus, in mid-1/01, he began to try to "talk the stock down" by periodically disclosing

5    cautionary or mildly negative news in the hope that this would cause Cisco's stock to decline

6    gradually, rather than collapse suddenly when the true and disastrous state of Cisco's business

7    became public. In mid-1/01, Chambers stated to analysts that Cisco's 2ndQ F01 had been "*a little*

8    *bit more challenging*" than expected because of a slowdown in customers' spending, Cisco was

9    "*slowing*" its hiring pace and "*our visibility isn't as good as it normally is.*" Analysts described

10    Chambers' comments as "*incrementally more cautious.*" However, analysts who reported on

11    Chambers' comments *continued to forecast a 30% three-year EPS growth rate for Cisco, F01 EPS*

12    *of $.79, with F01 quarterly EPS of $.19 for Cisco* – with one writing, "*No change in Cisco's*

13    *growth rate guidance, 30%-50% annually, but visibility decreased in near term.*"

14    27.    In late 1/01, Chambers briefed analysts, stating that "*business in January was a little*

15    *bit slow,*" as the "*business momentum*" of most of Cisco's customers "*was very tough in December*

16    *and equally tough in January.*" On 1/30/01, *Bloomberg* reported:

17        *Cisco's Chambers Lowers Forecast, Avoids Sell-off, WSJ Says*

18            ... Chambers has made several public appearances in what appears to be a
        move to reduce expectations for the company without openly admitting as much ....
19

20            During one recent appearance, Chambers signaled concern about Cisco's
        growth forecast ... [but] he never explicitly told analysts to reduce estimates ....
        Chambers said that analysts are "reading to much into" his statements ....
21

22        *The tactic can be effective in a volatile market, where missing estimates by
        a penny can provoke a stock sell-off, the paper said.   Chambers has been
        successful in reducing expectations, and the shares are little changed from before*
23        *he began making his public remarks ....*

24    28.    On 1/31/01, Chambers was quoted in a *Bloomberg* report as stating:

25        "*I don't have a hiring freeze on the company as a whole ...* [and] *I still see
        growth rates of 30 to 50 percent per year in the segment of the information*
26        *technology industry where we are involved ....*"

27    29.    On 2/6/01, Cisco reported its 2ndQ F01 results, with EPS of $.18 – $.01 *below*

28    *forecasted levels on revenues far below forecasted levels – and Q/Q revenue growth of just 3.5%*

36.     Purchasers of Cisco's stock during the Class Period paid artificially inflated prices for the stock and have suffered billions of dollars of damage. *However, Cisco's insiders named as defendants did not do nearly so poorly. During the Class Period, the Cisco insiders named as defendants sold over 11.6 million shares of their Cisco stock at artificially inflated prices as high as $80.24 per share, pocketing $609 million in illegal insider trading proceeds – one of the largest insider bail-outs in history*! The graphic below shows the insider stock sales of the Individual Defendants in the aggregate from 9/4/98 through 2/6/01 and demonstrates that the Individual Defendants' stock sales during the Class Period, when they knew Cisco's stock was artificially inflated, greatly exceeded their Cisco stock sales in the eight months prior to the Class Period:



## Cisco Systems, Inc.
### All Defendants' Insider Selling Activity - Dollar Volume
### September 4, 1998 - November 2001

37.     The Cisco insiders named as defendants sold the following amounts of stock during the Class Period:

| Defendant | Shares Sold | % of Shares Owned Sold | Proceeds |
|-----------|-------------|------------------------|----------|
| Bartz | 60,400 | 21.8% | $ 2,545,262 |

| | | | |
|---|---|---|---|
| Carter | 2,134,400 | 48.3% | $ 83,523,632 |
| Chambers | 2,300,000 | 9.7% | $151,512,500 |
| Daichendt | 2,216,866 | 46.4% | $109,623,108 |
| Estrin | 1,058,626 | 50.8% | $ 65,777,167 |
| Kozel | 993,690 | 46.4% | $ 54,980,565 |
| Listwin | 56,248 | 1.4% | $  1,794,592 |
| Puette | 190,000 | 82.6% | $ 14,124,500 |
| Redfield | 1,110,000 | 29.3% | $ 61,715,700 |
| Valentine | 940,000 | 19.0% | $ 29,344,400 |
| Volpi | 390,000 | 21.2% | $ 23,325,600 |
| West | 170,000 | 35.7% | $ 10,948,000 |
| TOTAL: | 11,620,230 | 22% | $609,215,026 |

38.    The following graphic shows the events of the Class Period, defendants' false statements, the performance of Cisco's stock, defendants' insider trading, how Cisco's stock outperformed an index of the stocks of similar companies during the Class Period and how Cisco's stock collapsed as information concerning the true state of its business entered the market:

1   Cisco continued its pattern of beating the Street, affirming strong demand for its products,

2   forecasting 30%-50% growth going forward and increasing its forecasted EPS growth.

3   ### FALSE AND MISLEADING STATEMENTS
### DURING THE CLASS PERIOD

4

5   I.   **Allegedly Untrue Statements of a Past or
Then-Current Material Fact**

6   60.   <u>STATEMENT NO. 1</u>:

7   Net sales for the fourth quarter were $3.55 billion, compared with $2.40
billion for the same period last year, an increase of 48%. Pro forma net income ...

8   was $727 million or [$.11] per share, compared with pro forma net income of $525
million or [$.08] per share for the fourth quarter of 1998, increases of 38% and 31%,

9   respectively

10                              *   *   *

11   Net sales for fiscal 1999 were $12.15 billion, compared with $8.49 billion for
the same period last year, an increase of 43%. Pro forma net income was $2.55

12   billion or [$.37] per share, compared with pro forma net income of $1.88 billion or
[$.29] per share during fiscal 1998, increases of 35% and 29%, respectively.

13   (a)   Date: 8/10/99.

14
(b)   Recipient: This statement was made directly to the public via a press release
15
issued by Cisco.
16
(c)   Author: Cisco issued this statement, as is clear on the face of the press
17
release, and the statement is attributable to the Individual Defendants in accordance with the group-
18
published information doctrine.[3]
19
(d)   True Facts: Cisco manipulated upward and artificially inflated its reported
20
4thQ F99 and F99 revenues, net income and EPS through several accounting tricks in violation of
21
GAAP, which are set forth in ¶¶181-216 and including the following:
22
(i)   When certain products were in short supply and Cisco could not ship
23
as much fully manufactured and functioning product as necessary to meet its internal revenue goals,
24
at the end of the quarter Cisco would ship empty shells of those products, *i.e.*, plastic casings which
25

26

27   [3]   The group-published information doctrine enables plaintiffs to impute false or misleading
statements made in company documents to each of the defendants, even though each defendant may
28   not have personally made the statement.

1   did not contain internal working parts, recording and reporting the revenue on such shipments in that

2   quarter, then providing customers functional working product in the following quarter;

3           (ii)        Via the so-called "yellow line" scheme, Cisco improperly recorded and

4   reported revenue when product in its warehouses or shipment centers was moved across a "yellow

5   line" in the facility, but not actually shipped to a customer;

6           (iii)       By closing a quarter "early" when sufficient improperly recognized

7   revenue had been created to enable Cisco to beat the consensus Street EPS forecast for that quarter

8   by $.01, thus carrying revenue over into, and inflating, the next quarter's results, thereby

9   manipulating its results to mislead the market;

10           (iv)       By improperly recording and reporting revenue on shipments of

11   products to uncreditworthy customers where Cisco had loaned 100% of the sales price of the

12   products and which customers would likely never repay in full the loans made by Cisco;

13           (v)        In connection with making vendor-financed loans to uncreditworthy

14   customers to purchase Cisco equipment, Cisco frequently required customers to purchase significant

15   additional amounts of equipment the customers did not need and did not want, which Cisco knew

16   would reduce demand for its products in the future. In fact, Cisco extended additional credit to

17   American MetroComm ("AMC") even though AMC was insolvent by 8/99 according to a complaint

18   filed by Cisco in 01. Cisco employees were present at AMC and had access to AMC's financial

19   statements which indicated that AMC's solvency was deteriorating significantly from a net equity

20   of $850,000 in 5/99 to a negative equity of $2.8 million by 7/99. By 8/99, AMC had current assets

21   of $3.6 million and current liabilities of $11.4 million;

22           (vi)       By not adequately reserving for vendor financing loans it had made

23   or recording revenue on shipments of product to uncreditworthy customers who Cisco knew would

24   likely be unable to repay in full their loans from Cisco;

25           (vii)      Cisco utilized third-party intermediaries, such as Sunrise Capital,

26   Deutsche Bank, GE Capital, American Express, and Silicon Valley Bank to facilitate sales to

27   customers who were not tier-one customers. Cisco guaranteed payments to these entities in case

28   these customers defaulted on loans; and

1           (viii)        Cisco booked large deals before quarter-end to Commercial Value

2 Added Partners ("CVAPs") and Commercial Value Added Resellers ("CVARs") without required

3 terms completed. The Special Handling Deals List set forth those transactions. For example, Cisco

4 booked orders from CVAP Timebridge, even though the ultimate customer (Nextel) was not

5 ordering the product. In addition, Cisco's sales representatives pressured resellers/CVAPS (such as

6 SBC Datacom, Bay Data Consultants, Solarcom, Ameritech, and G.E. Capital IT Solutions) to place

7 orders in advance of end-user commitments.

8        Cisco was making large amounts of vendor financing loans to new and untested companies,

9 even though they did not meet Cisco's stated internal criteria or standards for such loans, most of

10 which companies were not creditworthy, on terms which Cisco knew made it likely the loans would

11 never be repaid; loans were made in some instances with only two years of financial statements, in

12 addition to providing 100% (or sometimes more) financing for the purchase of its product. Cisco

13 was also secretly making large unsecured working capital loans to these new and untested companies

14 which unsecured working capital loans carried an extremely high risk of loss for Cisco and both of

15 which types of loans were not being adequately reserved for. Cisco's vendor financing involved

16 loans to companies that had no ability to repay. CAIS, Convergent, Digital Broadband, ICG

17 Communications, Pacific Gateway Exchange, Pathnet Telecommunications and PSI Net were

18 examples of uncreditworthy companies to which Cisco provided funds. Cisco pressured cash-poor

19 customers to inflate orders in order to obtain more financing, including working capital, from Cisco

20 Capital. AMC had received a $250 million credit facility despite the fact that AMC was insolvent

21 and contemplating bankruptcy at that time (6/99), and was in violation of loan covenants.

22        Cisco was treating customers (*i.e.*, PSInet, ICG Communications, NetConnections) receiving

23 vendor financing that were, in fact, new, untested and uncreditworthy as tier-one/financially secure

24 companies and thus recording revenue on product shipments to them (frequently by inserting an

25 established reseller in between Cisco and the customers), rather than waiting until the receipt of cash

26 payments on their vendor financed loans, as represented.

27        In exchange for arranging financing from Cisco Capital, Cisco executives received special

28 benefits from customers (such as Convergent Communications), including warrants and stock in

1  those companies. These practices created a conflict of interest and caused Cisco to lend money to,
2  or do business with, uncreditworthy customers.

3          These facts and the facts set forth in section (d) of other statements herein are based on the
4  investigation of plaintiffs' counsel, which included interviews with over 100 persons, including
5  former Cisco employees who were employed by Cisco during the Class Period in the sales, finance,
6  manufacturing and other various divisions, and Cisco customers, providers, and suppliers and
7  information in the public domain.

8          (e), (f)    Defendants' Scienter/Factual Basis:  The Individual Defendants knew or
9  were deliberately reckless in disregarding that Cisco's net sales and net income numbers materially
10 diverged from what was reported to the public, and that the reported numbers were derived by
11 earnings management and manipulation in violation of GAAP. Each of the senior officers, by virtue
12 of their high-level positions with Cisco, directly participated in the management of Cisco, was
13 directly involved in the day-to-day operations of Cisco at the highest levels and was privy to
14 confidential proprietary information concerning Cisco and its business, operations, products, growth,
15 financial statements and financial condition and was aware of or deliberately disregarded that the
16 false and misleading statements were being made by and regarding the Company. Because of their
17 managerial positions with Cisco, each of the senior officers had access to the adverse undisclosed
18 information about Cisco's business, products, financial condition and prospects and knew (or
19 deliberately disregarded) that these adverse facts rendered the positive representations made during
20 the Class Period materially false and misleading. Further, Cisco's senior officers closely monitored
21 the performance of Cisco's business via financial reports which Cisco's Finance Department (under
22 Carter) generated on an hourly, daily, weekly and monthly basis. There were "order reports" and
23 "backlog reports" that summarized orders by dollar volume and product type, as well as unit
24 "shipment" reports. The Finance Department also distributed monthly financial reports comparing
25 Cisco's *actual* financial results to *projected* results. Thus, defendants knew the status of orders for
26 and sales of *every Cisco product* so that they knew where Cisco stood in terms of the sale of and
27 demand for its products, as well as Cisco's actual financial results compared to budget. Thus, Cisco's
28 top officers were constantly aware of the current order rates for its products, as well as sales into and

1  out of its distribution channel and its own direct sales. In fact, Cisco's computerized financial
2  monitoring and reporting system is so sophisticated and refined that Cisco can "*close its books*" on
3  a corporate-wide basis instantly, the so-called "*real time*" or "*virtual*" close. Cisco's internal
4  forecasting system was Siebel System's Astro – which extended 12-15 months into future. Each
5  Monday, every sales department reviewed weekly/monthly/quarterly results vs. forecasts. At 9:00
6  a.m. on Monday mornings the regional sales managers would hold a conference call to discuss
7  booked sales and new opportunities. At 3:00 p.m. the vice presidents of sales would have a
8  conference call in with corporate, including Rick Justice, with the key developments in sales. Justice
9  would then report this information to Chambers, Listwin and Carter who all had offices next to one
10 another. Cisco has an extremely sophisticated system of internal financial and accounting controls
11 which operate under the supervision of Cisco's CFO Carter. The financial reporting system is so
12 efficient that Cisco, in essence, is able to close its books instantly and is in a position to determine
13 its quarterly revenues, profits and EPS to date instantly, at any time during the quarter, subject to
14 non-recurring charges and adjustments. In fact, Cisco's top executives received monthly financial
15 statements for Cisco within a day or two after the close of a month that provided detailed financial
16 information about revenues, profits and EPS on a company-wide basis and detailed sales data for
17 each of Cisco's products in each of the geographic regions where Cisco operates, as well as for its
18 own direct sales. Also, Cisco's top executives received ***daily reports*** on product sales, prices and
19 component part, work in progress and finished goods inventories that allowed them to monitor the
20 demand for each of Cisco's products in all of its markets and all of its distribution channels. Cisco's
21 unique ability to monitor its key business metrics on an instant basis ("virtual close") was often
22 commented upon in the press and often stressed by Cisco to analysts as giving Cisco's top executives
23 instant knowledge of all of Cisco's key operational metrics and unique visibility into Cisco's future
24 business operations:

25       •       [T]he company's accounting is already automated to such an extent that Cisco
26  can *close its books on any given day within a few hours*.

27       •       Larry Carter highlighted the financial innovation within Cisco, ***namely the***
   ***virtual close.*** The company is using its advanced IS systems to drive financial
   performance. ***For example, management has the ability to track revenue,***
28  ***discounts, and product margins on an hourly basis.***

\* \* \*

So, what Mr. Carter presented was how the role of finance has changed from collecting financial data *to having a system for continuous monitoring and analysis of critical information. The Cisco Executive Information System can drill down to day, geography, line of business, product sales channel, or customer/partner all the way down to specific account managers*.

• [Chambers said] [v]ery often at the end of a quarter [we] might have realized that we had a problem in one of our product lines, that we didn't meet our margin expectations on it. Well, today the first line manager can see who has responsibility for that product, either in engineering or in manufacturing [and] *that the second week into the quarter our margins aren't in line with what we expected*. They can explode that information down because of our use of Web-based architecture to understand exactly [what happened].... Well, those decisions used to come to the CFO and CEO two to three weeks after every quarter was closed. *That now is done by the first line manager any time they want to look into it. That's what empowerment is all about. That's what the Internet is about*.

The factual basis of defendants' scienter (for this statement and other statements herein) is also based on information provided by interviews with over 100 former Cisco employees, customers, suppliers and providers, as well as public information. The individual insider defendants also took advantage of the artificial inflation of Cisco's stock, created by their statements, by selling off 4,289,482 shares of Cisco stock they owned, pocketing $134 million in illegal insider trading proceeds during the period between 8/13/99 and 8/19/99. These sales, however, do not include defendants' additional secret sales of Cisco common stock through investments in venture capital partnerships. Defendants were further motivated to artificially inflate the price of Cisco's common stock so that it could be used to acquire additional companies and hire and maintain employees who were compensated with stock options.

61.    STATEMENT NO. 2:

REPORT OF INDEPENDENT ACCOUNTANTS ON FINANCIAL STATEMENT SCHEDULE

To the Board of Directors
Cisco Systems, Inc.

Our audits of the consolidated financial statements referred to in our report dated August 10, 1999 appearing in the 1999 Annual Report to Shareholders of Cisco Systems, Inc. (which report and consolidated financial statements are incorporated by reference in this Annual Report on Form 10-K) also included an audit of the financial statement schedules listed in Item 14(a)(2) of this Form 10-K. In our opinion, this financial statement schedule present fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

AO 88 (Rev. 1/94) Subpoena in a Civil Case - SDNY WEB 4/99

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF _____ __MASSACHUSETTS__

IN RE CISCO SYSTEMS, INC. SECURITIES
LITIGATION

V.

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: [1]   C-01-20418-JW(PVT) (ND Cal)

TO:   MFS Investment Management
      500 Boylston Street
      Boston, MA 02116

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

Please see attached Schedule A.

| PLACE | DATE AND TIME |
|---|---|
| 500 Boylston Street, Boston, MA 02116 (in lieu of producing documents for on-site copying, please mail them to Mr. Drosman at the address below). | 5/13/05 at 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| /Daniel S. Drosman | April 8, 2005 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Daniel S. Drosman, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, 401 B St., Suite 1600, San Diego, California 92101, (619) 231-1058

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
         DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)  (A)  A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)  (A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance,

(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that,

subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)  subjects a person to undue burden.

(B)  If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

1 | **SCHEDULE A**

2 | **(ANALYSTS)**

3 **I.**  **DEFINITIONS**

4     Unless stated otherwise, the terms set forth below are defined as follows:

5     1.    "You" or "your" refers to MFS Investment Management, and any of its international,

6 regional or local offices, or affiliates, predecessors, and successors in interest, parents, subsidiaries,

7 divisions, national directors, employees, analysts (including, but not limited to, David Sette-Ducati),

8 accountants, consultants, independent contractors, private investigators, or other agents, representatives

9 or persons acting on your behalf or the person or entity responding to these requests.

10     2.    "All" shall include the terms "each" and "any" and vice-versa, as necessary to bring

11 within the scope of the request all responses that might otherwise be construed to be outside the scope

12 of the request.

13     3.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively

14 as necessary to bring within the scope of the request all responses that might otherwise be construed to

15 be outside the scope of the request.

16     4.    "Communication" or "communications" refers to any exchange of information, words,

17 numbers, pictures, charts, studies, or graphs by any means of transmission, sending or receipt of

18 information of any kind by or through any means, including, but not limited to, personal delivery,

19 speech, writings, documents, language (machine, foreign or otherwise) of any kind, computer

20 electronics or electronic data, sound, radio or video signals, telecommunication, telephone, teletype,

21 facsimile, mail, telegram, microfilm, microfiche, photographic film of all types or other media of any

22 kind.    The term "communication" also includes, without limitation, all inquiries, discussions,

23 conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests,

24 responses, demands, complaints, or press, publicity or trade releases.

25     5.    "Concerning" means relating to, referring to, describing, evidencing or constituting.

26     6.    "Document" or "documents" is intended to have the broadest possible meaning under

27 Rule 34 of the Federal Rules of Civil Procedure and includes, without limitation, any writing, drawing,

28 graph, chart, photography, phonorecord, electronic data (as defined herein) or digitally encoded data,

1 database, graphic, and/or other data compilations from which information can be obtained, translated if
2 necessary, by the respondent through detection devices into reasonably usable form, or other
3 information, including originals, translations and drafts thereof, and all copies bearing notations and
4 marks not found on the original. The term "document" includes, without limitation, affidavits,
5 analyses, appointment books, appraisals, articles from publications, audit and scope plans (whether in
6 paper, database, electronic or other format(s)), audit work papers (whether in paper, database, electronic
7 or other format(s)), books, books of account, account statements, cables, calendars, charts, checks
8 (canceled or uncancelled), check stubs, confirmations, contracts, financial statements, forms, invoices,
9 journals, ledgers, letters, lists, memoranda, minutes, notations, notes, opinions, orders, pamphlets,
10 papers, partners', members' and employees' personnel files, partners', members' and employees'
11 review check lists, permanent files, pictures, press releases, projections, prospectuses, publications,
12 receipts, recordings of conferences, conversations or meetings, reports, statements, statistical records,
13 studies, summaries, tabulations, telegrams, telephone records, telex messages, transcripts,
14 understandings, videotapes, vouchers, work papers, copies of Cisco records and documents, and sheets
15 or things similar to any of the foregoing however denominated. The term "document" also includes,
16 without limitation, any document now or at any time in the possession, custody or control of the entity
17 to whom this document request is directed (together with any predecessors, successors, affiliates,
18 subsidiaries or divisions thereof, and their officers, directors, employees, agents and attorneys).
19 Without limiting the term "control" as used in the preceding sentence, a person is deemed to be in
20 control of a document if the person has the right to secure the document or a copy thereof from another
21 person having actual possession thereof, including without limitation, work product contracted by you
22 from others. Documents that are identical, but in the possession of more than one person or entity, are
23 separate documents within the meaning of this term. Also, a draft or non-identical copy is a separate
24 document within the meaning of this term.

25       7.     Person" or "persons" refers to natural persons, proprietorships, governmental agencies,
26 corporations, partnerships, trusts, joint ventures, groups, associations, organizations and all other
27 entities.

28

1    8.    "Employee" refers to any person who at any time acted or purported to act on your

2   behalf or under your supervision, direction or control, including, without limitation, past and current

3   directors, officers, principals, partners, executives, analysts, investment bankers, consultants, advisors,

4   representatives, attorneys, agents, trustees, independent contractors, assigns, business, or similar

5   persons or entities.

6    9.    "Cisco" refers to Cisco Systems, Inc., any of its direct or indirect subsidiaries, divisions

7   or affiliates (foreign and domestic), predecessors, successors and all of their present and former officers,

8   directors, employees, agents, directors, attorneys, accountants, advisors and all other persons acting or

9   purporting to act on their behalf.

10    10.    "Identify," when used to refer to a document, shall mean: (a) the date of each document;

11   (b) the type of each such document (i.e., correspondence, memorandum, business record, etc.); (c) the

12   identity of the author(s) or preparer(s) of each such document; and (d) the present location of each such

13   document or copies thereof.

14    11.    "Identify," when used to refer to a natural person, shall mean to set forth that person's:

15   (a) full name and title, if any; (b) present or last known address; (c) present or last known business and

16   home telephone number(s); and (d) present or last known employer.

17    12.    The term "Individual Defendants" means John T. Chambers, Larry R. Carter, Gary J.

18   Daichendt, Carl Redfield, Donald J. Listwin, Edward R. Kozel, Michelangelo Volpi, Judith L. Estrin,

19   Carol A. Bartz, Steven M. West, and Robert L. Puette, and includes, without limitation, their agents,

20   attorneys, accountants, advisors, or other persons occupying similar positions or similar functions.

21    13.    "Meeting" refers to the contemporaneous presence of any natural persons (including by

22   telephone or by computer or any other electronic means) for any purpose, whether such presence was

23   by chance or prearranged, and whether the meeting was formal or informal, or occurred in connection

24   with some other activity.

25    14.    "Refer" or "relate" or "referring" or "relating" means all documents which comprise,

26   explicitly or implicitly refer to, were reviewed in conjunction with, or were created, generated or

27   maintained as a result of the subject matter of the request, including, without limitation, all documents

28

1 which reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject
2 matter of the request.

3    15.    "SEC" means the United States Securities and Exchange Commission.

4    16.    "Defendants" refers to Cisco and the Individual Defendants.

5    17.    "Entity" or "entities" has the same meaning as person.

6    18.    "Customer" or "customers" refers to a person who makes purchases from, or has
7 business dealings with, Cisco or the Individual Defendants.

8    19.    "Security" or "Securities" refers to any note, stock, treasury stock, bond, debenture,
9 certificate or other evidence or indebtedness, certificate of interest or participation in any profit-sharing
10 agreement in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate,
11 preorganization certificate or subscription, transferable share, investment contract, voting-trust
12 certificate, certificate of deposit, or any certificate of interest or participation in, receipt for, or warrant
13 or right to subscribe to or purchase any of the foregoing.

14    20.    "Financing" refers to the delivery of a sum of money upon agreement, express or
15 implied, to repay it with or without interest; or the provision of funds through the issuance of stocks,
16 bonds, notes or mortgages; or the provision of capital or the loaning of money as needed to carry on a
17 business, or to purchase or acquire goods or services.

18    21.    "Acquisition" or "acquisitions" means the combination of one entity with another entity
19 by any means, including purchasing the entity's assets, by acquisition or merger.

20 **II.    INSTRUCTIONS**

21    1.    If any otherwise responsive document was, but is no longer, in existence or in your
22 possession, custody or control, identify its current or last known custodian and describe in full the
23 circumstances surrounding its disposition from your possession or control. A document shall be
24 deemed to be in your control if you have the right to secure the document or copy thereof from another
25 person or public or private entity having possession or custody thereof.

26    2.    If any document called for by these requests is not produced on the ground that it is
27 privileged or otherwise claimed to be protected against production, you are requested to provide the
28 following information with respect to each such document:

1                  (a)     its date;

2                  (b)     its author(s), its signatory or signatories and those who participated in its
3 preparation;

4                  (c)     the type of document it is (e.g., letter, chart, memorandum, etc.);

5                  (d)     a description of its subject matter and length;

6                  (e)     a list of those persons and entities to whom said document(s) were disseminated,
7 together with their last known addresses and business affiliations;

8                  (f)     the nature of the privilege or other rule relied upon in withholding production of
9 each such document; and

10                (g)     the basis for the assertion of the privilege or other rule relied upon in withholding
11 production of each such document.

12     3.     Notwithstanding the assertion of any objection to production, any document to which an
13 objection is raised containing non-objectionable matter which is relevant and material to a request must
14 be produced, but that portion of the document for which the objection is asserted may be withheld or
15 redacted provided that the above-requested identification is furnished.

16     4.     This request is continuing, and all documents coming into your possession, custody or
17 control which you would have been required to produce had they been available earlier shall be
18 produced forthwith.

19     5.     Each document requested herein is to be produced in its entirety and without deletion or
20 excision, regardless of whether you consider the entire document to be relevant or responsive to these
21 requests. If you have redacted any portion of a document, stamp the word "redacted" on each page of
22 the document which you have redacted. Redactions should be included on the privilege log described
23 in Instruction No. 2.

24     6.     If any documents requested herein have been lost, discarded or destroyed, they shall be
25 identified as completely as possible, including, but not limited to, the following information:

26                  (a)     the date of disposal;

27                  (b)     the manner of disposal;

28                  (c)     the reason for disposal; and

1      (d)  the person authorizing disposal.

2 **III. RELEVANT TIME PERIOD**

3     All requests herein refer to the period from August 1, 1998 to the date of production (the

4 "relevant time period"), unless otherwise specifically indicated, and shall include all documents and

5 information that relate in whole or in part to such period, even though prepared, dated, generated,

6 received or published outside of the relevant time period.

7 **IV. DOCUMENT REQUESTS**

8 <u>REQUEST NO. 1:</u>

9     All reports, bulletins, memoranda, correspondence, analyses, or other like documents, including

10 drafts, prepared or issued by you concerning Cisco or Cisco products.

11 <u>REQUEST NO. 2:</u>

12     All documents that you received, reviewed, relied upon, or maintained in preparing or issuing

13 any reports, bulletins, memoranda, correspondence, analyses, or other like documents concerning Cisco

14 or Cisco products, including, but not limited to, all news articles, memoranda, correspondence, notes, e-

15 mails, public filings, minutes, budgets, forecasts, or plans.

16 <u>REQUEST NO. 3:</u>

17     All documents concerning Cisco that were created or maintained by or on behalf of any of your

18 analysts, including, but not limited to, all handwritten notes, e-mails, correspondence, memoranda and

19 files.

20 <u>REQUEST NO. 4:</u>

21     All documents concerning any communications or meetings between or among your analysts,

22 agents or employees concerning Cisco.

23 <u>REQUEST NO. 5:</u>

24     All documents concerning any communications or meetings between or among you and Cisco or

25 any Individual Defendant, including all documents and handwritten notes reflecting any

26 communications or meetings between or among your analysts or employees and any officer, director,

27 partner, agent, or representative of Cisco or any Individual Defendant.

28

1  REQUEST NO. 6:

2      All documents, including, but not limited to, handwritten notes concerning any communications
3  or meetings between you and any of Cisco's past or present customers, resellers, distributors, suppliers
4  or contract manufacturers regarding Cisco or Cisco products.

5  REQUEST NO. 7:

6      All documents concerning any guidance or information provided by Cisco to assist you in
7  preparing any analyst reports, research reports, bulletins, or other like documents, or in formulating any
8  earnings estimates, financial projections or opinions concerning Cisco.

9  REQUEST NO. 8:

10     All documents concerning whether Cisco or any Individual Defendant disputed, corrected,
11 verified, adopted or endorsed any reports, estimates, projections, or opinions by you concerning Cisco,
12 or requested that you revise any report, estimate, projection, or opinion you issued concerning Cisco.

13 REQUEST NO. 9:

14     All documents concerning Cisco's budgets, projected or forecasted sales, actual sales or
15 revenues, inventory levels, product returns, earnings, cash flow schedules, new product introduction
16 timetables, customers, financial condition, or business or operating plans, including any models thereof.

17 REQUEST NO. 10:

18     All documents concerning Cisco's accounting or internal control systems, including documents
19 regarding inventory, days sales outstanding, accounts receivables, distribution controls, and product
20 return policies and procedures.

21 REQUEST NO. 11:

22     All electronic documents concerning or mentioning Cisco or Cisco's products, including, but not
23 limited to, computer files and e-mail messages, created or maintained by any of your analysts or
24 employees.

25 REQUEST NO. 12:

26     All documents concerning the participation or attendance of Cisco or any of the Individual
27 Defendants at any analyst conferences, analyst meetings, or investor or analyst conference calls.

28

1  REQUEST NO. 13:

2      All documents concerning Cisco's reserve for customer financing or structured loans as
3  identified in Cisco's SEC filing in September 2001.

4  REQUEST NO. 14:

5      All documents concerning Cisco's $275 million reserve as disclosed in Cisco's SEC filing in
6  December 2001.

7  REQUEST NO. 15:

8      All documents concerning Cisco's $2.5 billion write-off in the third quarter of Cisco's 2001
9  financial year.

10  REQUEST NO. 16:

11      All documents concerning any payments received by you from Cisco or any of the Individual
12  Defendants.

13  REQUEST NO. 17:

14      All documents concerning any agreements, whether written or oral (including all amendments
15  and modifications), between you and Cisco.

16  REQUEST NO. 18:

17      All documents concerning your document maintenance, retention or destruction policies or
18  practices, including, but not limited to, all maintenance, retention or destruction policies concerning
19  electronic documents and e mail.

20  REQUEST NO. 19:

21      All documents concerning any fees, securities, money or other compensation received from
22  Cisco for acquisitions or services related to financing or investment banking.

23  REQUEST NO. 20:

24      All documents relating to your participation or involvement in the any of the following
25  acquisitions made by Cisco:

26          (a)    Allegro Systems, Inc.;

27          (b)    Ardent Communications Corp.;

28          (c)    MaxComm Technologies;

1  (d)  Netsys Technologies;

2  (e)  Pipelinks, Inc.;

3  (f)  Sentient Networks;

4  (g)  Precept Software, Inc.;

5  (h)  StratumOne;

6  (i)  Monterrey Networks;

7  (j)  TransMedia;

8  (k)  Cerent;

9  (l)  WebLine Communications;

10  (m)  Pirelli;

11  (n)  Aironet Wireless;

12  (o)  Atlantech Technologies;

13  (p)  JetCell, Inc.;

14  (q)  PentaCom, Ltd.;

15  (r)  Qeyton Systems;

16  (s)  SlightPath, Inc.;

17  (t)  InfoGear Technology;

18  (u)  ArrowPoint Communications;

19  (v)  IP Mobile;

20  (w)  Komodo Technology;

21  (x)  HyNEX, Ltd.;

22  (y)  Netiverse, Inc.;

23  (z)  NuSpeed, Inc.;

24  (aa)  IPCell Technologies;

25  (bb)  Vovida Networks;

26  (cc)  PixStream, Inc.;

27  (dd)  CAIS Software;

28  (ee)  Radiata, Inc.; and

1        (ff)    Active Voice Corp.

2  REQUEST NO. 21:

3       All documents concerning any services that you provided to Cisco.

4  REQUEST NO. 22:

5       Documents sufficient to identify your employees who communicated with Cisco.

6  REQUEST NO. 23:

7       All documents concerning the payment or receipt of money, fees, securities or other

8  compensation by you to or from another entity for or relating to the issuance of research reports

9  concerning Cisco.

10  REQUEST NO. 24:

11       All documents concerning any communications or meetings between you and Cisco or any of

12  the Individual Defendants concerning this subpoena or your production of documents to plaintiffs.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  S:\CasesSD\Cisco\SCH 00020007.doc

| Attorney Or Party Without Attorney (Name and Address) | | | | | FOR COURT USE ONLY |
|---|---|---|---|---|---|

DANIEL S. DROSMAN, ESQ.    (619) 231-1058
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
401 B Street, Suite 1700
San Diego, CA 92101-4297

Ref. No. Or File No.
W2434012

Attorneys for:    PLAINTIFFS

Insert name of court, judicial district and branch court, if any:

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Plaintiff:

IN RE CISCO SYSTEMS, INC. SECURITIES LITIGATION

Defendant:

| **PROOF OF SERVICE** | Date: 5/13/2005 | Time: 10:00 a.m. | Dept/Div: WITNESS | Case Number: C-01-20418 JW (PVT) Pending USDC/NDCA |
|---|---|---|---|---|

I, James Campbell, Under penalty of perjury, hereby declare that I am and was on
the dates herein mentioned, a Citizen of the United States, over the age of eighteen, and not a
party to the within action;

I served the: SUBPOENA IN A CIVIL CASE; SCHEDULE A

in this action by personally delivering to and leaving with the following defendant or person
on the date set opposite their respective names, a true copy thereof:

Witness : MFS INVESTMENT MANAGEMENT

By Serving : JENNIFER BONMPANG, Legal Department, authorized to accept service of process

Address : 500 Boylston Street, Boston, Massachusetts 02116
Date & Time : Tuesday, April 12, 2005 @ 2:55 p.m.
Witness fees were : Not applicable.

Person serving:                         a. Fee for service:
James Campbell                          d. Registered California Process Server
**Wheels of Justice, Inc.**                (1) Employee or independent contractor
657 Mission Street, Suite 502             (2) Registration No.:
San Francisco, California 94105          (3) County:
Phone: (415) 546-6000                    (4) Expires:

I declare under penalty of perjury under the laws of the State of California that the foregoing
is true and correct.

Date: April 18, 2005                    Signature:_____
                                                    James Campbell



Printed on recycled paper

# WILMER CUTLER PICKERING
## HALE AND DORR LLP

April 27, 2005

**By Facsimile and First Class Mail**

Daniel S. Drosman, Esq.
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
401 B Street, Suite 1600
San Diego, California 92101

Re:    In Re Cisco Systems, Inc. Securities Litigation
       Case No. C-01-20418-JW(PVT)(N.D. Cal)

Dear Mr. Drosman:

I am writing on behalf of MFS Investment Management ("MFS") to object to your subpoena dated April 8, 2005, and served on April 13, 2005, in connection with the above-referenced action (the "Subpoena").

Pursuant to Rules 30 and 45 of the Federal Rules of Civil Procedure ("Rules"), MFS objects to the request for production of documents and for testimony as set forth in the Subpoena, on the following grounds.

### General Objections

MFS objects to each of the Definitions, Instructions, the Relevant Time Period and Document Requests to the extent that it:

A.    is beyond the scope of discovery permitted under the Rules, or purports to impose obligations not permitted or required by the Rules;

B.    is not relevant to the claims or defenses of the parties in the Action, or not reasonably calculated to lead to the discovery of evidence admissible in the Action;

C.    calls for the production of documents or information protected by a privilege, including the attorney-client privilege and work product doctrine;

D.    is unduly broad;

E.    is unduly burdensome;

F.    seeks trade secret or confidential research, development or commercial information;

G.    is vague, ambiguous, or does not describe documents, information or testimony requested with reasonable particularity;

H.    calls for production of information not within MFS's possession, custody or control;

William H. Paine

60 STATE STREET
BOSTON, MA 02109
+1 617 526 6134
+1 617 526 5000 fax
william.paine@wilmerhale.com

Daniel S. Drosman, Esq.
April 27, 2005
Page 2

I.      calls for information prepared by experts not employed by parties to the Action; or

J.      would require significant expense.

K.      MFS objects to the production of e-mail or other electronic data on the grounds that it is unduly burdensome and costly.

**Objections to Definitions**

In addition to the General Objections, MFS objects to the following Definitions on the following grounds:

A.      The definition of the terms "document" or "documents" and "communication" or "communications" are overbroad, and would impose an undue burden. In addition, the definition of "document" or "documents" includes the use of terms that are vague and ambiguous, including but not limited to the term, "work product contracted by you." MFS specifically objects to the extent that the definition of "document" includes materials constituting attorney work product. This definition also would impose an undue burden to the extent that it calls for the production of "[d]ocuments that are identical, but in the possession of more than one person or entity."

B.      The definition of "Employee" is overbroad and encompasses persons or entities that MFS does not control.

C.      The definition of the term "concerning" is vague, ambiguous and overly broad, and descriptions incorporating that term are insufficiently particular, to the extent that they incorporate the term "relating to."

D.      The definition of the terms "you" or "your" is overbroad in that it would require production of information not within MFS's possession, custody or control, and is vague, ambiguous and overbroad to the extent that it refers to past or present parent, subsidiary or affiliated entities or those acting on behalf of the foregoing.

E.      The definition of the term "Cisco" is overly broad and ambiguous to the extent that it refers to past or present parent, subsidiary or affiliated entities or those acting on behalf of the foregoing.

**Objections to Instructions**

In addition to the General Objections, MFS objects to the following Instructions on the following grounds:

Instructions 1 and 6 would impose an undue burden, as MFS cannot be expected to identify responsive documents that no longer exist, or to determine the whereabouts of documents not in MFS's possession or control. Moreover, Instructions 1 and 6 are improper in that they would impose obligations greater than those imposed by the Rules. MFS will not comply with Instructions 1 and 6; but will comply with the Rules.

Daniel S. Drosman, Esq.
April 27, 2005
Page 3

## The Relevant Time Period

The Relevant Time Period specified in Section III is overly broad and would impose an undue burden.

## Objections to Document Requests

In addition to the General Objections, MFS objects to the following Document Requests on the following grounds:

A.     MFS objects to Documents Requests 1-24 on the grounds that they are overly broad and would impose an undue burden.

B.     MFS objects to Document Requests 1 and 2 because the terms "analyses" and "other like documents" are vague and ambiguous.

C.     MFS objects to Document Request 3 because the term "on behalf of" is vague and ambiguous.

D.     MFS objects to Document Request 6 because it would impose obligations not imposed by the Rules, and because it is overbroad and would impose an undue burden. Specifically, MFS objects because this Request would impose an obligation on MFS to identify "any of Cisco's past or present customers, resellers, distributors, suppliers or contract manufacturers."

E.     MFS objects to Document Request 7 because the terms "guidance," "to assist," and "formulating" are vague and ambiguous.

F.     MFS objects to Document Request 8 on the grounds that it seeks to impose obligations not imposed by the Rules. MFS also objects because the terms "disputed, corrected, verified, adopted or endorsed" and "requested that you revised" are vague and ambiguous, would call for legal conclusions, and would impose an undue burden.

G.     MFS objects to Document Requests 9 and 10 because they are overbroad and would impose an undue burden.

H.     MFS objects to Document Request 11 because it is duplicative of other requests and because the time period is overbroad and would impose an undue burden.

I.     MFS objects to Document Requests 12 and 18 because they seek to impose obligations not imposed by the Rules and because they are overbroad and would impose an undue burden.

J.     MFS objects to Document Request 19 because it is duplicative of other requests.

K.     MFS objects to Document Request 20 because the terms "participation or involvement" are vague and ambiguous, because the time period is overbroad, and because it would impose an undue burden. MFS further objects because Document Request 20 does not provide enough information about the 32 specified entities to enable MFS to appropriately respond.

Daniel S. Drosman, Esq.
April 27, 2005
Page 4

L.     MFS object to Document Request 21 because it is duplicative of other requests and because the time period is overbroad and would impose an undue burden.

M.     MFS objects to Document Request 22 because the time period is overbroad and would impose an undue burden.

N.     MFS objects to Document Request 23 because it seeks to impose obligations not imposed by the Rules, the term "for or relating to" is vague and ambiguous, and because it is overbroad and would impose an undue burden.

O.     MFS objects to Document Request 24 because it seeks to impose obligations not imposed by the Rules, and because it would call for the production of protected attorney work product and attorney-client privileged communications.

Without limiting the foregoing, MFS also objects to Requests 1, 3-6, 10, 11, 13-15, 20 and 21 on the grounds that the Subpoena may improperly seek the disclosure by MFS of what would be its confidential research, development and commercial information, including notes and recommendations of its analyst, David Sette-Ducati, in contravention of Fed. R. Civ. P. 45(c)(3)(B)(ii). MFS is a third party and has not been retained as an expert witness by any party to the underlying action. Thus, MFS should not have to disclose its confidential research, work product and/or financial recommendations or conclusions developed for its and its paying clients' exclusive use. See In re Subpoena Duces Tecum to Lehman Brothers Kuhn Loeb, Inc., Fed. Sec. L. Rep. (CCH) ¶99,575 (S.D.N.Y. 1983) (compelling investment banking firm to produce its confidential work product is tantamount to compelling it to perform expert services for plaintiffs free of charge, and is not permissible under Rule 45).

The objections set forth in this letter are not necessarily comprehensive and MFS reserves the right to assert other, additional grounds. By notifying you of its obligations herein, MFS does not waive its rights to seek to quash or modify the Subpoena or to obtain any other relief.

MFS is of course willing to cooperate reasonably with you in connection with your subpoena.

Please call me so that we can discuss what you really need and when you need it.

Very truly yours,

*William H. Paine*

William H. Paine

WHP:mhf
Enclosure

cc: Laura A. Coyne, Esq.

7/2005 18:39 FAX 617 526 5000          W C P H AND D LLP          ☒001

# WILMER CUTLER PICKERING
## HALE AND DORR LLP

**FACSIMILE**

---

**DATE**
April 27, 2005

60 STATE STREET
BOSTON, MA 02109
+1 617 526 6000
+1 617 526 5000 fax
wilmerhale.com

---

**TO**
Daniel S. Drosman
Lerach Coughlin Stoia Geller
Rudman & Robbins LLP

**FAX**
**fax:** (619) 231-7423
**phone:** (619) 231-1058

---

**FROM**
Sharon Simpson Jones
+1 617 526 6887

**NUMBER OF PAGES, INCLUDING COVER**
5

---

**MESSAGE**

---

This facsimile transmission is confidential and may be privileged. If you are not the intended recipient,
please immediately call the sender or, if the sender is not available, call +1 617 526 5413 and destroy
all copies of this transmission. If the transmission is incomplete or illegible, please call the sender or, if
the sender is not available, call +1 617 526 5413. Thank you.

APR27 PM 6:45

WILMER CUTLER PICKERING
HALE AND DORR LLP

REC'D MAY 1 2 2005

May 9, 2005

Sharon Simpson Jones

60 STATE STREET
BOSTON, MA 02109
+1 617 526 6887
+1 617 526 5000 fax
sharon.simpsonjones@wilmerhale.com

**By Facsimile and First Class Mail**

Daniel S. Drosman, Esq.
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
401 B Street, Suite 1600
San Diego, California 92101

Re:    In Re Cisco Systems, Inc. Securities Litigation

Dear Daniel:

As I informed you by email on May 2, 2005, the deposition of David Sette-Ducati, which you have noticed for June 3, 2005, will need to be rescheduled for a later date. We will coordinate with you to schedule another mutually-convenient date in June.

I also write to confirm that, during our telephone conference on Friday, April 29, you agreed to the following modifications to the subpoena duces tecum to MFS Investment Management ("MFS") dated April 8, 2005 and served on April 13, 2005 ("Subpoena"):  (1) the relevant time period will be May 1, 1999 to June 1, 2001; (2) MFS will produce responsive documents on a rolling basis; and (3) Plaintiffs will defer Document Requests 13, 14, 15, 18, 20 and 21. Although MFS need not respond to these six requests at this time, Plaintiffs reserve the right to review them at a later date. MFS agreed to produce responsive communications between its research analysts assigned to cover Cisco Systems and Cisco Systems for the relevant time period outlined above, to the extent that such communications can be located through a reasonable search of those paper files and accessible email files (*i.e.*, searchable databases but not backup tapes) where responsive documents are likely to be found.

As we have discussed, MFS objects to the production of documents that constitute or reflect the expert opinion of its analysts, including but not limited to Mr. Sette-Ducati. Although MFS will produce documents responsive to the Subpoena, MFS continues to assert this objection, as well as the other objections, stated in our prior letter dated April 27, 2005. As we also have discussed, additional limitations to the Subpoena may be appropriate. Accordingly, by agreeing to the specific limitations described above, MFS does not waive its rights to seek to quash or modify the Subpoena or to obtain any other relief.

Very truly yours,

Sharon Simpson Jones

SS:mhf
cc: Laura A. Coyne, Esq.

| From: | Dan Drosman |
|---|---|
| To: | sharon.simpsonjones@wilmerhale.com |
| Date: | 5/16/2005 10:38:46 AM |
| Subject: | In re Cisco Systems, Inc. Sec. Litig. |

Dear Sharon:

Thank you for your telephone call on May 13. As we discussed, plaintiffs agree to reschedule Mr. Sette-Ducati's deposition to a date convenient for the witness and his counsel. Accordingly, we will take Mr. Sette-Ducati's deposition on June 17, 2005 at 10:00 a.m. as this was one of two dates in June that you indicated was convenient. You were also kind enough to allow us to take Mr. Sette-Ducati's deposition at your Boston office at 60 State Street.

My colleague, Lesley Weaver, will be taking Mr. Sette-Ducati's deposition, so please address all future correspondence to her. Her contact information is:100 Pine Street, 26th Floor, San Francisco, CA 94111; tel: 415-288-4545; fax: 415-288-4534.

You mentioned that Mr. Sette-Ducati has a hearing disability and may need special arrangements for his deposition. We are happy to make reasonable accommodation for Mr. Sette-Ducati. Please speak to Ms. Weaver about any specifics.

Finally, you stated that you would be able to produce certain documents responsive to plaintiffs' subpoena (limited by the agreements documented in your letter of May 12, 2005) within the next two weeks. Please let us know right away if you subsequently determine that you cannot meet this schedule. Thank you again for your courtesy in this matter.

Best regards,

Daniel Drosman, Esq.
Lerach Coughlin Stoia Geller
 Rudman & Robbins LLP
401 B Street, Ste. 1700
San Diego, CA 92101
www.lerachlaw.com
Tel: (619) 231-1058
Fax: (619) 231-7423

CC:          Lesley Weaver



**LERACH**
**COUGHLIN**
**STOIA**
**GELLER**
**RUDMAN**
**ROBBINS** LLP

Lesley E. Weaver

SAN DIEGO · SAN FRANCISCO
LOS ANGELES · NEW YORK · BOCA RATON
WASHINGTON, DC · HOUSTON
PHILADELPHIA · SEATTLE

June 15, 2005

<span style="text-align:right">**VIA FACSIMILE**
617/526-5000</span>

Sharon Simpson Jones
Wilmer Cutler Pickering
    Hale And Dorr Llp
60 State Street
Boston, MA  02109

    Re:    *In re Cisco Systems, Inc. Securities Litigation*

Dear Sharon:

    I write to follow up on my email sent to you last Friday and my voicemail today regarding the unidentified redactions in the documents produced on behalf of MFS. Please let me know when you are available to meet and confer today to discuss this issue. As you know, Mr. Sette-Ducati's deposition is set for 9 a.m. Friday, June 17, 2005 in Boston, and it will be best for all if we resolve the issue prior to tomorrow.

    I look forward to hearing from you.

        Very truly yours,

        Lesley E. Weaver

LEW:reg

T:\CasesSF\Cisco\Corres\061505_SimpsonJones.doc

Case 1:05-mc-10261-RWZ    Document 2-7    Filed 07/05/2005    Page 2 of 2

Rebecca Grounds - Re: Signed Exhibit A/Acknowledgment for Protective Order in In re Cisco Systems Inc. Sec. Litig.    Page 1

**From:**        Lesley Weaver
**To:**          Sharon, Simpson Jones,
**Date:**        6/13/2005 3:39:24 PM
**Subject:**     Re: Signed Exhibit A/Acknowledgment for Protective Order in In re Cisco Systems Inc.
Sec. Litig.

Dear Sharon,

I note that the production of documents that plaintiffs received on Friday, June 10, 2005, contains
redacted documents. *See, e.g.,* MFS-CSCO 00755 and MFS-CSCO 00757-758. On what grounds are
such documents redacted? I'm available to meet and confer by telephone today and tomorrow, if that is
the simplest approach.

Lesley

>>> "Simpson Jones, Sharon" <Sharon.SimpsonJones@wilmerhale.com> 06/13/05 9:23 AM >>>

Lesley,

Please find attached a scanned copy of Exhibit A to the Protective Order with David Sette-Ducati's
signature.

Thank you,
Sharon Simpson Jones

Sharon Simpson Jones
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Tel: 617-526-6887
Fax: 617-526-5000
sharon.simpsonjones@wilmerhale.com

This email message and any attachments are confidential and may be privileged. If you are not the
intended recipient, please notify Wilmer Cutler Pickering Hale and Dorr LLP immediately -- by replying to
this message or by sending an email to postmaster@wilmerhale.com -- and destroy all copies of this
message and any attachments without reading or disclosing their contents. Thank you.

For more information about Wilmer Cutler Pickering Hale and Dorr LLP, please visit us at
http://www.wilmerhale.com.

# WILMER CUTLER PICKERING
## HALE AND DORR LLP

Sharon Simpson Jones

60 STATE STREET
BOSTON, MA 02109
+1 617 526 6887
+1 617 526 5000 fax
sharon.simpsonjones@wilmerhale.com

June 16, 2005

**_By Facsimile_**

Lesley E. Weaver, Esq.
Lerach Coughlin Stoia Geller Rudman
  & Robbins LLP
100 Pine Street, 26th Floor
San Francisco, CA 94111

Re:  In re Cisco Systems, Inc. Securities Litigation

Dear Lesley:

I was surprised to receive your email at 9:40 p.m. last evening, in which you demanded that MFS produce documents constituting the expert work product of its research analysts "before 3:00 p.m. EST" today. MFS informed plaintiffs on April 27, 2005 that it objected to the production of its research analysts' expert work product and that MFS would not produce documents or portions of documents containing such expert work product. As I mentioned during our conversation yesterday, MFS consistently has maintained this objection throughout all subsequent communications with Plaintiffs.

Furthermore, as I confirmed in my letter to Mr. Drosman dated May 9, 2005, MFS agreed to produce responsive communications between Cisco Systems and its research analysts assigned to cover Cisco Systems from May 1, 1999 to June 1, 2001, but continued to assert its objection to the production of documents that constitute or reflect the expert opinion of its research analysts. There is nothing unusual about agreeing to produce certain documents while objecting to the production of documents protected by a privilege or constituting expert work product. Furthermore, it completely misstates my earlier discussions with Mr. Drosman, as summarized in the May 9 letter, to imply that MFS waived any of its objections by agreeing to produce responsive documents.

MFS's objection to the production of its analysts' expert work product finds support not only in _In re Subpoena Duces Tecum to Lehman Brothers Kuhn Loeb, Inc._, Fed. Sec. L. Rep. (CCH) para. 99, 575 (S.D.N.Y. 1983), but also in Fed. R. Civ. P. 45(c)(3)(B)(ii). Additional case law, which I cited in my discussion with Mr. Drosman on April 29, 2005, also supports MFS's position. In contrast, your argument that the passage of time somehow obviates the protections afforded to MFS's expert work product is unsupported. The existence of a confidentiality agreement also does not change the fact that plaintiffs are not entitled to obtain the expert work product of third-party research analysts.

Lesley E. Weaver, Esq.
June 16, 2005
Page 2

Although you now dispute the timing of MFS's document production, your email was the first time you have raised this issue. Regarding the scheduling of our meet and confer, which you first proposed in an email I received late Monday evening, I was unavailable on Tuesday and, likewise, you were unavailable when I attempted to speak with you yesterday morning. I believe that we spoke at the first mutually-convenient opportunity.

MFS agreed to produce responsive communications between Cisco and its research analysts assigned to Cisco, subject to its objection to the production of its analysts' expert work product, and MFS has done so. Plaintiffs now demand the production of additional documents on a few hours' notice. Plaintiffs are free to complain to the Court regarding MFS's failure to comply with their unreasonable and unwarranted ultimatum. However, MFS has cooperated fully with Plaintiffs in the production of responsive documents not constituting its expert work product, in agreeing to the restrictions imposed by the confidentiality agreement in this case, and in arranging for the deposition of Mr. Sette-Ducati at a mutually-convenient time and place.

Very truly yours,

Sharon Simpson Jones

SS:mhf


cc: Daniel Drosman, Esq. (by facsimile)
    William H. Paine, Esq.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

---

IN RE:                          ) C-01-20418-JW(PVT)

    CISCO SYSTEMS,              ) CLASS ACTION

    INCORPORATED SECURITIES )

    LITIGATION                  ) Volume:    I

This Document Relates to:       )

    ALL ACTIONS.                )

---                             )

VIDEOTAPED DEPOSITION of DAVID SETTE-DUCATI, a witness called on behalf of the Plaintiffs, pursuant to the applicable provisions of California's Rules of Civil Procedure, before Catherine L. Zelinski, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts at the Law Offices of Wilmer, Cutler, Pickering, Hale & Dorr, 60 State Street, Boston, Massachusetts, on Friday, June 17, 2005, commencing at 9:04 a.m.

1

**2**

1 APPEARANCES:

2

3 Lesley E. Weaver, Attorney-at-Law

4 LERACH, COUGHLIN, STOIA,

5 GELLER, RUDMAN & ROBBINS, LLP

6 415.288.4545

7 100 Pine Street, Suite 2600

8 San Francisco, California 94111

9 On Behalf of the Plaintiffs

10

11 Sharon Simpson Jones, Attorney-at-Law

12 WILMER, CUTLER, PICKERING, HALE & DORR

13 60 State Street,

14 Boston, Massachusetts 02109

15 On Behalf of the Deponent and

16 MFS Investment Management

17

18 Laura A. Coyne, Senior Vice President

19 and Associate General Counsel

20 MFS INVESTMENT MANAGEMENT

21 617.954.5195

22 500 Boylston Street

23 Boston, Massachusetts 02116-3741

24 On Behalf of the Deponent

25 and MFS Investment Management,

**3**

1 Alice Liu Jensen, Attorney-at-Law

2 FENWICK & WEST LLP

3 415.875.2303

4 275 Battery Street

5 San Francisco, California 94111

6 On Behalf of the Defendant

7 Cisco Systems, Incorporated

8

9

10

11

12 ALSO PRESENT: Ralph Scopa, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25

**4**

1      I N D E X
2 Deposition of: Direct Cross Redirect Recross
3 DAVID SETTE-DUCATI
4 (By Ms. Weaver) 9
5      E X H I B I T S
6 No.      Description      Page
7 541 Six-page Amended Notice of
      Taking Deposition      11
8
542 17-page Notice of Subpoena
9 to Non-Party MFS Investment
   Management      11
10
543 Documents With Bates No.
11 MFS-CSCO00870-MFS-CSCO01059      117
12 544 Wellington Management Company
   Documents With Bates No.
13 CIS-PPNPF-HC_0014577-0014581      120
14 545 Goldman Sachs Communications
   Technology Documents With
15 Bates No. CIS-PPNPF-HC_093818
   through CIS-PPNPF-HC_093820      124
16
546 Merrill Lynch Documents
17 With Bates No.
   CIS-PPNPF-HC_0013925 through
18 CIS-PPNPF-HC_0013929      128
19 547 Supercomm '99
   Bates No. CIS-PPNPF-HC_0014520
20 through CIS-PPNPF-HC_0014527      129
21 548 Fax Transmission With
   Bates No. CIS-PPNPF-HC_0014555
22 through CIS-PPNPF-HC_0014559      134
23 549 One-page List of Attendees for Cisco
   Bates No. CIS-PPNPF-HC_0014549   138
24
(Continued on the Following Page)
25

**5**

1      E X H I B I T S (Continued)
No.      Description      Page
2 550 E-mail Documents With Bates
   No. CIS-PPNPF-0998567 through
3 CIS-PPNPF-0998568      139
4 551 E-mail Documents With Bates
   No. CIS-PPNPF-0996772.      146
5
552 E-mail Documents With Bates
6 No. CIS-PPNPF-1001449      151
7 553 Documents With Bates
   No. CIS-PPNPF-0102514 through
8 CIS-PPNPF-0102523      176
9 554 Documents With Bates
   No. CIS-PPNPF-0100505 through
10 CIS-PPNPF-0100510      186
11 555 Documents With Bates
   No. MFS-CSCO01060 through
12 MFS-CSCO01220      188
13 556 Documents With Bates
   No. MFS-CSCO00740 through
14 MFS-CSCO00754      199
15 557 Document With Bates
   No. 0101591      201
16
558 Document With Bates
17 No. CIS-PPNPF-0103336      202
18 559 Memorandum With Bates
   No. MFS-CSCO00757 through
19 MFS-CSCO00758      204
20 560 Documents With Bates
   No. CIS-PPNPF-0091751 through
21 CIS-PPNPF-0091752      208
22 561 Documents With Bates
   No. CIS-PPNPF-0103794 through
23 CIS-PPNPF-0103795      208
24 562 Documents With Bates
   No. CIS-PPNPF-0996972 through
25 CIS-PPNPF-0996974      211

**6**

```
1        E X H I B I T S (Continued)
  No.        Description        Page

   563  Documents With Bates
3      No. CIS-PPNPF-0100939 through
       CIS-PPNPF-0100940        224
4
   564  Documents With Bates
5      No. MFS-CSCO000759 through
       MFS-CSCO00788        227
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**8**

```
1   the witness and MFS.            09:06:43
2        MS. SIMPSON JONES: Sharon Simpson 09:06:44
3   Jones also on behalf of the witness and MFS. 09:06:46
4   And I am with Wilmer, Cutler, Pickering, Hale 09:06:48
5   and Dorr here in Boston.          09:06:51
6        DAVID SETTE-DUCATI,
7   a witness called on behalf of the Plaintiffs,
8   having been satisfactorily identified by the
9   production of his driver's license, and
10  having first been duly sworn by the Notary
11  Public, deposes and says as follows:   09:07:09
12       MS. SIMPSON JONES: I would like to 09:07:09
13  place on the record the fact that      09:07:10
14  Mr. Sette-Ducati is deaf and counsel for  09:07:11
15  plaintiffs have been kind enough to    09:07:16
16  accommodate that by providing him with a Live 09:07:18
17  Note feed and a laptop commuter in front of 09:07:20
18  him and that is the reason why there is a  09:07:23
19  computer on the table here at the deposition 09:07:24
20  today.                 09:07:26
21       MS. WEAVER: And I'll also note for 09:07:28
22  the record that plaintiffs counsel also  09:07:31
23  offered a translator for the witness which  09:07:33
24  was declined and we will proceed from here. 09:07:35
25
```

**7**

```
1        P R O C E E D I N G S
2        THE VIDEOGRAPHER: Good morning. We
3   are now recording and on the record. My name 09:05:50
4   is Ralph Scopa. I'm a legal video specialist 09:05:52
5   for G&M Court Reporters Limited. Our    09:05:55
6   business address is 42 Chauncy Street, suite 09:05:58
7   1A, Boston, Mass, 02111. Today's date is  09:06:00
8   June 17, 2005. The time is 9:04 a.m..    09:06:04
9        This is the deposition of David   09:06:09
10  Sette-Ducati in the matter of In Re: Cisco 09:06:11
11  Systems Security Systems Litigation. US   09:06:14
12  District Court, Northern District of    09:06:19
13  California, San Jose Division. This    09:06:20
14  deposition is being taken at 60 State Street,
15  Boston. The court reporter is Cathy    09:06:23
16  Zelinski. Counsel will state their    09:06:25
17  appearances and the court reporter will   09:06:27
18  administer the oath.          09:06:28
19       MS. WEAVER: Lesley Weaver of   09:06:30
20  Lerach, Coughlin, Stoia, Geller, Rudman and
21  Robbins for the plaintiffs.       09:06:31
22       MS. JENSEN: Alice Jensen from   09:06:36
23  Fenwick and West on behalf of the Cisco   09:06:39
24  defendants.             09:06:40
25       MS. COYNE: Laura Coyne on behalf of 09:06:40
```

**9**

```
1        DIRECT EXAMINATION
2   BY MS. WEAVER:                 09:07:40
3   Q. Will you please state your name for the  09:07:40
4      record?               09:07:43
5   A. David Sette-Ducati.          09:07:44
6   Q. Would you state your current residence  09:07:46
7      address?              09:07:49
8   A. 42 Jack Pine Drive, Sudbury, Massachusetts, 09:07:50
9      01776.               09:07:55
10  Q. For the record, can you read the monitor in 09:07:57
11     front of you?            09:07:59
12  A. Yes.                 09:08:00
13  Q. Okay.                 09:08:01
14       So during the course of this   09:08:01
15  deposition if you have any problems     09:08:03
16  understanding what I'm saying, please just 09:08:05
17  ask for a correction.          09:08:08
18       Is that understood?        09:08:09
19  A. Sure.                 09:08:10
20  Q. Have you ever been deposed before?    09:08:10
21  A. Excuse me?              09:08:12
22  Q. Have you ever been deposed before?    09:08:13
23  A. I have not.              09:08:15
24  Q. So I'll just cover some of the basic ground 09:08:16
25     rules.                09:08:19
```

**10**

1      The most important thing is that we      09:08:19
2   not talk over each other so that the court   09:08:21
3   reporter can get an accurate transcription of 09:08:25
4   what we're saying. So I will work not to    09:08:27
5   interrupt you and you also should not       09:08:31
6   interrupt me.                09:08:35
7      Do you understand that?        09:08:36
8   A. Yes.                 09:08:37
9   Q. Do you understand that you're here to testify 09:08:38
10   to the best of your ability today?      09:08:41
11   A. Yes.                 09:08:43
12   Q. Can you think of any reason why you cannot   09:08:45
13   testify truthfully today?          09:08:47
14   A. No.                 09:08:48
15   Q. If you need a break at any point during the  09:08:51
16   proceedings, you can just ask me. The basic  09:08:54
17   rule is that you should not take a break     09:08:57
18   while a question is pending. But otherwise   09:08:59
19   we can break at any point during the day.    09:09:02
20      Do you understand?          09:09:04
21   A. Sure. Yes.               09:09:06
22   Q. As we proceed, I will mark certain exhibits  09:09:10
23   for the record which I will hand to the court  09:09:12
24   reporter and she will hand to you and then I  09:09:15
25   may ask you questions about them.      09:09:17

**11**

1      Do you understand that?        09:09:18
2   A. Okay.                09:09:19
3      MS. WEAVER: So I'll mark now as     09:09:20
4   Exhibit 541 the amended Notice of Deposition 09:09:21
5   of David Sette-Ducati?          09:09:25
6      (Six-page Amended Notice of
7      Taking Deposition Marked
8      Plaintiff's Exhibit No. 541 for
9      Identification.)          09:09:53
10   Q. Have you seen Exhibit 541 before?     09:09:53
11   A. Exhibit 541. May I review it?       09:09:57
12   Q. Yes, of course.            09:10:20
13      MS. WEAVER: While the witness is    09:10:46
14   looking over Exhibit 541, I'll state for the  09:10:47
15   record that it is the amended notice of    09:10:49
16   deposition of David Sette-Ducati dated May  09:10:52
17   16th.                 09:10:53
18   Q. Are you appearing today pursuant to Exhibit  09:10:54
19   541 to the best of your knowledge?      09:10:57
20   A. Yes.                 09:10:59
21      MS. WEAVER: I'll mark at Exhibit   09:11:02
22   542 the notice of subpoena to non-party MFS  09:11:04
23   Investment Management.          09:11:08
24      (Notice of Subpoena to Non-Party
25      MFS Investing Management Marked

**12**

1      Plaintiff's Exhibit No. 542 for
2      Identification.)
3   Q. Have you seen Exhibit 542 before?     09:11:41
4   A. Yes.              09:11:43
5   Q. When did you first see it?         09:11:43
6   A. Exact date I cannot recall.        09:11:47
7   Q. Was it more than a month ago?      09:11:48
8   A. I do not believe so.         09:11:51
9   Q. And did you search for documents pursuant to 09:11:54
10   Exhibit 542?            09:11:57
11   A. Yes.              09:11:59
12   Q. Where did you search?          09:11:59
13   A. Where?             09:12:01
14   Q. Yes.              09:12:02
15   A. There were two searches performed. One was  09:12:04
16   for paper documents at MFS Investment     09:12:09
17   Management where all of my primary notes    09:12:12
18   would be. The second was electronic, which   09:12:16
19   would include computer files that I can     09:12:18
20   access.               09:12:21
21   Q. Can you roughly describe the volume of the  09:12:23
22   paper documents that you found responsive to 09:12:25
23   your search?            09:12:28
24   A. Pardon me?             09:12:29
25      Roughly describe the volume. How     09:12:33

**13**

1      would you exactly define volume?     09:12:39
2   Q. Was it more than a box of documents?    09:12:41
3   A. No.               09:12:43
4   Q. Was it half a box of documents?      09:12:43
5   A. Approximately.            09:12:48
6   Q. Can you roughly --          09:12:49
7   A. Depending on the box size.        09:12:50
8   Q. Okay.               09:12:53
9      So a stack maybe?          09:12:53
10   A. It was a stack. It was a modest stack of   09:12:56
11   documents.             09:12:58
12   Q. Okay.               09:12:59
13      And with regard to the electronic    09:12:59
14   documents, can you roughly describe the    09:13:01
15   volume of those?           09:13:03
16   A. Well, that's -- most of those were Excel   09:13:08
17   files and Word documents. I could not access 09:13:14
18   -- I could not access the e-mail archives.   09:13:19
19   Q. Roughly how many Excel files did you find   09:13:23
20   responsive to the subpoena?        09:13:28
21   A. Specifically, I don't have the --     09:13:29
22      MS. SIMPSON JONES: Objection.     09:13:33
23   A. -- exact number.           09:13:34
24      THE WITNESS: Object.         09:13:36
25   A. I don't have the exact number.       09:13:37

**14**

1  Q. Was it more than 100?            09:13:40
2  A. Yes.                    09:13:42
3  Q. Was it more than 400?            09:13:43
4  A. No.                    09:13:48
5  Q. Was it somewhere in the neighborhood of 200? 09:13:49
6  A. Close to that, yes.            09:13:53
7  Q. And with regard to Word documents can you    09:13:53
8     estimate how many of those documents you    09:13:55
9     found responsive to the subpoena?        09:13:57
10         MS. SIMPSON JONES: Objection.    09:13:59
11  A. I cannot. The document number I gave you was 09:14:01
12     Word and Excel. The bulk was Excel.    09:14:05
13  Q. Did you perform any search for e-mail?    09:14:12
14  A. I did.                09:14:16
15  Q. And how many e-mails did you find?    09:14:17
16  A. Very few.                09:14:20
17  Q. More than 100?            09:14:21
18  A. No.                    09:14:24
19  Q. More than 20?            09:14:24
20  A. No. Again, I -- a lot of my e-mails are very 09:14:26
21     current.                09:14:33
22  Q. How often is e-mail archived at MFS?    09:14:34
23  A. I do not know exactly.        09:14:38
24  Q. Was the e-mail archive accessed and search  09:14:40
25     responsive to the subpoena?        09:14:44

**15**

1  A. E-mail archive access and search responsive. 09:14:47
2     Please, please explain.            09:14:52
3  Q. Did you refer a moment ago to an e-mail    09:14:54
4     archive?                09:14:57
5  A. Did I refer to anyone else to e-mail    09:14:57
6     archives?                09:15:00
7  Q. Did --                09:15:01
8  A. No, I'm sorry.            09:15:02
9  Q. Did you refer to the term e-mail archive a    09:15:03
10     moment ago?                09:15:05
11  A. Yes.                    09:15:06
12  Q. What were you referring to?        09:15:06
13  A. As I understand, MFS stores e-mails,    09:15:09
14     historical e-mails. I do not know how far    09:15:13
15     back that goes so that's what I referred to. 09:15:18
16  Q. Do you know if that e-mail archive was    09:15:20
17     searched for documents responsive to the    09:15:22
18     subpoena?                09:15:25
19  A. I do not know. I assume so.        09:15:25
20         MS. WEAVER: I'll state for the    09:15:28
21     record that we would ask counsel to search 09:15:28
22     that e-mail archive and produce all    09:15:31
23     responsive documents if you have not.    09:15:33
24         MS. SIMPSON JONES: And I will state 09:15:35
25     for the record that we have produced those  09:15:36

**16**

1     accessible e-mail documents that we were able 09:15:40
2     to find.                09:15:42
3         MS. WEAVER: Meaning the e-mail    09:15:45
4     archive was searched?            09:15:47
5         MS. SIMPSON JONES: Yes. To the    09:15:49
6     best of my understanding, yes.        09:15:50
7         MS. WEAVER: Okay.        09:15:53
8  Q. Returning for a moment to the paper    09:15:53
9     documents, did you find notes that you had  09:15:57
10     taken that were responsive to the subpoena? 09:15:59
11  A. Yes.                    09:16:01
12  Q. What was the volume of the notes that you    09:16:02
13     found?                09:16:04
14  A. Already disclosed, a modest stack.    09:16:06
15  Q. Were they contained in a single notebook?    09:16:09
16  A. Excuse me? Was any data in the notebook?    09:16:12
17     Yes, I produced all paper documents I had. 09:16:16
18     Notebook, memos.            09:16:19
19  Q. Was it a spiral notebook?        09:16:21
20  A. Yes.                    09:16:23
21  Q. Is there more than one notebook?        09:16:24
22  A. Possibly. I know of one. I'm trying to    09:16:33
23     think of a second. Notebooks take a variety 09:16:41
24     of forms I guess.            09:16:45
25  Q. I'll return to the notebook in just a moment. 09:16:47

**17**

1         Are you represented by counsel today? 09:16:55
2  A. Yes.                    09:16:59
3  Q. Who is your counsel?            09:17:00
4  A. Sharon Simpson Jones of -- I know the last  09:17:01
5     two. Hale and Dorr.            09:17:08
6  Q. Wilmer Cutler will be sad about that.    09:17:10
7  A. I'm sorry.                09:17:13
8  Q. Are you represented by anyone else?        09:17:15
9  A. Yeah. Laura Coyne of MFS.        09:17:17
10  Q. Did you meet with anybody to prepare for your 09:17:20
11     deposition today?            09:17:22
12  A. Yes.                    09:17:23
13  Q. Who did you meet with?            09:17:24
14  A. Sharon Simpson Jones and Laura Coyne.    09:17:25
15  Q. When did you meet?            09:17:27
16  A. When? Where? Over the past several weeks at 09:17:28
17     MFS.                    09:17:34
18  Q. Approximately how many hours have you spent  09:17:35
19     preparing for your deposition?        09:17:38
20  A. With those two parties?        09:17:39
21  Q. With anyone.                09:17:43
22  A. With anyone. Five to six hours.        09:17:45
23  Q. Did you prepare for this deposition with    09:17:49
24     anyone other than counsel?        09:17:51
25  A. No.                    09:17:53

**18**

1  Q. Roughly how many hours did you spend    09:17:55
2     preparing for the deposition with counsel?  09:17:57
3  A. With counsel? Five to six.          09:17:59
4     Let me back -- no. Yeah, five to six.  09:18:03
5     If you consider searching for documents    09:18:06
6     preparation? Do you consider --       09:18:09
7  Q. Sure, yes.                   09:18:11
8  A. All right. Then five to six with counsel.  09:18:12
9     An additional two to three outside of that.  09:18:15
10 Q. Did you review any documents while you were  09:18:17
11    meeting with counsel to prepare for your    09:18:20
12    deposition?                  09:18:24
13 A. Yes.                      09:18:24
14 Q. Did any of those documents refresh your    09:18:25
15    recollection?                09:18:28
16 A. Yes.                      09:18:28
17 Q. Do you recall what those documents were?   09:18:29
18    MS. SIMPSON JONES: Objection.       09:18:31
19    This is seeking work product and I    09:18:33
20    don't think that Mr. Sette-Ducati should have  09:18:36
21    to answer that considering that he was    09:18:39
22    meeting with counsel and whatever was    09:18:41
23    discussed is protected by the attorney-client 09:18:44
24    privilege and the attorney work product.   09:18:46
25    MS. WEAVER: Law is clear that if     09:18:50

**19**

1     the documents refresh the witness's      09:18:51
2     recollection, I'm entitled to explore what   09:18:53
3     documents he reviewed. I'm not asking for   09:18:55
4     his communications with counsel.       09:18:57
5  Q. Can you describe what documents refreshed   09:19:00
6     your recollection?              09:19:02
7  A. Which documents?               09:19:03
8     MS. SIMPSON JONES: Objection.       09:19:07
9     I don't think that Mr. Sette-Ducati     09:19:08
10    should describe documents that he discussed  09:19:10
11    in his meetings with counsel prior to the   09:19:14
12    deposition.                  09:19:16
13    MS. WEAVER: Are you instructing the   09:19:17
14    witness not to answer?            09:19:18
15    MS. SIMPSON JONES: I am.         09:19:20
16    If you have a particular document that    09:19:23
17    you want to show to Mr. Sette-Ducati to see  09:19:25
18    if it refreshes his recollection, that's   09:19:28
19    fine. But we are not going to disclose    09:19:31
20    discussions protected by the attorney-client  09:19:34
21    privilege.                  09:19:36
22    MS. WEAVER: And for the record,    09:19:37
23    that's not a discussion protected by the   09:19:38
24    attorney-client privilege. It's discovery of  09:19:40
25    a fact which plaintiffs are entitled to.   09:19:43

**20**

1     MS. SIMPSON JONES: The collection  09:19:45
2     of documents constitutes attorney work    09:19:46
3     product.                   09:19:48
4     MS. WEAVER: Actually, in this case,  09:19:48
5     a ruling has specifically come down to the   09:19:50
6     contrary just so you know.          09:19:52
7     MS. SIMPSON JONES: As a third party 09:19:54
8     I was not privy to that ruling.        09:19:56
9     MS. WEAVER: Well, okay. I may seek 09:19:58
10    to reopen the deposition based on that ground 09:19:59
11    as well as other grounds.           09:20:02
12 Q. Did you have discussions with anyone other   09:20:23
13    than counsel regarding this litigation?    09:20:26
14 A. Yes.                      09:20:28
15 Q. With whom did you have discussions?       09:20:28
16 A. Kate Meade at MFS Investment Management.   09:20:33
17 Q. I'm sorry, that's Ken Meade?          09:20:38
18 A. Kate.                      09:20:40
19 Q. Kate.                      09:20:42
20 A. Meade.                     09:20:44
21 Q. And what did you discuss?           09:20:44
22 A. Kate and I each were each Cisco analysts at  09:20:47
23    MFS at different points in time. Just      09:20:52
24    basically interested in what was going on.  09:20:55
25    It also related to the document search.    09:20:58

**21**

1  Q. Was Kate at one point named Kate McLosky?   09:21:02
2  A. Yes.                      09:21:07
3  Q. When did her name change?           09:21:08
4  A. Exact date, I do not know. She was married  09:21:09
5     sometime early 2000 -- I don't know the exact 09:21:12
6     date.                     09:21:15
7  Q. Was it after the year 2001?          09:21:15
8  A. I don't know.                 09:21:17
9  Q. So, can you be more specific about what you  09:21:29
10    discussed with Kate?             09:21:31
11 A. Sure. Well, it is common at MFS when      09:21:33
12    analysts move industries, change industries,  09:21:38
13    a research analysts are responsible for    09:21:43
14    particular industries. We move assignments  09:21:47
15    from time to time and when we do that, it is  09:21:49
16    customary to pass on all of your materials to 09:21:53
17    the next analyst. And so in my search for   09:21:56
18    documents, I had very few files. The     09:22:01
19    assumption was that they went on to Kate and  09:22:05
20    then Kate passed them on to another analyst  09:22:08
21    who is no longer with the firm.       09:22:11
22 Q. And who was that other analyst?        09:22:12
23 A. Dan Martino.                  09:22:14
24 Q. Did you discuss this litigation with Kate?  09:22:24
25 A. Briefly.                    09:22:26

22

1   Q. And what did you say?                09:22:27
2   A. Neither of us really knew what it was about, 09:22:29
3      so I guess anything if you're involved with, 09:22:32
4      it's just like what's going on.        09:22:34
5   Q. Have you ever had any discussions with anyone 09:22:36
6      at Cisco regarding this litigation?       09:22:38
7   A. No.                 09:22:40
8        At Cisco? No.            09:22:45
9   Q. Did Kate tell you that she had had      09:22:51
10     conversations with anyone at Cisco regarding 09:22:53
11     this litigation?           09:22:55
12  A. No.                 09:22:56
13  Q. Did Kate search her files for documents   09:23:00
14     responsive to the subpoena?        09:23:03
15  A. I assume so.             09:23:04
16  Q. Did you ask her to?           09:23:05
17  A. Did I ask her to? No.         09:23:06
18  Q. Do you know if she was asked?       09:23:08
19  A. Yes.                09:23:10
20  Q. And was she asked?          09:23:11
21  A. Yes.                09:23:13
22  Q. Who is paying for your counsel here today?  09:23:23
23  A. I don't know.            09:23:25
24  Q. Are you paying?            09:23:26
25  A. I'm not.               09:23:27

23

1   Q. Do you know if MFS is paying?        09:23:28
2   A. I assume so.             09:23:30
3   Q. Are you being compensated for the time that 09:23:32
4      you're spending in deposition today?    09:23:34
5   A. Please clarify.            09:23:38
6   Q. Are you receiving any -- do you understand 09:23:40
7      the word compensation?          09:23:43
8   A. Any incremental compensation? No.     09:23:44
9   Q. So other than your regular salary, you're not 09:23:48
10     receiving any special compensation for    09:23:51
11     appearing today; is that correct?      09:23:53
12  A. I am not receiving any special compensation 09:23:55
13     for appearing today.          09:23:58
14  Q. Let's cover your -- briefly your educational 09:24:07
15     and employment background.        09:24:09
16  A. Excuse me.              09:24:12
17        Okay.               09:24:14
18  Q. You attended Williams College; is that    09:24:14
19     correct?               09:24:20
20  A. Williams College?           09:24:20
21  Q. Yes.                 09:24:22
22  A. That's correct.            09:24:22
23  Q. And did you go to business school?     09:24:23
24  A. Yes, I did.              09:24:24
25  Q. And where did you go?          09:24:25

24

1   A. Amos Tuck School at Dartmouth.       09:24:27
2        (Clarification by the reporter.)
3   A. 1995.                09:24:41
4   Q. And did you join MFS after you graduated from 09:24:43
5      business school?            09:24:47
6   A. Yes, I did.              09:24:47
7   Q. In what position?            09:24:48
8   A. As a research analyst.          09:24:50
9   Q. Was that in 1995?           09:24:52
10  A. Yes.                09:24:53
11  Q. What does MFS do?           09:24:55
12  A. MFS is an investment manager.        09:24:58
13  Q. For whom?               09:25:01
14  A. Individuals, institutions, pensions,     09:25:04
15     foundations.              09:25:07
16  Q. Can you name some of MFS's largest clients? 09:25:11
17  A. Actually, no.             09:25:15
18  Q. Can you state the name of any client of MFS? 09:25:18
19  A. State the name of any client of MFS?    09:25:23
20  Q. Yes.                 09:25:26
21  A. Of course.              09:25:26
22  Q. And who is that?            09:25:31
23  A. Who is that?             09:25:32
24  Q. Yes.                 09:25:33
25  A. Any client?              09:25:34

25

1   Q. Yes.                 09:25:35
2   A. Brockton Retirement.          09:25:36
3   Q. What clients do you deal with -- well, strike 09:25:38
4      that.                 09:25:41
5        Do you know the rough value of the    09:25:42
6      assets that MFS manages currently?      09:25:49
7   A. Approximately $145 billion.        09:25:52
8   Q. During the course of this deposition I'm   09:25:57
9      going to refer to the relevant period, and  09:25:59
10     I'm going to define that now so it's a    09:26:02
11     defined time frame. The relevant period will 09:26:04
12     be August 1, 1999 to March 31, 2001. So,  09:26:07
13     going forward in the deposition, if I ask you 09:26:14
14     a question, I'm going to be referring to the 09:26:16
15     relevant period unless I state otherwise.   09:26:18
16  A. Okay.                09:26:20
17  Q. Do you understand that?         09:26:21
18        During the relevant period, do you    09:26:23
19     have an understanding as to the value of the 09:26:26
20     assets that MFS was managing?        09:26:29
21  A. During that period? No, I do not.     09:26:32
22  Q. Do you know if it was larger or smaller?  09:26:34
23  A. Than 145? I can't recall.         09:26:36
24  Q. In 1995 when you became a research analyst at 09:26:44
25     MFS, what were your duties and        09:26:48

26

1    responsibilities in that role?         09:26:50
2    A. I was assigned an industry to work on where I 09:26:51
3      would become the in-house consultant or      09:26:58
4      knowledge specialist of that industry.      09:27:05
5    Q. What industry was that?         09:27:08
6    A. I was first given media.         09:27:09
7    Q. And what is media?         09:27:15
8    A. Media encompassed -- well, as a research      09:27:17
9      analyst in the equity department, media      09:27:24
10     encompassed all companies, publicly traded   09:27:26
11     companies in the entertainment, publishing,   09:27:30
12     broadcasting industries.         09:27:36
13   Q. Did you stay in the media industry?      09:27:48
14   A. Did I stay in the media industry?      09:27:49
15   Q. Yes.         09:27:52
16   A. For what time period?         09:27:53
17   Q. Any time period while you were a research   09:27:54
18     analyst.         09:27:57
19   A. Yes.         09:27:58
20   Q. And at some point did your job position      09:27:58
21     change?         09:28:00
22   A. My job position did not change. Well, please 09:28:02
23     clarify.         09:28:06
24   Q. Did you -- are you currently a research      09:28:07
25     analyst at MFS?         09:28:09

27

1    A. No, I'm not. I'm a portfolio manager at this 09:28:10
2      point.         09:28:14
3    Q. When did you stop being a research analyst?  09:28:14
4      What was your next position at MFS?      09:28:16
5    A. In approximately March of 2000.      09:28:18
6    Q. And what was your new position?      09:28:21
7    A. I became a portfolio manager of the MFS      09:28:25
8      science and technology fund.         09:28:30
9    Q. And what is the MFS science and technology   09:28:38
10     fund?         09:28:41
11   A. It is a mutual fund that MFS sells or markets 09:28:41
12     to clients as a vehicle that invests in the   09:28:53
13     science and technology fields.         09:28:55
14   Q. Why were you selected to become a portfolio  09:29:00
15     manager for the science and technology fund? 09:29:02
16   A. Why?         09:29:05
17   Q. To the best of your understanding.         09:29:06
18   A. I believe the senior management thought I was 09:29:08
19     the best person to take that at that time.   09:29:11
20   Q. And why?         09:29:13
21   A. I had some technology background. I had some 09:29:15
22     successful investment results.         09:29:18
23   Q. Prior to March of 2000, had you followed      09:29:21
24     science and technology?         09:29:25
25   A. For a period of time. It is customary for   09:29:26

28

1    MFS analysts to rotate through multiple      09:29:28
2    industries during the course of their career. 09:29:31
3    Q. So did you rotate through multiple industries 09:29:33
4      prior to the time that you became the      09:29:36
5      portfolio manager for the science and      09:29:38
6      technology fund?         09:29:40
7    A. Yes, I did.         09:29:41
8    Q. And what, what industries did you rotate      09:29:42
9      through?         09:29:46
10   A. I followed media. I followed the majority of 09:29:47
11     the energy sector which encompasses      09:29:55
12     international oil companies, expiration and  09:29:58
13     production companies, oil field service      09:30:03
14     companies and equipment companies. And I   09:30:04
15     worked on telecommunications equipment and  09:30:07
16     data networking companies. Those were my   09:30:10
17     primary research responsibilities at MFS.   09:30:21
18   Q. And as a research analyst, did you write      09:30:25
19     reports?         09:30:28
20   A. Yes, I did.         09:30:28
21   Q. To whom are those reports circulated?      09:30:30
22   A. Internally.         09:30:32
23   Q. And when you say internally, to whom      09:30:34
24     specifically?         09:30:36
25   A. Portfolio managers and other analysts. Any  09:30:37

29

1    investment professionals as working to build 09:30:40
2    value for our shareholders.         09:30:45
3    Q. What was the purpose of the reports?      09:30:48
4    A. It depends.         09:30:51
5    Q. Well, let's talk about the reports that --  09:30:53
6      well, why don't you state one purpose?      09:30:55
7    A. Excuse me?         09:30:58
8    Q. Please state one of the purposes.         09:30:59
9    A. Reports from MFS took a variety of forms. It 09:31:04
10     could be a specific recommendation that you  09:31:10
11     have an on a stock. It could be -- that's   09:31:11
12     one example. There are multiple examples.   09:31:15
13   Q. How many examples are there?         09:31:18
14   A. There's no fixed number. A memo can take any 09:31:19
15     form.         09:31:23
16   Q. What's the most common type of memo that you 09:31:24
17     drafted as a research analyst?         09:31:26
18   A. Probably the most common memo were research  09:31:28
19     notes.         09:31:33
20   Q. And what are research notes?         09:31:39
21   A. It's an internal notes system where if an   09:31:40
22     analyst has something to communicate -- notes 09:31:41
23     are published daily. It's an internal note  09:31:41
24     system where if an analyst had something -- a 09:31:46
25     comment to write about a company, that he or 09:31:47

1  she would put it in the note system and it  09:31:49
2  would be published the next morning and all  09:31:54
3  portfolio managers and analysts would
4  hopefully, would read it.  09:31:58
5  Q. Was the note system an electronic system?  09:31:59
6  A. Yes, it was.  09:32:02
7  Q. And how were the notes published?  09:32:03
8  A. How? Printed.  09:32:05
9  Q. So that were they circulated in hard copy?  09:32:06
10  A. Yes.  09:32:12
11  Q. What was the next most common type of report  09:32:13
12  you prepared as a research analyst?  09:32:16
13  A. Hand out.  09:32:18
14  Q. And what's a hand out?  09:32:20
15  A. Hand out could be a variety of things. It  09:32:22
16  could be an update on an industry. An  09:32:24
17  analyst could choose to arbitrarily decide  09:32:28
18  here's some thoughts on an industry. Some  09:32:33
19  investment decisions that I would be doing.  09:32:35
20  Articulating fundamental changes or  09:32:39
21  evaluation in shifts. There's no set time  09:32:41
22  frame for that, but they can, they come at  09:32:45
23  the discretion of the analyst. Basically  09:32:48
24  summarizing thoughts.  09:32:51
25  Q. What's the next most common type of report  09:33:01

1  that you prepared as a research analyst?  09:33:03
2  A. Again, I think the handouts or memos take a  09:33:09
3  variety of forms, so I really don't seg -- I  09:33:14
4  can't segment it. It think it's memo form.  09:33:19
5  Q. Okay.  09:33:21
6  Are you familiar with a company called  09:33:23
7  Cisco Systems?  09:33:26
8  A. Yes, I am.  09:33:28
9  Q. And did you at some point in your  09:33:29
10  professional capacity as a research analyst  09:33:32
11  at MFS take an interest in Cisco?  09:33:35
12  A. Take an interest. Please define.  09:33:38
13  Q. Did you follow Cisco?  09:33:40
14  A. Yes.  09:33:41
15  Q. For MFS in your professional capacity?  09:33:41
16  A. For MFS, yes.  09:33:47
17  Q. And when did that first occur?  09:33:49
18  A. Fall of 1998.  09:33:51
19  Q. And how did that come about?  09:33:57
20  A. The -- the prior, as I said before, the  09:34:01
21  analysts in MFS rotate assignments. The  09:34:08
22  prior analyst was considered at the tail end  09:34:09
23  of his assignment and data networking telecom  09:34:14
24  equipment and the director of research  09:34:19
25  decided I would be the best fit to pick it  09:34:21

1  up.  09:34:23
2  Q. Who was the prior analyst?  09:34:23
3  A. Alec Murray.  09:34:25
4  Q. So were you specifically assigned Cisco as a  09:34:29
5  company to follow or was Cisco part of a  09:34:32
6  larger industry that you were to follow?  09:34:34
7  A. Part of an industry.  09:34:36
8  Q. And what industry was that?  09:34:37
9  A. It was considered telecom equipment and data  09:34:39
10  networking. All companies that fell under  09:34:43
11  our definition of that.  09:34:49
12  Q. Roughly how many companies did you follow in  09:34:50
13  that industry beginning in the fall of 1998?  09:34:52
14  A. I can't recall specifically. I can give you  09:34:56
15  a rough number.  09:34:58
16  Q. What's the rough number?  09:34:59
17  A. 20.  09:35:00
18  Q. Did you follow any competitors of Cisco  09:35:06
19  during that time frame?  09:35:08
20  A. Yes, I did.  09:35:08
21  Q. And who were they?  09:35:09
22  A. Lucent Technologies, Nortel Networks,  09:35:11
23  Alcatel, Siemens, Ascend Communications,  09:35:18
24  Juniper Networks. Those are the ones that  09:35:24
25  jump out. 3Com.  09:35:28

1  Q. Do you have an understanding as to why you  09:35:34
2  were selected to follow the telecom equipment  09:35:38
3  and networking industry?  09:35:40
4  A. No.  09:35:41
5  Q. Do you think you had an expertise at the  09:35:42
6  time?  09:35:48
7  A. No.  09:35:48
8  Q. Do you think you do today?  09:35:48
9  A. In the -- define expertise.  09:35:49
10  Q. Well, what does it mean to you?  09:35:50
11  A. Excuse me?  09:35:52
12  Q. What does the word expertise mean to you?  09:35:53
13  A. Well, it could take a variety of functions.  09:35:55
14  At MFS all analysts basically, very few of us  09:35:58
15  have prior industry expertise in a relevant  09:36:03
16  sector. So you're first and foremost looked  09:36:09
17  at -- looked at as an investor. If you have  09:36:14
18  relevant expertise, that's great. But it's  09:36:16
19  not a requirement. So, I did not have any  09:36:19
20  prior technology background. I think the  09:36:21
21  decision was weighed mostly on my success as  09:36:25
22  an investor and how I looked at analyzing  09:36:28
23  companies.  09:36:31
24  I guess a better way to put it is, the  09:36:33
25  skills and personality of an analyst who  09:36:38

**34**

1   looks at technology stock may be entirely   09:36:41
2   different than a scale and personality of an 09:36:45
3   analyst who looks at utility companies.      09:36:47
4   Q. And what scales did you possess at the time 09:36:49
5     that you were assigned the telecom equipment 09:36:51
6     and the networking sector?        09:36:53
7   A. I guess there was a confidence I could see 09:36:56
8     the forest among the trees well.      09:36:59
9   Q. And what do you mean by that?        09:37:01
10  A. Technology tends to require I think a bigger 09:37:02
11    picture thinking anticipation of what could 09:37:06
12    happen, what can't happen. Things move   09:37:09
13    quickly and change fast.         09:37:11
14  Q. And when you say bigger picture thinking,  09:37:15
15    what do you mean?            09:37:17
16  A. I think the ability to take a lot of     09:37:21
17    different data points and send them out   09:37:23
18    quickly and understand the ramifications, the 09:37:25
19    investment over a longer period of time. In 09:37:28
20    technology things moved again very quickly. 09:37:30
21    If you can't think out of the box, you know, 09:37:33
22    an assignment like technology tends not to  09:37:39
23    come your way.             09:37:43
24  Q. And when you say things move very quickly,  09:37:45
25    what do you mean?            09:37:47

**35**

1   A. Well, what I mean by that is technological  09:37:51
2     disruption can happen quickly. You can -- 09:38:00
3     the way we looked at it is companies would  09:38:02
4     build proprietary intellectual property where 09:38:04
5     they had seen a software code or some    09:38:10
6     proprietary intellectual property that    09:38:14
7     enables them to have a product that customers 09:38:17
8     use, but that intellectual property is always 09:38:19
9     at risk. And there's a lot of brain power  09:38:22
10    and capital thrown at developing new     09:38:24
11    technologies which can move things better,  09:38:27
12    faster, more productively. So it's not    09:38:29
13    uncommon -- again, utilities tend to be very 09:38:33
14    straight-forward and the business models are 09:38:37
15    pretty static, whereas technology companies 09:38:41
16    change pretty fast.           09:38:43
17  Q. So it's true that in the technology sector  09:38:44
18    products develop and have a shorter life   09:38:47
19    span, isn't it?             09:38:50
20  A. There's potential for that.        09:39:00
21  Q. As opposed to utilities companies?      09:39:02
22  A. Yes.                  09:39:04
23  Q. And what's the basis for that observation?  09:39:06
24  A. The basis for that observation is based on my 09:39:11
25    experience in having followed a variety of  09:39:14

**36**

1   sectors and industries at MFS. For example, 09:39:16
2   working in the energy industry, commodities 09:39:20
3   cyclical, very, very different than working  09:39:24
4   in the technology industry where proprietary 09:39:27
5   intellectual property much more profitable
6   companies, it's just based on experience.   09:39:34
7   Q. When you became portfolio manager, did you 09:39:40
8     continue to follow Cisco?        09:39:43
9   A. How do you define follow?         09:39:47
10  Q. Well, you were assigned the telecom equipment 09:39:50
11    and networking industry as a research    09:39:53
12    analyst; is that right?         09:39:55
13  A. Yes.                  09:39:56
14  Q. What was your assignment as a portfolio   09:39:56
15    manager?                09:39:59
16  A. As a portfolio manager, you come off your  09:39:59
17    industry assignments, you become responsible 09:40:02
18    for a portfolio. So you no longer have    09:40:03
19    formal responsibilities of an industry.   09:40:07
20    May I ask a question? If it's not    09:40:10
21    correct on here, what do you do?     09:40:14
22        THE WITNESS: What do we do?     09:40:17
23        MS. WEAVER: Let's go off the    09:40:17
24    record.                09:40:18
25        THE VIDEOGRAPHER: The time is 9:38. 09:40:23

**37**

1   We are off the record.          09:40:24
2       (Whereupon, a discussion was     09:41:39
3     held off the record.)         09:41:45
4       THE VIDEOGRAPHER: The time is 9:40. 09:41:45
5   We're back on the record.         09:41:47
6   Q. I'll repeat the last question.      09:41:54
7       What was your assignment as a    09:41:56
8   portfolio manager?            09:41:57
9   A. As a portfolio manager, you're responsible  09:41:58
10    for managing a fund. You do not have any  09:42:01
11    industry responsibility in the analyst    09:42:04
12    capacity.               09:42:08
13  Q. Did you continue to follow Cisco Systems as a 09:42:09
14    portfolio manager?           09:42:11
15  A. Well, as a portfolio manager, you're     09:42:13
16    responsible for all the stocks in your    09:42:16
17    portfolio. So, Cisco was in the portfolio. 09:42:18
18    So, yes, I was following it in a different  09:42:22
19    capacity.               09:42:24
20  Q. And how was that capacity different?     09:42:24
21  A. I am not as intricately involved with Cisco 09:42:27
22    because I'm investing in a hundred companies. 09:42:33
23    I have to know them all at a basic level.   09:42:37
24    That's where we have analysts, we rely on the 09:42:41
25    analysts to be the industry experts if you  09:42:44

38

1  want to put it that way.                09:42:48
2  Q. Did you prepare reports as a portfolio        09:42:51
3    manager?                            09:42:54
4  A. What kind?                          09:42:56
5  Q. I'm asking if you prepared any kind of     09:42:57
6    reports?                            09:43:01
7  A. Yes.                               09:43:01
8  Q. What kinds of reports did you prepare?      09:43:02
9  A. Oh, you have quarterly reports that you     09:43:03
10    prepare for shareholders. You have annual   09:43:06
11    reports you reports to report to shareholders 09:43:09
12    -- prepare for shareholders. You can on     09:43:13
13    occasion provide internal reports outlining  09:43:15
14    the strategy of your fund so the department  09:43:18
15    understands what you're investing in and how 09:43:23
16    you're doing it. Those are the ones that    09:43:25
17    jump to mind.                       09:43:28
18  Q. With regard to the quarterly reports that   09:43:29
19    were prepared for your shareholders, what,  09:43:31
20    what do those entail?                 09:43:35
21  A. Quarterly and annual and semi-annual. Oh,  09:43:38
22    boy. They're a little bit different.      09:43:45
23      These are basic reports where there's    09:43:48
24    a -- there's a prospectus that's done      09:43:53
25    annually. There are shareholder letters done 09:43:57

39

1  semi-annually and annually. I don't believe 09:44:01
2    they're done quarterly.              09:44:04
3      But these reports list your portfolio   09:44:06
4    holdings, go through the basis of performance 09:44:08
5    and have all their information required that 09:44:11
6    a shareholder needs to know and understand as 09:44:17
7    they're investing in a product. They may   09:44:20
8    also have a commentary.              09:44:23
9  Q. Did the shareholder communications discuss 09:44:24
10    specific companies?                 09:44:31
11  A. Yes.                             09:44:32
12  Q. Do you know if any of the reports that you 09:44:32
13    prepared as a portfolio manager mentioned  09:44:33
14    Cisco?                           09:44:36
15  A. Mentioned Cisco. In what fashion?        09:44:38
16  Q. In any form.                       09:44:41
17  A. Well, if Cisco was owned it would show up on 09:44:43
18    a portfolio schedule. Which should list the 09:44:46
19    stocks in the portfolio.             09:44:49
20  Q. Did any of your reports distributed to     09:44:50
21    shareholders mention Cisco in any other    09:44:54
22    capacity?                        09:44:56
23  A. I can't recall.                    09:44:56
24  Q. Is it possible?                    09:44:57
25  A. Yeah, it's possible. We usually discuss   09:44:59

40

1  focus detractors and contributors to       09:45:08
2    performance.                       09:45:12
3  Q. And regarding the internal communications  09:45:14
4    that you discussed, what form did those take? 09:45:16
5  A. I said if -- as a portfolio manager, on   09:45:21
6    occasion I would write up the strategy for  09:45:27
7    the science and technology fund or whatever 09:45:31
8    fund they're managing. Outline what I'm    09:45:33
9    doing, what I own and why. Provide a list of 09:45:37
10    the investments and then open that up for   09:45:42
11    debate within the department. It was called a 09:45:45
12    portfolio review.                   09:45:48
13  Q. And to whom are those communications      09:45:52
14    circulated?                       09:45:53
15  A. The investment department. So it would be  09:45:57
16    equity portfolio managers and other equity  09:46:01
17    analysts in the department. Associate      09:46:04
18    portfolio managers. Although we did not have 09:46:09
19    them at that time. Any investment personnel. 09:46:12
20  Q. Do you know --
21  A. On occasion -- marketing would have access. 09:46:16
22  Q. Do you know if any of the internal reports  09:46:21
23    that you circulated mentioned Cisco during  09:46:25
24    the relevant period?                09:46:28
25  A. It's possible.                    09:46:30

41

1  Q. And did you communicate by e-mail while you 09:46:33
2    were a research manager in portfolio?     09:46:39
3  A. Yes.                             09:46:42
4  Q. And with whom did you communicate by e-mail? 09:46:42
5  A. Anybody in the equity department or -- well, 09:46:48
6    two fold.                        09:46:52
7      E-mail communication, like any form of  09:46:56
8    communication, would -- we're trying to do a 09:46:59
9    couple of things. One, we interact with our 09:47:03
10    companies. As an analyst, you tend to      09:47:06
11    interact with your companies that you're   09:47:08
12    working on. So they can be e-mail or verbal 09:47:10
13    interaction there.                  09:47:13
14      As a portfolio manager, the same       09:47:14
15    thing. So there's an internal and external  09:47:16
16    audience that you're working with.       09:47:19
17  Q. Do you believe that you e-mailed about Cisco 09:47:23
18    during the relevant period? Which again --  09:47:27
19  A. Do you believe that you e-mailed Cisco --  09:47:33
20    yes.                            09:47:41
21  Q. And can you estimate roughly the volume of  09:47:41
22    e-mail that you sent while you were research 09:47:44
23    analyst regarding Cisco?             09:47:46
24  A. No. The rough volume? No.              09:47:49
25  Q. Would it be more than 500 e-mails in a year? 09:47:51

42

1   A. No idea.                           09:47:54
2   Q. Okay.                              09:47:54
3   A. I can say this is: Given my hearing        09:47:56
4     impairment, I rely more on e-mail than most. 09:48:02
5   Q. Do you recall with whom at Cisco you e-mailed 09:48:08
6     when you were a research analyst?        09:48:12
7   A. Yes.                               09:48:15
8   Q. Who was your primary contact?             09:48:15
9   A. The investor relations department.        09:48:19
10  Q. And who was that specifically?            09:48:22
11  A. There were several. Randi, Randi Fegin, Mary 09:48:26
12    Thurber, Roberta Detata.                09:48:38
13  Q. Anyone else?                          09:48:41
14  A. I can't recall. On an e-mail basis those are 09:48:46
15    the ones that would be the primary.         09:48:50
16  Q. Did you e-mail with anyone outside of IR? 09:48:52
17  A. I could have.                         09:48:55
18  Q. Did you ever e-mail with John Chambers?   09:48:56
19  A. Oh, my. I can't recall.               09:48:59
20  Q. Did you ever send an e-mail to Larry Carter? 09:49:03
21  A. Possibly.                            09:49:06
22  Q. What about Mike Volpi?                 09:49:07
23  A. Possibly.                            09:49:09
24  Q. Kevin Ken --                          09:49:12
25  A. I have met all those individuals. Whether or 09:49:13

43

1     not I actually e-mailed them, I can't recall. 09:49:15
2     It's possible.                        09:49:19
3   Q. How about Kevin Kennedy?               09:49:21
4   A. Possible.                            09:49:22
5   Q. Anyone else you can think of?             09:49:23
6   A. Yeah, Kevin DeNuccio.                 09:49:30
7     And that's -- there are others, I just 09:49:34
8     can't recall the names. These are people I 09:49:37
9     believe I have some form of interaction with. 09:49:39
10    What form, e-mail, verbal. There were    09:49:42
11    meetings, yes. E-mail, I can't, can't recall 09:49:45
12    exactly.                              09:49:49
13  Q. What meetings do you specifically recall?  09:49:49
14  A. Which meetings do I specifically recall?   09:49:53
15    Well, it was not uncommon for us to      09:49:59
16    meet with companies at conferences or trade 09:50:01
17    shows. That's what the investment community 09:50:05
18    does. So there could be a Wall Street broker 09:50:10
19    responsive conference, say, in communications 09:50:16
20    and Cisco could be present and we would   09:50:21
21    request a meeting with whoever the Cisco  09:50:24
22    representative was. It could be, case in  09:50:26
23    point, I remember a conference Lehman     09:50:28
24    Brothers sponsored. Mike Volpi was there. 09:50:35
25    We had a chance to sit down with Mike and 09:50:37

44

1     talk to him.                          09:50:40
2   Q. And what did you discuss?             09:50:40
3   A. I can't recall. We discussed Cisco, but the 09:50:43
4     specifics, I can't recall. It goes back so 09:50:46
5     far.                                 09:50:49
6   Q. Do you recall when that meeting was?       09:50:49
7   A. Huh? When?                           09:50:52
8   Q. Yeah.                               09:50:53
9   A. I don't have the exact date. I would have to 09:51:03
10    guess. I covered Cisco for a short period of 09:51:05
11    time so....                          09:51:09
12  Q. And during -- can you define that period? 09:51:10
13  A. Huh?                                09:51:13
14  Q. When you say short period of time, what    09:51:16
15    period are you referring to?             09:51:17
16  A. I'm referring fall '98 through March 2000. 09:51:19
17    That's a rough time frame.               09:51:22
18  Q. But then they were also in your portfolio  09:51:24
19    after that; is that right?               09:51:26
20  A. Excuse me?                           09:51:27
21  Q. Cisco was also in your portfolio after that 09:51:28
22    time; isn't that right?                  09:51:31
23  A. Yeah. But what would happen is the analyst 09:51:32
24    would often serve as a primary point contact 09:51:35
25    and then fund managers, if an analyst had a 09:51:38

45

1     meeting with a particular company executive, 09:51:42
2     fund managers could participate.          09:51:46
3   Q. And how long were you a portfolio manager? 09:51:49
4   A. How long? I still am.                 09:51:52
5   Q. And are you --                        09:51:54
6   A. Not on the science and technology.        09:51:55
7   Q. Okay.                               09:51:57
8     How long were you a portfolio manager 09:51:58
9     in the science and technology industry?   09:52:00
10  A. Approximately a year and a half, two years. 09:52:08
11  Q. Do you recall meeting with John Chambers? 09:52:17
12  A. Yes.                                09:52:20
13  Q. On how many occasions did you meet with him? 09:52:20
14  A. How many occasions? I can't recall.       09:52:23
15    Multiple.                             09:52:26
16  Q. More than five?                       09:52:30
17  A. Possible.                            09:52:30
18  Q. Do you have any specific recollection of any 09:52:31
19    one of those meetings?                   09:52:33
20  A. Yes.                                09:52:37
21  Q. And what's your recollection?           09:52:38
22  A. I believe in January 1999 MFS actually made a 09:52:48
23    trip out to Cisco to meet with a variety of 09:52:53
24    people. John Chambers was one of the key  09:52:57
25    people we wanted to see, and this was a group 09:52:59

**46**

1  of MFS analysts and portfolio managers and  09:53:01
2  John gave us some time which we appreciated. 09:53:07
3  Q. How much --                              09:53:11
4  A. That's what I recall. We discussed business, 09:53:12
5    what they were doing, but the details, I    09:53:14
6    can't recall.                             09:53:16
7  Q. How much time did he give you?           09:53:17
8  A. John specifically?                       09:53:18
9  Q. Yes.                                     09:53:20
10 A. 45 minutes to an hour.                    09:53:20
11 Q. Did you ask him any specific questions?   09:53:21
12 A. Yes.                                     09:53:24
13 Q. Do you recall what they were?            09:53:26
14 A. No.                                      09:53:27
15 Q. Did you provide him the questions ahead of 09:53:27
16   time?                                     09:53:29
17 A. No. I don't recall -- well, no, I don't   09:53:30
18   think so. I don't recall. It's, it's      09:53:34
19   possible. And the reason why I say that it 09:53:39
20   is, on occasion -- okay. So I deal with    09:53:43
21   hundreds of companies over the course of my 09:53:46
22   investment career and there are times when 09:53:50
23   companies will ask you to provide them with 09:53:53
24   some basic topics you may want to discuss. 09:53:54
25   So I can't recall if Cisco was one of them, 09:53:58

**47**

1  but it's not uncommon.                      09:54:00
2  Q. Do you recall any other meetings with John 09:54:12
3    Chambers?                                 09:54:14
4  A. Yes.                                     09:54:21
5  Q. And what else do you recall?             09:54:22
6  A. This was as a member of an investment group, 09:54:27
7    this is the only one that jumps out. This  09:54:35
8    was a Morgan Stanley technology conference, I 09:54:38
9    believe, in 1999 where John was a keynote  09:54:41
10   speaker addressing a variety of -- I mean, a 09:54:44
11   couple hundred industry professionals. So it 09:54:47
12   wasn't a one-on-one meeting. I just for some 09:54:49
13   reason I just recall that.                 09:54:53
14 Q. Do you recall any other one-on-one meetings 09:54:54
15   with John Chambers?                       09:54:56
16 A. No.                                      09:54:57
17 Q. Do you recall what he discussed at the    09:54:58
18   technology conference, the Morgan Stanley  09:55:00
19   technology conference?                    09:55:02
20 A. Yes, vaguely.                            09:55:08
21 Q. And what do you recall?                   09:55:09
22 A. It was not uncommon for John to discuss the 09:55:13
23   internet and what was so unique about it and 09:55:18
24   how it would change how we communicate,    09:55:26
25   service. So he's a big believer in the     09:55:31

**48**

1  internet as a significant change in the      09:55:35
2  economy. He'd talk about the -- they used to 09:55:42
3  call it the internet tornado or something    09:55:50
4  like that. Tidal wave, I don't know.        09:55:55
5  Q. Tornado, is that what you said?           09:55:56
6  A. Excuse me?                               09:55:58
7  Q. The internet tornado or tidal wave?       09:55:59
8  A. I think, yeah.                           09:56:03
9  Q. And what did that refer to?              09:56:04
10 A. Just that it's a whirlwind of change, it's 09:56:06
11   moving so quickly that you have to adapt or 09:56:08
12   you'll fall behind.                       09:56:11
13 Q. Do you recall any other meetings with John 09:56:13
14   Chambers?                                 09:56:14
15 A. John on occasion would come to Boston and  09:56:15
16   meet with investors. So, there were times  09:56:19
17   when he came in-house.                    09:56:21
18 Q. And when were those meetings to the best of 09:56:22
19   your recollection?                        09:56:24
20 A. Excuse me? When? I cannot recall. It had  09:56:26
21   to have been during that time frame.       09:56:31
22 Q. Were those one-on-one meetings as well?    09:56:32
23 A. Yes, I mean, that would be -- he would come 09:56:40
24   to MFS.                                   09:56:43
25 Q. And do you recall you had one-on-one meetings 09:56:47

**49**

1  with him during this time frame in Boston?   09:56:50
2  A. I'm trying to -- I cannot recall.        09:56:56
3  Q. Okay.                                    09:56:58
4  A. Physically. I just do know that infrequently 09:56:59
5    he would get around. Other Cisco executives 09:57:02
6    would get around as well to meet with       09:57:05
7    investors. Not a lot. But like any company, 09:57:06
8    they would do that.                       09:57:09
9  Q. Do you recall any meetings in 2000 with John 09:57:10
10   Chambers?                                 09:57:13
11 A. In 2000? No.                            09:57:14
12 Q. And do you recall any meetings in 2001 with 09:57:15
13   John Chambers?                           09:57:19
14 A. No, I can't. I cannot recall.            09:57:20
15 Q. Were you aware of any one-on-one meetings   09:57:21
16   that anyone else had from MFS with John    09:57:24
17   Chambers during the relevant period?       09:57:28
18 A. The relevant period being what again?     09:57:32
19 Q. It's August 1, '99 to March 31, 2001.    09:57:37
20 A. 2001. Do I recall? No. But it's possible  09:57:42
21   there were other meetings. It's not uncommon 09:57:46
22   for a portfolio manager to, outside of the  09:57:49
23   analyst, communication to meet with a       09:57:53
24   company. Whether John, I doubt it.         09:57:57
25 Q. When you met with John Chambers, did you take 09:58:00

50

1   notes?                                        09:58:02
2   A. Yes.                                       09:58:03
3   Q. And do you know what happened to those notes? 09:58:04
4   A. No.                                        09:58:06
5   Q. Do you currently possess them?            09:58:07
6   A. Do I currently possess them? No, I gave all 09:58:09
7      my notes over to you guys.                09:58:13
8   Q. I wish that were true. But you collected  09:58:15
9      those notes responsive to the subpoena, is 09:58:18
10     that what you mean to say?                09:58:22
11  A. Yes.                                       09:58:23
12  Q. And that included notes of your meetings with 09:58:23
13     John Chambers; is that right?             09:58:27
14  A. Again, I collected everything I had and   09:58:28
15     provided it, what I had.                  09:58:33
16  Q. And you did at one time possess notes of your 09:58:35
17     meetings with John Chambers, right?       09:58:39
18  A. Yes.                                       09:58:41
19  Q. Do you have any reason to believe that those 09:58:42
20     notes weren't contained in the materials that 09:58:43
21     you collected to respond to the subpoena?  09:58:46
22  A. Were not contained in the materials that you 09:58:51
23     collected. Again, I collected what I had and 09:58:53
24     I had to review what I had. So, I do recall 09:58:56
25     that there were some notes, keynotes rather 09:59:01

51

1      than to Supercomm or Worldnet Interop where 09:59:05
2      John was keynote speaker and I was taking 09:59:11
3      notes. But, again, I said earlier that    09:59:13
4      analysts pass on their files to other      09:59:15
5      analysts and I think that there was -- when I 09:59:18
6      went first looking through my Cisco notes, it 09:59:23
7      surprised me that I really had very little. 09:59:26
8      So I assumed it must have gone to Kate and 09:59:29
9      Dan.                                       09:59:33
10  Q. Okay.                                      09:59:33
11     And to the best of your knowledge,        09:59:33
12     Kate searched for those notes as well; is 09:59:35
13     that right?                               09:59:38
14  A. To the best of my knowledge, yes.         09:59:38
15  Q. Do you have any specific recollection of  09:59:40
16     excising the notes you took from your     09:59:42
17     meetings with John Chambers from the      09:59:44
18     materials that you maintained relative to 09:59:46
19     Cisco?                                    09:59:48
20         MS. SIMPSON JONES: Objection.         09:59:49
21  A. Any specific. Please explain.             09:59:50
22  Q. You don't have any reason to think that you 09:59:52
23     deliberately didn't include notes with John 09:59:54
24     Chambers in the notes that you collected in 09:59:57
25     responsive to the subpoena, do you?       09:59:59

52

1   A. Again, I provided everything I had.       10:00:01
2   Q. Okay.                                     10:00:03
3      Which would have included notes taken 10:00:03
4      with John Chambers; is that right?        10:00:05
5   A. If there were, yes.                       10:00:07
6   Q. Do you recall having one-on-one meetings with 10:00:19
7      anyone else other than John Chambers?     10:00:26
8   A. Yes.                                      10:00:28
9   Q. Who was that?                             10:00:29
10  A. Mike Volpi.                               10:00:30
11  Q. What do you recall about those meetings?  10:00:32
12  A. Again, I mentioned -- I know I met with him 10:00:36
13     at a Lehman Brothers conference and we just 10:00:39
14     discussed whatever was current for Cisco or 10:00:44
15     whatever I was working on.                10:00:49
16  Q. Do you recall any other meetings with him? 10:00:50
17  A. With Mike? No, that's the only one that   10:00:52
18     jumps out.          ·                     10:00:55
19  Q. Why were you meeting with mike?           10:00:56
20  A. Hum? Why? He was the Cisco person that was 10:00:58
21     going to be down there.                   10:01:02
22     These conferences, for clarity -- so,  10:01:04
23     let's take this Lehman Brothers conference. 10:01:09
24     So Nortel, Lucent, Cisco, lots of small   10:01:11
25     companies, usually one representative and an 10:01:15

53

1      investor relations person would attend. They 10:01:19
2      would not -- it would be a waste of time for 10:01:22
3      the entire management team to come out. So, 10:01:25
4      I know that Mike was coming out for Cisco. 10:01:28
5      And that hey he would be a good person to 10:01:31
6      talk to.                                  10:01:34
7   Q. What was Mike's position at the time you were 10:01:34
8      meeting with him to the best of your      10:01:36
9      knowledge?                                10:01:38
10  A. I don't know. It changed a few times. So I 10:01:38
11     can't recall exactly what his position was 10:01:41
12     then.                                     10:01:43
13  Q. What was his expertise at the time you were 10:01:43
14     meeting to the best of your knowledge?    10:01:46
15  A. How do you define expertise?              10:01:48
16  Q. The same way you defined it earlier. I can 10:01:50
17     restate the question. There's nothing tricky 10:01:53
18     about this. I just -- obviously you were 10:01:56
19     meeting with him because he knew something 10:01:57
20     about Cisco; isn't that true?             10:02:00
21  A. Mike's expertise to the best of my        10:02:02
22     recollection at that time, he was very    10:02:06
23     knowledgeable about Cisco and the technology. 10:02:07
24     Which area he was focused on at that point in 10:02:12
25     time, I can't recall.                     10:02:15

**54**

```
 1  Q. Okay.                        10:02:16
 2  A. If he had a group focus, we probably focused  10:02:16
 3     on what that was. It could have been         10:02:20
 4     switching, storage, whatever.       10:02:23
 5  Q. Do you recall any specific questions that you  10:02:27
 6     had for Mike?                      10:02:28
 7  A. No.                           10:02:29
 8  Q. Do you recall on how many occasions you met  10:02:33
 9     with him in the year 1999?          10:02:35
10  A. Again, if I -- if that Lehman Brothers       10:02:41
11     conference is right timing-wise and it was in  10:02:44
12     '99 or 2000, I met with him then, I know     10:02:49
13     that.                            10:02:54
14  Q. Okay.                         10:02:54
15  A. Outside of that, I can't recall.   10:02:55
16  Q. Okay.                         10:02:56
17     Let's say for during the time period   10:02:57
18     you were an analyst, do you think you met    10:02:59
19     with him one-on-one on more than ten        10:03:01
20     occasions?                       10:03:04
21  A. Oh, not ten.                   10:03:07
22  Q. More or fewer?                  10:03:10
23  A. No, not more than ten. No.        10:03:11
24  Q. Okay.                         10:03:13
25  A. Mike specifically?              10:03:14
```

**55**

```
 1  Q. Yes.                          10:03:15
 2  A. Definitely not more than ten.     10:03:16
 3  Q. Okay.                         10:03:18
 4  A. Less than ten. It was less than ten.   10:03:18
 5  Q. More than five?                 10:03:21
 6  A. One on one? Probably not.         10:03:22
 7  Q. So more than two?               10:03:26
 8  A. Possible. I mean, five or less.    10:03:30
 9  Q. Okay.                         10:03:33
10     Do you recall meeting with Kevin     10:03:34
11     DeNuccio as well?                 10:03:41
12  A. Yes.                          10:03:44
13  Q. How many meetings did you have with him?   10:03:44
14  A. I recall one.                  10:03:47
15  Q. And when was that?              10:03:49
16  A. It was at Supercomm an industry trade show.  10:03:52
17     I believe -- Supercomm tends to be in June  10:04:02
18     each year. I believe it was June '99 or June  10:04:06
19     2000. Probably June '99. That's to my --   10:04:10
20  Q. And did you meet with Kevin DeNuccio on any  10:04:13
21     other occasion to the best of your          10:04:16
22     recollection?                    10:04:17
23  A. I can't recall.                10:04:18
24  Q. What about Kevin Kennedy?          10:04:25
25  A. May I back up?                 10:04:28
```

**56**

```
 1  Q. Okay, please.                  10:04:30
 2  A. Kevin left Cisco at one point in time. The  10:04:33
 3     exact date, I cannot recall.       10:04:37
 4  Q. Do you recall why he left?        10:04:38
 5  A. No. He took a senior position in another  10:04:40
 6     company. I forget which one. He may have  10:04:44
 7     come through in 2001 with his new company or  10:04:46
 8     2002, met with him then, that was it.     10:04:49
 9  Q. Did you ever hear any rumors as to why Kevin  10:04:54
10     DeNuccio left?                   10:04:58
11  A. No. To the best of my knowledge, no.    10:04:59
12        MS. SIMPSON JONES: Would now be a  10:05:13
13     good time to take a break?         10:05:14
14        MS. WEAVER: Sure, that's fine.    10:05:15
15        THE VIDEOGRAPHER: The time is     10:05:18
16     10:03. We are off the record.      10:05:19
17        (A short recess was taken.)      10:05:23
18        THE VIDEOGRAPHER: The time is     10:12:13
19     10:10. We are on the record.       10:12:14
20  Q. Other than the Supercomm conference, do you  10:12:16
21     recall any other meetings with Kevin       10:12:19
22     DeNuccio?                        10:12:21
23  A. If I back up, earlier as I recall, he came in  10:12:23
24     representing another company at some point in  10:12:29
25     time. I don't know if it was within the    10:12:31
```

**57**

```
 1     specified time period.             10:12:32
 2  Q. What company was that?            10:12:33
 3  A. I don't know. I can't recall.     10:12:34
 4  Q. Do you recall meeting with anyone else from  10:12:43
 5     Cisco during the time that you were a        10:12:46
 6     research analyst?                 10:12:49
 7  A. Yes.                          10:12:50
 8  Q. Who else?                      10:12:51
 9  A. Kevin Kennedy, Judith Estrin, Charlie -- oh.  10:12:55
10     Charlie Giancarlo. Some guy named -- I      10:13:08
11     believe it's Mario Mazzola. I can't remember  10:13:16
12     his name exactly.                 10:13:21
13  Q. Mario Mazzola?                  10:13:22
14  A. Yeah -- yes.                   10:13:24
15     And they were junior people whose     10:13:25
16     names I can't recall.             10:13:29
17  Q. Were each of these separate one-on-one       10:13:29
18     meetings?                        10:13:32
19  A. Some yes, some no.               10:13:33
20  Q. What do you recall about meeting with Kevin  10:13:34
21     Kennedy?                         10:13:38
22  A. Kevin was part of the -- part of our schedule  10:13:39
23     where MFS went out and visited the company,  10:13:46
24     if I recall correctly, in January '99. He   10:13:48
25     was one of the people on our agenda. I do   10:13:51
```

**58**

1   remember that meeting.                          10:13:54
2   Q. And what do you remember about it?           10:13:56
3   A. That I met with him.                         10:13:58
4   Q. Do you recall what you discussed?            10:14:00
5   A. Well, Kevin was in charge of the telecom     10:14:05
6      business for Cisco, so -- which was an area  10:14:08
7      they were trying to build. And so we must    10:14:15
8      have discussed the telecom business.         10:14:20
9   Q. And do you recall generally what he said     10:14:22
10     about the telecom business?                  10:14:26
11  A. I can't recall.                              10:14:27
12  Q. Was he saying good things or bad things about 10:14:28
13     Cisco's telecom business?                    10:14:30
14  A. Good things or bad things? Most Cisco        10:14:33
15     executives would say good things.            10:14:37
16  Q. So the answer is that he would -- he was     10:14:39
17     reporting favorably on Cisco's telecom       10:14:42
18     business; is that correct?                   10:14:45
19  A. I believe so, yes.                           10:14:45
20  Q. Do you recall anything else that you         10:14:47
21     discussed with him?                          10:14:49
22  A. Recall what, please?                         10:14:50
23  Q. I'm sorry. Anything else?                    10:14:52
24  A. Let me.                                      10:14:54
25  Q. Yeah, I'm sorry.                             10:14:55

**59**

1   A. I do not.                                    10:14:56
2   Q. Other than that meeting in 1999, do you      10:14:59
3      recall any other meetings with him?          10:15:06
4   A. No.                                          10:15:09
5   Q. And what do you recall about meeting with    10:15:12
6      Judy Estrin?                                 10:15:14
7   A. We met with Judith as well. I believe --     10:15:20
8      shoot. I believe it was -- she did a keynote 10:15:29
9      at Supercomm and Networth Interop, I can't   10:15:37
10     recall, addressing hundreds of people. And   10:15:42
11     then we also had a one-on-one with her at one 10:15:44
12     point in time and I can't recall the exact   10:15:47
13     date.                                        10:15:49
14  Q. Do you recall what you discussed with her?   10:15:49
15  A. No.                                          10:15:52
16  Q. Do you recall what her position was?         10:15:54
17  A. I believe at that point in time she was the  10:15:57
18     chief technology officer.                    10:16:00
19  Q. Did you discuss technology with her?         10:16:01
20  A. Of course, yeah.                             10:16:03
21  Q. Do you recall whether or not -- well, strike 10:16:04
22     that. Is it your recollection that Judith    10:16:07
23     Estrin represented Cisco's technology as     10:16:10
24     favorable?                                   10:16:14
25  A. There are actually two sides to that answer: 10:16:31

**60**

1      Yes and no.                                  10:16:33
2   Q. And what facts support the yes?              10:16:34
3   A. Facts. Judith was instrumental in really     10:16:38
4      launching the internet. So she was really a  10:16:45
5      big believer in the internet. But facts      10:16:47
6      supporting that.                             10:16:51
7   Q. I just want you to explain your answer.      10:16:51
8   A. Excuse me?                                   10:16:54
9      Well, two things: On the yes, Judith         10:16:57
10     was a big believer in data trafficking,      10:17:03
11     internet protocol, you know. So, like I      10:17:08
12     said, a big believer in the internet.        10:17:14
13     On the no side, she was always very          10:17:18
14     candid about things. And I think they        10:17:21
15     believed that there were things that the     10:17:26
16     company, like any company would have to      10:17:28
17     continue to innovate going forward and that  10:17:29
18     would be a challenge for anybody.            10:17:32
19  Q. Do you recall what she was candid about?     10:17:33
20  A. Not specifically other than what I just      10:17:38
21     mentioned.                                   10:17:41
22  Q. And what specific things were a challenge for 10:17:42
23     Cisco that she was referring to?             10:17:45
24  A. I can't, I can't put it into the context that 10:17:53
25     she was referring. I would just go back to   10:17:57

**61**

1      the statement that I think a lot of people in 10:18:02
2      the technology industry have a healthy       10:18:07
3      paranoia about the business and they don't   10:18:10
4      get too complacent and they have to keep     10:18:12
5      moving forward.                              10:18:15
6   Q. And you think that was a view that Judith    10:18:15
7      Estrin expressed to you?                     10:18:19
8   A. Yeah. I mean and it was not uncommon. I get  10:18:21
9      that from a lot of technology executives.    10:18:25
10  Q. Do you have any recollection of anything else 10:18:28
11     about your meeting with Judith Estrin?       10:18:31
12  A. No. It's just a very generic recollection.   10:18:33
13  Q. Do you recall any other meetings with her?   10:18:38
14  A. No. Just the keynote I mentioned.            10:18:40
15  Q. Okay.                                        10:18:44
16  A. That was not one on one.                     10:18:44
17  Q. What do you recall about meeting with -- is  10:18:46
18     it Mike Giancarlo?                           10:18:50
19  A. Charlie Giancarlo.                           10:18:52
20  Q. Charlie Giancarlo, right.                    10:18:54
21     What do you recall the meeting with          10:18:55
22     Charlie Giancarlo?                           10:18:56
23  A. I just know that we met with him. I can't    10:18:59
24     even recall if it was in that time period.   10:19:02
25     If I recall correctly, he was in and out of  10:19:07

**62**

1    the company, so....                    10:19:09
2    Q. And when you say he was in and out of the    10:19:14
3       company, what do you mean?              10:19:16
4    A. I believe, I could be wrong, that he was with 10:19:18
5       a company for a period of time, left. I    10:19:22
6       don't know if it was another company or     10:19:28
7       start-up or something, came back. Or I could 10:19:31
8       have it wrong. It could have been somebody  10:19:34
9       else.                                 10:19:36
10   Q. Do you recall what you discussed with him?  10:19:37
11   A. No.                                 10:19:40
12   Q. What about meeting with Mario Mazzola, what  10:19:44
13      do you recall about that?              10:19:47
14   A. I don't know. It's just a name that I      10:19:48
15      remember.                           10:19:50
16   Q. With regard to all of the meetings with     10:19:52
17      individuals that we've discussed over the   10:19:55
18      past half an hour or so, did you take notes 10:19:57
19      during those meetings?                10:19:59
20   A. Yes.                               10:20:00
21   Q. And those notes again would have been      10:20:02
22      maintained in your files which were then    10:20:05
23      passed on to Kate; is that correct?       10:20:08
24   A. Yes, they should have been.            10:20:10
25   Q. Okay.                             10:20:21

**63**

1       What's your current position?         10:20:21
2    A. Position? Title Senior Vice President. I'm 10:20:25
3       a portfolio manager.                  10:20:30
4    Q. And when did you obtain that title?       10:20:32
5    A. Actually, I don't know. I can't, I don't -- 10:20:39
6       two years ago, three years ago.         10:20:42
7    Q. And what are your current duties and        10:20:45
8       responsibilities?                    10:20:48
9    A. I am portfolio manager of the MFS mid cap   10:20:51
10      growth fund. Portfolio manager of MFS new   10:20:56
11      endeavor. Portfolio manager MFS emerging    10:21:11
12      growth.                             10:21:13
13      (Clarification by the reporter.)
14   A. I head up the MFS small and mid cap       10:21:15
15      investment team, and I'm a member of the    10:21:17
16      investment management -- excuse me, the    10:21:22
17      equity management committee.            10:21:25
18   Q. And do you personally have holdings in any of 10:21:29
19      the funds that you manage?              10:21:31
20   A. Yes.                               10:21:33
21   Q. Which are those?                    10:21:33
22   A. MFS emerging growth, MFS new endeavor and MFS 10:21:36
23      investment mid cap growth which are all the  10:21:48
24      funds I manage.                      10:21:51
25      (Clarification by the reporter.)    10:21:52

**64**

1    Q. Do you have any holdings in MFS high yield   10:21:52
2       fund?                               10:21:58
3    A. Do I have any holdings in the MFS high yield 10:21:58
4       fund? Currently.                     10:22:01
5    Q. Currently?                          10:22:07
6    A. I don't think so.                     10:22:09
7    Q. Did you at any point in time?            10:22:10
8    A. Yes.                               10:22:12
9    Q. And when was that?                   10:22:14
10   A. Wow. I'm guessing -- I'm going to -- I know 10:22:17
11      I owned it at some point in 2002, possibly   10:22:30
12      2001.                               10:22:33
13   Q. And --                            10:22:36
14   A. Maybe even 2003.                    10:22:37
15   Q. And what about the time period 1999 forward? 10:22:40
16   A. I can't recall.                      10:22:43
17   Q. What about the MFS fundamental growth fund.  10:22:44
18      Did you have holdings in that?           10:22:48
19   A. Do I have holdings in that?            10:22:49
20   Q. Did you have holdings in that?           10:22:51
21   A. Yes, I did.                        10:22:52
22   Q. And does it exist currently?            10:22:53
23   A. No.                               10:22:55
24   Q. When was it liquidated?               10:22:56
25   A. Either fall of 2004 or June of 2004.      10:23:04

**65**

1    Q. Of all the funds that we just discussed, how 10:23:11
2       many of those hold Cisco Securities?      10:23:14
3    A. Today?                            10:23:21
4    Q. Yes, today.                        10:23:22
5    A. I believe one.                      10:23:34
6    Q. And which one was that?               10:23:36
7    A. MFS emerging growth would be the only one   10:23:37
8       that holds Cisco securities.            10:23:42
9    Q. And do you recall the volume of those       10:23:46
10      holdings?                           10:23:47
11   A. No.                               10:23:48
12      May I back up?                     10:23:50
13   Q. Yes.                               10:23:51
14   A. As fund manager MFS emerging growth, I act as 10:23:52
15      the backup.                         10:23:59
16   Q. What does that mean?                 10:23:59
17   A. Technically on the -- technically in the    10:24:00
18      prospectus the lead manager is Eric Fishman 10:24:03
19      one of my colleagues.                 10:24:08
20      (Clarification by the reporter.)
21   A. I lead manage them at the mid cap growth   10:24:11
22      fund. Eric is the backup on that. So, when 10:24:15
23      you ask -- technically ask me which funds I'm 10:24:18
24      a fund manager on, I'm on both of those.    10:24:21
25   Q. So currently how many funds in which you have 10:24:25

**66**

1   holdings hold Cisco stock?   10:24:29
2   A. Only emerging growth can.   10:24:34
3   Q. And what's the value of your holdings in that 10:24:36
4   fund?   10:24:38
5   A. I can't recall.   10:24:38
6   Q. Is it more than $500,000?   10:24:39
7   A. Again, I can't recall.   10:24:43
8   Q. Is it more than $5 million?   10:24:44
9   A. If it was owned today it was more than 500K. 10:24:50
10   Q. Is it more than a million?   10:24:54
11   A. Let me back up.   10:25:02
12     You're referring to one fund, okay.   10:25:03
13   MFS emerging growth has, we manage the pool 10:25:08
14   of assets across a variety of accounts. So 10:25:11
15   there's a certain dollar amount across   10:25:15
16   everything. So it's easier to look at it as 10:25:17
17   what would the dollar value be across all the 10:25:20
18   products. That's why I'm getting those   10:25:23
19   stuck. If you say -- because if you just   10:25:26
20   talk about emerging growth, it could be just 10:25:27
21   one silo. There are multiple silos. So   10:25:30
22   there are currently holds, it would be in the 10:25:36
23   multiple million dollars range. Because his 10:25:38
24   total assets under management are   10:25:41
25   approximately six billion.   10:25:43

**67**

1   Q. Just to be clear, are you talking about your 10:25:45
2   personal holdings in that fund?   10:25:47
3   A. Let me back up.   10:25:52
4     Oh, what is the value? Oh, no. 1   10:25:56
5   have this wrong.   10:25:58
6   Q. All right.   10:26:00
7   A. May I go off the record?   10:26:01
8   Q. Sure.   10:26:05
9   A. I was answering a different question.   10:26:06
10     THE VIDEOGRAPHER: The time is   10:26:06
11   10:24. We are off the record.   10:26:08
12     (Whereupon, a discussion was   10:26:33
13     held off the record.)   10:26:38
14     THE VIDEOGRAPHER: The time is   10:26:38
15   10:25. We're back on the record.   10:26:39
16   Q. I'll ask the question again.   10:26:41
17   A. Sure.   10:26:43
18   Q. And then you can clarify.   10:26:43
19     What is the value of your personal   10:26:45
20   holdings in any fund that also holds Cisco 10:26:47
21   stock currently?   10:26:51
22   A. My personal holdings? Do I have to disclose 10:26:52
23   that?   10:26:58
24   Q. Yes.   10:26:59
25   A. The value of my personal holdings in the fund 10:27:02

**68**

1   that would own Cisco is, is approximately   10:27:07
2   200,000.   10:27:09
3   Q. And what is the value of the Cisco stock that 10:27:11
4   is held in that fund?   10:27:15
5   A. I -- yeah, again.   10:27:18
6   Q. Is that your estimate, it might be two   10:27:19
7   million?   10:27:22
8   A. It would be multiple millions.   10:27:23
9   Q. Okay.   10:27:28
10     During the time that you were a   10:27:28
11   research analyst, did you have any personal 10:27:30
12   holdings in a fund that also held Cisco   10:27:33
13   stock?   10:27:35
14   A. Yes.   10:27:36
15   Q. And what funds were those?   10:27:37
16   A. Oh, I'm going back a long ways here. I know 10:27:41
17   the science and technology fund was one.   10:27:48
18   There are other funds that owned it, but I 10:27:57
19   can't recall actually who was holding those 10:28:00
20   funds.   10:28:02
21   Q. During the time you were a research analyst, 10:28:03
22   what was the total value of your holdings in 10:28:06
23   funds that held Cisco stock?   10:28:08
24   A. I can't recall.   10:28:10
25   Q. Was it more than $200,000?   10:28:11

**69**

1   A. No.   10:28:15
2   Q. Was it less than $100,000?   10:28:16
3   A. Possibly. This is all to the best of my   10:28:21
4   recollection.   10:28:23
5   Q. From August 1, 1999 to March 31, 2001, did 10:28:32
6   you have any shares of Cisco stock?   10:28:38
7   A. No.   10:28:40
8   Q. And why was that?   10:28:41
9   A. Why was that? I guess the best answer is our 10:28:45
10   fiduciary responsibilities are to our   10:28:55
11   shareholders. I have a personal approach to 10:28:58
12   if I'm going to invest in securities on an 10:29:01
13   individual basis, it would be very limited. 10:29:03
14   Q. And can you explain that, why that is?   10:29:06
15   A. Why that is? To remove any potential   10:29:09
16   conflict of interest.   10:29:13
17   Q. So in your professional opinion, it would be 10:29:14
18   a conflict of interest for you to hold the 10:29:17
19   stock of an individual company while you were 10:29:20
20   advising your clients about investments in 10:29:24
21   that stock; is that correct?   10:29:27
22     MS. SIMPSON JONES: Objection.   10:29:28
23   A. It depends on the situation.   10:29:28
24     THE WITNESS: Go ahead.   10:29:29
25     MS. SIMPSON JONES: You can answer. 10:29:30

70

1    But I just wanted to put an objection on the    10:29:32
2    record.    10:29:33
3    A. It depends on the situation.    10:29:35
4    Q. Isn't that the reason that you didn't hold    10:29:37
5    Cisco stock?    10:29:39
6    A. Yeah.    10:29:40
7    Q. During the relevant period how were you    10:30:00
8    compensated at MFS?    10:30:02
9    A. The process or the dollar amount?    10:30:10
10    Q. The process.    10:30:14
11    A. We are -- we were given a base salary and    10:30:17
12    then we have incentive compensation which is    10:30:24
13    really based on objective and subjective    10:30:26
14    performance.    10:30:29
15    Q. This is during the time that you were a    10:30:31
16    research analyst, right?    10:30:33
17    A. Yes.    10:30:35
18    Q. And also a portfolio manager?    10:30:36
19    A. Yes.    10:30:38
20    Q. And can you explain the incentive    10:30:38
21    compensation?    10:30:41
22    A. How so?    10:30:41
23    Q. What were the factors that played into the    10:30:42
24    objective analysis?    10:30:44
25    A. Oh, the objective and subjective?    10:30:46

71

1    Q. Yes.    10:30:49
2    A. Subjective elements are based on, excuse me,    10:30:50
3    internal review by peers, the manager. So,    10:30:56
4    analysts and fund managers would evaluate you    10:31:01
5    based on a variety of variables.    10:31:04
6    Objectively, basically, your    10:31:07
7    performance as a stock picker and any    10:31:09
8    contributions to certain funds.    10:31:12
9    Q. Are you familiar with the term buy side?    10:31:24
10    A. Yes.    10:31:26
11    Q. What does that mean?    10:31:27
12    A. What does buy side mean? Buy side means the    10:31:29
13    buy side. No, buy side is -- refers to    10:31:32
14    investment managers, people investing money    10:31:36
15    for individuals, endowments, pensions, the    10:31:40
16    like.    10:31:44
17    Q. Are you familiar with the term sell side?    10:31:44
18    A. Yes.    10:31:47
19    Q. And what does that refer to?    10:31:48
20    A. Sell side refers to Wall Street, the brokers.    10:31:49
21    Q. Do you have an understanding or belief as you    10:31:52
22    sit here today as to whether or not buy side    10:31:56
23    analysts are more objective than sell side    10:31:58
24    analysts?    10:32:02
25    A. As a belief I say yes.    10:32:03

72

1    Q. And why is that?    10:32:05
2    A. Well, buy side analysts -- all right, there    10:32:10
3    are two things:    10:32:15
4    One, there's been a long-standing    10:32:17
5    concern about conflict of interest on the    10:32:20
6    sell side because a lot of companies that    10:32:22
7    they represent and promote stock-wise are    10:32:25
8    clients of theirs.    10:32:32
9    On the buy side it's a little bit    10:32:34
10    different -- it's a lot different. We are    10:32:37
11    investing the money of our shareholders to    10:32:39
12    drive portfolio performance that rewards them    10:32:43
13    over time. So we don't have a conflict of    10:32:47
14    interest in terms of the companies we're    10:32:50
15    investing in. We really don't hold -- we're    10:32:52
16    trying to drive performance for our    10:32:58
17    shareholders.    10:33:01
18    Q. And what is the basis -- strike that.    10:33:06
19    And that observation is based on your    10:33:10
20    experience on the buy side; is that correct?    10:33:14
21    MS. SIMPSON JONES: Objection.    10:33:17
22    Go ahead.    10:33:19
23    A. Yes.    10:33:20
24    Q. Did you work at Lehman Brothers prior to    10:33:27
25    joining MFS?    10:33:30

73

1    A. Yes.    10:33:31
2    Q. For how long did you work there?    10:33:31
3    A. Two years.    10:33:33
4    Q. Was that on the sell side as well?    10:33:33
5    A. Yes.    10:33:41
6    Q. So, actually, you've had experience on both    10:33:43
7    the sell side and the buy side, haven't you?    10:33:45
8    A. Yes. My experience on the sell side was not    10:33:48
9    in the research capacity.    10:33:54
10    Q. And what was your experience at Lehman    10:33:55
11    Brothers?    10:33:58
12    A. I was part of the investment banking division    10:33:58
13    specializing in mergers and acquisitions.    10:34:01
14    Q. Why did you leave Lehman Brothers?    10:34:03
15    A. It was a two-year program.    10:34:05
16    Q. Do you hold any other degrees than those    10:34:08
17    we've discussed today?    10:34:13
18    A. No.    10:34:14
19    Q. Do you hold any professional licenses?    10:34:18
20    A. No.    10:34:20
21    Q. Are you now or have you ever been a member of    10:34:28
22    a board of directors of any company?    10:34:30
23    A. No.    10:34:32
24    Q. During the relevant period, did you have    10:34:45
25    contact with sell side analysts who were    10:34:47

74

1      following Cisco?                    10:34:50
2   A. Yes.                    10:34:51
3   Q. With whom did you have contact?          10:34:52
4   A. If I recall correctly, time period. Tim Luke 10:34:58
5      of Lehman Brothers. Nikos Thesodopoulos of 10:35:06
6      VBS. Chris Depoy of Morgan Stanley. I      10:35:13
7      cannot recall the name of the Merrill Lynch 10:35:24
8      rep and analyst. There are others, I just  10:35:27
9      can't recall them right now.          10:35:31
10  Q. What was your professional opinion of Nikos 10:35:32
11     Thesodopoulos?                10:35:38
12          MS. SIMPSON JONES: Objection.    10:35:38
13  A. What was your professional opinion of --  10:35:44
14  Q. Nikos?                      10:35:48
15  A. -- of Nikos? Define professional opinion,  10:35:49
16     please.                    10:35:53
17  Q. Do you understand what the word professional 10:35:55
18     means?                    10:35:58
19  A. Yeah.                    10:35:59
20  Q. And opinion, do you understand that word?  10:35:59
21  A. Yeah.                    10:36:03
22  Q. Do you know what it means to hold a      10:36:03
23     professional opinion of someone?      10:36:06
24  A. Yeah.                    10:36:07
25  Q. So what was your professional opinion of  10:36:07

75

1      Nikos?                    10:36:09
2          MS. SIMPSON JONES: Objection.    10:36:10
3      You can answer, though.          10:36:13
4   A. Nikos was, I thought, well-versed and    10:36:14
5      well-connected in the industry. There are  10:36:22
6      varying degrees as to why it would work with 10:36:27
7      the sell side. Sometimes it's industry    10:36:31
8      knowledge. We do not use them for stock    10:36:33
9      picking. It's more industry knowledge.    10:36:35
10     Nikos tended to be one of the stronger ones 10:36:37
11     on the industry knowledge side. We did not 10:36:39
12     use them for stock picking. We use them for 10:36:52
13     industry knowledge.              10:36:54
14  Q. Was it your understanding that you were    10:37:03
15     meeting with the Cisco representatives we  10:37:08
16     discussed to learn more about the company to 10:37:10
17     evaluate your investment?          10:37:12
18  A. Yeah.                    10:37:17
19  Q. Do you have a different understanding as to 10:37:19
20     why sell side analysts met with Cisco during 10:37:23
21     the relevant period?              10:37:25
22          MS. JENSEN: Objection. Lacks      10:37:28
23     foundation.                  10:37:29
24          MS. SIMPSON JONES: Objection.    10:37:30
25  A. Yes.                      10:37:31

76

1   Q. And what's your understanding?          10:37:32
2   A. At that point in time most of the sell side 10:37:35
3      people were more interested in building their 10:37:38
4      business. Retaining their client, i.e.    10:37:41
5      Cisco. We were interested in Cisco as a    10:37:46
6      stock and its performance in our portfolios. 10:37:50
7      So I think that's the fundamental difference. 10:37:54
8   Q. When you say retaining their client, what do 10:38:00
9      you mean?                  10:38:02
10  A. Some of these -- well, some of these sell    10:38:03
11     side firms have -- they could advise a    10:38:09
12     company in a variety of things.        10:38:14
13     Underwriting, mergers and acquisitions,    10:38:17
14     advice, capital market advice, placements and 10:38:19
15     the like. Sell side gets paid fees for that. 10:38:25
16     It's a pretty cut-throat business.      10:38:31
17     So, sell side would do their best to  10:38:35
18     retain their clients and also try to grab new 10:38:38
19     clients and Cisco was a high profile client. 10:38:41
20     To my knowledge.              10:38:44
21  Q. Did the sell side analysts you mentioned    10:38:52
22     publish reports on Cisco to the best of your 10:38:56
23     knowledge?                  10:38:59
24  A. Yes.                      10:39:00
25  Q. And these were public reports; isn't that  10:39:00

77

1      right?                      10:39:04
2   A. Yeah, to the best of my knowledge, yes, they 10:39:04
3      were public.                  10:39:07
4   Q. Do you believe that sell side analysts had an 10:39:07
5      incentive to publish favorable reports on  10:39:11
6      Cisco because they wanted to retain Cisco as 10:39:14
7      a client?                  10:39:16
8   A. Retain or gain Cisco, yeah.          10:39:19
9   Q. Does MFS publish public reports on the    10:39:30
10     companies in which it invests?        10:39:36
11  A. No, all internal.              10:39:37
12  Q. Why not?                    10:39:39
13  A. Again, our -- what we consider what we've    10:39:39
14     learned about our companies is proprietary  10:39:45
15     knowledge that we want to leverage for our  10:39:48
16     shareholders. So it does us no good to    10:39:51
17     publish externally. We're either right or  10:39:54
18     we're wrong.                  10:39:59
19  Q. What was your understanding as to why Cisco 10:40:00
20     was meeting with people from MFS during the 10:40:04
21     relevant period?              10:40:08
22  A. Well, they understand that we are a material 10:40:09
23     shareholder of Cisco, and to that extent we 10:40:14
24     own part of the company. So it is in their 10:40:21
25     best interest to meet with their owners over 10:40:24

**78**

1     time.     10:40:40
2   Q. Did you have an understanding during the   10:40:40
3     relevant period as to why Cisco was meeting   10:40:42
4     with sell side analysts?     10:40:46
5         MS. JENSEN: Objection.     10:40:49
6         MS. SIMPSON JONES: Objection.   10:40:50
7         MS. WEAVER: Well, strike that. Let 10:40:52
8     me, let me back up.     10:40:55
9   A. Sure.     10:40:56
10   Q. Did you have knowledge that Cisco met with   10:40:57
11     sell side analysts during the relevant     10:41:00
12     period?     10:41:02
13         MS. JENSEN: Objection.     10:41:03
14   A. They must have.     10:41:03
15   Q. Right.     10:41:04
16         And Lehman Brothers and Morgan Stanley   10:41:04
17     held conferences; isn't that true?     10:41:07
18   A. That's correct.     10:41:09
19   Q. And Cisco Management attended them; is that   10:41:09
20     right?     10:41:11
21   A. Exactly.     10:41:11
22   Q. What was your understanding of the reason   10:41:12
23     Cisco attended those conferences?     10:41:15
24   A. There are several views here, but one is get 10:41:24
25     them in front of investors. The other thing 10:41:26

**79**

1     is I don't know exactly what business     10:41:29
2     discussions they held, but that's the     10:41:34
3     assumption was that it was a chance for them 10:41:35
4     to discuss business.     10:41:38
5   Q. And when you say discuss business, what do   10:41:39
6     you mean?     10:41:41
7   A. Again, I'm guessing here. I don't know what 10:41:44
8     goes on --     10:41:46
9         MS. WEAVER: Let's go off the     10:41:57
10     record.     10:41:58
11         THE VIDEOGRAPHER: The time is     10:42:00
12     10:40. We are off the record.     10:42:01
13         (Whereupon, a discussion was     10:42:05
14     held off the record.)     10:42:08
15         THE VIDEOGRAPHER: The time is     10:42:14
16     10:41. We are on the record.     10:42:30
17   Q. Is it your understanding that Cisco also met 10:42:36
18     with sell side analysts so that they could   10:42:39
19     favorably influence the reports that were   10:42:42
20     written about Cisco?     10:42:44
21   A. It depends.     10:42:47
22   Q. Is that one of the reasons?     10:42:48
23   A. You have to ask them.     10:42:51
24   Q. What would it depend on?     10:42:53
25   A. Let me read the question again.     10:42:59

**80**

1     It depends on the relationship they     10:43:08
2     have with Cisco.     10:43:11
3   Q. Who is they?     10:43:12
4   A. The sell side.     10:43:14
5   Q. And what about the relationship depends on   10:43:16
6     it?     10:43:18
7   A. Excuse me?     10:43:18
8   Q. What about the relationship does it depend   10:43:19
9     on?     10:43:23
10   A. I can't -- I can't, I can't -- it's hard for 10:43:24
11     me to say why they were meeting, what they   10:43:30
12     were meeting about. The assumption is is   10:43:34
13     that if Cisco was or was not a client, they   10:43:39
14     would be discussing opportunities for     10:43:43
15     financing, restructuring, acquisitions, the   10:43:45
16     like. Those are all assumptions.     10:43:49
17   Q. But based on your knowledge of the industry, 10:43:51
18     isn't it true that companies such as Cisco   10:43:53
19     did business with sell side analysts?     10:43:59
20   A. Yeah.     10:44:02
21         MS. JENSEN: Objection.     10:44:03
22   A. Sell side analysts also write very     10:44:03
23     unfavorable reports on companies, too.     10:44:09
24   Q. During the relevant period do you recall any 10:44:11
25     sell side analysts who were writing     10:44:17

**81**

1     unfavorable reports about Cisco?     10:44:22
2         During the relevant period do you
3     recall any sell side analysts who were
4     writing any unfavorable reports about Cisco?
5     Unfavorable.     10:44:23
6   A. Unfavorable?     10:44:23
7   Q. Yes.     10:44:26
8   A. I'm assuming that there were favorable and   10:44:26
9     unfavorable reports written in that time     10:44:29
10     period.     10:44:31
11   Q. Why are you assuming that?     10:44:31
12   A. If you just based on experience no matter   10:44:33
13     what most time periods I can look at as a   10:44:36
14     portfolio manager or research analyst,     10:44:40
15     there's always going to be two opinions on   10:44:43
16     the stock, favorable and unfavorable.     10:44:45
17   Q. Do you have any specific recollection of any 10:44:47
18     unfavorable reports that were written about   10:44:50
19     Cisco during this time period?     10:44:52
20   A. I don't.     10:44:54
21   Q. Of the sell side analysts you named earlier, 10:44:56
22     do you recall if any of them thought Cisco   10:45:00
23     stock was a good buy during the relevant   10:45:04
24     period?     10:45:07
25   A. Most did.     10:45:09

82

1   Q. And why was that?                     10:45:11
2   A. Again, I don't go into -- first of all, when 10:45:17
3       we look at sell side research, we take the   10:45:24
4       opinion and put it aside. Okay. So, you     10:45:27
5       know, it's not uncommon for a sell side      10:45:30
6       person to have a buy on the stock forever.   10:45:32
7       That's happened. Or sell end stock forever. 10:45:35
8       So I really wasn't paying attention to the  10:45:38
9       buys or sells. It's more the content behind 10:45:41
10      it.                                 10:45:43
11          So, what their writing is purely a      10:45:44
12      function of they sometimes have a business  10:45:55
13      objective, but I don't know if that's their 10:45:57
14      personal opinion.                   10:46:01
15  Q. And what was the purpose of your discussions 10:46:01
16      with those analysts?                10:46:03
17  A. Mostly industry knowledge.           10:46:05
18  Q. So to obtain information; is that right?   10:46:06
19  A. Yeah. You take it with a grain of salt.   10:46:09
20  Q. What was the -- what was your understanding 10:46:14
21      of where their information came from?    10:46:16
22  A. It depends. Some of them had contact within 10:46:21
23      the industry. There's a big supply chain.  10:46:25
24      Some analysts did a better job of talking to 10:46:31
25      the manufacturer of Cisco product. The   10:46:35

83

1       components known as Cisco product. The    10:46:37
2       resellers. There are lots of ways to get   10:46:41
3       info outside of what's usually assumed which 10:46:45
4       is the company, but the best info is usually 10:46:48
5       outside of the company.             10:46:51
6   Q. And when you say outside of the company, what 10:46:52
7       do you mean?                     10:46:54
8   A. The supply chain. I say their competitors,  10:46:54
9       their suppliers, their customers. Customers 10:46:59
10      really provide you with what's really    10:47:02
11      happening.                      10:47:06
12  Q. And do you recall any specific customers of  10:47:07
13      Cisco that provided good information to you 10:47:10
14      during the relevant period?          10:47:13
15  A. No, I can't recall.                  10:47:15
16  Q. Other than the sell side analysts you     10:47:19
17      discussed earlier, did you have any contacts 10:47:21
18      that were informal within Cisco?        10:47:24
19  A. Within Cisco? I can't recall.         10:47:30
20  Q. Is it possible that you did?          10:47:33
21  A. It's possible.                    10:47:35
22  Q. Do you recall any contacts outside the    10:47:37
23      company who provided you with information   10:47:41
24      other than the sell side analysts we just   10:47:44
25      discussed?                      10:47:46

84

1   A. Well, I could always go to Nortel and get  10:47:47
2       their opinion on how Cisco is going. So, you 10:47:50
3       know, again, my supply chain is we would also 10:47:53
4       build a network of contacts. There were the 10:47:56
5       contact manufacturers or ship players or    10:47:59
6       resellers. And that's how we really get our 10:48:03
7       analysis done completely.            10:48:09
8           There is also third-party consultants. 10:48:13
9       Got in a group to lower a group, NHK which  10:48:18
10      provided projections on the market that Cisco 10:48:24
11      and the competitors were competing in.    10:48:27
12  Q. When you had conversations with sell side   10:48:55
13      analysts about Cisco, did you take notes?   10:48:59
14  A. Probably.                       10:49:03
15  Q. And did you also take notes when you       10:49:05
16      discussed Cisco with Cisco's competitors?   10:49:07
17  A. Yeah.                          10:49:11
18  Q. And where did you maintain those notes?    10:49:12
19  A. That's one of my Cisco files.         10:49:15
20  Q. I know, it gets tiresome. Believe me, I    10:49:17
21      don't like asking them.             10:49:21
22          Did your analysis of Cisco affect    10:49:24
23      MFS's investment in Cisco?           10:49:31
24          MS. SIMPSON JONES: Objection.       10:49:34
25  A. Yes.                           10:49:43

85

1   Q. And how?                        10:49:44
2   A. To the best of my -- well, as an analyst -- 10:49:45
3       now, I can't recall how our holdings      10:49:51
4       fluctuated during that time frame. But as an 10:49:53
5       analyst, portfolio managers would rely on you 10:49:55
6       to really know what's going on. So if a fund 10:50:00
7       manager changed a position based on your    10:50:03
8       recommendation of a stock, that's how, based 10:50:08
9       on my analysis, that's how it would affect  10:50:14
10      our holdings.                    10:50:18
11  Q. Do you recall generally the trend of MFS's  10:50:21
12      investment in Cisco during the relevant    10:50:25
13      period? And, again, that's August 1, '99  10:50:27
14      through March 31, 2001.             10:50:30
15  A. Assuming it was financial.           10:50:32
16  Q. Did it increase or decrease to the best of  10:50:33
17      your knowledge?                  10:50:38
18  A. I can't recall.                   10:50:38
19  Q. Has it decreased since that time?       10:50:38
20  A. Yeah.                          10:50:41
21  Q. And why is that --                 10:50:42
22  A. That's a loaded question.            10:50:43
23  Q. Why is it loaded?                  10:50:45
24  A. Well, we're talking about the peak of the  10:50:46
25      market to the trough of the market so of   10:50:48

86

1    course it increased. The value of the    10:50:50
2    holding, even if the shares stayed the same,    10:50:52
3    went down.    10:50:55
4    Q. Is it your understanding that the share    10:50:59
5    amount has decreased since the relevant    10:51:01
6    period?    10:51:03
7    A. I can't recall. I would assume, yes. I    10:51:03
8    can't recall.    10:51:10
9    Q. And why would you assume yes?    10:51:11
10    MS. SIMPSON JONES:    10:51:15
11    Mr. Sette-Ducati --    10:51:16
12    THE WITNESS: Yes.    10:51:18
13    MS. SIMPSON JONES: -- if you're    10:51:19
14    basing your answers on the guess and you're    10:51:19
15    using the word assumption and guess    10:51:22
16    interchangeably, you're not supposed to    10:51:25
17    guess.    10:51:27
18    Q. That's right. I don't want you to guess.    10:51:27
19    But if you have an understanding that's based    10:51:29
20    on your expertise in the industry, you can    10:51:31
21    base your opinion on that.    10:51:32
22    A. Well, I actually do have an objective basis    10:51:34
23    behind -- our shares probably declined. And    10:51:39
24    -the reason for that is as a portfolio manager    10:51:44
25    in the emerging growth fund, which went    10:51:46

87

1    through some leadership changes, and the    10:51:49
2    Cisco stake was brought down.    10:51:53
3    Are we talking relevant time frame or    10:51:56
4    from the relevant time frame to today?    10:51:58
5    Q. From the relevant time frame to today. And    10:52:00
6    why is that?    10:52:03
7    A. Why is what?    10:52:03
8    Q. Why has it decreased?    10:52:04
9    A. Because there is a portfolio leadership    10:52:07
10    change in that portfolio. The portfolio had    10:52:10
11    shrunk in size and the stake in Cisco was    10:52:16
12    brought down.    10:52:17
13    Q. Do you have an understanding as to the    10:52:17
14    rationale behind bringing down the stake in    10:52:19
15    Cisco?    10:52:21
16    MS. SIMPSON JONES: Objection. And    10:52:22
17    I just want to put on the record that MFS    10:52:22
18    objects to any questions intended to get at    10:52:25
19    the expert work product of MFS's research    10:52:27
20    analysts. I'll allow Mr. Sette-Ducati to    10:52:32
21    answer, but we have maintained this objection    10:52:35
22    consistently ever since we first received the    10:52:37
23    subpoena both from Mr. Sette-Ducati's    10:52:41
24    testimony and for the production of    10:52:43
25    documents, and MFS continues to maintain that    10:52:45

88

1    objection.    10:52:48
2    You may answer.    10:52:48
3    MS. WEAVER: And for the record,    10:52:50
4    plaintiffs obviously dispute that    10:52:51
5    characterization of events. And as we've    10:52:53
6    indicated in our correspondence, I expect    10:52:55
7    that we will be bringing a motion if we    10:52:59
8    cannot agree to obtain both    10:53:01
9    Mr. Sette-Ducati's notes and unfortunately    10:53:04
10    recall him for deposition so we can examine    10:53:08
11    him on those.    10:53:11
12    MS. SIMPSON JONES: Well, it's MFS    10:53:12
13    position that Mr. Sette-Ducati's deposition    10:53:15
14    will conclude today. And if you return with    10:53:18
15    a court order, then we will proceed.    10:53:20
16    MS. WEAVER: I understand.    10:53:21
17    Q. I'll return to the question which is: Do you    10:53:25
18    have an understanding as to the rationale in    10:53:28
19    bringing down MFS's stake in Cisco?    10:53:29
20    MS. SIMPSON JONES: Same objection.    10:53:32
21    A. Remember these are other fund managers making    10:53:39
22    these decisions so I can't discuss that for    10:53:42
23    them.    10:53:45
24    Q. Does that fund manager report to you?    10:53:45
25    A. No.    10:53:48

89

1    Q. At the time that MFS's stake in Cisco was    10:53:49
2    brought down, did that manager report to you?    10:53:53
3    A. No.    10:53:56
4    Q. And you have no understanding as to why MFS's    10:53:59
5    stake in Cisco has decreased?    10:54:05
6    A. Well, like I said, that manager knows the    10:54:07
7    decision, okay. I'm an observer on the    10:54:09
8    outside. And I think this is my own opinion,    10:54:11
9    is that the manager was more risk averse than    10:54:15
10    the prior manager of that product.    10:54:28
11    (Clarification by the reporter.)    
12    A. Again, it's also a product. It's my own    10:54:31
13    opinion of the market declining pretty fast.    10:54:33
14    People looking for other stocks outside of    10:54:38
15    growth stocks to invest in.    10:54:41
16    Q. Is it your understanding that Cisco is a    10:54:45
17    riskier stock to invest in than other stocks?    10:54:47
18    MS. SIMPSON JONES: Could you put a    10:54:52
19    time period on that?    10:54:53
20    Q. From the relevant period to the present.    10:54:55
21    A. Please define riskier.    10:55:00
22    Q. Well, what did you mean when you said the    10:55:03
23    word riskier?    10:55:05
24    A. I said growth. I really said people -- well,    10:55:06
25    different managers have different styles.    10:55:12

90

1    Portfolio construction. There are different  10:55:14
2    ways to manage risk in a portfolio. A big    10:55:19
3    chunk of that is your diversification. So it 10:55:24
4    could have been diversification, not so much  10:55:27
5    Cisco being riskier. So there are different   10:55:31
6    ways to manage.                    10:55:35
7    Q. What is your opinion of Cisco stock -- well  10:55:36
8    strike that.                    10:55:40
9        During the time that you were a        10:55:40
10   research analyst, did you ever share with    10:55:47
11   Cisco your analysis of the company?        10:55:49
12   A. I can't recall.                10:55:53
13   Q. Is it possible?                10:55:54
14   A. Yeah.                        10:55:55
15   Q. Did you ever share with Cisco any reports   10:55:59
16   that you wrote about the company?        10:56:02
17   A. It's possible.                10:56:03
18   Q. And --                    10:56:05
19   A. Well, reports, no. Not reports.        10:56:08
20   Q. Did you share written communications with   10:56:10
21   them or analyses?                10:56:12
22   A. Analyses, yes.                10:56:14
23   Q. And why?                    10:56:15
24   A. To test my assumptions.            10:56:16
25   Q. Do you have any recollection of what form   10:56:18

91

1    those written analyses took?            10:56:22
2    A. Usually it's in Excel model which has a    10:56:25
3    financial model of the company. And I'm      10:56:28
4    making assumptions, drawing conclusions about 10:56:30
5    what I think different parts of the business  10:56:34
6    grow and how profitable they are. And one    10:56:36
7    way to check that is with the company. You   10:56:39
8    don't have to believe it but you check it.   10:56:41
9    Q. Do you recall during the relevant period with 10:56:43
10   whom you sent written analyses of Cisco?     10:56:46
11   A. If I did, it would be just checking with the 10:56:53
12   investor relations team. They were the      10:56:56
13   primary contact in that regard.          10:56:58
14   Q. And --                    10:57:00
15   A. But they had a limited function there.     10:57:00
16   Q. And when you were testing your assumptions,  10:57:05
17   who provided the responses?            10:57:08
18   A. Again, investor relations most likely.     10:57:11
19   Q. Do you recall any specific assumptions that  10:57:14
20   you tested about Cisco during the relevant   10:57:17
21   period?                        10:57:19
22   A. Usually you focused on growth rate or the   10:57:21
23   balance sheet.                    10:57:25
24   Q. And what specific issues on the balance sheet 10:57:26
25   were you focused on during the relevant      10:57:29

92

1    period?                        10:57:31
2    A. Inventories and receivables.          10:57:32
3    Q. And what specifically were you focused on    10:57:35
4    about inventories?                10:57:38
5    A. Any stock we look at, it's part of your basic 10:57:40
6    analysis. It's your understanding to show    10:57:44
7    you how the trends are moving.          10:57:48
8    Q. And why is it part of your basic        10:57:50
9    understanding of how the stock has been      10:57:52
10   moving?                        10:57:55
11   A. Well, for technology companies in particular, 10:57:55
12   inventory trends -- again, as an investor,    10:57:59
13   you're trying to stay ahead of the curve in  10:58:04
14   terms of what is happening. Inventories      10:58:06
15   would sometimes give you an indication of how 10:58:08
16   business is moving so you want to get as much 10:58:10
17   granularity and detail of that. You get that 10:58:14
18   number once a quarter when they publish their 10:58:16
19   reports. A trend up tends to be -- you want   10:58:18
20   to have detail and questions behind why it's  10:58:23
21   turning up. Turning down, likewise. Just     10:58:27
22   making sure you understand what's going on.   10:58:30
23   Q. Did you have concerns about Cisco's increase  10:58:31
24   in inventory during the relevant period?     10:58:33
25       MS. JENSEN: Objection.            10:58:36

93

1        MS. SIMPSON JONES: Objection.        10:58:38
2    A. I can't recall.                10:58:38
3    Q. Do you have a recollection that Cisco's      10:58:39
4    inventory increased during the relevant      10:58:41
5    period?                        10:58:44
6    A. I can't recall. You're going back a long    10:58:44
7    time.                        10:58:47
8    Q. Do you have any recollection that Cisco wrote 10:58:48
9    off $2.5 billion in inventory in 2001?       10:58:53
10   A. I've heard about that, yes.          10:58:57
11   Q. And do you have any recollection -- how did   10:58:58
12   you hear about it?                10:58:59
13   A. Pardon me?                    10:59:00
14   Q. How did you hear about it?            10:59:01
15   A. That was a big write-off. It caught the     10:59:04
16   attention of a lot of people. So I think     10:59:07
17   just about any growth investor knew about    10:59:09
18   that.                        10:59:12
19   Q. Do you think that you could have predicted    10:59:12
20   that write-off based on your research on     10:59:14
21   Cisco?                        10:59:17
22       MS. SIMPSON JONES: Objection.        10:59:18
23   A. Me predicted that? Actually -- a $2.5      10:59:20
24   billion write-off or just the write-off?     10:59:33
25   Q. Either.                    10:59:36

94

1  A. Companies write off inventory a lot. A        10:59:38
2     write-off of that size is very hard to        10:59:41
3     predict.                                      10:59:44
4  Q. So do you recall now that Cisco's inventory  10:59:55
5     increased during the relevant period?         10:59:57
6  A. It must have been, yes.                       10:59:59
7  Q. Do you recall specifically asking anyone in   11:00:01
8     investor relations about the inventory        11:00:04
9     increase?                                     11:00:07
10 A. What was the date of the inventory write-off, 11:00:08
11    do you know? I'm sorry.                        11:00:11
12 Q. It was announced February 6, 2001.            11:00:12
13 A. February 6th. Okay.                           11:00:18
14 Q. It began --                                   11:00:21
15 A. Did I ask anybody at Cisco? I can't recall.   11:00:23
16    Again, I'm not -- I was not the analyst. Our  11:00:27
17    analyst probably had the primary question     11:00:33
18    because I was off the stock at that point in  11:00:36
19    time. Did I specifically ask them? I can't    11:00:39
20    recall.                                       11:00:41
21 Q. But you were the portfolio manager for that   11:00:46
22    industry at the time, right?                  11:00:51
23 A. No.                                           11:00:52
24 Q. Who was?                                      11:00:53
25 A. We don't have portfolio managers designated   11:00:54

95

1     to industries. We have research analysts      11:00:57
2     designated to industries.                     11:00:59
3  Q. The fund that you were managing had holdings  11:01:01
4     in technology?                                11:01:04
5  A. Science and technology, yes.                  11:01:05
6  Q. Okay.                                         11:01:07
7        So the fund you were managing had          11:01:07
8     holdings in Cisco at the time, didn't it?     11:01:09
9  A. Probably. To the best of my knowledge, yes.   11:01:12
10 Q. Is it your belief that the analyst who was    11:01:20
11    covering Cisco at the time talked to Cisco    11:01:23
12    about the write-off in inventory?             11:01:26
13 A. I can't recall, but I would assume so.        11:01:34
14 Q. Is that based on your understanding of how    11:01:36
15    MFS operates?                                 11:01:39
16 A. Yes.                                          11:01:41
17 Q. Do you have any knowledge as to Cisco's       11:01:46
18    explanation for the write-off?                11:01:49
19 A. I can't recall the specifics.                 11:01:53
20 Q. Do you recall generally?                      11:01:55
21 A. No. Again, companies write off inventory a    11:01:56
22    lot. It's when components become obsolete.    11:02:02
23    I'm sure that was one of the standard         11:02:07
24    arguments, but I don't have the specifics.    11:02:10
25 Q. But a ballooning inventory could also be an   11:02:13

96

1     indicator of customer slow down, right?       11:02:16
2  A. Possibly.                                     11:02:18
3  Q. And that's why you testified earlier that     11:02:19
4     inventory is one way to monitor the financial 11:02:21
5     performance of a company, correct?            11:02:24
6  A. Yes.                                          11:02:26
7  Q. You also testified earlier that you monitored 11:02:27
8     Cisco's balance sheet; is that right?         11:02:34
9  A. Yes.                                          11:02:37
10 Q. And what other component of the balance sheet 11:02:37
11    did you monitor?                              11:02:40
12 A. Several things. Receivables. And then cash    11:02:43
13    which is a function of -- the leverage. And   11:02:50
14    the cash which is the function of the cash    11:02:55
15    flow statement.                               11:02:56
16 Q. What do you recall about Cisco's receivables  11:02:59
17    during the relevant period?                   11:03:02
18 A. I cannot recall.                              11:03:03
19 Q. As a trend generally, what do you recall?     11:03:05
20 A. Is this objective or subjective, question?    11:03:15
21 Q. Your recollection?                            11:03:19
22 A. Yeah, I'm trying to recall.                   11:03:20
23       Well, first of all, earlier in that        11:03:22
24    period business for a lot of people was going 11:03:26
25    very well. So it was not uncommon for the     11:03:29

97

1     receivables trend to be stable to improving.  11:03:31
2     As we headed into 2000, I can't recall        11:03:38
3     exactly what was happening, if it was stable, 11:03:40
4     deteriorating or improving.                   11:03:43
5  Q. And what --                                   11:03:46
6  A. The period goes to March 2000?                11:03:47
7  Q. March 31, 2001.                               11:03:50
8  A. 2001.                                         11:03:52
9        Well, either 2001 there's probably         11:03:54
10    decelerating trends on the receivable front.  11:03:59
11 Q. Do you ever recall having concerns about      11:04:01
12    vendor financing with regard to Cisco?        11:04:03
13 A. Oh, that's interesting. It's possible, yes.   11:04:08
14 Q. And why do you say yes?                       11:04:12
15 A. Again, financing for Cisco was a popular      11:04:15
16    discussion topic.                             11:04:18
17 Q. Why?                                          11:04:19
18 A. Not just for Cisco, in the industry. Because  11:04:21
19    it was not uncommon for companies with very   11:04:24
20    good cash positions and balance sheets that   11:04:32
21    kind of act as financial intermediary with    11:04:36
22    modern companies or customers in short-term   11:04:42
23    cases where they need financial help to build 11:04:45
24    the business.                                 11:04:47
25 Q. Was that risky?                               11:04:48

**98**

1   A. Yes.                                    11:04:51
2   Q. Why?                                   11:04:51
3   A. It depends on the mix of the customers that  11:04:55
4      you're providing independent financing with.  11:05:01
5      If there are a lot of startups, that's a    11:05:04
6      risk.                                 11:05:07
7   Q. And why is that a risk?               11:05:07
8   A. Startups tend to be riskier businesses. It's  11:05:10
9      not guaranteed whether or not they would   11:05:14
10     survive.                             11:05:16
11  Q. So the risk for Cisco was not only that Cisco  11:05:18
12     would lose the receivables but that they    11:05:21
13     would lose the money that they were using to  11:05:23
14     fund the startups; right?             11:05:34
15         MS. JENSEN: Objection.           11:05:36
16         MS. SIMPSON JONES: Objection.    11:05:37
17     (Clarification by the reporter.)      11:05:37
18  A. Possible. That's one.                11:05:37
19  Q. Is there another risk?                11:05:39
20  A. It's not just sales. Anything doing     11:05:42
21     business. Certain part of wireless or data  11:05:45
22     networking or communications that is trying  11:05:50
23     to move along, and if startups are failing,  11:05:52
24     it slows down the pace. And this was not   11:05:56
25     Cisco specific. This was pretty broad-based.  11:06:01

**99**

1   Q. Do you recall any specific conversations with  11:06:13
2      anyone you had about Cisco's vendor     11:06:14
3      financing?                          11:06:17
4   A. I cannot recall specifics.            11:06:18
5   Q. Do you recall generally?             11:06:20
6   A. I'm sure it was discussed during my time as  11:06:22
7      an analyst but I can't recall the specifics.  11:06:26
8   Q. Did concerns about vendor financing relate in  11:06:29
9      any way to your following Cisco's       11:06:33
10     receivables?                         11:06:35
11  A. I'm sure it did. I tie them all together.  11:06:44
12     They're not isolated in a vacuum.       11:06:51
13  Q. Do you recall Cisco telling you that vendor  11:06:53
14     financing was not a problem?          11:06:56
15  A. I can't recall that.                  11:06:58
16  Q. Do you recall Cisco telling the market that  11:07:00
17     vendor financing was not a problem?     11:07:03
18  A. That's possible. The company of their --   11:07:05
19     well, with a company of their cash strength,  11:07:08
20     depending on the extent to which they're   11:07:14
21     providing vendor financing, they should be  11:07:17
22     able to implore things pretty well. Before  11:07:21
23     they capitalized that would be a bigger risk  11:07:23
24     to a company, i.e. Lucent.            11:07:26
25         MS. WEAVER: I'm going to move to   11:07:32

**100**

1      strike that as non-responsive. I asked a   11:07:33
2      different question.                   11:07:35
3         The word that I'm saying is market.  11:07:39
4      So if you can type that for him.        11:07:43
5   Q. Do you recall Cisco assuring the market that  11:07:45
6      vendor financing was not a problem?     11:07:47
7   A. I can't recall that.                  11:07:50
8         MS. WEAVER: We have five minutes   11:07:57
9      left on the tape so we can take a break right  11:07:58
10     now.                                 11:08:01
11        THE VIDEOGRAPHER: The time is     11:08:01
12     11:06. This is the end of cassette No. 1.  11:08:03
13     We are off the record.                11:08:06
14        (A short recess was taken.)        11:08:11
15        THE VIDEOGRAPHER: The time is     11:14:28
16     11:13. This is the beginning of cassette No.  11:14:34
17     2 in the deposition of Mr. David       11:14:38
18     Sette-Ducati. We are on the record.     11:14:41
19  Q. You testified earlier that sometimes you    11:14:52
20     would provide reports to Cisco for feedback;  11:14:54
21     is that correct?                     11:14:59
22  A. No, not reports. Analysis.            11:14:59
23  Q. Analyses.                            11:15:02
24        And after you received the feedback,  11:15:04
25     did you write a report that then reflected  11:15:06

**101**

1      the feedback you'd received from Cisco?   11:15:09
2   A. It depends.                          11:15:11
3   Q. And what does it depend on?           11:15:11
4   A. What I was looking for in the analysis and  11:15:13
5      how it related to my fundamental thesis and  11:15:16
6      whether or not it was relevant that should be  11:15:22
7      known.                              11:15:23
8   Q. And when you wrote reports that reflected   11:15:24
9      Cisco's feedback, did you expressly state   11:15:28
10     that Cisco had provided certain information?  11:15:31
11  A. Yeah, it depends also.                11:15:44
12  Q. Okay.                                11:15:48
13        Do you ever recall receiving feedback  11:15:48
14     from John Chambers with regard to something  11:15:50
15     you had written about Cisco?          11:15:52
16  A. I cannot recall.                     11:15:54
17  Q. Is it possible?                      11:15:57
18  A. John direct? About something I had written?  11:15:59
19     He never saw anything I had written to my   11:16:06
20     knowledge so....                     11:16:09
21  Q. Okay.                                11:16:20
22        Prior to the time that you began    11:16:21
23     covering Cisco for MFS, did you have any   11:16:22
24     business relationship with Cisco?       11:16:25
25  A. No.                                  11:16:28

102

1  Q. Did you have any special relationship with   11:16:29
2     anyone at Cisco?                             11:16:31
3  A. No.                                          11:16:33
4  Q. Did you during the relevant period have any  11:16:35
5     relationship other than a business           11:16:38
6     relationship with anyone at Cisco?           11:16:40
7  A. No.                                          11:16:42
8  Q. Did you attend Cisco conference calls?       11:16:50
9  A. Which ones?                                  11:16:57
10 Q. Any Cisco conference call during the relevant 11:16:58
11    period?                                      11:17:01
12 A. Yeah, yes. I was on those conference calls.  11:17:01
13 Q. And why were you on those calls?             11:17:04
14 A. Well, those calls are mostly -- the regular  11:17:07
15    calls are given during quarterly results,    11:17:11
16    and quarterly results to any investor is a   11:17:14
17    focal point to get an understanding how      11:17:18
18    business is moving financially, how they're  11:17:20
19    doing. And the conference call was -- the    11:17:24
20    earnings conference calls were a point in    11:17:30
21    time where John and his management team would 11:17:34
22    address the public about the state of the    11:17:36
23    technology markets and the state of business. 11:17:39
24    Other conference calls were acquisitions and 11:17:43
25    special events and stuff like that.          11:17:47

103

1  Q. Do you have any specific recollection of     11:17:50
2     attending any of those conference calls?     11:17:53
3  A. How so? I mean, I can say right now I        11:17:56
4     participated in most during that time period. 11:17:59
5  Q. When you say participated, what do you mean? 11:18:01
6  A. At the very least listening.                 11:18:04
7  Q. Do you ever recall asking questions?         11:18:05
8  A. I can't recall that.                         11:18:09
9  Q. Was it a common practice for you to e-mail   11:18:10
10    questions or call with questions following   11:18:12
11    conference calls?                            11:18:15
12 A. It's -- yeah -- yes. It's very difficult to  11:18:21
13    ask questions on the call. Most buy siders   11:18:24
14    do not so it's usually follow up.            11:18:28
15 Q. Why is it that most buy siders do not ask    11:18:30
16    questions on conference calls?               11:18:33
17 A. Because the sell side ask all the questions. 11:18:34
18    But also because the buy siders, again, are  11:18:38
19    building their intellectual knowledge based  11:18:40
20    on the company that they want to retain and  11:18:45
21    not share with others.                       11:18:47
22 Q. And in your opinion and based on your        11:18:48
23    experience during the relevant period, did   11:18:51
24    the sell side analysts typically ask         11:18:54
25    difficult questions on conference calls?     11:18:56

104

1  A. It varied.                                   11:18:58
2  Q. Do you understand what the expression analyst 11:19:22
3     expectations means?                          11:19:25
4  A. Yes.                                         11:19:26
5  Q. What does it refer to?                       11:19:27
6  A. Well, in the simple fashion Wall Street sell 11:19:31
7     side analysts publish expectations, revenue  11:19:36
8     and EPS and profitability expectations that  11:19:39
9     companies are expected to meet quarterly and 11:19:45
10    annually. So it's known as basically the     11:19:47
11    published numbers that people assume the     11:19:52
12    company will achieve each quarter and        11:19:55
13    annually.                                    11:19:57
14 Q. Do you have an -- did you have an            11:20:02
15    understanding during the relevant period that 11:20:04
16    it was important to Cisco to meet analyst    11:20:06
17    expectations?                                11:20:10
18 A. Yes, and it's important for most companies to 11:20:12
19    do that.                                     11:20:16
20 Q. Do you recall that Cisco, during the relevant 11:20:17
21    period, beat analyst expectations by a penny 11:20:22
22    every single quarter except for the last     11:20:27
23    quarter?                                     11:20:32
24 A. Yes.                                         11:20:32
25 Q. Do you have a recollection that Cisco missed 11:20:32

105

1     by a penny in the last quarter of the        11:20:35
2     relevant period?                             11:20:37
3  A. March 2000 or March 2001?                    11:20:40
4  Q. February 2001.                               11:20:44
5  A. I don't have that recollection. It's         11:20:45
6     possible.                                    11:20:47
7  Q. Do you have a general recollection that Cisco 11:20:49
8     missed its numbers in 2001?                  11:20:51
9  A. Yeah. I would say one thing. It's not just   11:20:54
10    about the penny.                             11:21:00
11 Q. What do you mean it's not just about the     11:21:10
12    penny?                                       11:21:12
13 A. When you're assessing whether or not a       11:21:13
14    company is meeting or exceeding expectations, 11:21:19
15    it's not just about -- any buy sider is not  11:21:22
16    just going to focus on the EPS result.       11:21:25
17    You're trying to get a gauge of how healthy  11:21:28
18    business is. I did not get -- would not get  11:21:28
19    terribly disappointed if a company barely    11:21:29
20    missed or barely beat. That's not as         11:21:32
21    relevant to me as some of the more important 11:21:36
22    trends gauging the fundamental health of the 11:21:39
23    company and the financial health of the      11:21:42
24    company.                                     11:21:44
25 Q. Do you have a recollection at the time that  11:21:46

106

1  Cisco missed its numbers as to your    11:21:48
2  assessment of Cisco's health financially    11:21:53
3  speaking?    11:22:00
4       MS. SIMPSON JONES: Objection.    11:22:02
5       You can answer.    11:22:04
6  A. Can you please repeat the question?    11:22:05
7  Q. At the time that Cisco missed its numbers, do 11:22:13
8  you have a recollection of your assessment of 11:22:16
9  Cisco's financial health based on your    11:22:20
10  experience as its research analyst?    11:22:22
11 A. I don't have a recollection of that period of 11:22:25
12 time.    11:22:27
13 Q. Were you concerned in advance of February    11:22:32
14 2001 that Cisco might miss its numbers?    11:22:35
15 A. It's possible.    11:22:41
16 Q. And why?    11:22:42
17 A. Remember we're going through a period where 11:22:44
18 there's a broad base slow down going on.    11:22:47
19 Q. Were you concerned about the vendor financing 11:22:49
20 in face of the broad base slow down?    11:22:51
21 A. That could possibly. It's just one of a lot 11:22:54
22 of things.    11:23:01
23 Q. What other things?    11:23:01
24 A. Well, we're going through -- if I recall    11:23:02
25 correctly, we're going through a period in    11:23:07

107

1  2001. We're just not talking about Cisco    11:23:09
2  trend market slowing down. This is a broader 11:23:13
3  economic situation. So you're not just going 11:23:15
4  to just focus on vendor financing. Okay.    11:23:17
5  You're dealing with big issues more so in the 11:23:20
6  telecommunications market, what happened and 11:23:23
7  what was about to happen.    11:23:27
8  Q. Were you aware that Cisco sold products    11:23:41
9  called futures during the relevant period?    11:23:44
10 A. No, that's new to me.    11:23:46
11 Q. Did anybody ever define the term futures to 11:23:50
12 you as a product that had not yet been    11:23:54
13 created where Cisco sold a product to its    11:23:56
14 customers and then replaced it with a future 11:23:59
15 product once it was created?    11:24:02
16 A. I'm not familiar with that --    11:24:03
17       MS. SIMPSON JONES: Objection.    11:24:05
18       THE WITNESS: Go ahead.    11:24:07
19       MS. JENSEN: I join the objection.    11:24:07
20 A. I'm not familiar with that fact. It's again 11:24:09
21 assigned futures concept with that.    11:24:11
22 Q. So no one at Cisco ever informed you that    11:24:13
23 they were selling futures; is that right?    11:24:15
24 A. That's right.    11:24:16
25 Q. Were you aware during the relevant period    11:24:22

108

1  that certain members of Cisco's sales force    11:24:24
2  had equity interest in their customers?    11:24:27
3  A. I'm not aware of that.    11:24:31
4  Q. As you --    11:24:37
5  A. Equity interest in their customers? Well,    11:24:38
6  let me ask, ask you that. You're asking me    11:24:43
7  about two salespeople among a force of    11:24:47
8  thousands who potentially could own stock    11:24:52
9  among the customers. I have no --    11:24:55
10 Q. Okay.
11 A. -- understanding of what those people do.    11:24:57
12 Q. Do you think it -- strike that.    11:24:59
13       Based on your knowledge of the    11:25:03
14 company, do you think that if you had known 11:25:05
15 during the relevant period that Cisco's sales 11:25:07
16 team held equity interest in its customers,    11:25:11
17 some of which it was financing, would have    11:25:16
18 affected your assessment of Cisco?    11:25:17
19       MS. JENSEN: Objection. It's    11:25:20
20 speculation. Compound.    11:25:21
21 A. It depends on to the extent.    11:25:24
22 Q. So can you elaborate?    11:25:29
23 A. Sure.    11:25:34
24       First off, we're discussing a period    11:25:37
25 where a lot of people were actively investing 11:25:39

109

1  in the stock market. So, I can't say average 11:25:42
2  salespeople doing their own investing, who    11:25:49
3  knows. If there was a broad base systematic    11:25:52
4  process at Cisco, then it would be an issue. 11:25:56
5  Q. But you, yourself, didn't own Cisco stock    11:25:59
6  because you think it poses a conflict of    11:26:02
7  interest, correct?    11:26:05
8  A. Yes, because I believe -- yes, I'm in a    11:26:07
9  different fiduciary position.    11:26:11
10 Q. And is it your testimony that Cisco is not in 11:26:14
11 a fiduciary relationship with its    11:26:17
12 shareholders?    11:26:20
13       MS. SIMPSON JONES: Objection.    11:26:21
14       MS. JENSEN: Objection.    11:26:21
15 A. Yeah, but I cannot make statements or    11:26:25
16 assumptions about individual actions.    11:26:28
17 Q. Okay.    11:26:46
18 A. Is that clear?    11:26:47
19 Q. Yeah.    11:26:47
20       Did you ever have any conversations    11:26:48
21 with anyone during the relevant period about 11:26:52
22 Cisco managing its earnings?    11:26:55
23 A. Define managing its earnings, please.    11:27:01
24 Q. Do you understand what the phrase means    11:27:04
25 managing its earnings?    11:27:08

**110**

1   A. On the buy side we talk about it everyday.   11:27:09
2   Q. Okay. On the buy side what do you mean when   11:27:13
3      you talk about it?   11:27:16
4   A. Well, there are -- companies call what we   11:27:17
5      call manage expectations. Many companies do   11:27:20
6      this and that is partially to constrain   11:27:23
7      enthusiasm about what business the can or   11:27:32
8      cannot look like. So it's not uncommon for   11:27:39
9      companies to, if expectations get ahead of   11:27:42
10     themselves, that they will talk to the   11:27:45
11     street, the sell side. But then also the buy   11:27:49
12     side to say, you know, let's not carried   11:27:52
13     away. Things can't grow 200 percent year in   11:27:58
14     and year out. So when we talk about managing   11:28:02
15     expectations, most of the buy siders believe   11:28:05
16     it's a good proactive measure for a company   11:28:07
17     to do that.   11:28:09
18  Q. And what are the methods of managing   11:28:13
19     earnings?   11:28:16
20  A. Well, managing earnings is something -- well,   11:28:19
21     I was talking about managing expectations.   11:28:25
22  Q. Oh, I'm sorry.
23  A. Yeah, managing earnings are a different   11:28:28
24     thing.   11:28:30
25  Q. I'll ask you that question.   11:28:30

**111**

1      What are the methods of managing   11:28:32
2      expectations?   11:28:34
3   A. Discussing with the sell side and the buy   11:28:34
4      side in terms of what to expect of business   11:28:37
5      going forward and growth rates.   11:28:41
6   Q. Is managing earnings different than managing   11:28:43
7      expectations in your understanding?   11:28:45
8   A. Yes.   11:28:47
9   Q. And what is managing earnings?   11:28:48
10  A. Managing earnings can take a variety of   11:28:49
11     forms. Some intentional, some not. But if a   11:28:54
12     company manages its earnings, it can involve   11:28:58
13     taking accounting measures to change for the   11:29:03
14     good, the bad and what the financial picture   11:29:07
15     really looks like. Some of those are gap   11:29:10
16     compliant, some of those are not.   11:29:14
17  Q. When you say gap, you mean generally accepted   11:29:15
18     accounting principals; is that right?   11:29:20
19  A. That's correct.   11:29:22
20  Q. What's an example of a way to manage earnings   11:29:22
21     that's not gap compliant?   11:29:26
22  A. Not gap compliant? It depends. Use of off   11:29:28
23     balance sheet items or questionable practices   11:29:35
24     to generate sales. Hiding items on the cost   11:29:41
25     line to mask profitability.   11:29:46

**112**

1   Q. Is closing quarters early a way to manage   11:29:54
2      earnings?   11:29:58
3         MS. JENSEN: Objection. Vague.   11:29:58
4   A. Closing quarters early a way to manage   11:30:03
5      earnings.   11:30:08
6   Q. Let's strike that.   11:30:08
7         Do you understand what I mean by   11:30:10
8      closing quarters --   11:30:11
9   A. Yes, I do.   11:30:12
10  Q. What does that mean?   11:30:13
11  A. A company closes a quarter at the end of --   11:30:15
12     what is closing quarter mean? I'm following   11:30:20
13     this thing.   11:30:29
14         MS. WEAVER: I'm sorry.   11:30:29
15     You're missing the word early. That's   11:30:30
16     okay.   11:30:33
17  A. Can you repeat the question again?   11:30:33
18  Q. Yes. Do you understand what I mean by   11:30:35
19     closing quarters early?   11:30:37
20  A. Yes.   11:30:38
21  Q. What does that mean?   11:30:38
22  A. That means a company has a certain financial   11:30:40
23     objective for a quarter. Sometimes when   11:30:46
24     business is going extraordinarily well, to   11:30:50
25     hit or receive their objections, the company   11:30:57

**113**

1      can actually close the books early a day or   11:31:00
2      two.   11:31:02
3   Q. Is it your understanding that that's gap   11:31:02
4      compliant?   11:31:05
5   A. Actually, I can't recall. Yeah, I mean, I   11:31:07
6      don't know how that whether when a   11:31:11
7      company decides -- it's worked so hard, it   11:31:15
8      gives everybody an extra day off.   11:31:19
9   Q. Do you have an understanding as to what it   11:31:31
10     means to pull in orders?   11:31:33
11  A. Yes.   11:31:35
12  Q. And what does that mean?   11:31:35
13  A. That can happen when a company is stretching   11:31:39
14     to make its results hit its financial   11:31:42
15     objectives. They will extend favorable   11:31:45
16     conditions to customers to pull forward   11:31:48
17     business. You will -- is that clear?   11:31:50
18  Q. Yes.   11:31:56
19     Is it true that managing earnings by   11:32:06
20     closing quarters early can mask a slow down?   11:32:10
21  A. Yes, that's possible.   11:32:19
22  Q. And how is that possible?   11:32:21
23  A. Well, I need clarification. A pending slow   11:32:25
24     down or a current slow down?   11:32:31
25  Q. Either.   11:32:32

114

1   A. It is interesting to me. We see a company   11:32:39
2      pushing aggressively to close its quarter,   11:32:45
3      sometimes that pops up. So you can   11:32:48
4      extrapolate that. It pops up in some place   11:32:52
5      in the financial halls. And you say why is   11:32:54
6      that happening? A slow down may be coming.   11:32:59
7         A current slow down is more difficult.   11:33:01
8      If you say we closed early, and there's a   11:33:04
9      slow down happening right now, that would be   11:33:07
10        more difficult to catch.              11:33:08
11  Q. Why?                                      11:33:09
12  A. Because usually when a company closes its   11:33:11
13     quarters early, you will see what's known as  11:33:13
14     the receivable trend is actually still pretty  11:33:19
15     good. And inventory trend could be moving    11:33:21
16     against you, but you can't draw conclusions   11:33:24
17     just based on one quarter. You always need   11:33:28
18     to see more. They may need to see the mix of  11:33:30
19     the inventory. So that's why I say sometimes  11:33:33
20     it's hard to draw whether a slow down is     11:33:36
21     actually happening on a one quarter basis and  11:33:38
22     you have a gross shortfall in sales. And     11:33:41
23     usually when you have a gross shortfall in    11:33:44
24     sales, you're not closing your books early.   11:33:47
25  Q. Did you have an understanding during the    11:33:52

115

1      relevant period that Cisco might be closing   11:33:54
2      its quarters early?                        11:33:57
3   A. It's possible.                             11:33:59
4   Q. And why is it possible?                    11:34:00
5   A. It was widely discussed among the investment  11:34:01
6      in sell side community.                    11:34:04
7   Q. Did you have those discussions?            11:34:05
8   A. Yes.                                       11:34:07
9   Q. With whom?                                 11:34:08
10  A. Other sell siders, buy siders, even the    11:34:11
11     company.                                   11:34:14
12  Q. And what was the basis of that information?  11:34:14
13  A. Well, when remember we're going into it -- we  11:34:17
14     were in a period when business was         11:34:21
15     extraordinarily good. And to get all       11:34:24
16     indications -- for example, the day sales   11:34:26
17     outstanding trend is going down. That's in  11:34:30
18     indication --                              11:34:30
19        MS. WEAVER: The day sales
20     outstanding trend is going down.
21  A. If that's going down, that's one potential  11:34:32
22     indication that business is going well enough  11:34:34
23     that your first month you closed more than  11:34:36
24     you thought you would. Your second month you  11:34:40
25     closed more than you thought you would. And  11:34:42

116

1      then the third month they could close a    11:34:44
2      little early because they already met      11:34:46
3      everything they need.                      11:34:50
4         And so everybody had during the strong  11:34:50
5      period, trends that suggest you could be --  11:34:52
6      you could close your quarters early, give   11:34:56
7      your employees a couple days off because    11:34:58
8      they've done good -- really well. And it's  11:35:00
9      something that still happens today.        11:35:03
10  Q. Do you recall during the relevant period   11:35:05
11     becoming aware that Cisco was no longer     11:35:08
12     closing its quarters early?                11:35:11
13  A. Can't recall.                              11:35:13
14        Again, a topic of intense discussion    11:35:16
15     during that whole time frame.              11:35:19
16  Q. And who was having those discussions?      11:35:20
17  A. Again, sell siders, buy siders, the company.  11:35:23
18  Q. And why was that a topic of discussion?    11:35:27
19  A. I think it's really a topic of discussion for  11:35:31
20     any company during that period.            11:35:34
21  Q. That if the companies had stopped --       11:35:38
22  A. Not an unusual topic of discussion.        11:35:40
23  Q. It's true that if Cisco had stopped closing  11:35:42
24     its quarters early, that that could be a    11:35:45
25     signal of a slow down for Cisco; isn't that  11:35:48

117

1      right?                        11:35:50
2   A. Oh, it is a signal of slowing. A slow down,  11:35:50
3      it depends how you define it.              11:35:55
4         MS. WEAVER: I'll mark as Exhibit   11:36:17
5      543 a document bearing Bate stamps         11:36:22
6      MFS-CSCO000870 through 1059.               11:36:28
7         And I only brought one copy for
8      counsel. I'm sorry, it was just too big.
9         (MFS Marked Plaintiff's Exhibit
10        No. 543 for Identification.)            11:36:56
11  Q. Do you recognize Exhibit 543?             11:36:56
12  A. No. Can you tell me what it is?           11:37:05
13  Q. I can't tell you what it is. This was a   11:37:07
14     document produced by your counsel. Just to  11:37:10
15     give you a little orientation to documents.  11:37:13
16     The number in the lower right-hand corner is  11:37:15
17     called a Bate stamp. This has been Bate    11:37:17
18     stamped as being produced from MFS in      11:37:20
19     response to the subpoena in this action.   11:37:23
20        Taking a look at Exhibit 543, is it    11:37:27
21     your understanding that this represents    11:37:32
22     holdings in Cisco's stock by MFS funds?    11:37:34
23  A. Yeah, that's what it looks like. I don't   11:37:38
24     have any more clarity on what this is. But  11:37:41
25     just so it's clear.                        11:37:43

118

1  Q. Just in the Perry Mason kind of way that    11:37:44
2     depositions work you have to identify the    11:37:48
3     documents because I don't have personal    11:37:50
4     knowledge of it. So that's why.    11:37:52
5        Okay. Let's start over. Do you    11:37:53
6     recognize Exhibit 543?    11:37:56
7        MS. SIMPSON JONES: What you do you    11:38:00
8     mean by recognize?    11:38:01
9        MS. WEAVER: Yeah, okay.    11:38:03
10 A. Yeah, I mean.    11:38:03
11 Q. What is Exhibit 543 to the best of your    11:38:04
12    understanding?    11:38:06
13 A. To the best of my understanding it looks like 11:38:06
14    -- may I look at it for a second?    11:38:09
15 Q. Of course.    11:38:10
16 A. Sure. This looks like a list of portfolios    11:38:33
17    and the transaction activity in Cisco's stock 11:38:36
18    during '99, 2000, 2001. Across the many    11:38:40
19    portfolios in the firm.    11:38:49
20 Q. And by portfolio, do you mean fund?    11:38:52
21 A. Portfol -- no, not necessarily.    11:38:57
22 Q. What do you mean?    11:39:00
23 A. Well, a fund is a retail product and sold to 11:39:03
24    retail investors. A portfolio we could have 11:39:08
25    a retirement plan or foundation or pension 11:39:11

119

1     account that invests in a growth portfolio 11:39:14
2     that replicates our retail fund.    11:39:18
3  Q. So Exhibit 543 is a summary of all the    11:39:20
4     holdings of MFS in Cisco stock through its 11:39:25
5     funds and portfolios; is that correct?    11:39:30
6  A. It's possible. I don't know if it's    11:39:31
7     complete.    11:39:34
8  Q. Do you know who prepares these reports?    11:39:35
9  A. I do not know.    11:39:38
10 Q. Have you -- did you prepare these reports?    11:39:41
11 A. No.    11:39:43
12 Q. Is somebody at MFS tasked with the jobs    11:39:43
13    preparing reports similar to this?    11:39:47
14 A. Possibly the treasurer. I really don't know. 11:39:49
15 Q. Have you seen a report similar to this    11:39:51
16    before?    11:39:54
17 A. No.    11:39:55
18 Q. Why is it that you believe that this report 11:39:56
19    reflects MFS's holdings in Cisco stock?    11:39:59
20 A. Because it has -- well, reflects the holdings 11:40:03
21    in these particular products, the fund, the 11:40:10
22    portfolio name, the acronym which is the    11:40:12
23    portfolio or fund code. And basic queu-sip 11:40:15
24    for Cisco systems. Security name, security 11:40:22
25    type, buy, sell. I mean, it's -- it shows    11:40:25

120

1     account activity. Portfolio or fund    11:40:31
2     activity.    11:40:34
3  Q. And as you look at the fund names listed in 11:40:35
4     Exhibit 543, are those in fact MFS funds?    11:40:38
5  A. Again, some are funds, some are accounts.    11:40:44
6  Q. All right. And portfolios.    11:40:47
7        MS. WEAVER: I'll mark as Exhibit    11:40:54
8     544 a document bearing Bate stamp    11:40:56
9     CIS-PPNPF-HC_0014577.    11:41:04
10       (Document Marked Plaintiff's
11       Exhibit No. 544 for
12       Identification.)    11:41:32
13       MS. JENSEN: As a matter of    11:41:32
14    housekeeping, did we get the protective order 11:41:32
15    signed?    11:41:35
16       MS. WEAVER: Yes.    11:41:35
17       MS. JENSEN: Can I get a copy of    11:41:36
18    that, please?    11:41:37
19       MS. WEAVER: Sure.    11:41:38
20 Q. I'd like to ask you to turn to the second    11:41:43
21    page of Exhibit 544.    11:41:45
22 A. (Witness complies.)
23 Q. Do you see MFS Investment Management at the 11:41:48
24    top of the second page?    11:41:52
25 A. Yes.    11:41:53

121

1  Q. And do you see where it says Peer Ownership 11:41:54
2     on the right?    11:42:01
3  A. Yes.    11:42:04
4  Q. And do you see Cisco listed?    11:42:05
5  A. Yes.    11:42:10
6  Q. Do you have an understanding -- well, strike 11:42:11
7     that.    11:42:14
8        Does Exhibit 544 refresh your    11:42:15
9     recollection as to the holdings of MFS and 11:42:16
10    Cisco stock in 1998?    11:42:20
11 A. Refresh my recollection as to Cisco holdings. 11:42:35
12    MFS holdings in 1998. No.    11:42:38
13 Q. Do you have an understanding as to MFS's    11:42:50
14    holdings in Cisco in 1998?    11:42:52
15 A. During particular time periods, yes.    11:42:57
16 Q. And what do you recall?    11:42:59
17 A. That we own the stock.    11:43:02
18 Q. Do you recall an amount or interest?    11:43:04
19 A. Actually, during the time I was an analyst I 11:43:10
20    probably had a better feel for what ownership 11:43:14
21    was. And there were times when I was not the 11:43:16
22    analyst on the stock, I wasn't as closely    11:43:19
23    tied to it. So 1998 is, again, that's why I 11:43:22
24    say I don't recall all holdings during that 11:43:25
25    time period.    11:43:27

122

1  Q. Does this look consistent with your        11:43:28
2     recollection?                      11:43:30
3        MS. SIMPSON JONES: Objection. He  11:43:30
4     said he didn't recall.              11:43:31
5  A. Say that again, please?            11:43:35
6  Q. Does the data on the second page of Exhibit  11:43:37
7     544 look consistent with your general    11:43:43
8     recollection?                      11:43:45
9        MS. JENSEN: Same objection.      11:43:46
10 A. Again, I don't have a recollection. I'm  11:43:46
11    saying as an analyst who came on board to the  11:43:48
12    stock in fall of '98, okay, I may have had an  11:43:51
13    idea of what we owned at that point in time,  11:43:55
14    but so -- but I can't recall specifically  11:43:57
15    what exactly we owned.             11:44:02
16 Q. Do you have any idea as to this could be  11:44:03
17    inaccurate?                      11:44:06
18 A. It could be. Who provided it?       11:44:07
19 Q. Again, I'm not the deponent, but I will  11:44:09
20    represent to you that this document was  11:44:14
21    provided by the defendants in this action?  11:44:15
22 A. Again, this could be very inaccurate.  11:44:17
23 Q. At the time that you started following Cisco  11:44:19
24    stock, was it your understanding that MFS had  11:44:23
25    holdings in Cisco?                 11:44:25

123

1  A. Yeah, yes.                       11:44:26
2  Q. And when you started following Cisco, did you  11:44:28
3     increase MFS's holding in Cisco?     11:44:31
4        MS. SIMPSON JONES: Objection based  11:44:34
5     on the expert work product as a research  11:44:34
6     analyst privilege that I cited before.  11:44:41
7        You may answer.               11:44:44
8  A. It's possible.                   11:44:47
9        May I make an observation --     11:45:13
10 Q. Sure?
11 A. -- as to this exhibit?             11:45:14
12 Q. Absolutely.                      11:45:16
13 A. I have seen these from time to time. You  11:45:18
14    know, when the third party is trying to  11:45:21
15    generate understanding of holdings in our  11:45:23
16    company, it's very hard to check that. And  11:45:25
17    I'm just looking at the key contacts but for  11:45:27
18    the most part incorrect.           11:45:31
19 Q. What's incorrect about it?          11:45:33
20 A. At the top of the page the key contacts.  11:45:40
21 Q. Yeah. What's inaccurate about that?  11:45:45
22 A. Well, first of all, Lisa Nurmi is a  11:45:48
23    conservative portfolio manager. I don't know  11:45:54
24    what the determination of key contact is.  11:45:57
25    The mix of people seen some growth, some  11:45:59

124

1     value. And I would guess that one of the  11:46:02
2     primary portfolio managers in that key  11:46:05
3     contact base, go to all portfolio managers.  11:46:08
4     Probably a more important one is -- the most  11:46:12
5     important one is not even on it.     11:46:15
6  Q. And who is the most important one?  11:46:16
7  A. Chris Philip. He managed our large growth  11:46:18
8     fund. And John Ballon.             11:46:23
9  Q. Looking at the bottom of the first page?  11:46:24
10       MS. WEAVER: And just for the
11    record, that's bearing Bate stamp 14578.  11:46:27
12 Q. Do you see your name?              11:46:30
13 A. Yes.                          11:46:31
14 Q. And do you see where it says met with Landi,  11:46:33
15    Carter, Goodwinson, Mazzola?         11:46:36
16 A. Yep.                          11:46:38
17 Q. Is that accurate?                 11:46:40
18 A. It could be.                     11:46:41
19 Q. Okay.                          11:46:46
20       And it lists Christin Philip on the  11:46:47
21    bottom; isn't that true?            11:46:50
22 A. Yes.                          11:46:51
23       MS. WEAVER: I'll now mark as     11:46:54
24    Exhibit 545 a document bearing Bate stamp  11:46:55
25    CIS-PPNPF-HC093818 through 820.      11:47:00

125

1        (Goodman Sachs Communications
2         Technology Documents Marked
3         Plaintiff's Exhibit No. 545 for
4         Identification.)                11:47:28
5  Q. I'll direct your attention to the second page  11:47:28
6     of Exhibit 545 in the middle.        11:47:31
7  A. Second page. Yes.                 11:47:41
8  Q. Do you see where MFS is listed?      11:47:45
9  A. Yep.                          11:47:48
10 Q. And it reflects that you were the primary  11:47:49
11    contact for Cisco on behalf of MFS as of  11:47:51
12    January 1999. Is that accurate?      11:47:57
13 A. That's correct. I was the analyst on the  11:48:01
14    stock then.                     11:48:04
15 Q. And did you attend a Cisco conference in  11:48:05
16    November of 1998?                 11:48:07
17 A. Which one?                      11:48:11
18 Q. Well, Exhibit 545 refers to --       11:48:13
19 A. Oh, oh.                        11:48:16
20 Q. -- an analyst conference. Is it consistent  11:48:17
21    with your recollection that you attended an  11:48:21
22    analyst conference?               11:48:22
23 A. It's possible. You sign up for these,  11:48:23
24    sometimes you don't go.            11:48:26
25 Q. Okay.                          11:48:27

126

1      And do you see where Exhibit 545      11:48:27
2   states that MFS had a holding of 21 million  11:48:30
3   shares by November 30, 1998?      11:48:35
4   A. I do see that.      11:48:42
5   Q. Is it consistent with your general      11:48:44
6   understanding that that was MFS's holdings in  11:48:45
7   Cisco during this time period?      11:48:49
8      MS. SIMPSON JONES: Objection.      11:48:52
9   A. That is tough to answer because I do not know  11:48:53
10   the source of that.      11:48:56
11   Q. Okay.
12   A. That could be grossly off. It could be dead  11:48:57
13   on.      11:49:01
14   Q. Do you see where it says peer ownership as of  11:49:05
15   September '98?      11:49:08
16   A. Yes.      11:49:12
17   Q. Do you have an understanding as to what that  11:49:13
18   refers to?      11:49:14
19   A. Yes.      11:49:15
20   Q. What does that refer to?      11:49:16
21   A. It's actually referring to other technology  11:49:17
22   companies, not necessarily networking      11:49:21
23   companies. Intellent, Microsoft, and those  11:49:24
24   are not networking companies.      11:49:29
25   Q. Okay.      11:49:31

127

1      And do you see where it says equity      11:49:31
2   assets equals 56 billion?      11:49:34
3   A. Yes.      11:49:37
4   Q. Do you have an understanding as to what that  11:49:37
5   refers to?      11:49:40
6   A. That is whomever's assumption, whoever drew  11:49:41
7   this up, the assumption of what our equity  11:49:43
8   funds management were at that point in time,  11:49:45
9   It could be correct, it could be wrong.      11:49:49
10   Q. Is it within a reasonable range?      11:49:50
11      MS. SIMPSON JONES: Objection.      11:49:52
12      MS. JENSEN: Objection.      11:49:52
13   A. Probably.      11:49:53
14   Q. Do you ever recall meeting with Don Listwin  11:50:01
15   at Cisco?      11:50:05
16   A. One on one?      11:50:07
17   Q. Yes.      11:50:09
18   A. It's possible.      11:50:13
19   Q. Do you recall attending conferences where Don  11:50:15
20   Listwin attended?      11:50:20
21   A. Yeah -- yes.      11:50:20
22   Q. And what do you recall about that?      11:50:21
23   A. Well, Don was considered John's second in      11:50:24
24   command, and so he was always at the analyst  11:50:29
25   conference. And I may have seen people who  11:50:35

128

1   would frequently talk at the analyst      11:50:41
2   conference and then on occasion you would see  11:50:43
3   him at sell side conferences. I can't recall  11:50:46
4   specifically which one.      11:50:49
5   Q. Do you have any specific recollection of      11:50:52
6   anything that he said during the relevant      11:50:54
7   period at a conference that you attended?      11:50:56
8   A. Don specific? No.      11:50:58
9      MS. WEAVER: All right. I'll mark  11:51:12
10   as Exhibit 546 a document bearing Bates No.  11:51:12
11   CIS-PPNPF-HC_0013925 through 929.      11:51:18
12      (Merrill Lynch Documents Marked      11:51:24
13      Plaintiff's Exhibit No. 546 for
14      Identification.)      11:51:54
15   Q. Turning to page three of Exhibit 545, do you  11:51:54
16   see your name?      11:52:04
17      MS. WEAVER: 546. Thank you.      11:52:07
18   Q. Is your name up here?      11:52:08
19   A. Yes.      11:52:19
20   Q. And do you have any recollection of meeting  11:52:19
21   with anyone from Cisco on March 23, 1999?  11:52:21
22   A. If I was there, I don't recall that      11:52:36
23   particular conference or meeting.      11:52:38
24   Q. Okay.      11:52:40
25      Do you see where it says on Exhibit  11:52:41

129

1   545 that MFS was Cisco's ninth largest      11:52:46
2   shareholder. Is that generally consistent  11:52:49
3   with your understanding?      11:52:52
4   A. Shareholder.      11:52:55
5   Q. Do you recall if whether it was ninth?      11:52:56
6   A. I don't know if we were exactly ninth.      11:53:03
7   Q. Okay.      11:53:06
8      But were you -- was that within the  11:53:06
9   ball park?      11:53:08
10   A. It's possible.      11:53:09
11      MS. WEAVER: I'll mark as Exhibit  11:53:12
12   547 a document bearing Bate stamp      11:53:14
13   CIS-PPNPF-HC_0014520 through 527.      11:53:24
14      (Supercomm Documents Marked      11:53:31
15      Plaintiff's Exhibit No. 547 for
16      Identification.)      11:53:46
17   Q. Do you recognize -- strike that.      11:53:46
18      Turning to page five or Bates number  11:53:49
19   ending in 14524, do you see that your name  11:53:53
20   appears? Does your name appear?      11:54:03
21   A. Yes, it does.      11:54:06
22   Q. Does this refresh your recollection with      11:54:08
23   regard to -- with regard to having a meeting  11:54:11
24   on Thursday, June 10th with Kevin DeNuccio?  11:54:14
25   A. This is the meeting I mentioned before.      11:54:18

130

1    Thank you for bringing the details of it.    11:54:20
2  Q. You had a meeting in Atlanta; is that right? 11:54:23
3  A. Pardon me?                11:54:26
4  Q. You had a meeting in Atlanta?            11:54:26
5  A. Yes, at Supercomm.            11:54:28
6  Q. And this was the Supercomm conference?    11:54:30
7  A. Uh-huh.                11:54:32
8  Q. Okay.            11:54:33
9        And do you have any specific        11:54:33
10   recollection of what you discussed at that 11:54:36
11   breakfast meeting -- or strike that. At that 11:54:39
12   meeting with Kevin DeNuccio?            11:54:41
13 A. Yes.            11:54:43
14 Q. And what was that?            11:54:44
15 A. I do recall discussing the addressable market 11:54:45
16   Cisco was participating and the sizes and how 11:54:49
17   they're attempting to grow.        11:54:54
18 Q. What do you mean by addressable market?        11:54:57
19 A. Addressable market is when they have a        11:54:59
20   product portfolio aimed -- so let's say in a 11:55:02
21   certain segment of the market they found --  11:55:09
22   they develop a particular -- they say that  11:55:11
23   these products can address so many billion    11:55:15
24   dollars. If they add products on top of        11:55:18
25   that, they can address a larger pool of        11:55:21

131

1    money. So when they talk about addressable 11:55:24
2    markets, they might say the telecom service  11:55:26
3    provider equipment space is so many billions. 11:55:28
4    We really only address with our products    11:55:32
5    about a quarter of that. That's what I mean. 11:55:33
6  Q. And what specific -- what specifically were  11:55:38
7    you discussing about Cisco's addressable    11:55:41
8    markets?            11:55:44
9  A. I just remember discussing the market        11:55:45
10   opportunities as he saw them in Enterprise    11:55:47
11   and Telecom.            11:55:49
12 Q. And what was your assessment of those market 11:55:50
13   opportunities?            11:55:54
14 A. It wasn't anything --        11:55:54
15        MS. SIMPSON JONES: Objection.        11:55:55
16        THE WITNESS: Go ahead.        11:55:56
17        MS. SIMPSON JONES: Objection on the 11:55:58
18   same grounds as before regarding work        11:55:59
19   product.            11:56:01
20        Go ahead.            11:56:01
21 A. It wasn't anything new. It was, I think the 11:56:05
22   standard discussion from -- I'd seen the        11:56:08
23   Cisco framework before. So it's just talking 11:56:13
24   to a new person about it and just wanted to  11:56:17
25   pick this particular executive's mind on it  11:56:19

132

1    to see if he was consistent with the others. 11:56:22
2  Q. Was he consistent?            11:56:24
3  A. I can't recall.            11:56:26
4  Q. Did you have an opinion as to whether or not 11:56:33
5    Cisco's assessment of its market        11:56:35
6    opportunities were the same as your        11:56:38
7    assessment?            11:56:39
8        MS. SIMPSON JONES: Objection.        11:56:41
9  A. They tended to be aggressive like a lot of  11:56:46
10   technology companies.            11:56:50
11 Q. And what do you mean by that?            11:56:51
12 A. I think investors in general tend to be        11:56:53
13   skeptical. Whenever a company throws out    11:56:56
14   what we call a TAM or a total addressable    11:56:58
15   market, we're skeptical as to what the number 11:57:01
16   is. It happens all the time.        11:57:05
17 Q. And why is that?            11:57:06
18 A. Because we're trained to be skeptical by        11:57:07
19   nature.            11:57:11
20 Q. And why do you think Cisco had a tendency to 11:57:11
21   be aggressive with regard to its market        11:57:24
22   opportunities?            11:57:28
23        MS. SIMPSON JONES: Objection.        11:57:31
24 A. I think -- well, tendency to be aggressive.  11:57:35
25   I think like any rapidly growing company they 11:57:39

133

1    were more aggressive. Not more -- they were  11:57:41
2    aggressive. But not to the extent whereas    11:57:43
3    over the top. I've seen far more companies    11:57:46
4    that are much, much more aggressive to the    11:57:49
5    extent that it almost made you sick. Cisco  11:57:53
6    was not in that camp.            11:57:56
7  Q. Like what companies?            11:57:58
8  A. I have a software company that's got a        11:57:59
9    hundred million dollars in sales and they say 11:58:01
10   the addressable market's five billion when I 11:58:04
11   know it's only 250 million.        11:58:07
12 Q. And how do you know that?            11:58:10
13 A. You can size it up. You do the math based on 11:58:10
14   what you know. Product pricing, volume,        11:58:12
15   market shares. Companies have stretched    11:58:15
16   total addressable market opportunities over  11:58:18
17   time.            11:58:20
18 Q. So Cisco's addressable market was not a        11:58:20
19   concern for you during this time period; is  11:58:24
20   that right?            11:58:26
21 A. Again, it could have been. I'm trained to be 11:58:26
22   skeptical about that.            11:58:28
23 Q. Okay.            11:58:29
24 A. They can. It's really, addressable market is 11:58:30
25   not a science, it's an art.        11:58:34

**134**

1       MS. WEAVER: We'll mark as Exhibit  11:58:41

2   548 a document bearing Bates numbers   11:58:43

3   CIS-PPNPF-HC_0014555 through 559.   11:58:52

4       (Fax Transmission Documents   11:59:07

5       Marked Plaintiff's Exhibit No.

6       548 for Identification.)   11:59:16

7  Q. I'll direct your attention to page three -- I 11:59:16

8   guess it's two, ending in 557.   11:59:19

9  A. Yes.   11:59:27

10  Q. Do you see where it says: David Sette-Ducati 11:59:28

11   visited Cisco for a full day in April of this 11:59:33

12   year and met with Ian Landi, Larry Carter,   11:59:35

13   David Goodmanson, Mario Mazzola, Amar Hunafy, 11:59:39

14   Judy Estrin and John Chance?   11:59:41

15  A. Yes.   11:59:44

16  Q. Does that refresh your recollection that you 11:59:44

17   had meetings with those individuals in April 11:59:47

18   of 1999?   11:59:49

19  A. I guess it was April not January which is   11:59:55

20   what I thought.   11:59:58

21  Q. Okay.   11:59:59

22  A. Yes, I do recall meeting with all those   12:00:00

23   individuals.   12:00:02

24  Q. What do you recall about meeting with Larry 12:00:02

25   Carter?   12:00:04

**135**

1  A. I recall we actually met within the content  12:00:06

2   of the meetings. I can't recall.   12:00:10

3  Q. Was that the first time you met Larry Carter? 12:00:12

4  A. I can't recall. Based upon the timing of my 12:00:14

5   assignment, probably.   12:00:16

6  Q. Do you have an understanding as to why you   12:00:19

7   were meeting with Larry Carter?   12:00:21

8  A. We always did --   12:00:23

9  Q. You always did?   12:00:26

10  A. We always wanted to meet with CFOs.   12:00:29

11  Q. And why is that?   12:00:32

12  A. The chief financial officers have the best   12:00:33

13   understanding of what's happening financially 12:00:35

14   with the company and that's true for any   12:00:37

15   company.   12:00:39

16  Q. Do you see where the exhibit says: MFS owns 12:00:40

17   about 18 million Cisco shares. They have   12:00:46

18   lightened up a little bit but still own a   12:00:48

19   considerable position.   12:00:51

20     Do you see that?   12:00:52

21  A. Yes.   12:00:53

22  Q. Do you recall MFS lightening up a bit in its 12:00:53

23   ownership?   12:00:57

24  A. Specifically during that time frame, can't   12:00:57

25   recall.   12:00:59

**136**

1  Q. Is it possible that this is accurate?   12:00:59

2  A. It's possible.   12:01:01

3  Q. Okay.   12:01:07

4     Do you recall making the determination 12:01:07

5   -- strike that.   12:01:11

6     Who had the authority to determine   12:01:12

7   MFS's holdings in Cisco?   12:01:16

8  A. That depends.   12:01:23

9  Q. Did it depend on just what each portfolio   12:01:24

10   manager individually decided to do?   12:01:28

11  A. The portfolio manager's ultimately   12:01:30

12   responsible for any decision made about a   12:01:34

13   stock that an analyst can influence that.   12:01:36

14  Q. So as a research analyst working in Cisco's 12:01:41

15   sector, you provided information to many   12:01:45

16   different portfolio managers; is that   12:01:48

17   correct?   12:01:50

18  A. That's correct.   12:01:50

19  Q. Were you aware during this time frame that   12:01:51

20   anyone at MFS decided to own less Cisco   12:01:55

21   stock?   12:01:58

22  A. I can't recall.   12:02:00

23  Q. Okay.   12:02:21

24     Looking again at Exhibit 559, do you   12:02:21

25   see that the first page is dated in June of 12:02:24

**137**

1   1999 and then it refers to a New York trip in 12:02:26

2   June of 1999?   12:02:30

3     MS. JENSEN: I'm sorry, we're on   12:02:33

4   548? Oh, page 559.   12:02:35

5  A. Which one?   12:02:39

6  Q. I'm sorry. Returning to this exhibit --   12:02:39

7   returning to Exhibit 548, do you see the page 12:02:50

8   is dated June 11th of 1999?   12:02:53

9     MS. SIMPSON JONES: She'll ask it

10   again.   12:02:56

11  A. Yes.   12:02:56

12  Q. And that it refers to a trip from June 14 to 12:02:57

13   16, 1999?   12:03:01

14  A. Yeah.   12:03:03

15  Q. And so turning to that third page, do you   12:03:03

16   believe that it's referring to a subsequent   12:03:07

17   meeting in June of 1999 that you had with   12:03:10

18   Cisco representatives?   12:03:12

19     MS. SIMPSON JONES: I'm sorry, I'm 12:03:24

20   not following this either. I apologize.   12:03:26

21     MS. WEAVER: Okay. I'll explain.   12:03:29

22  Q. It appears that this is an agenda for a June 12:03:31

23   trip. The notes actually refer to a previous 12:03:33

24   trip in April.   12:03:36

25  A. Right.   12:03:37

138

1  Q. Does this document refresh your recollection 12:03:37
2     that you had meetings with Cisco personnel in 12:03:39
3     both April and in June of 1999?        12:03:43
4  A. It's possible.              12:03:45
5  Q. Okay.                    12:03:47
6  A. It's -- yeah, it says here they're coming to 12:03:48
7     see us on June 15th.           12:03:51
8  Q. Okay.                    12:03:53
9  A. At one p.m.                12:03:54
10 Q. And do you have a specific recollection 12:03:55
11    that meeting?                12:04:00
12 A. I don't. I don't know who attended it, who 12:04:00
13    represented Cisco. I'm sure you can deduct 12:04:04
14    it from the front page but -- this looks like 12:04:10
15    Oppenheimer. I don't know, some sell sider 12:04:15
16    was taking it outside of Boston.     12:04:24
17 Q. Okay.                    12:04:31
18        MS. WEAVER: I'll mark as Exhibit 12:04:31
19    549 a document bearing Bates No.     12:04:32
20    CIS-PPNPF-HC_0014549.         12:04:36
21        (Document Marked Plaintiff's
22        Exhibit No. 549 for
23        Identification.)          12:05:10
24 Q. Does Exhibit 549 refresh your recollection 12:05:10
25    that you attended a dinner at Goldman Sachs 12:05:13

139

1     in June of 1999 or thereabouts?       12:05:21
2  A. I cannot recall the dinner. It could      12:05:28
3     possibly be associated with Supercomm given 12:05:32
4     the date.                 12:05:35
5        MS. WEAVER: I'll mark as Exhibit 12:05:46
6     550 a document bearing Bates No.     12:05:49
7     CIS-PPNPF0998567 through 568.      12:05:55
8        (E-mail Document Marked
9        Plaintiff's Exhibit No. 550 for
10       Identification.)          12:06:14
11 Q. In the middle of page do you see your name? 12:06:14
12 A. Yep.                     12:06:19
13 Q. And what is Exhibit 550 to the best of your 12:06:20
14    knowledge?                12:06:26
15        MS. SIMPSON JONES: Could you take a 12:06:26
16    moment and read it?           12:06:27
17       THE WITNESS: Sure.         12:06:29
18 A. Give me a second.            12:06:29
19 Q. No problem.                12:06:31
20 A. Okay, I've read it.           12:07:22
21 Q. Do you recognize Exhibit 550?       12:07:24
22       MS. SIMPSON JONES: Do you mean all 12:07:28
23    of it?                  12:07:28
24 Q. Is -- you maintained an e-mail address? 12:07:31
25 A. Clear I wrote an e-mail to Larry Carter. 12:07:33

140

1  Q. Okay.                    12:07:36
2        And do you have any reason to believe 12:07:36
3     that Exhibit 550 does not represent a portion 12:07:37
4     -- or a portion of Exhibit 550 does not
5     represent an e-mail that you sent to Larry 12:07:43
6     Carter?                 12:07:45
7  A. It appears to represent an e-mail I sent to 12:07:45
8     Larry.                  12:07:48
9  Q. Do you recall -- well, strike that.     12:07:48
10       Do you see where it says: Congrats on 12:07:55
11    Cerent and Monterey, strategically sound but 12:07:57
12    values worry me?             12:08:01
13 A. Yes.
14 Q. What were you referring to?         12:08:03
15 A. They paid a lot of money for Cerent and 12:08:04
16    Monterey. Cerent imparticular.      12:08:09
17 Q. And what was Cerent?           12:08:11
18 A. What was Cerent?             12:08:13
19 Q. Yeah.
20 A. Wow. How much time do I have to discuss it? 12:08:13
21 Q. You have as much time as you need.     12:08:15
22       MS. SIMPSON JONES: Seven hours. 12:08:21
23 Q. Right.                   12:08:22
24 A. Seeing as I recall correctly, this goes a 12:08:22
25    long way back, so I can't remember all the 12:08:26

141

1     details. It was a startup in, I believe, 12:08:28
2     Optical either switching the transport, which 12:08:35
3     was a product area Cisco was interested in 12:08:37
4     building. They were a successful startup 12:08:39
5     that had attracted the interest of many 12:08:43
6     companies. Supposedly they had been talking 12:08:49
7     to Cisco off and on for a period of time. I 12:08:51
8     don't know if Cisco actually was an investor 12:08:54
9     in it then or not, but what was happening 12:08:57
10    during this time frame, there was a lot of 12:09:01
11    companies, small startups were going public, 12:09:03
12    and they still had vague business plans and 12:09:05
13    Cerent was an example of a company that
14    actually had revenues and was gaining 12:09:10
15    traction in the marketplace and gaining 12:09:10
16    customers with a good product. And so if -- 12:09:12
17    they had an option to either sell or go 12:09:16
18    public. If they went public, which was an 12:09:19
19    easily, easy option for them, they'd easily 12:09:22
20    get billions and billions dollar market caps 12:09:26
21    overnight.                12:09:30
22       Cisco obviously felt it was       12:09:31
23    opportunistic for them not to let Cerent go 12:09:36
24    public and buy it for themselves and was 12:09:38
25    willing to pay 6.9 billion for it. Which 12:09:40

142

1   would have translated what they would have   12:09:43
2   gotten in the public on an IPO basis at that   12:09:46
3   point in time.                12:09:50
4       The issue is, like anything at that   12:09:51
5   point in time, evaluations were stretched and   12:09:53
6   so I think it was just unrealistic for me to   12:09:55
7   say $6.9 billion for I don't even know what   12:10:01
8   the revenue run rate -- it wasn't profitable   12:10:05
9   yet. And it was a lot of money. And it was   12:10:08
10  more of the hard profile acquisitions for      12:10:10
11  them. Strategically it made a lot of sense.   12:10:12
12      So, this was a follow up, you know --   12:10:16
13  understand strategically, but wow that's a   12:10:20
14  big number.                12:10:23
15  Q. Do you see where you wrote: I don't think   12:10:24
16  the current IPO snapshot is really      12:10:28
17  appropriate considering the internet      12:10:31
18  equipment stocks are on a big bubble?   12:10:33
19  A. Yeah. Well, like anything then it was      12:10:36
20  extremely -- well, highly priced.   12:10:40
21  Q. Okay. So I have to ask you a question first   12:10:43
22  which is I'm glad --            12:10:45
23  A. Yes.                12:10:46
24  Q. The question is: What did you mean by that?   12:10:47
25  A. I'm sorry.                12:10:48

143

1   Q. Let's try again.            12:10:50
2   A. Yes, I see that.            12:10:51
3   Q. And what do you mean by that?      12:10:52
4   A. A lot of the internet equipment stocks were   12:10:54
5   richly priced in the marketplace along with   12:10:58
6   everything dot-com.            12:11:01
7   Q. And what do you mean by richly priced?   12:11:04
8   A. If you took the market caps and the current   12:11:07
9   profitability and revenues to justify owning   12:11:12
10  a particular name, you'd have to have revenue   12:11:15
11  base multiplied by ten-fold to justify owning   12:11:19
12  it and that was an unrealistic assumption.   12:11:27
13  Q. Do you see where you wrote: Chances are high   12:11:29
14  that all of these internet equipment IPOs   12:11:32
15  lose 30 to 50 percent of their value within   12:11:35
16  the last 12 months?            12:11:38
17  A. Yes.                12:11:39
18  Q. What were you referring to there?   12:11:40
19  A. IPOs over the long term tend not to have a   12:11:43
20  history holding up in price, very few worked   12:11:47
21  really well. They tend to get priced   12:11:55
22  initially high and then they rationalize over   12:11:57
23  time. We're in a period of extraordinary   12:12:02
24  where everything is priced and everything   12:12:04
25  moved up dramatically. So, conventional   12:12:06

144

1   wisdom that on a normal basis that IPOs      12:12:09
2   priced high to start and then come down over   12:12:12
3   time.                12:12:15
4   Q. Is it normal for most IPOs to lose 30 to 50   12:12:15
5   percent of their value within 12 months?   12:12:20
6   A. That was a generalization.         12:12:22
7   Q. Setting aside internet IPOs, is it common for   12:12:26
8   companies to lose 30 to 50 percent of their   12:12:30
9   value within 12 months of their IPO?      12:12:33
10      MS. JENSEN: Objection.         12:12:36
11  A. I can't -- again, a generalization. Part of   12:12:37
12  this, this could have been posturing, it may   12:12:43
13  not have been truly objective.         12:12:47
14  Q. Okay.                12:12:55
15  A. Okay.
16  Q. Do you see where you wrote: Why was the      12:12:55
17  compelling factor to do it today? And you   12:12:57
18  were referring to the Cerent deal.      12:12:59
19  A. Yes.              12:13:02
20  Q. What was your concern there?         12:13:03
21  A. Well, they had supposedly being an off and on   12:13:06
22  discussions, and so for some reason it      12:13:10
23  happened. And just a question as so why      12:13:13
24  right now? What enabled this? We had heard   12:13:18
25  over time that the Cerent CEO didn't really   12:13:23

145

1   want to sell out to Cisco. So it happened.   12:13:26
2   Q. Do you see where you wrote: Unless you think   12:13:57
3   your stock is moving to $40, I can't see any   12:14:00
4   reason why this had to get done today at      12:14:03
5   current valuation?            12:14:08
6   A. Yes.                12:14:09
7   Q. What did you mean by that?         12:14:09
8   A. This is just an investor being skeptical. I   12:14:10
9   think a lot of this e-mail is about being      12:14:13
10  skeptical and trying to pull out of them      12:14:18
11  something that's not conventionally known.   12:14:21
12      So we come out from the skeptical      12:14:24
13  angle. You're wrong, it's too expensive.      12:14:27
14  Prove me wrong.            12:14:31
15  Q. I think what I'm asking is: How would      12:14:32
16  acquiring Cerent move Cisco stock to $40?   12:14:34
17      MS. SIMPSON JONES: Objection.      12:14:39
18  A. That's not the intent. The acquisitions      12:14:45
19  don't necessarily move the stock.      12:14:49
20  Q. So what did you mean?         12:14:50
21  A. I could mean that first of all, he's using   12:14:51
22  his stock to acquire, all right. And when   12:14:55
23  companies are using the stock to acquire,      12:15:00
24  that tends to reflect that they think the   12:15:03
25  currency -- the stock is currency strong or   12:15:06

**146**

1    the seller and the -- the seller needs stock 12:15:08
2    for tax purposes as opposed to cash. This   12:15:12
3    could just be me saying you obviously must   12:15:16
4    have some confidence in your business and   12:15:20
5    assume the stock is going to be doing well   12:15:22
6    going forward, because to justify an   12:15:24
7    acquisition of this price, you're going to   12:15:26
8    need your stock as high as possible. Why I   12:15:28
9    picked $40, who knows.   12:15:37
10   Q. Okay.   12:15:42
11        MS. WEAVER: I'll mark as Exhibit   12:15:51
12   551 a document bearing Bates No.   12:15:54
13   CIS-PPNPF-0996772.   12:16:03
14        (E-mail Documents Marked
15        Plaintiff's Exhibit No. 551 for
16        Identification.)   12:16:17
17   Q. Do you recognize Exhibit 551?   12:16:17
18   A. May I read it, please?   12:16:19
19   Q. Yes.   12:16:22
20   A. Okay. All set.   12:16:40
21   Q. Do you recognize Exhibit 551?   12:16:41
22   A. It looks like an e-mail I sent to Mary   12:16:43
23   Thurber.   12:16:48
24   Q. Okay.   12:16:50
25        And do you see the sentence that says:   12:16:50

**147**

1    I wanted to catch up with you on the recent   12:16:57
2    IBM transaction?   12:17:00
3        Do you have any recollection -- did   12:17:04
4    you write that sentence?   12:17:05
5    A. I can read it.   12:17:07
6    Q. Did you write that sentence?   12:17:08
7    A. I guess, yes, I wrote it.   12:17:12
8    Q. Do you have an understanding as to what you   12:17:16
9    were referring to?   12:17:18
10   A. Actually, no. It's not likely to be an   12:17:18
11   acquisition. It must have been some sort of 12:17:26
12   partnership.   12:17:29
13   Q. Okay.   12:17:30
14        Returning for just a moment to Exhibit 12:17:30
15   550.   12:17:33
16   A. Yes.   12:17:34
17   Q. Do you recall if you got a response from   12:17:34
18   Larry Carter with regard to your concerns   12:17:36
19   about Cerent and Monterey?   12:17:39
20   A. Do I recall a -- let me. I can't recall if I 12:17:42
21   got a response from Larry specifically.   12:17:50
22   Q. Do you recall if you got a response from   12:17:52
23   Cisco?   12:17:53
24   A. It's possible. Probably did.   12:17:54
25   Q. And what do you recall?   12:17:56

**148**

1    A. I don't recall the details, but they're   12:17:57
2    usually good at getting back to me, someone. 12:18:00
3    It's unlikely it was Larry. Larry always   12:18:05
4    delegated down to the investor relations   12:18:07
5    people.   12:18:09
6    Q. Did you gain an understanding as to why the 12:18:10
7    Cerent transaction had to happen with the   12:18:12
8    urgency that it did?   12:18:14
9    A. No.   12:18:16
10   Q. Okay.
11   A. Probably not.   12:18:17
12   Q. And why do you say probably not?   12:18:18
13   A. Because they're not going to tell you exactly 12:18:20
14   why it had to happen. They make you figure 12:18:23
15   it out yourself. But I think it was pretty 12:18:26
16   clear saying it was going to go public.   12:18:28
17   Q. Okay.
18   A. They wanted to have him under their product 12:18:32
19   list.   12:18:35
20   Q. You stated earlier that Cisco was interested 12:18:35
21   in building an optical network; is that   12:18:37
22   right?   12:18:42
23   A. Building an optical network?   12:18:42
24   Q. Yes.   12:18:44
25   A. That's incorrect.   12:18:45

**149**

1    Q. That's incorrect in what way?   12:18:47
2    A. They're not building an optical network.   12:18:49
3    Q. What were they doing?   12:18:52
4    A. They are interested in building product,   12:18:55
5    products and equipment that could supply   12:19:00
6    optical networks.   12:19:02
7    Q. Okay.   12:19:03
8    A. Or carriers.   12:19:04
9    Q. And why were they interested in going into   12:19:05
10   the optical industry in your understanding? 12:19:07
11   A. Because that was the slice of the telecom pie 12:19:09
12   that they felt they could compete -- they   12:19:11
13   needed to compete effectively in over time. 12:19:14
14   Q. Why did they need to compete in it?   12:19:16
15   A. Because it was a market opportunity that they 12:19:18
16   had some core competencies -- some core   12:19:20
17   competencies that they could bring to the   12:19:26
18   table, and it was a clear market that they   12:19:27
19   probably can have a shot of successfully   12:19:29
20   competing in.   12:19:32
21   Q. Was Nortel selling in the optical market?   12:19:33
22   A. Yes.   12:19:36
23   Q. And Nortel was a competitor of Cisco; isn't 12:19:37
24   that right?   12:19:40
25   A. Yes. At that point in time, yes.   12:19:40

150

1  Q. What's your understanding of --          12:19:43
2  A. At that point in time, yes.              12:19:45
3  Q. Right.                        12:19:49
4      What's your recollection of your        12:19:50
5  assessment of the Cerent acquisition and how 12:20:01
6  it worked out for Cisco during the relevant  12:20:04
7  period?                    12:20:07
8          MS. SIMPSON JONES: Objection on   12:20:08
9  analyst work product grounds.            12:20:11
10     You may answer.              12:20:13
11 A. First of all, we'd probably be drawing that 12:20:16
12 conclusion today. So I really don't have -- 12:20:21
13 oh, during the period only. Yeah, it's hard  12:20:28
14 to assess that.                12:20:30
15 Q. Why?                    12:20:30
16 A. Because for this to be an acquisition that  12:20:32
17 works is really a longer view. Okay. What's  12:20:35
18 happening in a short one-year window. The   12:20:37
19 only thing that can happen is it continues to 12:20:42
20 grow by leaps and bounds. In all cases if I  12:20:45
21 recall correctly, that standard of growth    12:20:48
22 remained unbated during that period.         12:20:52
23 Q. What about the Monterey acquisition?       12:20:55
24 A. Monterey was more of a struggle. It was more 12:20:57
25 the purchase price as well.          12:21:00

151

1  Q. Why was it a struggle?            12:21:01
2  A. It did not -- based on what I know and what I 12:21:04
3  can recall, it did not have the traction that 12:21:07
4  Cerent had.                  12:21:12
5  Q. And what do you mean by traction?         12:21:13
6  A. It's, again, if I recall correctly, it was  12:21:15
7  more of an earlier stage acquisition where    12:21:17
8  Cerent was generating revenue, signing up     12:21:22
9  customers. And I think Monterey was more of   12:21:25
10 a question mark.                12:21:27
11 Q. And do you have any specific recollection of 12:21:29
12 product problems with Monterey products?      12:21:31
13 A. I recall there were, I can't recall        12:21:34
14 specifically what they were.            12:21:37
15 Q. Were there product problems with Cerent     12:21:39
16 products to your knowledge?          12:21:42
17 A. I don't believe so.              12:21:43
18         MS. WEAVER: I'll mark as Exhibit   12:21:56
19 552 a document bearing Bates No.         12:21:58
20 CIS-PPNPF-1001449.              12:22:10
21         (E-mail Document Marked         12:22:10
22         Plaintiff's Exhibit No. 552 for
23         Identification.)            12:22:16
24 Q. Please let me know when you're ready.      12:22:16
25 A. Okay.                    12:22:31

152

1  Q. Do you recognize Exhibit 552?          12:22:31
2  A. Yes, I do.                  12:22:33
3  Q. What is it?                  12:22:33
4  A. It's an e-mail I sent to Mary Thurber      12:22:34
5  investor relations at Cisco about revenues    12:22:38
6  that they have with Sprint and Wilcom.        12:22:41
7  Q. Do you recall why you were asking that      12:22:43
8  question?                    12:22:47
9  A. I would -- like any company, we always like 12:22:54
10 to know what the customer nix is. So I think 12:22:55
11 this was the standard trying to understand    12:22:58
12 how much these two carriers were of Cisco    12:23:01
13 Systems revenue.                12:23:03
14 Q. And do you see the response in the e-mail:  12:23:04
15 Let him know we don't give out revenues by   12:23:07
16 customer?                    12:23:11
17 A. Yes.                    12:23:11
18 Q. Is that consistent with your recollection?  12:23:11
19         MS. SIMPSON JONES: Objection.    12:23:14
20 A. Consistent with my recollection?          12:23:20
21 Q. Do you recall that they gave you revenues by 12:23:22
22 customer?                    12:23:24
23 A. I don't -- if they answered they don't give 12:23:25
24 revenues by customer, I'm just trying to take 12:23:28
25 a shot and get it and know that they're going 12:23:30

153

1  to say no, but I'm going to try it anyway.    12:23:33
2  Q. Okay.                    12:23:36
3      I'll show you a document that was        12:23:50
4  previously marked as Exhibit 379. Take a    12:23:52
5  moment to review it.              12:24:00
6      It's already been marked.            12:24:14
7  A. Okay.                    12:24:35
8  Q. Do you recognize Exhibit 379?          12:24:36
9  A. Yes, I do.                  12:24:38
10 Q. What is it?                  12:24:39
11 A. These are -- it's a chain of e-mails between 12:24:40
12 myself and Roberta Detata.            12:24:42
13 Q. Do you see the middle section of the        12:24:48
14 e-mail --                    12:24:50
15 A. Page one.                  12:24:51
16 Q. -- beginning actually with 4150, ending Bates 12:24:52
17 number. Do you see where Roberta Detata      12:24:57
18 writes: I've included my responses, thoughts 12:25:04
19 below?                    12:25:21
20         MS. WEAVER: Responses, thoughts
21 below.                    12:25:25
22 A. Yes.                    12:25:25
23 Q. And as you review that e-mail, can you see  12:25:26
24 that the e-mail reflects your questions and  12:25:29
25 then her answers in the body of it?          12:25:32

154

1      MS. SIMPSON JONES: Why don't you   12:25:40
2   take sometime to read these two pages.   12:25:41
3   A. (Witness complies.)   12:25:44
4      Yes.   12:25:57
5   Q. Do you see where you wrote: I'd like to know 12:25:59
6   what Cisco's guidance is at this point in   12:26:01
7   time?   12:26:04
8   A. Yes.   12:26:04
9   Q. And you wrote: Obviously some concerns exist 12:26:11
10   for the Enterprise business as this would not 12:26:15
11   be immune to any Y2K related deferrals?   12:26:17
12   A. Where is that, please?   12:26:23
13   Q. At the bottom of 4150 and going to the top of 12:26:24
14   4151.   12:26:28
15   A. Okay.   12:26:29
16   Q. What were you referring to there?   12:26:30
17   A. Yes, I see that comment.   12:26:35
18   Q. What were you referring to?   12:26:37
19   A. Well, this was written in the fall of 1999   12:26:39
20   and I was very much still learning a lot   12:26:45
21   about the company. So not unusual to have a 12:26:49
22   lot of discourse back and forth about how -- 12:26:52
23   what makes up the business. We did have Y2K 12:26:55
24   on the horizon and to Enterprise customers'   12:27:02
25   feedback we were getting it a lot of people 12:27:06

155

1   is that they would spend a lot before the   12:27:09
2   calendar fourth quarter of the year to get   12:27:11
3   the sending out of the way and make sure   12:27:13
4   everything was set for Y2K. So it was a   12:27:16
5   natural assumption. We would ask a lot of   12:27:18
6   companies during this time frame if they're 12:27:20
7   spending the calendar fourth quarter which   12:27:22
8   was the January quarter for Cisco, would be a 12:27:24
9   risk at being a little bit slow. So I was   12:27:27
10   trying to get the take on guidance and what 12:27:29
11   they publicly said and assessing it against 12:27:34
12   what the street was modeling.   12:27:38
13   Q. And do you recall what you thought of the   12:27:39
14   response you received?   12:27:42
15      MS. SIMPSON JONES: Objection.   12:27:47
16   A. Which response specifically?   12:28:08
17   Q. The Roberta Detata's response to your   12:28:10
18   question about the concerns of the Enterprise 12:28:16
19   business. I'll ask a different question.   12:28:21
20      Did she provide any information that   12:28:30
21   changed your analysis?   12:28:31
22      MS. SIMPSON JONES: I think we're   12:28:36
23   having a problem figuring out what   12:28:36
24   information she provided.   12:28:38
25      MS. WEAVER: Okay.   12:28:39

156

1      MS. SIMPSON JONES: So maybe you   12:28:40
2   just want to read it allowed.   12:28:41
3      MS. WEAVER: Sorry.   12:28:42
4   Q. Do you see at the top of Roberta Detata's   12:28:43
5   response. We have not given any guidance of 12:28:46
6   Q 200 other than regarding a wide range of   12:28:53
7   estimates?   12:28:55
8   A. These are working -- the later e-mails come   12:28:55
9   on the preceding page, right?   12:29:00
10   Q. Yes.   12:29:02
11   A. Okay. So --   12:29:03
12   Q. So, we're in the same e-mail she's just   12:29:06
13   responding to your question, right?   12:29:08
14   A. Yeah.   12:29:10
15   Q. And do you see where she wrote: We haven't   12:29:10
16   given any guidance for Q 200?   12:29:13
17   A. That's correct.   12:29:15
18   Q. And her response follows. Did her response 12:29:16
19   provide you any information that affected   12:29:18
20   your analysis?   12:29:20
21   A. I can't recall. It depends on where. I   12:29:24
22   mean, basically what it's saying is we have   12:29:27
23   not given guidance for 2 Q 00. And they may 12:29:30
24   expect a wide range of estimates. How I   12:29:35
25   ultimately interpreted that, I really can't   12:29:37

157

1   recall.   12:29:40
2   Q. Okay.   12:29:42
3      Going down to numeral two, do you see   12:29:42
4   where you wrote: Caught the Fortune article 12:29:45
5   on the Cisco eminae machine?   12:29:48
6   A. Yes.   12:29:50
7   Q. Do you recall that article?   12:29:50
8   A. Yes.   12:29:51
9   Q. What did it discuss?   12:29:52
10   A. It basically -- if I recall correctly,   12:29:54
11   discussed Cisco's rapid acquisition strategy. 12:29:59
12   Q. And what was that strategy?   12:30:04
13      MS. SIMPSON JONES: You mean as in 12:30:10
14   the article?   12:30:11
15      MS. WEAVER: Well, he just referred 12:30:15
16   to Cisco's acquisition strategy so I'm asking 12:30:16
17   what that strategy was.   12:30:20
18      MS. SIMPSON JONES: It's not clear 12:30:20
19   whether he read it in the article or whether 12:30:21
20   he had an independent understanding.   12:30:24
21   Q. His understanding.   12:30:26
22   A. Is that specific to the article or --   12:30:27
23   Q. Your understanding.   12:30:29
24   A. My understanding was this: It's like any   12:30:30
25   technology company, product positionings is a 12:30:32

158

1  pretty paramount. And Cisco pursued and made  12:30:35
2  buy or partner approach. And that made buy a  12:30:43
3  partner approach was a function of whether or  12:30:49
4  not they could own the product and at the  12:30:53
5  time to market -- the speed they had to get  12:30:53
6  to market with the product. Sometimes it  12:30:55
7  took too long to make it yourself so they  12:30:58
8  would buy it. Given Cisco's cash position,  12:31:00
9  they were not afraid to act kind of like a  12:31:03
10  venture capitalist and that they would make  12:31:06
11  investments in a lot of small startups. And  12:31:09
12  those that were successful, they would  12:31:11
13  ultimately buy.  12:31:14
14      So, as they invested cash in promising  12:31:15
15  technologies and new technologies and in some  12:31:19
16  cases acquire like a Cerent, paying a good  12:31:21
17  number for it to get a product that they felt  12:31:25
18  they needed to compete long term.  12:31:28
19  Q. Did you think this was a sound strategy  12:31:30
20  during the relevant period?  12:31:35
21      MS. SIMPSON JONES: Objection.  12:31:37
22  A. Define sound.  12:31:41
23  Q. Did you think it was a good idea during the  12:31:43
24  relevant period?  12:31:46
25  A. The company had a tremendous amount of cash  12:31:47

159

1  and there were a lot of promising startups.  12:31:50
2  So to some extent they were doing -- making  12:31:53
3  the right strategic moves. I think that they  12:31:56
4  liberally used their stock, that was the only  12:31:59
5  question mark I had.  12:32:02
6  Q. Turning to the page that ends at 4150.  12:32:09
7  A. Yes.  12:32:13
8  Q. In the middle, do you see where you wrote:  12:32:16
9  In the July '99 quarter what was the  12:32:19
10  percentage break down of revenues by segment?  12:32:21
11  And then later you continue: My guess is  12:32:24
12  that SP continued to accelerate as a percent  12:32:26
13  of revenues.  12:32:30
14      Does SP refer to service providers  12:32:31
15  there?  12:32:34
16  A. Yes.  12:32:35
17  Q. What did you mean by that?  12:32:35
18  A. Service providers are a customer segment  12:32:38
19  which are traditional wireless and telecom  12:32:41
20  carriers. All I'm trying to do in this  12:32:46
21  e-mail is get the mix by quarter.  12:32:49
22  Q. And why were you trying to get the mix by  12:32:54
23  quarter?  12:32:56
24  A. Just -- I -- remember this is early on in my  12:32:57
25  coverage of Cisco so I'm trying to build the  12:33:00

160

1  best understanding I can of the company and  12:33:03
2  breaking it down by segment is one part of  12:33:06
3  that equation.  12:33:09
4  Q. Why do you think that service providers  12:33:09
5  would accelerate as a percentage of revenue?  12:33:12
6  A. Because what was happening in the equipment  12:33:15
7  marketplace, the carriers were spending a lot  12:33:17
8  of money. So I think it was intuition to  12:33:21
9  assume that it -- they're doing well, that  12:33:23
10  their service provider business would keep  12:33:25
11  going and everything else.  12:33:31
12  Q. Okay.  12:33:32
13      Turning to the first page of the  12:33:33
14  document that ends at 4148 at the bottom, do  12:33:34
15  you see where Roberta Detata asked you: Do  12:33:38
16  you have all the logistics information for  12:33:42
17  our conference call next week?  12:33:44
18  A. Yes.  12:33:50
19  Q. Is that referring to a conference call that  12:33:50
20  Cisco was holding?  12:33:54
21  A. Yeah -- yes, yes.  12:33:56
22  Q. And then do you see your response where you  12:34:01
23  wrote: The entire world will be listening.  12:34:05
24  I plan to call in half hour early. I can't  12:34:07
25  begin to tell you how significant this call  12:34:10

161

1  will be. The noise out there is tremendous.  12:34:12
2      Do you see that?  12:34:15
3  A. Yes.  12:34:16
4  Q. What did you mean by that?  12:34:16
5  A. Well, first of all, this is an upcoming  12:34:19
6  earning conference call and a published  12:34:23
7  earning conference call with logistics well  12:34:25
8  in advance. Weeks to months in advance. So  12:34:29
9  that conference call information for  12:34:34
10  investors was public knowledge. But what I  12:34:37
11  heard was that given so many participants can  12:34:40
12  get in on the call. And we're in the middle  12:34:43
13  of the big growth boom. I think Cisco's  12:34:47
14  market cap is one of the highest in the  12:34:51
15  market. Every fund manager in the world  12:34:53
16  would try and learn and hear what they're  12:34:55
17  saying. So calling in early sometimes is a  12:34:57
18  way to get on and not have to worry about it.  12:35:01
19  If you're to call in five, ten minutes before  12:35:03
20  it started, you probably would be bumped back  12:35:06
21  a half hour. So I'm trying to dial in to the  12:35:08
22  call early enough to make sure I'm on it.  12:35:12
23      The second thing is Cisco is being a  12:35:15
24  prominent technology company and the Y2K  12:35:19
25  phenomenon is not very far away. A lot of  12:35:24

162

1    people would be very much interested in what  12:35:26
2    they have to say in what is happening in     12:35:27
3    Y2K-related and what a lot of companies are  12:35:31
4    doing on the spending front. So just a focus 12:35:33
5    point.                           12:35:36
6   Q. Okay.                        12:35:37
7        And then do you see where you wrote:  12:35:37
8    By the way, when did the quarter close on    12:35:39
9    time or early? We have been hearing that the 12:35:41
10   prior two quarters closed one to two weeks   12:35:43
11   early and that this one closed on time.      12:35:46
12   Comment?
13       Do you see that? Did you write that?   12:35:49
14  A. Yes.                         12:35:51
15  Q. And you wrote at the time that this e-mail is 12:35:51
16   dated to the best of your knowledge?         12:35:56
17  A. Yes.                         12:35:59
18  Q. What did you mean by that inquiry?        12:36:00
19  A. Well, again, closing as I mentioned earlier, 12:36:10
20   whether or not a company is closing business 12:36:13
21   early is for anybody in technology during    12:36:14
22   this time frame was a widely thrown out      12:36:19
23   phrase and topic. So it tended to intensify  12:36:22
24   at around actual quarter close for a lot of  12:36:27
25   companies. So Wall Street buy side, a lot of 12:36:33

163

1    people involved in the process were trying to 12:36:35
2    gauge or guess whether or not, wow, they're  12:36:38
3    going to close early again. Or they will be  12:36:41
4    closing early this quarter. That's a signal  12:36:44
5    that business is good.               12:36:46
6        It's a question I knew they would     12:36:48
7    probably were not going to answer. But the   12:36:52
8    context of it is I don't know if I had a fund 12:36:54
9    manager who was pushing me to do this or I   12:36:57
10   took it upon my own initiative to try to find 12:37:00
11   out. So, ask the question.           12:37:03
12  Q. And do you see where Roberta Detata        12:37:04
13   responded: Dave, our quarters close on the   12:37:08
14   last Saturdays of October, January, April and 12:37:09
15   July. The exact date of this quarter was     12:37:12
16   October 30th?                      12:37:14
17  A. Yes.                         12:37:16
18  Q. How did you interpret that response?      12:37:16
19  A. I can't recall exactly how I interpreted   12:37:19
20   that.                          12:37:22
21  Q. As you sit here today, how do you interpret 12:37:23
22   that response?                     12:37:26
23  A. Yes, she's just giving me the date it      12:37:32
24   actually does close.                 12:37:35
25  Q. As opposed to a date when they might have   12:37:35

164

1    actually closed; is that right?          12:37:38
2        MS. JENSEN: Objection.            12:37:40
3   A. Yeah, because -- yes.              12:37:43
4   Q. And do you see where you wrote: Oh, come on? 12:37:47
5   A. Yes.                         12:37:51
6   Q. In response to that?                12:37:51
7        What did you mean by that? I'll read  12:37:55
8    the rest of that into the record --        12:38:06
9   A. No, this just goes back to I either        12:38:07
10   interpreted her prior answer incorrectly or  12:38:11
11   saying come on, I know you don't give me the 12:38:14
12   answer but everybody in the world is saying  12:38:16
13   you closed earlier so what the heck.        12:38:17
14  Q. And you wrote: We've heard Cisco has been   12:38:20
15   closing early over the last few quarters     12:38:23
16   considering business has been excellent.     12:38:26
17   Some of the sources are saying that this Q or 12:38:30
18   quarter was actually more normal. I guess    12:38:31
19   we'll see it in the DSOs up or down.        12:38:34
20       Did you write that?              12:38:37
21  A. Yes, I did.                     12:38:39
22  Q. And what did you mean about the DSOs?      12:38:41
23  A. The DSO's outstanding trend which is what I  12:38:46
24   referred to earlier.                 12:38:49
25  Q. And how would that reflect whether or not   12:38:50

165

1    they were closing early?              12:38:52
2   A. It's just one piece of information. Again,  12:38:53
3    it's one part of the puzzle and not the sole 12:38:57
4    variable in the equation. But if the         12:39:04
5    company's DSO's are trending down, that means 12:39:06
6    business is going pretty good. Which means   12:39:09
7    the probability of closing early is better.  12:39:11
8    That doesn't necessarily mean they can't.    12:39:15
9   Q. Do you recall if Roberta Detata responded to 12:39:17
10   this e-mail?                       12:39:20
11  A. I cannot recall. Did she?             12:39:23
12  Q. Did you ever have any other conversations   12:39:27
13   with anyone at Cisco about closing quarters   12:39:29
14   early?                          12:39:32
15  A. It's possible.                    12:39:35
16  Q. And do you ever recall receiving a response 12:39:38
17   where they admitted that they did?          12:39:41
18  A. It's possible.                    12:39:45
19  Q. Why is it possible?                 12:39:46
20  A. Well, because, you know, a lot of the work we 12:39:48
21   do sometimes involves talking to people at   12:39:52
22   the junior level. And senior level managers  12:39:55
23   are trained not to discuss that topic. The   12:39:59
24   junior level managers know you go to         12:40:06
25   Supercomm and you grab a sales guy and you're 12:40:08

**166**

1 talking to them about the products and stuff 12:40:11
2 and so you ask him how business is going.     12:40:14
3 And that person will say it's going great and 12:40:16
4 I've heard we closed the quarter early.     12:40:19
5 Salespeople, it's not uncommon for them to   12:40:22
6 discuss how the books are closing on        12:40:24
7 business. So, but, you know, that's just     12:40:27
8 one -- that would just be one answer among   12:40:30
9 many. So you statistically have to really    12:40:32
10 think how bad it is.               12:40:36
11 Q. Do you recall having any conversations with 12:40:42
12 anyone at Cisco talking about pulling        12:40:43
13 quarters in?                  12:40:45
14 A. No. Pulling quarters in? No.        12:40:48
15 Q. Do you recall if you looked at the DSOs to 12:40:57
16 see whether or not it appeared that Cisco was 12:41:01
17 closing early or not?             12:41:06
18        MS. SIMPSON JONES: Objection.     12:41:15
19 A. Yeah. Can you rephrase that?        12:41:17
20 Q. Your e-mail says: I guess we'll see you in 12:41:22
21 the DSOs --                  12:41:26
22 A. Yes.                    12:41:26
23 Q. -- whether or not the quarter was more normal 12:41:27
24 for Cisco; is that right?           12:41:31
25 A. Yes, again that's one variable in the    12:41:32

**167**

1 equation.                   12:41:35
2 Q. Right.                   12:41:35
3 A. One thing.                 12:41:36
4 Q. And by more normal you mean it was closing  12:41:37
5 closer to on time, on date as opposed       12:41:39
6 to closing early; is that right?        12:41:43
7 A. Yes, I -- well, the Cisco had a target DSO  12:41:47
8 level. So a normal DSO level would be within 12:41:55
9 whatever the stated ban was. So it sounds    12:42:00
10 like they've been closing below that if we're 12:42:05
11 going back to something more normal. So     12:42:08
12 that's the input that's going on here.      12:42:10
13 Q. Do you recall if you checked the DSO levels 12:42:12
14 to see if that occurred?           12:42:16
15 A. Well, you check the DSO levels every quarter. 12:42:18
16 Q. And do you recall checking them after this  12:42:20
17 quarter and seeing if the DSO levels --      12:42:22
18 A. I must have.                 12:42:24
19 Q. And do you have any recollection as to what  12:42:25
20 your determination was?            12:42:28
21 A. I can't tell you what the DSO level was for  12:42:30
22 that quarter, so I really can't conclude what 12:42:33
23 the trend was, what my interpretation was.   12:42:38
24 Q. And was this the kind of information that was 12:42:41
25 contained in your memos or reports?        12:42:44

**168**

1 A. Yes.                     12:42:47
2 Q. And do you believe that this information is  12:42:50
3 contained in your memos or reports?       12:42:52
4 A. Yes.                     12:43:04
5      Remember, though, that -- I'll go back 12:43:07
6 to our memos and reports on note system is   12:43:11
7 primarily where I would write something like 12:43:15
8 that or in a bigger note on Cisco or a      12:43:17
9 handout. So it will be there someplace.     12:43:22
10       MS. WEAVER: Okay. I'm okay for    12:43:26
11 taking a lunch break now if that's okay for  12:43:27
12 you.                     12:43:31
13       MS. SIMPSON JONES: That sounds    12:43:31
14 good.                    12:43:32
15       MS. WEAVER: We can go off the     12:43:32
16 record.                   12:43:33
17       THE VIDEOGRAPHER: The time is     12:43:34
18 12:42. This is the end of cassette No. 2.   12:43:36
19 We are off the record.             12:43:38
20       (A lunch recess was taken.)     12:43:41
21
22
23
24
25

**169**

1        A F T E R N O O N   S E S S I O N    13:38:02
2        THE VIDEOGRAPHER: The time is 1:36. 13:38:06
3 This is the beginning of cassette No. 3 in   13:38:08
4 the deposition of Mr. David Sette-Ducati. We 13:38:11
5 are on the record.               13:38:14
6        DAVID SETTE-DUCATI
7        DIRECT EXAMINATION (Resumed)
8 BY MS. WEAVER:                 13:38:15
9 Q. Mr. Sette-Ducati, do you realize you are   13:38:15
10 still under oath?               13:38:17
11 A. Yes.                     13:38:18
12 Q. Returning for just a moment to Exhibit 379. 13:38:19
13 In that second sentence: We've heard Cisco   13:38:28
14 has been closing early over the last few Q.  13:38:30
15 I'd like you to tell me who you're        13:38:34
16 referring to when you say We've?         13:38:39
17 A. I think that's a general comment as opposed  13:38:50
18 to saying I. Collectively it could be other  13:38:56
19 people. Buy siders, sell siders claiming    13:39:03
20 that they've been closing early. So I'm just 13:39:06
21 using we as a generalization.          13:39:09
22 Q. So I just want to pin down all the facts    13:39:13
23 supporting that statement. So some sell     13:39:17
24 siders were talking about Cisco closing     13:39:20
25 early; is that correct?            13:39:22

170

1   A. That's possible, yes.                          13:39:23
2   Q. And then what other basis did you have for    13:39:25
3      saying that?                                   13:39:31
4   A. Well, the business had been going real well.  13:39:31
5      And so, again, I'm in a business where         13:39:34
6      there's a lot of noise or misinformation       13:39:37
7      thrown out by various parties. But if a        13:39:41
8      company collect business is going very, very   13:39:47
9      well, in technology in particularly, there is  13:39:51
10     a potential to close early.                    13:39:54
11  Q. Are you aware of other companies that had      13:39:56
12     closed early?                                  13:39:58
13  A. Or claimed to close early, yeah.               13:40:00
14  Q. Who was that?                                  13:40:02
15  A. When?                                          13:40:03
16  Q. Who were the other companies that were         13:40:04
17     claiming to close early that you're just       13:40:06
18     referring to?                                  13:40:08
19  A. Just over my investment experience, a lot of   13:40:09
20     software companies can close the books early   13:40:12
21     if business is going, very, very, well. A      13:40:15
22     lot of technology companies when business is   13:40:18
23     going very, very well.                         13:40:21
24  Q. When you wrote over the last few quarters,     13:40:23
25     what did you mean?                             13:40:25

171

1   A. Prior couple quarters.                         13:40:28
2   Q. So you had heard from sell side analysts over  13:40:30
3      the past couple of quarters that Cisco was     13:40:35
4      closing early; is that right?                  13:40:37
5   A. Not necessarily sell siders. It could have     13:40:39
6      been buy siders that were making that          13:40:42
7      statement or other investors.                  13:40:44
8   Q. Or in fact other individuals from Cisco?       13:40:46
9   A. Possibly. Remember, this was written when I    13:40:48
10     was just starting to pick up -- no, no, no,    13:40:51
11     no. This was written almost a year after I     13:40:57
12     picked up the stock, okay. Yeah, so I'm        13:41:00
13     pretty much in the loop. I have my network     13:41:04
14     of contacts.                                   13:41:07
15  Q. And so I'm just trying to get an exhaustive    13:41:10
16     list of all of the sources. So I have sell     13:41:12
17     siders, other buy siders, the fact that the    13:41:15
18     business was going well and your experience    13:41:17
19     with other industry or companies like Cisco    13:41:19
20     that closed early.                             13:41:24
21  A. The supply chain.                              13:41:25
22  A. The supply chain.                              13:41:27
23  A. Potentially, yes.                              13:41:28
24  Q. Who specifically in the supply chain, do you   13:41:29
25     recall?                                        13:41:31

172

1   A. Well, you can be contract manufacturers and    13:41:31
2      chip companies. Sometimes the contract        13:41:35
3      manufacturers would manufacture Cisco boxes    13:41:39
4      so they very much -- Cisco wouldn't do a       13:41:42
5      portion of the manufacturing. A lot of it's    13:41:45
6      out sourced to contract manufacturers. They    13:41:47
7      were often a common point in the supply chain  13:41:50
8      where you could get a sense for how their      13:41:54
9      order is moving. If Cisco is a big customer.   13:41:57
10     And so, you know, of points to try and work    13:42:01
11     off of.                                        13:42:05
12  Q. Do you recall the names of any of the supply   13:42:06
13     chain customers whom you might have spoken     13:42:09
14     with in this regard?                           13:42:14
15  A. I mean, I know who they are. I don't know      13:42:16
16     who I exactly I spoke with.                    13:42:21
17  Q. Who are they?                                  13:42:23
18  A. Some of the chip vendors are Broadcom, PNC     13:42:23
19     Sierra.                                        13:42:31
20     Some of these contract manufacturers          13:42:32
21     are Jabel, Sanmina, I think. Selectron.        13:42:34
22     Those are just a couple of examples.           13:42:43
23  Q. Did you have contacts of all of those         13:42:45
24     customers?                                     13:42:47
25  A. I -- well, we have analysts following those    13:42:50

173

1      companies. So I have a semiconductor analyst   13:42:54
2      who I could go to and say hey, you know, can   13:42:58
3      we talk to somebody over there about how       13:43:01
4      business is going and then maybe allude --     13:43:04
5      you know, we just wouldn't do it for Cisco.    13:43:07
6      It would be, you know, let's talk to Broadcom  13:43:09
7      about some of what they sell into networking   13:43:12
8      or cable set top boxes or, you know -- and     13:43:18
9      get a sense for how business could be going    13:43:20
10     with them at Cisco, Scientific Atlanta,        13:43:24
11     General Instrument, Cabletron and such. So     13:43:28
12     that's more of those contacts. If we had       13:43:31
13     industry contact, it usually came through      13:43:34
14     other MCF analysts.                            13:43:36
15  Q. And then you also spoke with Cisco's          13:43:37
16     competition; isn't that true?                  13:43:40
17  A. Yes.                                           13:43:42
18  Q. So did Cisco's competitors provide            13:43:43
19     information about Cisco closing early?         13:43:48
20  A. Yes, yeah, but you have to take it with       13:43:51
21     perspective.                                   13:43:52
22  Q. Right. Because they're competitors, right?    13:43:53
23  A. (Witness nods head.)                          13:43:56
24  Q. Do you have any specific recollection of any  13:43:57
25     Cisco competitor saying that Cisco was        13:43:59

174

1   closing early?                          13:44:04
2   A. No.                                  13:44:05
3   Q. Other than all of the potential sources of  13:44:05
4       all this information that we just discussed,  13:44:09
5       can you think of any other source of  13:44:11
6       information with regard to Cisco closing  13:44:13
7       early?                              13:44:15
8   A. I'm wondering if the consultants, you know,  13:44:20
9       the gardener groups, they're a possible  13:44:23
10      source. But I don't know -- I don't think  13:44:26
11      so, that they were used on my behalf.  13:44:28
12  Q. Okay.                                13:44:32
13      Do you know if Cisco continued to  13:44:32
14      close early throughout -- through the time  13:44:35
15      that you were a research analyst?  13:44:38
16  A. We never got confirmation that they ever  13:44:40
17      really closed early. It was all drawn on --  13:44:43
18      what they're getting -- they would never  13:44:44
19      confirm that they closed early, so....  13:44:47
20  Q. But did the facts that you were relying on  13:44:50
21      when you wrote your e-mail continue to  13:44:53
22      support the inference that they were closing  13:44:56
23      early?                              13:44:58
24  A. By talking a whole bunch of dots, data points  13:45:01
25      and try to put them together, and see if it  13:45:06

175

1   makes up a conclusion. Whether I'm right or  13:45:08
2   wrong, it depends.                      13:45:12
3   Q. Through the time that you were a research  13:45:21
4       analyst in that position following Cisco, did  13:45:23
5       you see a change in the facts, the data  13:45:27
6       points that would have led you to conclude  13:45:31
7       that Cisco was not closing early?  13:45:33
8       MS. SIMPSON JONES: Objection on the  13:45:35
9       basis that this is seeking research analyst  13:45:37
10      work product.                        13:45:40
11      But you may answer.                  13:45:41
12  A. I can't recall, because I can't recall the  13:45:46
13      granularity level of detail. I need to  13:45:51
14      support that.                        13:45:53
15  Q. Generally speaking did you ever receive any  13:45:53
16      information that led you to conclude that  13:45:57
17      Cisco definitively was not closing early?  13:45:59
18  A. Did I receive any information that led me --  13:46:07
19      I cannot recall that. I'm sure there are  13:46:09
20      lots of opinions, but something objectively  13:46:11
21      to really rely on, no.                13:46:14
22  Q. Okay.
23  A. Again, a lot of assumptions thrown around  13:46:18
24      about that. The only person who really knows  13:46:21
25      is Larry Carter and his finance team.  13:46:25

176

1   Q. And they're not talking.              13:46:28
2       MS. WEAVER: Okay. I'll mark as  13:46:36
3       Exhibit 553 a document bearing Bates numbers  13:46:39
4       CIS-PPNPF-0102514 through 523?  13:46:48
5       (E-mail Documents Marked
6       Plaintiff's Exhibit No. 553 for
7       Identification.)                    13:47:10
8   Q. Have you seen Exhibit 553 before?  13:47:10
9   A. Let me read it, please.               13:47:18
10  Q. Sure, take your time. I'll be focusing on  13:47:19
11      just the first two pages.            13:47:39
12      Have you had a moment to review it?  13:49:07
13  A. Yes.                                  13:49:09
14  Q. I'm just looking really at the first two  13:49:10
15      pages.                              13:49:12
16  A. Sure.                                13:49:13
17  Q. What is Exhibit 553?                  13:49:17
18  A. E-mails between Roberta Detata and I.  13:49:20
19  Q. And do you see on the bottom of Exhibit 553  13:49:23
20      where you ask to speak with Don Listwin, John  13:49:30
21      Chambers, Larry Carter, Mike Volpi and  13:49:33
22      someone in SMB?                     13:49:37
23  A. Yes, I see that.                     13:49:43
24  Q. Do you recall if you actually met with all of  13:49:45
25      those individuals?                  13:49:47

177

1   A. Before or after that date?            13:49:55
2   Q. At any -- yeah, right. On or around January  13:49:56
3       13, 2000.                           13:50:00
4   A. Yeah, I think that refers to that -- yes.  13:50:04
5   Q. Who did you meet with?                13:50:08
6   A. I think that refers to that MFS visit in  13:50:11
7       January. I think John and Larry. I don't  13:50:15
8       know if I saw Mike or Don. And I believe we  13:50:20
9       saw Kevin Kennedy and a few others. Judy may  13:50:23
10      have been in that mix. I can't recall  13:50:26
11      exactly if there was that meeting or not.  13:50:28
12  Q. Did you ask John Chambers if Cisco was  13:50:31
13      closing quarters early?              13:50:35
14  A. We usually do not ask that question.  13:50:39
15  Q. Why is that?                         13:50:41
16  A. Pardon me?                           13:50:43
17  Q. Why is that?                         13:50:43
18  A. Because we get no for an answer.       13:50:44
19  Q. Yes.                                 13:50:46
20      Because he's senior management?      13:50:47
21  A. No -- they understand -- let me put it this  13:50:50
22      way: I understand that it's almost a  13:50:56
23      fruitless question to ask because you only  13:51:00
24      get so much time with these people. You'd  13:51:02
25      rather focus on things more to get an inside  13:51:04

178

1    in terms of what they're doing with their    13:51:10
2    business long term, not exactly what's    13:51:13
3    happening with their business quarter to    13:51:16
4    quarter.    13:51:18
5    Q. And do you have any specific recollection of    13:51:18
6    anything that you discussed with any of the    13:51:20
7    individuals you met in January?    13:51:22
8    A. Yes, I -- yes.    13:51:29
9    Q. What do you recall?    13:51:30
10    A. If I recall this correctly, I took Kevin    13:51:34
11    Kennedy aside for a minute on my own to    13:51:37
12    discuss how this service provider business    13:51:39
13    was going.    13:51:42
14    Q. What did he say?    13:51:44
15    A. I think his confirmation was that it's going    13:51:45
16    well.    13:51:49
17    Q. And what do you mean by going well?    13:51:51
18    A. I can't recall exactly outside of that. I    13:51:57
19    just recall asking him on the side a few    13:52:00
20    questions about the service provider business    13:52:04
21    and how it was doing.    13:52:06
22    Q. And what were your questions?    13:52:07
23    A. I can't recall specifics.    13:52:08
24    Q. Why were you focused on the service provider    13:52:10
25    business?    13:52:13

179

1    A. Because it was -- Cisco's core competency    13:52:13
2    historically has been in the Enterprise. And    13:52:19
3    the service provider was the incremental    13:52:23
4    market opportunity for them. Their success    13:52:25
5    over time for the most part was going to be    13:52:27
6    driven by how that did.    13:52:33
7    Q. What were the kinds of indicators that you    13:52:47
8    looked at to assess how Cisco was doing in    13:52:52
9    the software -- in the service provider    13:52:52
10    industry?    13:52:54
11    MS. SIMPSON JONES: Objection based    13:52:55
12    on research analyst work product.    13:52:56
13    You can answer.    13:52:58
14    A. The key thing is a service provider space,    13:53:04
15    they were really going to be competing    13:53:09
16    against the Lucent and Nortels and Siennas of    13:53:10
17    the world. And Arcotels and Nokias and    13:53:16
18    Erickson. You could tell how they were doing    13:53:21
19    because that was an established market, so it    13:53:23
20    was more a function of how much market share    13:53:25
21    Cisco could gain, and that would be    13:53:27
22    reflective by the revenue growth and how    13:53:29
23    profitable they were growing that revenue    13:53:32
24    base. I think a lot of the focus was how are    13:53:35
25    they doing revenue-wise against some of the    13:53:38

180

1    other players. If they were growing faster    13:53:41
2    than any of the other players, that would    13:53:46
3    implied that they were gaining market share.    13:53:48
4    Q. So the market share was an important factor    13:53:50
5    in assessing Cisco's success in the service    13:53:53
6    provider network?    13:53:55
7    A. Yeah, the ability to build a revenue in the    13:53:56
8    profit model and the growth rates there.    13:54:00
9    Q. Were you concerned at all about the quality    13:54:02
10    of the revenues?    13:54:04
11    A. I'm sure it came up from time to time. I    13:54:09
12    could not recall. I had questions about the    13:54:12
13    quality of revenues of Tier II and Tier III    13:54:14
14    players more so.    13:54:16
15    Q. Who were the Tier II and Tier III players?    13:54:19
16    A. Some of the -- some of the smaller vendors.    13:54:22
17    Ratback networks. O&I Systems. Even Sienna    13:54:28
18    to a degree.    13:54:39
19    Q. Did Cisco make representations to you about    13:54:39
20    reserves that they took with regard to the    13:54:42
21    revenues for Tier II and Tier III companies?    13:54:44
22    A. Wait a second. I don't understand the    13:54:53
23    question.    13:54:57
24    Q. Did you have discussions with Cisco regarding    13:54:59
25    taking any reserves for revenues that they    13:55:04

181

1    received from Tier II and Tier III players?    13:55:07
2    A. Well, there was Tier II and Tier III vendors    13:55:10
3    or customers? Because the vendors are the    13:55:13
4    competitors. So I'm referring to Sienna and    13:55:15
5    Redback and the like. Those are Tier II and    13:55:20
6    Tier III vendors that are competitors.    13:55:24
7    Q. Were you aware that Cisco had an interim    13:55:25
8    analysis of its network service providers    13:55:29
9    based on their credit where they referred to    13:55:34
10    them as Tier II and Tier III?    13:55:36
11    A. I do not.    13:55:38
12    Q. Okay.    13:55:40
13    That's what I was referring to hence    13:55:41
14    the confusion.    13:55:42
15    A. Yeah, I think we're talking about two    13:55:43
16    different things.    13:55:45
17    Q. Got it.    13:55:46
18    A. You're talking more about the customers. I    13:55:48
19    was talking more about the vendors.    13:55:51
20    Q. Yes.    13:55:52
21    What were your concerns about the Tier    13:55:59
22    II or Tier III vendors?    13:56:02
23    A. The competitors?    13:56:06
24    Q. Yes. No, no, vendors. Right?    13:56:07
25    A. Vendors are the competitors, yeah.    13:56:12

182

```
 1   Q. Yeah, okay.                    13:56:14
 2   A. Well, I mean as part of your assessment, so  13:56:15
 3      like I'm not just looking at Cisco, I'm      13:56:17
 4      looking at the whole industry. And a lot of  13:56:19
 5      this telecom equipment build out was the     13:56:23
 6      function of carriers being financed with     13:56:28
 7      aggressive money. Building out a lot of      13:56:31
 8      networks, global crossing, level three, world 13:56:35
 9      com and such. So as part of my analysis, it  13:56:40
10      would be looking not only at the leaders on  13:56:44
11      the equipment side, but the Tier II and Tier 13:56:47
12      III side and how they go about business. And 13:56:50
13      sometimes we look at what we call quality of 13:56:52
14      revenues. So if a vendor had Sprint,         13:56:54
15      Verizon, Otophone as its customers. If that  13:57:02
16      was -- that would be considered a high       13:57:05
17      quality revenue base. Whereas, a smaller     13:57:07
18      vendor may have all these startup carriers as 13:57:10
19      its customers, and we would look at that as  13:57:13
20      lessor quality.                   13:57:16
21         So, you know, you assess the quality   13:57:21
22      of the revenues, where it was coming from and 13:57:23
23      the financial health of their customers as   13:57:25
24      part of your analysis.            13:57:28
25   Q. Did you also assess the quality of revenues 13:57:30
```

183

```
 1      from Cisco's customers?              13:57:33
 2   A. Yeah.                         13:57:37
 3   Q. And what did you think about the quality of 13:57:38
 4      the service provider customers?      13:57:40
 5   A. Well, there were, there were -- there were 13:57:42
 6      too many players trying to do the same thing. 13:57:48
 7   Q. And --                        13:57:51
 8   A. So, I think, again, having to go to my    13:57:52
 9      telecom services analyst for more    13:57:55
10      granularity, you know, it wasn't until later 13:58:03
11      on in the process that we realized that there 13:58:05
12      was a lot of, a lot of money chasing too 13:58:08
13      small a pool.                    13:58:13
14         I mean, there's the -- that's a hard  13:58:18
15      way to say it. I think you look at it more 13:58:24
16      as some of the carriers were on shaky   13:58:27
17      financial ground so you didn't know if they 13:58:29
18      were really -- is this a sustainable company 13:58:32
19      over time. You know, new entry into a   13:58:35
20      capital intensive business. If the balance 13:58:38
21      sheets and they were over extended, if the 13:58:43
22      capital markets close, they go out of   13:58:45
23      business and that happened to a variety of 13:58:47
24      them. This is all the telecom side, okay. 13:58:49
25   Q. Did you ask Cisco if they were taking any 13:58:55
```

184

```
 1      reserves for the revenues received from the 13:58:58
 2      service providers?               13:59:01
 3   A. I can't recall.                   13:59:02
 4   Q. Were you aware that Cisco was taking any   13:59:03
 5      reserves for the service providers?    13:59:06
 6   A. I can't recall. And it's a big, it's a big 13:59:09
 7      business. It could be normal to take some 13:59:15
 8      reserves if you have some, yeah, across a  13:59:20
 9      diverse customer set. You have some that are 13:59:24
10      financially a little riskier than the others. 13:59:27
11      I think reserves are not uncommon. To what 13:59:30
12      extent is more the question.          13:59:33
13   Q. Were you aware of the phrase called Soft   13:59:38
14      Costs?                        13:59:41
15   A. Soft costs?                      13:59:43
16   Q. With regard to Cisco's financing of its   13:59:44
17      customers?                      13:59:47
18   A. That's a new one.                  13:59:48
19   Q. Were you aware during the relevant period  13:59:49
20      that Cisco was providing financing to some of 13:59:51
21      its customers --                 13:59:55
22   A. Yes.                         13:59:56
23   Q. -- above and beyond the monies used to    13:59:56
24      purchase Cisco equipment and that the excess 14:00:00
25      financing was used to pay the operating costs 14:00:04
```

185

```
 1      of Cisco's customers?               14:00:09
 2   A. I did not know the second -- that latter part 14:00:11
 3      I did not know. I was unaware.        14:00:14
 4   Q. Would that have changed your assessment of 14:00:17
 5      the quality of the revenues coming from the 14:00:22
 6      Cisco financed customers?            14:00:23
 7         MS. JENSEN: Objection.            14:00:24
 8   A. Yes, I do. On a more important basis I would 14:00:26
 9      like to know what extent.            14:00:27
10   Q. And how would it affect your analysis?     14:00:29
11   A. Well, that comes back to the quality of their 14:00:31
12      business. And I think it would be if they 14:00:33
13      were aggressively doing that, you would   14:00:37
14      question the true growth rates of their   14:00:40
15      businesses and try to normalize it.      14:00:43
16         MS. SIMPSON JONES: And I'm sure you 14:00:52
17      figured this out, but you need to wait until 14:00:54
18      the end of the question. Okay.        14:00:56
19   Q. Looking at the top of Exhibit 553, do you see 14:01:00
20      the sentence: Optical is very, very     14:01:07
21      important?                      14:01:09
22   A. Yes.                         14:01:14
23   Q. What does that refer to?            14:01:14
24   A. Again, it's part of trying to build a    14:01:18
25      position. Cisco's trying to build a position 14:01:22
```

**186**

1  as a telecom equipment vendor. Optical was  14:01:25
2  really a focus of many of the carriers in   14:01:30
3  terms of building out Optical networks and  14:01:36
4  Optical technologies. And the vendors were  14:01:40
5  trying to jockey for position and Cisco was  14:01:44
6  in the mix.               14:01:51
7      MS. WEAVER: I'll mark as Exhibit   14:02:15
8  554 a document bearing Bate Stamp     14:02:18
9  CIS-PPNPF-0100505 through 510.          14:02:28
10     (E-mail Document Marked          14:02:31
11     Plaintiff's Exhibit No. 554 for
12     Identification.)              14:03:04
13 A. May I review it?              14:03:04
14 Q. Yes, of course.               14:03:06
15     MS. SIMPSON JONES: Please do.    14:03:08
16 A. Okay.                    14:03:29
17 Q. What is Exhibit 554?            14:03:29
18 A. E-mails between Roberta Detata and I.    14:03:34
19 Q. And do you see the sentence: I've been able  14:03:39
20  to get John Chambers for a luncheon meeting  14:03:41
21  with your team?               14:03:45
22 A. Yes.                    14:03:46
23 Q. Do you recall that luncheon meeting?      14:03:46
24 A. Yes. I believe that refers to that MFS   14:03:49
25  meeting we were able to get.          14:03:52

**187**

1  Q. What was -- how was that meeting structured? 14:03:54
2  A. There's a party of us that went out to Cisco 14:04:04
3   and we had a conference room set up and the  14:04:06
4   executives came in and talked about their   14:04:09
5   respective businesses one by one.      14:04:12
6  Q. Did they do formal presentations?      14:04:14
7  A. No. Just -- no, I believe not.       14:04:17
8  Q. Were you able to ask questions as they     14:04:21
9   occurred to you or was there a formal     14:04:23
10   question and answer session?         14:04:25
11 A. I believe there's an informal question and  14:04:26
12   answer session.               14:04:29
13 Q. Do you recall how long the meeting was?    14:04:30
14 A. The entire thing? I can't recall. It's    14:04:33
15   roughly 45 minutes per exec. It depends how  14:04:42
16   many people were on the agenda.        14:04:48
17 Q. Did you take notes during that meeting?    14:04:49
18 A. Yes.                    14:04:51
19 Q. Did you write any reports or memos based on  14:04:52
20   that meeting?                14:04:56
21 A. I'm sure I did.               14:04:57
22 Q. Do you have any recollection of what the   14:05:03
23   reports were concerning?           14:05:05
24 A. No.                     14:05:08
25 Q. Or the memos, do you have any recollection as 14:05:08

**188**

1    to what they involved?           14:05:10
2  A. No.                   14:05:18
3  Q. Okay.                  14:05:21
4  A. That was such a long time ago. I can't    14:05:21
5    recall --                 14:05:23
6  Q. Okay.
7  A. -- the details.             14:05:24
8      MS. WEAVER: I'll mark as Exhibit   14:05:32
9  555 a bundle of documents that was produced  14:05:34
10  together like this (indicating) Bates     14:05:39
11  numbers. MFS-CSCO01060 through 01220 and I  14:05:41
12  only again did two copies of these.      14:06:14
13     (Documents Marked Plaintiff's    14:06:16
14     Exhibit No. 555 for
15     Identification.)             14:06:19
16 Q. Please take a moment to look through it.    14:06:19
17     Do you recognize Exhibit 555?      14:06:25
18 A. Yes, I do.                 14:06:27
19 Q. What is it?                14:06:28
20 A. This is a -- this is the materials that Cisco 14:06:29
21  provided for one of the analyst days in    14:06:35
22  December of '99.               14:06:40
23 Q. I'll direct you to specific pages as we turn 14:06:42
24  to them. On the first page, do you see the  14:06:45
25  word redacted?                14:06:52

**189**

1  A. Yes.                   14:06:53
2  Q. Do you know what that means?        14:06:54
3  A. No. What?                 14:06:55
4  Q. Do you know if there was writing there that  14:06:58
5   has been covered up?            14:07:00
6  A. I recall writing on this page.       14:07:15
7  Q. Okay.                  14:07:17
8      And when did you write on that page?  14:07:18
9  A. I do know that John Chambers, I believe I  14:07:23
10   wrote John Chambers --           14:07:26
11     MS. SIMPSON JONES: I'm sorry, I'm  14:07:28
12   going to instruct you not to say what was  14:07:29
13   actually written there because it was    14:07:33
14   redacted for a reason.           14:07:35
15     THE WITNESS: Yes.           14:07:37
16     MS. SIMPSON JONES: But if you    14:07:37
17   recall when you wrote it --        14:07:38
18 A. When I wrote it or what I wrote?       14:07:40
19 Q. When?                   14:07:42
20 A. I do not recall when.           14:07:43
21 Q. Was it at the time of the presentation?    14:07:44
22 A. Probably.                 14:07:47
23 Q. Was it while you were meeting with John    14:07:48
24   Chambers?                  14:07:50
25 A. This wasn't when we were -- no, this was --  14:07:53

190

1    you have to understand the context of the    14:07:56
2    meeting. This is -- this is not an MFS    14:07:57
3    schedule. This is in front of several    14:08:02
4    hundred investors. Sell side and buy side.  14:08:04
5    Q. So you took those notes while you were at    14:08:07
6    this presentation; is that right?    14:08:10
7    A. That's correct.    14:08:12
8    Q. Okay.    14:08:16
9         MS. SIMPSON JONES: And, again,    14:08:16
10    going forward, if there are other places    14:08:17
11    where the word redacted appears, please do    14:08:18
12    not describe what is in that material. Okay? 14:08:21
13         THE WITNESS: Okay.    14:08:25
14         MS. SIMPSON JONES: Thank you.    14:08:27
15    Q. And I won't ask you that because your counsel 14:08:29
16    has inserted this objection. But I will ask  14:08:33
17    you when, things of that nature I am entitled 14:08:35
18    to ask you.    14:08:38
19       Turning to the page No. 01071.    14:08:41
20    A. 71?    14:08:53
21    Q. Yes.    14:08:54
22         MS. SIMPSON JONES: Right here    14:08:55
23    (indicating).    14:08:56
24  · A. Sure.    14:08:57
25    Q. Is that your handwriting?    14:08:57

191

1    A. Yes, it is.    14:08:59
2    Q. And at the top of the page does it say:    14:09:01
3    Chambers lead off?    14:09:04
4    A. That's correct.    14:09:06
5    Q. And then what does it say after that?    14:09:06
6    A. The fast will beat the slow.    14:09:11
7    Q. And lower down does he -- do your notes    14:09:17
8    reflect that John Chambers was projecting    14:09:20
9    Cisco's economic growth?    14:09:23
10    A. I do not think that was a comment about    14:09:33
11    Cisco's economic growth. This is about    14:09:37
12    broader economic growth.    14:09:39
13    Q. And what does it say after the five to six  14:09:41
14    percent question mark?    14:09:45
15    A. Driven by productivity improvements. The    14:09:47
16    implication is that the economy grows three  14:09:51
17    to four percent normally but it could be    14:09:54
18    driven five to six percent driven by    14:09:57
19    productivity improvements.    14:09:59
20    Q. Lower on the page do you see the number one? 14:10:08
21    A. Yes.    14:10:13
22    Q. What does that, what does that entry there   14:10:14
    say?    14:10:19
-4    A. It says the company -- the company goals    14:10:20
25    three to five years out would be the leader  14:10:26

192

1    in DVD, voice, video and data.    14:10:30
2    Q. And underneath it, what does it say?    14:10:32
3    A. The next line?    14:10:34
4    Q. Yes.    14:10:35
5    A. They want to be the No. 1 and No. 2 player in 14:10:36
6    these respective businesses. System    14:10:39
7    software, market and something Enterprise and 14:10:42
8    service provider, whatever.    14:10:46
9    Q. And was there a note there under the    14:10:50
10    redaction stamp that you took at the same    14:10:52
11    time that you were writing the rest of these 14:10:55
12    notes?    14:10:57
13    A. Can you rephrase that question again?    · 14:11:11
14    Q. Sure.    14:11:13
15       Do you see the redacted stamp?    14:11:14
16    A. Yes.    14:11:15
17    Q. Was there a notation underneath there that   14:11:16
18    you made?    14:11:19
19    A. I can't recall.    ·    14:11:20
20    Q. Turning to the document with the Bates number 14:11:36
21    01093, is there handwriting at the top of the 14:11:41
22    page?    14:11:50
23    A. Yes.    14:11:50
24    Q. Is that yours?    14:11:50
25    A. Yes.    14:11:53

193

1    Q. What does it say?    14:11:54
2    A. Jabber second industrial revolution first   14:11:56
3    start up four years ago.    14:12:02
4    Q. What does that mean?    14:12:03
5    A. Cisco executives often used to talk about the 14:12:04
6    internet being the next industrial revolution 14:12:07
7    and that it would change our economy    14:12:10
8    permanently.    14:12:14
9    Q. And what was your assessment of that claim? 14:12:15
10         MS. SIMPSON JONES: Objection,    14:12:18
11    again, on grounds of research analyst work   14:12:19
12    product.    14:12:23
13       But you may answer.    14:12:24
14    A. The internet's a pretty powerful    14:12:26
15    technological shift so it obviously would    14:12:30
16    have an important impact on our economy.    14:12:32
17    Whether or not it's in the extent of the    14:12:36
18    industrial revolution, I don't know.    14:12:37
19    Q. Do you think that was overstating it maybe? 14:12:39
20    A. Remember, you take everything with a grain of 14:12:41
21    salt.    14:12:44
22    Q. Okay.    14:12:45
23       Turning to the page ending in 1110.   14:12:46
24    A. Same exhibit?    14:12:55
25    Q. Yes, exactly.    14:12:57

194

1        MS. SIMPSON JONES: Last page of   14:12:59
2    that.                          14:13:00
3    A. Yes.                        14:13:18
4    Q. Does it read: Chambers part two on the top? 14:13:01
5    A. Uh-huh -- yes.              14:13:04
6    Q. What does that refer to?    14:13:08
7    A. Well, when I take notes, John was presenting 14:13:09
8    and discussing things, and as I'm taking   14:13:11
9    notes, this is just -- I usually I just   14:13:14
10   indicate my second page as part two.   14:13:16
11   Q. On the right do you see where it says:   14:13:18
12   Virtual everything, virtual meeting. virtual 14:13:21
13   close?                         14:13:26
14   A. What about that?            14:13:26
15   Q. Does it say that?           14:13:27
16   A. Virtual everything, virtual meeting, virtual 14:13:33
17   close, yes.                    14:13:37
18   Q. What does that refer to?    14:13:37
19   A. I think these comments need to be taken in   14:13:39
20   perspective to each so I wouldn't want to   14:13:42
21   make it a vacuum of just that. But these are 14:13:44
22   some of the dynamics that the internet can   14:13:47
23   enable us to do. And the virtual comment is 14:13:50
24   everything can be done on a virtual almost   14:13:54
25   realtime basis if done properly.       14:13:57

195

1    Q. Did --                      14:13:59
2    A. From any location.          14:14:00
3    Q. Did John Chambers at this meeting represent 14:14:01
4    that Cisco could monitor its financial   14:14:03
5    systems almost realtime?       14:14:06
6    A. I don't recall if that comment was made at   14:14:09
7    this meeting.                  14:14:16
8    Q. Okay.                       14:14:20
9        Do you recall making a notation that   14:14:21
10   was where the other -- this redacted stamp   14:14:25
11   was?                           14:14:27
12   A. What about it, please?       14:14:29
13   Q. Do you recall if you made that notation at   14:14:30
14   the same time that you made all of the   14:14:33
15   others?                        14:14:34
16   A. It's possible. Yeah, it's not uncommon for 14:14:34
17   me to write stuff down and as I'm writing it, 14:14:40
18   revising it and making changes.        14:14:44
19   Q. Okay.                       14:14:45
20       On the bottom of the page, could you   14:14:46
21   read into the record what you wrote here?   14:14:48
22   A. Yes.                         14:14:50
23       Service provider position important   14:14:56
24   transition over next two years. I believe.   14:14:59
25   If I'm reading that right. See comparable   14:15:08

196

1    growth to what experienced recently.   14:15:12
2    Q. And what, what do you take that to mean?   14:15:14
3    A. Well, we had gotten to a question and answer 14:15:18
4    session and someone asked a specific question 14:15:21
5    about growth rates for service provider. I   14:15:23
6    would state that what I wrote down just   14:15:27
7    reflects a comment made by Cisco.   14:15:30
8    Q. And was that comment made by John Chambers? 14:15:32
9    A. I can't recall.              14:15:35
10   Q. And what was -- what was the Cisco response? 14:15:36
11   A. Specifically?               14:15:41
12   Q. Yes.                        14:15:42
13   A. I can't recall.             14:15:42
14   Q. Okay.                       14:15:44
15       Is it your recollection based on what   14:15:44
16   you wrote that the Cisco response was that   14:15:47
17   the service provider industry was going   14:16:01
18   through an important transition?   14:16:04
19   A. This could have meant Cisco going through an 14:16:11
20   important transition.           14:16:13
21   Q. And what did your notation: Comparable   14:16:15
22   growth to what experienced recently mean?   14:16:21
23   A. That could relate to either that was an   14:16:24
24   answer or my implication that what the   14:16:26
25   service provider growth business had been   14:16:30

197

1    growing, that they may have stated that they 14:16:33
2    see growth rates being comparable to that,   14:16:34
3    going forward.                 14:16:37
4    Q. Turning to the page ending 01115. It looks 14:16:51
5    like this (indicating).        14:16:55
6    A. This one here?              14:17:05
7    Q. No, the next one.           14:17:06
8    A. Yes.                        14:17:14
9    Q. Is that your handwriting as well?   14:17:14
10   A. Yes.                        14:17:16
11   Q. Will you read into the record what you wrote 14:17:17
12   there?                         14:17:19
13   A. Growth Q over Q remains consistent. NTO is 14:17:21
14   robust.                        14:17:27
15   Q. And why did you write that?   14:17:27
16   A. This is from a presentation at the conference 14:17:33
17   that Kevin Kennedy gave and I was probably   14:17:36
18   taking notes of what he was discussing and   14:17:39
19   wrote down those comments.     14:17:45
20   Q. So is it your belief that Kevin Kennedy   14:17:48
21   stated that the service provider growth from 14:17:51
22   quarter to quarter was remaining constant?   14:17:54
23   A. Consistent.                 14:17:58
24   Q. Consistent. Thank you.       14:17:59
25   A. Yes.                        14:18:02

198

1    Q. Was that your understanding at the time?   14:18:16
2    A. That the service provider growth would remain 14:18:21
3       as it had been? Yes.          14:18:24
4    Q. Turning to the page ending 1131.        14:18:29
5    A. 31?                14:18:34
6    Q. Yeah.              14:18:36
7       Is that your handwriting as well?   14:18:44
8    A. Yes.               14:18:46
9    Q. And does this reflect market share of Cisco  14:18:47
10      as compared to competitors?       14:18:51
11   A. Yes.               14:18:54
12   Q. And in what industry?        14:18:55
13   A. These are market shares in key products for  14:19:01
14      Cisco in the Enterprise switching business.  14:19:06
15      The layer three switch business being one of 14:19:11
16      the largest -- larger product lines. Gigabit 14:19:15
17      internet being a more emerging product line  14:19:19
18      per higher growth. And this looks like it  14:19:24
19      was taken from -- this had to have been taken 14:19:28
20      from a slide Cisco put up and I wrote down  14:19:31
21      the numbers.            14:19:33
22   Q. Was it important for Cisco to maintain market 14:19:34
23      share?               14:19:37
24   A. Absolutely.          14:19:40
25   Q. Why?              14:19:41

199

1    A. It was a corporate objective. Maintain or  14:19:44
2       gain market share.          14:19:50
3    Q. And why?             14:19:52
4    A. That's what most companies want to do, beat  14:19:52
5       the competition.          14:19:55
6    Q. And why is that?         14:19:56
7    A. Why not?             14:19:58
8    Q. Did market share have an affect on Cisco's   14:20:01
9       stock price?            14:20:05
10   A. It potentially can.        14:20:05
11   Q. In what way?            14:20:06
12   A. Well, I think it's not just Cisco. Any    14:20:08
13      company who showed market share losses,    14:20:10
14      people tend to wonder what -- especially in  14:20:12
15      technology. If you start to lose market   14:20:15
16      share, the assumption is it's a potentially  14:20:18
17      intellectual property or product problem. If 14:20:22
18      that becomes permanent, you're out of    14:20:24
19      business in two years or less.     14:20:27
20         MS. WEAVER: I'll mark as Exhibit   14:21:05
21      556 a document bearing Bates numbers    14:21:08
22      MFS-CSCO00740 through 754.        14:21:14
23         And I'm sorry, I'm shy a copy again.  14:21:21
24         (Documents Marked Plaintiff's   14:21:47
25      Exhibit No. 556 for

200

1          Identification.)       14:21:54
2    Q. What is Exhibit 556?          14:21:54
3    A. It is a Morgan Stanley research report    14:21:57
4       written by Chris Depoy on Cisco Systems.   14:22:00
5    Q. And was it in your possession at some point  14:22:06
6       during the relevant period?       14:22:10
7    A. Most likely.             14:22:12
8    Q. How did it come into your possession?    14:22:14
9    A. Well, this is not -- well, this is not    14:22:18
10      uncommon. We frequently get research reports 14:22:22
11      written by Wall Street brokers on companies  14:22:25
12      we work on so it's not uncommon for an    14:22:28
13      industry analyst to receive whenever a Wall  14:22:32
14      Street report is published that content.   14:22:38
15      Wall Street makes an effort to get it in our 14:22:40
16      hands so we can see what's being written.   14:22:43
17   Q. Do you see on the first page of the exhibit  14:22:45
18      where it says: Personal folders back slash  14:22:47
19      May 133S (509 to 510)?          14:22:49
20   A. Yes.               14:22:55
21   Q. What does that refer to?        14:22:56
22   A. It looks like an e-mail folder.     14:22:59
23   Q. Was this your e-mail folder?      14:23:01
24   A. Possibly. But the May -- I don't know.   14:23:04
25      Well, I usually do not use personal folder as 14:23:11

201

1       a notation for a directory. And then the May 14:23:14
2       133S would not be my creation. I don't group 14:23:20
3       or categorize by that.         14:23:22
4    Q. Could this be from the e-mail archive that  14:23:23
5       you were referring to earlier?     14:23:26
6    A. I don't know. Possibly.        14:23:27
7       Or let me say another thing about    14:23:38
8       this. This -- it could be the location of  14:23:41
9       the person who sent it.         14:23:46
10         MS. SIMPSON JONES: But you don't  14:23:48
11      know.               14:23:48
12         THE WITNESS: I don't know.     14:23:49
13         MS. WEAVER: I'll mark -- no. I'll 14:23:59
14      mark as Exhibit 557 -- you know, strike that. 14:24:15
15         I'll mark as Exhibit 557 a document   14:24:29
16      bearing Bates numbers 0101591.     14:24:32
17         (E-mail Document Marked
18         Plaintiff's Exhibit No. 557 for
19         Identification.)       14:24:52
20   Q. Do you recognize Exhibit 557?     14:24:52
21   A. Yes.               14:24:55
22   Q. What is it?            14:24:59
23   A. It's an e-mail between Roberta Detata and I. 14:25:01
24   Q. Did you write that you had some questions   14:25:08
25      which Nortel provoked about Cisco's strategy? 14:25:19

**202**

1   A. Yes, looks like it.                          14:25:31
2   Q. And do you recall what those questions were? 14:25:32
3   A. No, I can't recall. It's not uncommon for    14:25:37
4       the competitors to go after each other.     14:25:41
5   Q. Who is Carl Russo?                           14:25:43
6   A. I, I -- the name is familiar but I can't     14:25:46
7       recall exactly what he did.                 14:25:49
8   Q. Okay.                                        14:25:54
9   A. I'm just stuck.                              14:25:55
10  Q. Okay.                                        14:26:06
11  A. If he -- I can't -- I shouldn't guess because 14:26:06
12      I don't know the answer to that. So I can't  14:26:13
13      recall.                                     14:26:15
14          MS. WEAVER: I'll mark as Exhibit        14:26:16
15      558 a document bearing Bates No.            14:26:19
16      CIS-PPNPF-0103336.                          14:26:26
17          (E-mail Document Marked
18          Plaintiff's Exhibit No. 558 for
19          Identification.)                        14:26:45
20  Q. Do you recognize Exhibit 558?                14:26:45
21  A. Yes, I do.                                   14:27:03
22  Q. And what is it?                              14:27:04
23  A. It's an e-mail between Roberta Detata and I. 14:27:05
24  Q. And what was it concerning?                  14:27:09
25  A. I had a question about Cisco's -- that Cisco 14:27:10

**203**

1       acquires a lot of promising startups and    14:27:20
2       gains a lot of market share to potentially  14:27:22
3       get into a competitive practice issue similar 14:27:25
4       to Microsoft where Washington starts to focus 14:27:29
5       on the company's acquisitions and the       14:27:33
6       crowding out of other players.              14:27:36
7   Q. Do you recall what the response to this was? 14:27:38
8          MS. SIMPSON JONES: Objection.            14:27:41
9   A. No, I do not.                                14:27:43
10  Q. Did Cisco, to your knowledge, have a         14:27:47
11      competitive problem similar to Microsoft?   14:27:49
12  A. I don't think so. I did not think so at the  14:27:53
13      time, but I was just trying to think of     14:27:59
14      proactively what would happen next as we try 14:28:02
15      to -- a lot of what we do is try to         14:28:05
16      anticipate into the future which is not in  14:28:07
17      the stock today.                            14:28:11
18  Q. Do you see where you wrote: I assume the     14:28:11
19      recent line in market developments, 3Com    14:28:16
20      dropping out of certain markets and Cabletron 14:28:16
21      pulling back must have caught some attention 14:28:18
22      in DC?                                      14:28:20
23  A. It's possible.                              14:28:21
24  Q. Do you see that you wrote that?              14:28:23
25  A. Yeah, I saw that, yes.                       14:28:24

**204**

1   Q. Okay.                                        14:28:25
2       Do you know what that refers to?            14:28:26
3   A. Well, it's just gained a lot of land market  14:28:27
4       share and I know Cabletron and 3Com were    14:28:31
5       competitively having problems. So Cisco was 14:28:34
6       dominating the market. And just have the    14:28:37
7       question if it comes across as              14:28:39
8       anti-competitive.                           14:28:49
9          MS. WEAVER: I'll mark as Exhibit         14:29:11
10      559 a document bearing Bates numbers        14:29:16
11      MFS-CSCO00757 through 758.                  14:29:22
12          (Memorandum Marked Plaintiff's          14:29:25
13          Exhibit No. 559 for
14          Identification.)                        14:29:40
15  Q. Do you recognize Exhibit 559?                14:29:40
16  A. Yes.                                         14:29:49
17  Q. What is it?                                  14:29:49
18  A. It's a memo that a group of us wrote to our  14:29:51
19      investment department drawing some thoughts 14:29:56
20      on our attendance at the Supercomm trade show 14:30:00
21      in June 2000.                               14:30:03
22  Q. And do you recall what your thoughts were?   14:30:04
23  A. No.                                          14:30:09
24          MS. SIMPSON JONES: Objection.           14:30:10
25      Again, to the extent that you're trying to  14:30:12

**205**

1       inquire into what was on this document, I   14:30:14
2       would instruct Mr. Sette-Ducati not to      14:30:17
3       answer.                                     14:30:20
4           But you can answer questions about the  14:30:21
5       text that does appear.                      14:30:23
6           THE WITNESS: Okay.                      14:30:26
7   Q. As you sit here today, do you recall what    14:30:26
8       your thoughts were about the Supercomm trade 14:30:29
9       show that you attended?                     14:30:33
10  A. I can't recall my conclusions.              14:30:35
11  Q. Turning to the second page of Exhibit 559, do 14:30:41
12      you see where it says: Cisco heard more     14:30:46
13      about the Monterey product which has been   14:30:48
14      written off by the street, more confident in 14:30:51
15      their position in their ability to develop in 14:30:54
16      growing markets?                            14:30:58
17  A. Yes, I do.                                   14:31:03
18  Q. Did you write that?                          14:31:04
19  A. I can't -- cannot -- I cannot say that I did 14:31:06
20      give -- it was sent by a group and there was 14:31:17
21      a different analyst actually following Cisco 14:31:18
22      at that point in time. So I don't know who  14:31:21
23      actually came up with that specific comment. 14:31:23
24      It could have been one of -- one of four of 14:31:26
25      us.                                         14:31:31

206

1   Q. But you adopted that essentially by sending  14:31:31
    out the memo, right?                14:31:34
        MS. SIMPSON JONES: Objection.        14:31:35
4   A. The group adopted that.              14:31:36
5   Q. So what does it refer to when it says that  14:31:41
6      the Monterey product was written off by the  14:31:45
7      street?                       14:31:47
8   A. That says that the sell side had written off  14:31:49
9      Monterey as an acquisition. Basically said  14:31:52
10     it's a flop.                    14:31:55
11  Q. And then when it says: More confident in   14:31:56
12     their positioning in ability to grow through  14:32:00
13     developing markets, what does that refer to?  14:32:03
14  A. It means that there's been a change. It's   14:32:08
15     not as bad as the street has made it out to  14:32:10
16     be and that we have some confidence in      14:32:15
17     Monterey's position and ability to grow.     14:32:18
18  Q. Now, does this reflect that that's what Cisco  14:32:20
19     said or did this reflect that that was your  14:32:23
20     conclusion?                   14:32:25
21  A. I cannot draw a conclusion. If Cisco said  14:32:28
22     that or if it was just us gleaning        14:32:32
23     information from people we were talking to at  14:32:35
24     the show.                    14:32:37
25  Q. Was Exhibit 559 the kind of memo that you   14:32:42

207

1      prepared and circulated regularly as part of  14:32:45
2      your job?                     14:32:49
3          MS. SIMPSON JONES: Objection.     14:32:53
4   A. It was not uncommon for us after attending a  14:33:02
5      conference or a trade show to write up      14:33:05
6      summary thoughts.                 14:33:07
7   Q. And then who were investment personnel as   14:33:07
8      referred to at the top of the memo?        14:33:11
9   A. Equity analysts and portfolio managers.    14:33:13
10  Q. Within MFS?                    14:33:17
11  A. Yes, MFS only. Because my name comes first,  14:33:18
12     I'm not quite sure who actually authored    14:33:23
13     this.                       14:33:26
14  Q. Why?                         14:33:28
15  A. Well, who actually did the writing of this.  14:33:29
16  Q. If your name came last, would it be --     14:33:33
17  A. No, I'm saying it could have been -- it's   14:33:35
18     either -- it's probably not John. It's      14:33:38
19     either Kate, myself or Alan. Kate and Alan  14:33:42
20     were analysts in the industry at that point  14:33:45
21     in time.                      14:33:47
22  Q. Okay.                         14:33:49
        MS. WEAVER: We'll mark as Exhibit  14:34:34
24     560 a document bearing Bates numbers        14:34:38
25     CIS-PPNPF-0091751 through 752.          14:34:44

208

1          (Document Marked Plaintiff's
2           Exhibit No. 560 for
3           Identification.)             14:35:07
4   Q. Have you seen Exhibit 560 before?        14:35:07
5   A. Yes.                         14:35:08
6   Q. What is it?                     14:35:09
7   A. It looks like a schedule for -- it's an     14:35:14
8      itinerary schedule.                14:35:26
9   Q. Did you attend a dinner at Paleo's with    14:35:26
10     members of Cisco or Cisco employees on      14:35:31
11     December 9th, 2000?                14:35:35
12  A. I cannot recall if I attended the dinner.   14:35:38
13  Q. When did you last see Exhibit 560?        14:35:45
14  A. When did I last see this?              14:35:52
15  Q. Have you ever seen it before?           14:35:54
16  A. No, I have not seen this before.         14:35:56
17  Q. Okay.                        14:35:59
18  A. It's not uncommon for us to sign up for stuff  14:36:01
19     and not attend.                  14:36:04
20         MS. WEAVER: I'll mark as Exhibit  14:36:06
21     561 a document bearing Bates numbers        14:36:08
22     CIS-PPNPF-0103794 through 795.          14:36:13
23         (E-mail Document Marked
24          Plaintiff's Exhibit No. 561 for
25          Identification.)             14:36:46

209

1   Q. Have you seen Exhibit 561 before?        14:36:46
2   A. This exhibit?                    14:36:50
3   Q. Yes.                         14:36:52
4   A. I have not seen this exhibit before.       14:36:52
5   Q. What is Exhibit 561?                14:36:56
6   A. E-mails between Roberta Detata and I.      14:36:58
7   Q. And you wrote the e-mails; is that right?   14:37:02
8   A. Yes.                         14:37:05
9   Q. On or around December 14, 2000; is that    14:37:06
10     right?                      14:37:16
11  A. Oh, the one that I wrote?              14:37:16
12  Q. Yes.                         14:37:18
13  A. I wrote the one on 12/13/2000. And the reply  14:37:22
14     on December 14, 2000, yes.             14:37:30
15  Q. Do you see where you wrote: I figure we'll  14:37:32
16     be stuck in a difficult tech investing      14:37:37
17     climate through the early part of '01,     14:37:38
18     expectations are just too high in many     14:37:38
19     industries?                    14:37:41
20  A. Yes, I see that.                  14:37:41
21  Q. What were you referring to?            14:37:44
22  A. Well, the market at that -- stock market at  14:37:50
23     that point started was, economic and stock  14:37:55
24     market cycle was starting to decline. And  14:37:57
25     one thing we were doing at MFS at that stage  14:38:02

**210**

1    which is typically what we do at the end of    14:38:05
2    the year is make sure we take a good hard    14:38:07
3    look at what expectations are for the    14:38:10
4    companies we invest in and make -- it's a    14:38:13
5    reality check we do a couple of times a year.    14:38:18
6    Q. And how do you look at expectations?    14:38:20
7    A. What's published based on first call.    14:38:22
8    Q. Do you see where you wrote: I hope the 60    14:38:25
9    percent guidance holds up for Cisco. If it    14:38:27
10    doesn't, the ensuing tech wreck will be    14:38:30
11    immense?    14:38:36
12    A. Yes, I see that.    14:38:36
13    Q. What was that referring to?    14:38:37
14    A. That Cisco had some guided to 60 percent    14:38:38
15    growth for the ensuing period.    14:38:42
16    Q. And were you saying that if Cisco did not    14:38:49
17    make its numbers, that it would have an    14:38:55
18    affect on the tech industry?    14:38:58
19        MS. SIMPSON JONES: Objection.    14:39:00
20    A. That's an implication if the Bellworth    14:39:12
21    technology is unable to meet it guidance that    14:39:15
22    most tech stock is not going to be performing    14:39:22
23    well.    14:39:25
24        MS. WEAVER: I'll mark as Exhibit    14:39:29
25    561.    14:39:38

**211**

1        MS. SIMPSON JONES: I think you just    14:39:38
2    did 561.    14:39:39
3        MS. WEAVER: 562, a document    14:39:42
4    CIS-PPNPF-0996972 through 74.    14:39:45
5        (Document Marked Plaintiff's
6        Exhibit No. 562 for
7        Identification.)    14:40:10
8    Q. Do you recognize Exhibit 562?    14:40:24
9    A. No.    14:40:27
10    Q. Did anyone from MFS visit Cisco on or around    14:40:28
11    February 20, 2001 to the best of your    14:40:34
12    knowledge?    14:40:38
13    A. It's possible. It looks like it.    14:40:38
14    Q. Does Exhibit 562 look like a document    14:40:40
15    generated by someone at MFS?    14:40:44
16    A. It's possible. I really can't conclude it.    14:40:52
17    Q. In advance of meetings with Cisco, did -- was    14:41:00
18    it customary for analysts to prepare an    14:41:03
19    agenda like this?    14:41:07
20    A. Yeah. Oh, yeah. It's just part of your    14:41:13
21    preparation. The fund managers and analysts    14:41:17
22    like to have an agenda so they can review it    14:41:21
23    on the flight out or just have it in front of    14:41:24
24    them in a meeting.    14:41:26
25    Q. And did those agendas look like this?    14:41:27

**212**

1    A. It looked like a standard agenda. We didn't    14:41:31
2    have a specific template.    14:41:36
3    Q. MFS did not have a specific template?    14:41:39
4    A. Agenda template?    14:41:42
5    Q. Yeah.    14:41:44
6    A. No.    14:41:44
7    Q. Okay.    14:41:45
8        Who was covering Cisco at this time?    14:41:45
9    A. Not me. Kate McLosky.    14:41:49
10    Q. Do you believe that Exhibit 562 sets forth    14:41:58
11    the concerns that MFS had with regard to    14:42:10
12    Cisco in February 20, 2001?    14:42:12
13        MS. SIMPSON JONES: Objection.    14:42:15
14    A. It's just the first time I seen this memo to    14:42:15
15    my recollection, so unless you give me time    14:42:17
16    to review it.    14:42:20
17    Q. Please go ahead and take time to review it.    14:42:21
18    A. Okay.    14:42:24
19        THE WITNESS: Can I borrow a pen?    14:42:32
20        MS. COYNE: I don't think you can    14:42:34
21    write on the exhibits.    14:42:36
22        THE WITNESS: Should I, no?    14:42:38
23        MS. SIMPSON JONES: No, I don't    14:42:40
24    think you should write on the exhibits. I    14:42:41
25    lost my mind for a minute. Sorry.    14:42:50

**213**

1    A. Okay. What is your question about this memo,    14:44:39
2    please?    14:44:41
3    Q. Having reviewed it more carefully, do you    14:44:48
4    think it's likely that this was a document    14:44:50
5    created by an analyst at MFS in preparation    14:44:53
6    for meeting with Cisco?    14:44:56
7    A. It's possible, yes.    14:44:57
8    Q. And --    14:44:59
9    A. This looks like a buy side analyst    14:45:01
10    preparation.    14:45:03
11    Q. And what makes you say that?    14:45:04
12    A. I just think it is. It reviews a lot of the    14:45:05
13    things we were probably keeping in our sights    14:45:08
14    for the company, for any company in    14:45:12
15    technology, whether it's accelerated, stable    14:45:15
16    or decelerating. And highlights some    14:45:21
17    individual items which would be things we    14:45:24
18    would be focused on.    14:45:26
19    Q. What things in particular strike you as    14:45:27
20    issues that you were focused on?    14:45:29
21        MS. SIMPSON JONES: Objection. He    14:45:35
22    didn't say that he was focused on    14:45:35
23    particular.    14:45:39
24        THE WITNESS: May I answer?    14:45:44
25    Q. Yes.    14:45:46

214

1    MS. SIMPSON JONES: If you    14:45:47
2    understand the question, go ahead.    14:45:47
     THE WITNESS: Yeah.    14:45:55
4  Q. I can ask it a different way.    14:45:55
5  A. That I was focused on?    14:45:56
6  Q. What things in particular strike you as    14:45:58
7    issues that MFS was focused on?    14:45:58
8  A. A lot -- just about everything here. Lead    14:46:04
9    times, cash flow, revenues, margins,    14:46:06
10   financing, growth objectives by product,    14:46:10
11   product portfolio by competition, service    14:46:13
12   provider on a business. Enterprise. You    14:46:16
13   know, acquisitions. New markets. I mean,    14:46:19
14   this hits on everything we would normally ask    14:46:22
15   in regard business is good, business is bad.    14:46:26
16 Q. What with regard to lead times was an issue    14:46:28
17   that MFS was concerned about with regard to    14:46:31
18   Cisco?    14:46:34
19 A. Well, with any technology company, when your    14:46:34
20   lead times extends that means that the    14:46:37
21   business is tighter and the customers have to    14:46:39
22   order earlier and prepare to wait longer.    14:46:41
23     When lead times come in, that's a    14:46:46
24   signal that demand is slowing down a little    14:46:48
25   bit. Business is -- products, components are    14:46:51

215

1    easier to get. So I think we use lead time    14:46:54
2    any time we talk to a technology company, get    14:46:57
3    a sense, it's a standard question. You use    14:47:00
4    lead time any time we talk to a technology    14:47:02
5    company, get a sense -- it's a standard    14:47:03
6    question, how is lead time by product line is    14:47:03
7    it going out, coming in or is it stable.    14:47:05
8  Q. Do you recall having conversations with Cisco    14:47:06
9    about what steps Cisco took to test the    14:47:07
10   quality of the order book or backlog?    14:47:09
11     MS. JENSEN: Objection.    14:47:12
12 A. Come again?    14:47:18
13     MS. WEAVER: I said -- it should say    14:47:25
14   -- okay.    14:47:27
15 Q. Do you recall what steps Cisco took to test    14:47:27
16   the quality of the order book or backlog?    14:47:32
17 A. What steps?    14:47:37
18 Q. If any?    14:47:38
19 A. I do not.    14:47:38
20 Q. Were you ever told that Cisco took any steps    14:47:39
21   to test the quality of the order book or    14:47:42
22   backlog?    14:47:44
     A. No.    14:47:44
     Q. Do you see where it says cash flow metrics    14:47:48
25   have deteriorated over the balance of the    14:47:51

216

1    last 12 months?    14:47:55
2  A. Yes.    14:47:56
3  Q. Do you have any recollection that that's    14:47:56
4    accurate?    14:47:59
5  A. I -- I'm not in position to make that, make    14:48:02
6    that comment.    14:48:06
7  Q. But do you believe that somebody at MFS was    14:48:07
8    noting that cash flow metrics had    14:48:10
9    deteriorated at Cisco of the balance over the    14:48:13
10   last 12 months?    14:48:15
11 A. Yes, someone did note the cash flow    14:48:16
12   deterioration. That's something we spend a    14:48:20
13   lot of time looking at for any company.    14:48:22
14 Q. And do you see where it says: Please discuss    14:48:25
15   the recent gross margin deterioration?    14:48:28
16 A. Yes.    14:48:31
17 Q. Do you believe that refers to the fact that    14:48:32
18   growth margins had deteriorated at Cisco, yes.    14:48:35
19 A. Growth margins were deteriorating, yes.    14:48:40
20 Q. And do you see the next sentence: If it's    14:48:43
21   mostly related to high inventory levels, why    14:48:46
22   shouldn't we expect to see improvement in the    14:48:48
23   July quarter?    14:48:51
24     Do you see that sentence?    14:48:55
25 A. On the margins?    14:48:58

217

1  Q. Yes.    14:48:59
2  A. Yeah -- yes, I see that sentence.    14:49:04
3  Q. Do you have an understanding as to what    14:49:06
4    that's referring to?    14:49:08
5  A. That's referring to that the inventory levels    14:49:10
6    are rising. When that happens your gross    14:49:12
7    margins are usually under pressure.    14:49:15
8  Q. Then why would that lead to improvement in    14:49:16
9    the July quarter potentially?    14:49:19
10 A. Well, whenever a company has a step up in    14:49:20
11   inventory, to some point it's going to go    14:49:23
12   down. Okay. And we're trying to get a sense    14:49:26
13   of what their view was, when that --    14:49:29
14   inventories would continue to climb or if it    14:49:31
15   would start to decline.    14:49:34
16 Q. Do you recall --    14:49:36
17 A. Continue to climb and then start to decline.    14:49:37
18 Q. Do you recall if that's what happened for    14:49:39
19   Cisco in the July quarter?    14:49:41
20 A. I can't recall.    14:49:43
21 Q. Do you see where it says vendor financing?    14:49:43
22 A. Yeah.    14:49:46
23 Q. And then it says there have been a number of    14:49:47
24   Celex emerging carriers who have not done    14:49:50
25   well who have received financing from Cisco.    14:49:53

**218**

1     What is the current exposure and how should   14:49:55
2     we think about this?          14:49:58
3          Do you see that sentence?          14:49:59
4     A. Yes.          14:50:00
5     Q. What is that referring to?          14:50:00
6     A. Well, as we talked about earlier, Cisco did a   14:50:02
7     certain degree of vendor financing. A lot of   14:50:05
8     the emerging carriers who had business models   14:50:08
9     that were probably higher risk could be seen.   14:50:16
10    If they're fundamentals are deteriorating,   14:50:19
11    want to get a sense what kind of exposure   14:50:24
12    Cisco would have with these customers in the   14:50:25
13    event that some of these companies went   14:50:27
14    under.          14:50:28
15    Q. And do you see the question: What is the   14:50:29
16    current mix between sales type and finance   14:50:31
17    leases?          14:50:33
18    A. Yes.          14:50:36
19    Q. What's that referring to?          14:50:36
20    A. I don't know the specifics to that question,   14:50:41
21    but it looks like just trying to get a sense   14:50:44
22    of sales versus finance.          14:50:46
23    Q. And what, why is the distinction important if   14:50:48
24    at all?          14:50:51
25    A. Well, it's one question among many so....   14:50:53

**219**

1     Q. What is the distinction between a sales type   14:50:56
2     lease and a finance lease?          14:50:58
3     A. Oh, I can't. I don't -- I can't explain that   14:51:00
4     because I don't specifically know how sales   14:51:04
5     type is being defined versus finance lease.   14:51:08
6     This is not my writing.          14:51:12
7     Q. Okay.          14:51:14
8          Turning to the next page on No. 2   14:51:15
9     under product portfolio, do you see the third   14:51:19
10    sentence: Does Nortel's recent difficulties   14:51:23
11    in the long haul optical segment change how   14:51:27
12    Cisco thinks about future product   14:51:30
13    development?          14:51:32
14    A. Yes.          14:51:32
15    Q. What is that sentence referring to to the   14:51:33
16    best of your knowledge?          14:51:36
17    A. Well, Nortel was having problems in their   14:51:36
18    optical business and we're trying to see how   14:51:39
19    that -- after a period of extraordinary   14:51:43
20    growth, these companies started to slow down   14:51:48
21    and digest and we were just trying to assess,   14:51:50
22    I think, Cisco planning any differently.   14:51:54
23    Q. And do you see the question: Are the   14:51:54
24    products NEBS compliant and Osmond certified   14:51:57
25    to get into the Rbox? Same paragraph.   14:52:02

**220**

1     A. Yes. Yes, I do. I see that.          14:52:06
2     Q. Do you know what that's referring to?          14:52:12
3     A. There are certain requirements,          14:52:13
4     certifications that a telecom vendor would   14:52:16
5     have to meet to be able to place equipment at   14:52:19
6     carriers. In particular, the Dells had very   14:52:21
7     stringent requirements. And I think that   14:52:25
8     these are two certifications that would have   14:52:31
9     to be received in order to sell equipment   14:52:33
10    there.          14:52:35
11    Q. Do you recall that Cisco had a product called   14:52:35
12    Summa 4?          14:52:38
13    A. Summa 4? No, that's a new one to me.   14:52:40
14    Q. Do you recall at any point in time hearing   14:52:44
15    that Cisco's products were not NEBS   14:52:45
16    compliant?          14:52:48
17    A. I don't. I can't recall.          14:52:48
18    Q. Were you aware that certain of Cisco's   14:52:50
19    customers contended that Cisco's products   14:52:52
20    weren't NEBS compliant?          14:52:56
21    A. Which customers?          14:52:59
22    Q. American Metrocom?          14:53:01
23    A. Who is that?          14:53:04
24    Q. Were you aware of any customers of Cisco that   14:53:07
25    were concerned with NEBS compliance with   14:53:11

**221**

1     regard to Cisco products?          14:53:17
2     A. I can't recall. All I can -- all I can get   14:53:18
3     from this are more speculative carriers.   14:53:21
4     Q. Okay.          14:53:23
5     A. You know.          14:53:23
6     Q. Do you see where it refers to the service   14:53:42
7     line provider of business?          14:53:45
8     A. Yes.          14:53:46
9     Q. And you see the sentence: There's been a lot   14:53:47
10    of talk about the mix shift in carrier   14:53:49
11    capital spending between IP and Optical?   14:53:51
12    A. Yes.          14:53:54
13    Q. What's that referring to?          14:53:55
14    A. I thought that was a long-standing trend in   14:53:56
15    telecom capital spending as data traffic   14:53:59
16    overtakes voice traffic. Carriers were   14:54:07
17    shifting their spending away from legacy   14:54:10
18    circuit switch systems to IP based and   14:54:13
19    Optical technologies.          14:54:17
20    Q. And what was the impact for Cisco?          14:54:19
21    A. When Cisco's legacy -- Cisco's long term core   14:54:20
22    competency as a data company and so that was   14:54:2?
23    one of the big reasons why they made a strong   14:54:29
24    push into telecom, was that data traffic was   14:54:31
25    going to overwhelm voice traffic over time   14:54:34

**222**

1  and become the majority revenue driver for  14:54:36
   the telecom carriers. And Cisco wanted to  14:54:38
   leverage its data core competency into that.  14:54:40
4  Q. Looking at Exhibit 562 is it your belief that  14:54:49
5  someone from MFS at least intended to meet  14:54:56
6  with Cisco and meet Michael Ashby, Terry  14:54:56
7  Brown, Mike Volpi and Bill Erdmann?  14:54:59
8  A. Which number? Same one?  14:55:03
9  Q. Yeah.
10      MS. SIMPSON JONES: Same one.  14:55:15
11 A. It looks like it.  14:55:15
12 Q. Is it your belief. Okay.  14:55:16
13      Do you know if that meeting occurred?  14:55:17
14 A. I do not know.  14:55:19
15      MS. WEAVER: I need to go off the  14:55:21
16 record.  14:55:22
17      THE VIDEOGRAPHER: The time is 2:54.  14:55:23
18 This is the end of cassette No. 3 and we are  14:55:26
19 off the record.  14:55:28
20      (A short recess was taken.)  14:55:31
21      THE VIDEOGRAPHER: The time is 3:02.  15:04:06
22 This is the beginning of cassette No. 4 in  15:04:09
23 the deposition of Mr. David Sette-Ducati. We  15:04:12
24 are on the record.  15:04:15
25 Q. A quick question for you about the holdings  15:04:16

**223**

1  of MFS and Cisco stock. Are you aware that  15:04:18
2  following Cisco's announcement that it was  15:04:24
3  going to miss its numbers, that MFS continued  15:04:27
4  to hold Cisco stock or did it sell?  15:04:31
5  A. What time period was that, please?  15:04:39
6  Q. After February 6th of 2001. And let me  15:04:43
7  restate the question so it's clear.  15:04:48
8      Do you have any knowledge as to  15:04:50
9  whether MFS sold its holdings in Cisco stock  15:04:53
10 after February 6, 2001?  15:04:58
11 A. I can't recall the specifics on that.  15:05:00
12 Q. Do you generally recall if MFS sold Cisco  15:05:02
13 stock as a result of Cisco missing its  15:05:06
14 numbers?  15:05:10
15      MS. SIMPSON JONES: Objection.  15:05:11
16 A. Possibly.  15:05:11
17      MS. SIMPSON JONES: It's okay.  15:05:15
18 A. It's possible.  15:05:16
19 Q. And why do you say it's possible?  15:05:17
20 A. Well, it's not uncommon. There are some  15:05:18
21 investors in any shop there is the minute the  15:05:21
22 company disappoints, they sell a portion of  15:05:25
23 the holdings.  15:05:27
24 Q. And is that true of MFS?  15:05:27
25 A. Oh, yeah, it's true at any shop.  15:05:30

**224**

1  Q. Do you know if you showed Cisco stock?  15:05:33
2  A. I can't recall.  15:05:35
3      MS. WEAVER: I'll mark as Exhibit  15:05:38
4  563 a document bearing Bates No.  15:05:40
5  CIS-PPNPF-0100939 through 940.  15:05:53
6      (Document Marked Plaintiff's  15:05:57
7      Exhibit No. 563 for
8      Identification.)  15:06:15
9  Q. Do you recognize Exhibit 563?  15:06:15
10 A. Actually, I do not. I know what it is, but I  15:06:26
11 don't recognize it.  15:06:29
12 Q. Did Kate McLosky send e-mail while she was  15:06:30
13 working at MFS?  15:06:35
14 A. It looks like it.  15:06:40
15 Q. Was her e-mail addressed KMCCLOSKEY@MFS.com?  15:06:40
16 A. I think so.  15:06:49
17 Q. Do you believe that Exhibit 563 is an e-mail  15:06:51
18 that Kate McLosky sent to Roberta Detata?  15:06:54
19 A. It looks like.  15:07:01
20 Q. Do you see that the e-mail refers to a call  15:07:02
21 with Larry?  15:07:04
22 A. Yes.  15:07:18
23 Q. Do you believe that to refer to Larry Carter?  15:07:19
24 A. Most likely.  15:07:23
25 Q. Do you have any recollection of attending a  15:07:25

**225**

1  call with Larry Carter in April of 2001?  15:07:27
2  A. I do not. I do not know if that call ever  15:07:31
3  happened.  15:07:36
4  Q. Do you see that this document refers to you  15:07:36
5  saying that you had indicated an interest in  15:07:39
6  attending such a call?  15:07:41
7  A. Yes.  15:07:43
8  Q. Okay.  15:07:45
9  A. Specifically I have an interest, an interest  15:07:46
10 in hearing what they have to say.  15:07:49
11 Q. Do you recall discussing with anybody the  15:07:51
12 results of a call with Larry Carter in April  15:07:55
13 of 2001?  15:07:58
14 A. I do not.  15:07:59
15 Q. Do you see the list of issues that Kate  15:08:03
16 McLosky set forth here on Exhibit 563?  15:08:06
17 A. Yes, I do.  15:08:12
18 Q. Are you familiar with that list of issues?  15:08:13
19 A. Yes.  15:08:16
20 Q. And why are you familiar with that list?  15:08:17
21 A. Well, this relates to the two and a half  15:08:20
22 billion dollar let down that Cisco took. I  15:08:23
23 think most investors in technology were  15:08:28
24 familiar with what was happening when it  15:08:33
25 occurred.  15:08:35

226

1   Q. Do you recall if MFS got answers to the    15:08:39
2       questions that are listed here?    15:08:42
3   A. I do not know.    15:08:44
4   Q. Did you ever come to learn Cisco's    15:08:47
5       methodology and process used in determining    15:08:50
6       the timing and magnitude of the charge?    15:08:53
7           MS. SIMPSON JONES: Objection.    15:08:56
8   A. I did not.    15:09:01
9   Q. Do you know if anybody at MFS did?    15:09:03
10  A. Don't know.    15:09:06
11  Q. Did you ever learn how much of the charge    15:09:08
12      related to future deliveries of products    15:09:10
13      Cisco was under contractual obligation to    15:09:14
14      receive?    15:09:18
15  A. No.    15:09:18
16  Q. Did you ever learn if everything was written    15:09:18
17      down to zero?    15:09:21
18  A. Again, I -- I did not -- I do not -- I'm    15:09:23
19      unable to recall specifics of that and I'm    15:09:31
20      pretty sure I did not really didn't get the    15:09:35
21      specifics of what happened with the    15:09:39
22      inventory. I did not. Someone else at MFS    15:09:41
23      investment may have.    15:09:48
24  Q. Do you know if anyone received the answer to    15:09:49
25      the current or outstanding commitments    15:09:52

227

1       regarding the vendor financing?    15:09:55
2   A. I do not know.    15:09:56
3           MS. WEAVER: I'll mark as Exhibit    15:10:17
4       564 a document bearing Bates numbers    15:10:22
5       MFS-CSCO00759 through 00788.    15:10:28
6           (Document Marked Plaintiff's
7           Exhibit No. 564 for
8           Identification.)    15:10:52
9   Q. Do you recognize Exhibit 564?    15:10:52
10  A. Yes, I do.    15:10:55
11  Q. What is it?    15:10:56
12  A. These are handwritten notes of mine taken out 15:10:59
13      of my trade show notebook.    15:11:03
14  Q. And what is your trade show notebook?    15:11:11
15  A. When I attend trade shows, I write notes on    15:11:15
16      all the companies that I meet with and keep    15:11:18
17      it all in one binder. That's part of the    15:11:21
18      recovery process I took the Cisco notes out.    15:11:25
19  Q. Is it a loose-leaf binder where you can    15:11:30
20      insert separate pages?    15:11:34
21  A. No, it's a spiral.    15:11:35
22  Q. It's a spiral?    15:11:37
23  A. Yeah.
24  Q. And so did you tear pages out of the    15:11:37
25      notebook?    15:11:39

228

1   A. Yeah, I had to.    15:11:40
2   Q. Okay.    15:11:41
3       And looking at Exhibit 564, can you    15:11:41
4       flip through it and tell me if you think it    15:11:44
5       appears right now in the order that it was in    15:11:48
6       your notebook?    15:11:50
7   A. That's going to be a tough one.    15:11:51
8   Q. Well, I can help you out perhaps a bit. But    15:11:54
9       if you look at the first page, Bates No. 759,    15:11:58
10      that bears a date of 3/7/00; is that right?    15:12:02
11  A. Uh-huh.    15:12:05
12  Q. And then two pages later do you see it bears    15:12:05
13      a date of 3/2/00 on Bates No. 761?    15:12:08
14  A. What was that last?    15:12:16
15  Q. 761.    15:12:18
16  A. 61? Okay.    15:12:20
17  Q. Do you see that also bears a date of March of 15:12:32
18      2-0 --    15:12:35
19  A. Yeah.    15:12:36
20  Q. And then if you go to the Bates No. 00766?    15:12:36
21  A. Yeah.    15:12:43
22  Q. Do you see a date of 5/12/99?    15:12:43
23  A. Yes.    15:12:48
24  Q. Okay.    15:12:48
25      So how is this notebook normally

229

1       maintained, Is it maintained --    15:12:50
2   A. Well, it's chronologically and then what    15:12:51
3       happens is is that I tend -- usually it's    15:12:54
4       filled with Networth Interop notes or    15:12:55
5       Supercomm notes which was the primarily the    15:12:57
6       large trade shows each year, and so I tend to 15:13:00
7       keep the notes, you know. One notebook I may 15:13:03
8       as well fill it up before I start another    15:13:08
9       one.    15:13:10
10  Q. And the notes that you're taking are what's    15:13:10
11      transpiring at the meetings; is that right?    15:13:12
12  A. Yeah, it's usually two fold or three fold.    15:13:14
13      If I have a keynote that I've attended    15:13:17
14      and I've taken notes from that keynote on or    15:13:21
15      if I talked to people on the floor at the    15:13:24
16      Cisco or Nortel or Lucent, they tend to be    15:13:30
17      engineers or salespeople who I have a    15:13:33
18      specific one-on-one meeting set-up with the    15:13:35
19      company somehow. Or if I talked to other    15:13:40
20      investors and sell siders.    15:13:42
21  Q. Okay. Looking at --    15:13:52
22      (Clarification by the reporter.)
23  Q. Turning to the first page?    15:13:53
24  A. Yes.    15:13:55
25  Q. Does this -- do your notes here reflect that 15:13:56

230

```
1   you attended a Cisco presentation?     15:13:59
    A. Yes.                    15:14:01
    Q. And what presentation was that?     15:14:02
4   A. Well, this was -- oh, this could have been at 15:14:13
5   another trade show, OFC Optical fiber    15:14:21
6   convention. This looks like a presentation  15:14:26
7   -- these companies have booths set up and   15:14:28
8   they will have half hour, hour have     15:14:30
9   presentations on products with a marketing  15:14:32
10  salesperson discussing the product and    15:14:36
11  pitching it to an audience of customers.    15:14:38
12  And, you know, whomever is attending the    15:14:39
13  trade show. So this looks like a      15:14:43
14  presentation on transport and networking and 15:14:46
15  I just took notes on.            15:14:50
16  Q. And on the bottom of the page it says Cisco 15:14:52
17  again. Was that from the same presentation? 15:14:55
18  A. No, that looks like a note from someone I   15:15:01
19  talked to at Cisco -- at the Cisco booth.   15:15:06
20  Q. And who was that?            15:15:09
21  A. Craig. I can't read his last name.    15:15:10
22  Q. Do you know what you discussed with him?  15:15:13
23  A. Well, whatever I wrote down there. It looks 15:15:16
24  like he was an optical networking account   15:15:20
25  manager for Sprint. He said expect a few   15:15:39
```

231

```
1   major carrier announcements over the next
2   three to six months.
3        (Clarification by the reporter.)
4   A. So his name is Craig Fine, Fane. I don't   15:15:40
5   know what his last name is. I can't make out 15:15:43
6   the writing completely. It looks like he was 15:15:46
7   an account manager for Sprint in the      15:15:48
8   networking optical business. And I wrote    15:15:51
9   down some things he got. That he told me he 15:15:52
10  wanted to expect a few major carrier      15:15:54
11  announcements over the next three to six    15:15:56
12  months. Sounds like he came from Cerent   15:15:59
13  business accelerated. Cisco only lost 47    15:16:03
14  people. Sienna net wave division        15:16:07
15  multiplexing only. Cisco's transport multi  15:16:12
16  service something.              15:16:14
17  Q. And what do you think he meant when he -- or 15:16:18
18  what was your understanding what he meant   15:16:20
19  when he said expect a few major carrier    15:16:22
20  announcements over the next three to six    15:16:24
21  months?                   15:16:28
22  A. That's -- there would be carriers making some 15:16:28
23  announcements of product, product selection. 15:16:30
24  I don't know if there's -- if we're talking   15:16:34
25  about Cisco specifically or just within the  15:16:36
```

232

```
1   field that carriers would be making some    15:16:39
2   announcements over the next four to six    15:16:41
3   months about who they're selecting.       15:16:43
4   Q. Do you have any recollection of anyone else  15:16:49
5   with whom you met at this presentation?     15:16:51
6   A. No, no.                 15:16:55
7   Q. Turning to the page with the Bates No. 764 -- 15:17:03
8   A. Okay.                  15:17:12
9   Q. -- what is this notation referring to?    15:17:12
10  A. I actually don't know exactly.        15:17:31
11  Q. What did you write?            15:17:35
12  A. I wrote Cisco. Pirelli appalled. Product   15:17:36
13  line. It's something weak. Talking to     15:17:42
14  Corvus. Cerent and Monterey, far better.   15:17:46
15  Cerent strong. Optical, cross SC good. Very 15:17:49
16  difficult to deal with acquisition currencies 15:17:51
17  in the market. OFC go to Kestrel in corner. 15:17:54
18  So I don't know who exactly I'm        15:17:58
19  talking to about this. It could be a      15:18:00
20  customer. It could be competitor. I      15:18:04
21  obviously asked them a question about      15:18:07
22  Pirelli.                  15:18:10
23  Q. What does appalled mean?           15:18:11
24  A. Disgusted I guess.              15:18:16
25  Q. And do you know who Corvus is?        15:18:19
```

233

```
1   A. Corvus is a -- was a startup competitor.   15:18:21
2   Q. Right.                  15:18:32
3        Turning to the Bates No. 766.      15:18:32
4   A. Okay.                  15:18:38
5   Q. Do you have an understanding as to what these 15:18:39
6   notes are relating to?            15:18:40
7   A. Yes. This, it clearly looks like notes from 15:18:42
8   a keynote at Networld Interop. Networld    15:18:47
9   Interop occurred within the next year. And  15:18:53
10  Judy Estrin was delivering a keynote.     15:18:56
11  Q. And what was she discussing briefly?     15:19:03
12  A. She was discussing clearly the internet and 15:19:05
13  the convergence of voice, video and data.   15:19:09
14  Talking a lot about being with and how    15:19:14
15  communications in the future would be.    15:19:18
16  Q. Turning to the page ending 770.       15:19:36
17  A. 70?                   15:19:39
18  Q. Yeah.                  15:19:40
19  A. Yes.                   15:19:45
20  Q. What do these notes refer to?        15:19:46
21  A. Okay. Looks like I'm talking to a particular 15:19:51
22  individual Fred Saint something at ACT     15:19:54
23  Telecom and just writing down what they're  15:19:58
24  doing.                   15:20:09
25  Q. Does this relate to Cisco?          15:20:10
```

234

1   A. Yes, he makes a reference to Cisco.    15:20:12
2   Q. And what is ACT Telecom?    15:20:15
3   A. I actually can't recall exactly what the    15:20:18
4       model was, but it looks like they were    15:20:21
5       deploying -- it says here they're deploying    15:20:25
6       voiceover frame relay. So they were some    15:20:28
7       sort of service provider.    15:20:32
8   Q. How did this relate to Cisco?    15:20:34
9   A. Possibly a customer. Or a potential    15:20:37
10      customer.    15:20:39
11  Q. Turning to the next page, do you see a    15:20:41
12      reference to Cisco?    15:20:43
13  A. Next page? Yes.    15:20:44
14  Q. And what did you write here about Cisco?    15:20:47
15  A. I wrote optical networking solution lacks and    15:20:53
16      needs big time scalability, huge needs big    15:20:57
17      time. It doesn't say much.    15:21:01
18  Q. Do you know what that was referring to?    15:21:02
19  A. (Witness shakes head.)    15:21:05
20  Q. Do you know if you were speaking with    15:21:06
21      somebody who said that about Cisco?    15:21:08
22  A. That's just it, I don't know. I don't know    15:21:09
23      if I have enough on the page to really    15:21:15
24      understand who is -- who made the comment or    15:21:16
25      if in fact it was the guy.    15:21:19

235

1   Q. Would it help to have your entire notebook to    15:21:23
2       look?    15:21:25
3   A. The entire notebook?    15:21:28
4   Q. Yeah. If you had the --    15:21:30
5   A. Not necessarily. I mean, should I have    15:21:39
6       pulled out every page.    15:21:42
7   Q. If you had your entire notebook in order,    15:21:43
8       would it help you determine what this was    15:21:46
9       referencing?    15:21:48
10  A. It's possible.    15:21:51
11      MS. SIMPSON JONES: I would just    15:21:52
12      like to point out there aren't any redactions    15:21:53
13      on this page and it does mention ACT which    15:21:55
14      you were just talking about. So I don't know    15:22:00
15      what the basis of that question is. Just to    15:22:02
16      put that on the record.    15:22:05
17  A. I think it refers to IMC but ACT is    15:22:06
18      mentioned.    15:22:11
19      THE WITNESS: Yeah, I agree.    15:22:12
20  Q. Turning to the next page ending in 772.    15:22:17
21  A. Yes.    15:22:23
22  Q. What does this page refer to?    15:22:24
23  A. This looks like notes from a presentation    15:22:28
24      that Cisco provided. Could have been at a --    15:22:31
25      this is -- it looks like it was at Networld    15:22:35

236

1       Interop because it was May '99. I'm taking    15:22:38
2       notes off of some Cisco multi-service    15:22:42
3       presentation. I do not know if it was at the    15:22:48
4       booth or if there was corporate presentation    15:22:50
5       someplace. There were times they have    15:22:52
6       corporate presentations around these industry    15:22:56
7       trade shows.    15:22:58
8   Q. Do you see on the bottom where it says:    15:22:58
9       Cisco IP problem?    15:23:00
10  A. Yes.    15:23:02
11  Q. And then what does it say underneath?    15:23:03
12  A. Cisco IP problems. Delays. Delay variation.    15:23:06
13      Placards loss.    15:23:13
14  Q. What does that refer to?    15:23:14
15  A. Specifically those are all common problems    15:23:15
16      and data traffic is one of the big issues    15:23:19
17      with routers versus switches. And the    15:23:21
18      technology is that-when placards are lost or    15:23:26
19      fall or lost, it hampers communication, it    15:23:29
20      creates delay. And that is the big, a big    15:23:33
21      discussion in the telecom world was where it    15:23:38
22      needs flawless service. Sometimes you do not    15:23:43
23      have flawless service when you have plaqued    15:23:46
24      loss and delays in placards and it was    15:23:50
25      something Cisco had to overcome.    15:23:53

237

1   Q. How did you become aware of those problems?    15:23:54
2   A. That was really something kind of an -- on    15:23:58
3       the strengthnesses and weaknesses chart of    15:24:02
4       Cisco. At the very start anyone could    15:24:03
5       identify as you move into the telecom    15:24:06
6       business where they put up with a latency and    15:24:09
7       placard loss of data. Networking vendors.    15:24:14
8   Q. Was it a problem that Cisco acknowledged?    15:24:16
9   A. No, but I wouldn't even categorize it as a    15:24:22
10      problem. It's more hurdle than anybody who    15:24:25
11      is a data networking, core technology company    15:24:28
12      in terms of trying to get that.    15:24:32
13  Q. But you did call it a problem here, right?    15:24:33
14  A. Huh?    15:24:35
15  Q. You did call a problem when you took your    15:24:36
16      notes, right?    15:24:39
17  A. Yeah.    15:24:39
18  Q. Turn to page 774.    15:24:40
19  A. Yes.    15:24:46
20  Q. What does this page refer to?    15:24:47
21  A. Notes relating to Cisco's digital subscriber    15:24:59
22      line, CX solutions going through -- oh, no,    15:25:07
23      not just Cisco. These are competitor    15:25:11
24      solutions in here as well. And some notes    15:25:15
25      about Rbox and Celex.    15:25:16

238

1    Q. Do you see --
2    A. I don't know exactly who I'm talking to or    15:25:23
     where this occurred.                15:25:26
4    Q. Does it help if you look on the next page?    15:25:32
5    A. Yes.              15:25:35
6    Q. Oh.                15:25:42
7    A. Well, when I go back to that discussion about 15:25:43
8    Kevin DeNuccio, this is kind of information 15:25:45
9    that he talked about in terms of the        15:25:49
10   opportunities, you know, in the prior page    15:25:51
11   really discusses the, you know, the Rbox and 15:25:56
12   Celex as being the solution -- some of the    15:25:58
13   solutions around that. And if you go to the 15:26:02
14   next page, it talks more about that service 15:26:04
15   provider market opportunity that they look    15:26:06
16   at.              15:26:09
17   Q. Do you see on the first page where it says:    15:26:09
18   Celex more aggressive pricing?        15:26:13
19   A. More aggressive pricing. Yep.        15:26:18
20   Q. What does that refer to?            15:26:20
21   A. It could be one of two things. It could be    15:26:24
22   one, either the Celex themselves are pressing 15:26:26
23   more aggressively and that was the case at    15:26:29
24   that time. Or it could be that equipment    15:26:30
25   going to Celex was being priced more    15:26:32

239

1    aggressively.            15:26:36
2    Q. Do you know which it was?        15:26:39
3    A. Huh?              15:26:41
4    Q. Do you know which it was?        15:26:43
5    A. No.                15:26:48
6    Q. Turning to the page numbered 777.        15:26:54
7    A. Yes. That's Kevin's comments.        15:27:01
8    Q. So these reflect Kevin DeNuccio's comments 15:27:05
9    when you met with him; is that correct?    15:27:12
10   A. Yes.              15:27:13
11   Q. And what were his comments?        15:27:14
12   A. Well the top is -- relates to that prior page 15:27:15
13   I think. Someone else talked about that a 15:27:17
14   little more there. So Kevin is talking about 15:27:20
15   the same thing. Again, trying to test the    15:27:22
16   consistency of executives of Cisco and    15:27:24
17   salespeople. But we talked a lot about    15:27:29
18   what's going on in telecom and Cisco's    15:27:32
19   participation versus Lucent and Nortel.    15:27:40
20   Q. And what affect did meeting with Kevin    15:27:46
21   DeNuccio have on your assessment of Cisco? 15:27:50
22   A. You know, I guess, again, just another piece 15:27:53
     of the puzzle. Did it drive any -- I'm sure 15:27:56
     looking at this -- these notes, this didn't 15:28:00
25   drive any new incremental conclusions.    15:28:03

240

1    Q. Turning to the page ending 779.        15:28:11
2    A. 79?              15:28:14
3    Q. Yes.              15:28:16
4    A. Yes.              15:28:17
5    Q. What do these notes reflect?        15:28:18
6    A. I think these are also may relate to    15:28:20
7    Cisco's -- discussion with Kevin. Because we 15:28:23
8    were breaking down the telecom customers and 15:28:26
9    that's the field he -- where his expertise    15:28:28
10   fell.                15:28:33
11   Q. And did he represent that a third of Cisco's 15:28:33
12   customers were Celex and ISPs?        15:28:37
13   A. Roughly, yes.            15:28:41
14   Q. And what did he say about the Celex and ISPs? 15:28:43
15   A. The notes there say rapid growth access to 15:28:48
16   capital markets. Integrated solutions and    15:28:51
17   broad solutions, gun slingers and premium    15:28:54
18   free integrated solutions.        15:28:59
19   Q. What does gun shinger mean?        15:29:01
20   A. Oh. That these guys were swinging for the 15:29:05
21   fences really. Most of the companies in    15:29:08
22   technology were at that point in time·    15:29:13
23   swinging for the fences.            15:29:16
24   Q. And what do you mean by that?        15:29:17
25   A. Doing business any way they can to win. I 15:29:19

241

1    think that -- remember the Celex and ISP page 15:29:31
2    were built on a very aggressive capital.    15:29:33
3    Q. Turning to the page ending Bates No. 782.    15:29:41
4    A. 82?              15:29:46
5    Q. Yeah.              15:29:47
6    What do these notes refer to?        15:29:51
7    A. This is dated 6/16/99 and it's most likely    15:29:54
8    notes from Supercomm '99 where I had some    15:30:00
9    sort of interaction with Grant Fraser or a VP 15:30:04
10   and GM optical networking now. This is the 15:30:09
11   clear notes from a presentation that he    15:30:15
12   provided at Supercomm somehow. So I don't    15:30:19
13   know if it was an investor presentation or a 15:30:23
14   presentation at a booth.            15:30:25
15   Q. And what was the gist of what Grant Fraser    15:30:26
16   was saying?            15:30:30
17   A. Let me read it.            15:30:32
18       This is really just a lot, the optical 15:30:55
19   focus and strategy for Cisco.        15:31:01
20   Q. And what was the focus and strategy?    15:31:05
21   A. The focusing on, I think, the blending of    15:31:12
22   router platform with optical infrastructure. 15:31:21
23   He clearly says that in the long haul    15:31:25
24   transport they will not focus here for now. 15:31:28
25   They'll focus more on Monterey like say it    15:31:31

242

1    was more value added technology. I think the 15:31:37
2    overall message is that they're going to    15:31:41
3    focus on the higher marginal op -- business 15:31:44
4    opportunities where there's more intelligence 15:31:49
5    and as the prosper bit drops, that you can   15:31:51
6    see more deployment. And at the top I        15:31:57
7    mentioned cordage. I think they were trying 15:32:11
8    to build a cordage portfolio.        15:32:15
9    Q. And what's that?        15:32:21
10   A. At the basic level carriers have a core of  15:32:24
11   their network that build out to the edge.    15:32:28
12   The edge is getting closer to the home. So  15:32:31
13   the different transport letter requirements  15:32:34
14   based on where you are in the network core  15:32:37
15   versus edge. More higher volume at the core. 15:32:39
16   It gets more home end user specific towards 15:32:44
17   the edge. And I think Cisco, like a lot of  15:32:49
18   people, were trying to build a broad-base    15:32:51
19   portfolio so they can go to the carrier and  15:32:53
20   sell the whole solution.        15:32:57
21   Q. Turning to page -- the page ending 785.    15:32:59
22   A. 85?        15:33:04
23   Q. 785, yeah.        15:33:06
24       What does that refer to?        15:33:11
25   A. At the top it says: Cisco Pavilions. So   15:33:13

243

1    this is on the trade show floors Cisco would 15:33:17
2    have a pavilion or booth where there are    15:33:20
3    multiple, pretty large. It would be a    15:33:24
4    central structure flanked by product specific 15:33:28
5    or customer specific booths that talked about 15:33:33
6    Cisco solutions. And I often found it was    15:33:35
7    the best, one of the best places to go to   15:33:39
8    just to talk to people who -- you know, very 15:33:41
9    middle layer managers and products and stuff 15:33:46
10   to talk about what they do or how they do it. 15:33:48
11       This particular page refers to notes,  15:33:52
12   ICG, Caprock and Teleglobe which were    15:33:58
13   customers that -- of Cisco who used    15:34:02
14   particular Cisco equipment and it was not   15:34:05
15   uncommon for the pavilion to have a --    15:34:09
16   partner pavilion where they have a lot of   15:34:11
17   customers talking about Cisco products.    15:34:14
18   Q. And do you recall what you learned from these 15:34:16
19   customers about Cisco product at this    15:34:18
20   pavilion?        15:34:23
21   A. Not the specifics. This was just more, you 15:34:23
22   know, data gathering and just trying to get a 15:34:26
23   cross section of discussion about Cisco and 15:34:28
24   how they are as a vendor and what they do.  15:34:31
25   Q. Do you recall when this meeting was?    15:34:33

244

1    A. Again, it's either -- this looks -- I, they 15:34:35
2    do a lot of carrier customers and so on. So 15:34:42
3    I'm guessing this was Supercomm. If not    15:34:44
4    Supercomm it was Networld Interop. This is 15:34:48
5    definitely a trade show.        15:34:52
6    Q. So what year would that be, do you think?  15:34:53
7    A. '99.        15:34:56
8    Q. '99.        15:35:00
9        Turning to the last page of the    15:35:01
10   document at Bates number ending 788. What  15:35:01
11   does it say at the top of that page?    15:35:07
12   A. Fiscal 1999, June 30th -- what? Morgan   15:35:17
13   Stanley but that doesn't look like Morgan   15:35:30
14   Stanley. That looks like something else.    15:35:33
15   Q. At the bottom of that page where it says CS, 15:35:34
16   does that refer to Cisco?        15:35:37
17   A. I don't know because these notes look like  15:35:40
18   notes I had taken from Gordon Stitt who is  15:35:44
19   the CEO of Extreme Networks. So I don't know 15:35:48
20   if that relates to Cisco.        15:35:51
21   Q. Okay.
22   A. Does that answer your question?    15:35:57
23   Q. Yes. Thank you.        15:35:58
24       What does a buy side analyst do?    15:36:09
25   A. What does a buy side analyst do? The buy  15:36:12

245

1    side analyst does a couple of things. The   15:36:17
2    first of which is -- well, builds an industry 15:36:22
3    knowledge or an industry expertise in what he 15:36:28
4    or she is following to understand the    15:36:31
5    companies and their prospects, strengths,   15:36:34
6    weaknesses, opportunities. Competitive    15:36:37
7    picture bears to entry financial models. And 15:36:43
8    understand what the company is all about in  15:36:46
9    terms of its potential and how can it achieve 15:36:49
10   that potential.        15:36:54
11       The goal is to develop a proprietary   15:36:55
12   differentiated perspective on e-companies so 15:36:59
13   that you can out think the market and then   15:37:02
14   make decisions on stocks for your portfolio  15:37:07
15   managers that enable them to make smart buy  15:37:10
16   and sell decisions.        15:37:15
17   Q. What education is required to become a buy  15:37:19
18   side analyst?        15:37:24
19   A. Oh, you'd have to have a strong working    15:37:25
20   knowledge of financials. And depending on   15:37:28
21   how it's approached, it's -- the financial   15:37:35
22   knowledge is required. You really cannot be 15:37:43
23   a financial analyst or research analyst in   15:37:46
24   the investment field if you don't have the  15:37:49
25   financial understanding of how to put    15:37:51

**246**

```
 1   financials together and project and value   15:37:53
 2   companies. So the financial base is needed. 15:37:56
 )   Outside of that, it's pretty open ended.    15:38:00
 4   Q. What is your financial background?        15:38:03
 5   A. MBA. And experience in the financial field. 15:38:05
 6   MNA at Lehman Brothers.                      15:38:12
 7   Q. How many years experience have you had in the 15:38:13
 8   field?                           15:38:15
 9   A. In the field? As of today? Fourteen -- 13, 15:38:15
10   14, somewhere in there.                      15:38:25
11   Q. Have you taken any courses during that time 15:38:26
12   frame since you received your MBA that relate 15:38:29
13   to your work?                      15:38:31
14   A. Since I received my MBA?             15:38:32
15   Q. Yes.                            15:38:35
16   A. No.                             15:38:36
17   Q. Have you taught any classes or courses in the 15:38:36
18   field?                           15:38:38
19   A. No.                             15:38:39
20   Q. Have you published any articles in the field 15:38:43
21   of your work?                      15:38:46
22   A. No. The MBA, the MBA curriculum, though,  15:38:48
23   took a lot of financial courses.       15:38:53
24   Q. And what did those include?         15:38:55
25   A. Excuse me?                       15:38:57
```

**247**

```
 1   Q. What did those include?             15:38:58
 2   A. Financial accounting, strategic cost    15:39:00
 3   analysis, evaluation, investments, financial 15:39:05
 4   corporate financial strategy. You know,    15:39:09
 5   working for two years on Wall Street. Three 15:39:11
 6   years on Wall Street gave a pretty good    15:39:14
 7   framework of understanding how to value    15:39:18
 8   companies from a variety of methods.       15:39:21
 9   Q. Have you ever testified as an expert?   15:39:24
10   A. No.                             15:39:27
11   Q. With regard to the e-mails that you reviewed 15:39:48
12   today, do you believe that all of the e-mails 15:39:51
13   you reviewed today that you wrote, you wrote 15:39:58
14   in the course of your duties as an employee  15:40:02
15   of MFS as an analyst or portfolio manager? 15:40:07
16   A. Do I believe all of the e-mails that you  15:40:16
17   reviewed today that I wrote.               15:40:18
18   Q. I can ask it a different way.           15:40:22
19   A. To what extent, yeah. Want to ask it    15:40:24
20   differently?                       15:40:27
21   Q. Was it part of your normal duties and    15:40:28
22   responsibilities to communicate with other  15:40:30
23   individuals at MFS about Cisco and other    15:40:32
     related matters?                   15:40:35
25   A. Yes.                            15:40:36
```

**248**

```
 1   Q. Did you send and receive e-mail as part of 15:40:36
 2   your job duties as MFS?             15:40:39
 3   A. Yes.                             15:40:41
 4   Q. Do you believe that the e-mails that you  15:40:41
 5   reviewed today you sent and received as part 15:40:43
 6   of your job at MFS?                   15:40:45
 7   A. Yes. You have to take it within context.  15:40:47
 8   Sometimes an e-mail has a certain intention. 15:40:49
 9   Q. And what does that mean?              15:40:52
10   A. Well, sometimes we will take it a different 15:40:54
11   course to see if a company deviates from what 15:41:00
12   we've asked in the past. Just to mix it up a 15:41:04
13   little bit, we may ask a question that you   15:41:09
14   have already asked to see if they will answer 15:41:11
15   it the same way again. They try to put some 15:41:14
16   thought behind the e-mails.              15:41:19
17         MS. WEAVER: Okay. That concludes  15:41:39
18   my examination for today. The attorneys have 15:41:41
19   put on record that they have a disagreement  15:41:45
20   as to with regard to whether or not this    15:41:48
21   deposition is closed but I am not closing. I 15:41:49
22   want to continue it. And I understand that   15:41:52
23   there might be some cross.              15:41:54
24         MS. JENSEN: I just want to take a  15:41:56
25   few minutes to look over my notes to see if 15:41:57
```

**249**

```
 1   there's anything else I want to add.       15:41:59
 2         MS. WEAVER: No problem. We'll go  15:42:02
 3   off the record.                    15:42:02
 4         MS. JENSEN: We'll go off the record 15:42:03
 5   for a few minutes.                   15:42:05
 6         THE VIDEOGRAPHER: The time is 3:40. 15:42:06
 7   We are off the record.                 15:42:08
 8         (A short recess was taken.)        15:42:11
 9         THE VIDEOGRAPHER: The time is 3:46. 15:47:35
10   We're back on the record.              15:47:37
11         MS. JENSEN: I don't have any       15:47:39
12   questions for the witness.             15:47:40
13         MS. WEAVER: We're good to go.      15:47:44
14         THE VIDEOGRAPHER: The time is 3:46. 15:47:46
15   This deposition concluded. This is the end  15:47:48
16   of cassette No. 4. We are off the record.   15:47:51
17         (Whereupon, at 3:46 p.m.,
18         the deposition was suspended.)
19
20
21
22
23
24
25
```

**250**

1    DEPONENT'S ERRATA SHEET
2    AND SIGNATURE INSTRUCTIONS
3
4        The original of the Errata Sheet has
5    been delivered to Sharon Simpson Jones, Esq.
6        When the Errata Sheet has been
7    completed by the deponent and signed, a copy
8    thereof should be delivered to each party of
9    record and the ORIGINAL delivered to
10   Lesley E. Weaver, Esq., to whom the original
11   deposition transcript was delivered.
12
13       INSTRUCTIONS TO DEPONENT
14       After reading this volume of your
         deposition, indicate any corrections or
15   changes to your testimony and the reasons
         therefor on the Errata Sheet supplied to you
16   and sign it.  DO NOT make marks or notations
         on the transcript volume itself.
17
18  .
19   REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
20   COMPLETED AND SIGNED ERRATA SHEET WHEN
21   RECEIVED.
22
23
24
25

**252**

1        C E R T I F I C A T E
2    COMMONWEALTH OF MASSACHUSETTS
     BRISTOL, SS.
3
        On this 17th day of June, 2005, before
4    me, Catherine Lawson Zelinski, a Certified
     Shorthand Reporter, the undersigned Notary
5    Public, personally appeared DAVID
     SETTE-DUCATI, proved to me through
6    satisfactory evidence of identification, in
     the form of a driver's license issued by the
7    Commonwealth of Massachusetts, to be the
     person whose testimony is hereinbefore set
8    forth, having been duly sworn.
9        I certify that I am not related to any
     of the parties in this matter by blood or
10   marriage and that I am in now ay interested
     in the outcome of this matter.
11
         I further certify that the testimony
12   hereinbefore set forth is a true and accurate
     transcription of my stenographic notes to the
13   best of my knowledge, skill and ability.
14       IN WITNESS WHEREOF, I have hereunto
     set my hand this 27th day of June, 2005.
15
16   _____
         Catherine L. Zelinski
17       Notary Public
         Certified Shorthand Reporter
18       License No. 147703-
         My Commission Expires:  May 9, 2008
19
20   THE FOREGOING CERTIFICATION OF THIS
     TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
21   OF THE SAME BY ANY MEANS UNLESS UNDER THE
     DIRECT CONTROL AND/OR DIRECTION OF THE
22   CERTIFYING REPORTER.
23
24
25

**251**

1    ATTACH TO DEPOSITION OF:  DAVID SETTE-DUCATI
     DATE:  06/17/05
2    CA #:  C-01-20418-JW (PVT)
     REP:  CAZ
3        ERRATA SHEET
4    INSTRUCTIONS:  After reading the transcript
     of your deposition, note any change or
5    correction to your testimony and the reason
     therefor on this sheet.  DO NOT make any
6    marks or notations on the transcript volume
     itself.  Sign and date this errata sheet
7    (before a Notary Public, if required).  Refer
     to Page 250 of the transcript for Errata
8    Sheet distribution instructions.
9    PAGE    LINE
             _____  CHANGE: _____
10       REASON: _____
             _____  CHANGE: _____
11       REASON: _____
             _____  CHANGE: _____
12       REASON: _____
             _____  CHANGE: _____
13       REASON: _____
             _____  CHANGE: _____
14       REASON: _____
             _____  CHANGE: _____
15       REASON: _____
             _____  CHANGE: _____
16       REASON: _____
             _____  CHANGE: _____
17       REASON: _____
             _____  CHANGE: _____
18       REASON: _____
19       I have read the foregoing transcript
     of my testimony, and except for any
20   corrections or changes noted above, I hereby
     subscribe to the transcript as an accurate
21   record of the statements made by me.
22
23   _____
         DAVID SETTE-DUCATI
24
25

**A**

ability 10:10 34:16
180:7 205:15 206:12
206:17 252:13
able 16:1 99:22 186:19
186:25 187:8 220:5
Absolutely 123:12
198:24
accelerate 159:12
160:5
accelerated 213:15
231:13
accepted 111:17
access 12:20 13:17,18
15:1 40:21 240:15
accessed 14:24
accessible 16:1
accommodate 8:16
account 119:1 120:1
230:24 231:7
accounting 111:13,18
247:2
accounts 66:14 120:5
accurate 10:3 124:17
125:12 136:1 216:4
251:20 252:12
achieve 104:12 245:9
knowledged 237:8
acquire 145:22,23
158:16
acquires 203:1
acquiring 145:16
acquisition 146:7
147:11 150:5,16,23
151:7 157:11,16
206:9 232:16
acquisitions 73:13
76:13 80:15 102:24
142:10 145:18 203:5
214:13
acronym 119:22
act 65:14 97:21 158:9
233:22 234:2 235:13
235:17
action 1:7 117:19
122:21
actions 1:9 109:16
actively 108:25
activity 118:17 120:1,2
actual 162:24
adapt 48:11
add 130:24 249:1
added 242:1
additional 18:9
dress 7:6 9:7 102:22
130:23,25 131:4

139:24
addressable 130:15,18
130:19 131:1,7
132:14 133:10,16,18
133:24
addressed 224:15
addressing 47:10 59:10
administer 7:18
admitted 165:17
adopted 206:1,4
advance 106:13 161:8
161:8 211:17
advice 76:14,14
advise 76:11
advising 69:20
affect 84:22 85:9
185:10 199:8 210:18
239:20
afraid 158:9
agenda 57:25 137:22
187:16 211:19,22
212:1,4
agendas 211:25
aggressive 132:9,21,24
133:1,2,4 182:7
238:18,19 241:2
aggressively 114:2
185:13 238:23 239:1
ago 12:7 15:3,10 63:6,6
188:4 193:3
agree 88:8 235:19
ahead 46:15 69:24
72:22 92:13 107:18
110:9 131:16,20
212:17 214:2
aimed 130:20
Alan 207:19,19
Alcatel 32:23
Alec 32:3
Alice 3:1 7:22
allow 87:20
allowed 156:2
allude 173:4
Amar 134:13
amended 4:7 11:4,6,15
American 220:22
Amos 24:1
amount 66:15 70:9
86:5 121:18 158:25
analyses 90:21,22 91:1
91:10 100:23
analysis 70:24 84:7,22
85:9 90:11 92:6
100:22 101:4 155:21
156:20 181:8 182:9
182:24 185:10 247:3

analyst 21:17,20,22
24:8 25:24 26:9,18,25
27:3 28:18 29:17,22
29:24 30:12,17,23
31:1,10,22 32:2 33:25
34:3 36:12 37:11
41:10,23 42:6 44:23
44:25 49:23 54:18
57:6 68:11,21 70:16
74:8 81:14 85:2,5
90:10 94:16,17 95:10
99:7 104:2,16,21
106:10 121:19,22
122:11 123:6 125:13
125:20,22 127:24
128:1 136:13,14
150:9 173:1 174:15
175:4,9 179:12 183:9
188:21 193:11 200:13
205:21 213:5,9
244:24,25 245:1,18
245:23,23 247:15
analysts 20:22 21:12,13
28:1,25 30:3 31:21
33:14 37:24,25 40:17
46:1 51:4,5 71:4,23
71:24 72:2 73:25
75:20 76:21 77:4
78:4,11 79:18 80:19
80:22,25 81:3,21
82:16,24 83:16,24
84:13 87:20 95:1
103:24 104:7 171:2
172:25 173:14 207:9
207:20 211:18,21
analyzing 33:22
AND/OR 252:21
angle 145:13
announced 94:12
announcement 223:2
announcements 231:1
231:11,20,23 232:2
annual 38:10,21
annually 38:25 39:1
104:10,13
answer 18:21 19:14
58:16 59:25 60:7
69:9,25 75:3 87:21
88:2 106:5 123:7
126:9 150:10 163:7
164:10,12 166:8
175:11 177:18 179:13
187:10,12 193:13
196:3,24 202:12
205:3,4 213:24
226:24 244:22 248:14

answered 152:23
answering 67:9
answers 86:14 153:25
226:1
anticipate 203:16
anticipation 34:11
anti-competitive 204:8
anybody 17:10 41:5
60:18 94:15 107:11
162:21 225:11 226:9
237:10
anyway 153:1
apologize 137:20
appalled 232:12,23
appear 129:20 205:5
appearances 2:1 7:17
appeared 166:16 252:5
appearing 11:18 23:11
23:13
appears 129:20 137:22
140:7 190:11 228:5
applicable 1:14
APPLY 252:20
appreciated 46:2
approach 69:11 158:2
158:3
approached 245:21
appropriate 142:17
approximately 13:5
17:18 25:7 27:5
45:10 66:25 68:1
April 134:11,17,19
137:24 138:3 163:14
225:1,12
arbitrarily 30:17
archive 14:24 15:1,4,9
15:16,22 16:4 201:4
archived 14:22
archives 13:18 15:6
Arcotels 179:17
area 53:24 58:6 141:3
arguments 95:24
art 133:25
article 157:4,7,14,19,22
articles 246:20
Articulating 30:20
Ascend 32:23
Ashby 222:6
aside 82:4 144:7 178:11
asked 22:18,20 100:1
160:15 196:4 232:21
248:12,14
asking 19:3 38:5 84:21
94:7 103:7 108:6
145:15 152:7 157:16
178:19

assess 150:14 179:8
182:21,25 219:21
assessing 105:13
155:11 180:5
assessment 106:2,8
108:18 131:12 132:5
132:7 150:5 182:2
185:4 193:9 239:21
assets 25:6,20 66:14,24
127:2
assigned 26:2 32:4 34:5
36:10 107:21
assignment 31:23 34:22
36:14 37:7 135:5
assignments 21:14
31:21 36:17
Associate 2:19 40:17
associated 139:3
assume 15:19 22:15
23:2 86:7,9 95:13
104:11 146:5 160:9
203:18
assumed 51:8 83:3
assuming 81:8,11 85:15
assumption 21:19 79:3
80:12 86:15 127:6,7
143:12 155:5 199:16
assumptions 80:16
90:24 91:4,16,19
109:16 175:23
assuring 100:5
Atlanta 130:2,4 173:10
ATTACH 251:1
attempting 130:17
attend 53:1 102:8
125:15 208:9,19
227:15
attendance 204:20
attended 23:18 78:19
78:23 125:21 127:20
128:7 138:12,25
205:9 208:12 229:13
230:1
Attendees 4:23
attending 103:2 127:19
207:4 224:25 225:6
230:12
attention 82:8 93:16
125:5 134:7 203:21
attorney 18:24 20:2
attorneys 248:18
Attorney-at-Law 2:3
2:11 3:1
attorney-client 18:23
19:20,24
attracted 141:5

**audience** 41:16 230:11
**August** 25:12 49:19
   69:5 85:13
**authored** 207:12
**authority** 136:6
**average** 109:1
**averse** 89:9
**aware** 49:15 107:8,25
   108:3 116:11 136:19
   170:11 181:7 184:4
   184:13,19 220:18,24
   223:1 237:1
**ay** 252:10
**a.m** 1:22 7:8

———— **B** ————
**B** 4:5 5:1 6:1
**back** 15:15 18:4 37:5
   44:4 55:25 56:23
   60:25 62:7 65:12
   66:11 67:3,15 68:16
   78:8 93:6 140:25
   148:2 154:22 161:20
   164:9 167:11 168:5
   185:11 200:18 203:21
   238:7 249:10
**background** 23:15
   27:21 33:20 246:4
**backlog** 215:10,16,22
**backup** 65:15,22
**bad** 58:12,14 111:14
   166:10 206:15 214:15
**balance** 91:23,24 96:8
   96:10 97:20 111:23
   183:20 215:25 216:9
**ball** 129:9
**Ballon** 124:8
**ballooning** 95:25
**ban** 167:9
**banking** 73:12
**barely** 105:19,20
**base** 70:11 86:21
   106:18,20 109:3
   124:3 143:11 179:24
   182:17 246:2
**based** 20:10 35:24 36:6
   70:13 71:2,5 72:19
   80:17 81:12 85:7,8
   86:19 93:20 95:14
   103:19,22 106:9
   108:13 114:17 123:4
   133:13 135:4 151:2
   179:11 181:9 187:19
   196:15 210:7 221:18
   242:14
**basic** 9:24 10:16 37:23

38:23 46:24 92:5,8
   119:23 242:10
**basically** 20:24 30:23
   33:14 71:6 104:10
   156:22 157:10 206:9
**basing** 86:14
**basis** 35:23,24 39:4
   42:14 69:13 72:18
   86:22 114:21 115:12
   142:2 144:1 170:2
   175:9 185:8 194:25
   235:15
**Bate** 117:5,17,17 120:8
   124:11,24 129:12
   186:8
**Bates** 4:10,12,15,17,19
   4:21,23 5:2,4,5,7,9,11
   5:13,15,16,18,20,22
   5:24 6:2,4 128:10
   129:18 134:2 138:19
   139:6 146:12 151:19
   153:16 176:3 188:10
   192:20 199:21 201:16
   202:15 204:10 207:24
   208:21 224:4 227:4
   228:9,13,20 232:7
   233:3 241:3 244:10
**Battery** 3:4
**bearing** 117:5 120:8
   124:11,24 128:10
   129:12 134:2 138:19
   139:6 146:12 151:19
   176:3 186:8 199:21
   201:16 202:15 204:10
   207:24 208:21 224:4
   227:4
**bears** 228:10,12,17
   245:7
**beat** 104:21 105:20
   191:6 199:4
**becoming** 116:11
**began** 94:14 101:22
**beginning** 32:13 100:16
   153:16 169:3 222:22
**behalf** 1:13 2:9,15,24
   3:6 7:23,25 8:3,7
   125:11 174:11
**belief** 71:21,25 95:10
   197:20 222:4,12
**believe** 12:8 27:18 39:1
   41:17,19 43:9 45:22
   47:9 50:19 55:17,18
   57:11 58:19 59:7,8,17
   62:4 65:5 77:4 84:20
   91:8 109:8 110:15
   119:18 137:16 140:2

141:1 151:17 168:2
   177:8 186:24 187:7
   187:11 189:9 195:24
   212:10 216:7,17
   224:17,23 247:12,16
   248:4
**believed** 60:15
**believer** 47:25 60:5,10
   60:12
**Bellworth** 210:20
**best** 10:10 11:19 16:6
   27:17,19 31:25 48:18
   51:11,14 53:8,14,21
   55:21 56:11 69:3,9
   76:17,22 77:2,25 83:4
   85:2,16 95:9 118:11
   118:13 135:12 139:13
   160:1 162:16 211:11
   219:16 243:7,7
   252:13
**better** 33:24 35:11
   82:24 121:20 165:7
   232:14
**beyond** 184:23
**big** 47:25 60:5,10,12
   82:23 90:2 93:15
   107:5 117:8 142:14
   142:18 161:13 172:9
   184:6,6 221:23
   234:16,16 236:16,20
   236:20
**bigger** 34:10,14 99:23
   168:8
**Bill** 222:7
**billion** 25:7 66:25 93:9
   93:24 127:2 130:23
   133:10 141:25 142:7
   225:22
**billions** 131:3 141:20
   141:20
**binder** 227:17,19
**bit** 38:22 72:9 135:18
   135:22 155:9 214:25
   228:8 242:5 248:13
**blending** 241:21
**blood** 252:9
**board** 73:22 122:11
**body** 153:25
**book** 215:10,16,21
**books** 113:1 114:24
   166:6 170:20
**boom** 161:13
**booth** 230:19 236:4
   241:14 243:2
**booths** 230:7 243:5
**borrow** 212:19

**Boston** 1:21 2:14,23 7:7
   7:15 8:5 48:15 49:1
   138:16
**bottom** 124:9,21
   154:13 160:14 176:19
   195:20 230:16 236:8
   244:15
**bounds** 150:20
**box** 13:2,4,7 34:21
**boxes** 172:3 173:8
**boy** 38:22
**Boylston** 2:22
**brain** 35:9
**break** 10:15,17,19
   56:13 100:9 159:10
   168:11
**breakfast** 130:11
**breaking** 160:2 240:8
**briefly** 21:25 23:14
   233:11 ·
**bring** 149:17
**bringing** 87:14 88:7,19
   130:1
**BRISTOL** 252:2
**broad** 106:18,20 109:3
   240:17
**broadcasting** 26:12
**Broadcom** 172:18
   173:6
**broader** 107:2 191:12
**broad-base** 242:18
**broad-based** 98:25
**Brockton** 25:2
**broker** 43:18
**brokers** 71:20 200:11
**Brothers** 43:24 52:13
   52:23 54:10 72:24
   73:11,14 74:5 78:16
   246:6
**brought** 87:2,12 89:2
   117:7
**Brown** 222:7
**bubble** 142:18
**build** 29:1 35:4 58:7
   84:4 97:23 159:25
   180:7 182:5 185:24
   185:25 242:8,11,18
**building** 76:3 103:19
   141:4 148:21,23
   149:2,4 182:7 186:3
**builds** 245:2
**built** 241:2
**bulk** 14:12
**bumped** 161:20
**bunch** 174:24
**bundle** 188:9

**business** 7:6 23:23 24:?
   35:14 46:4 58:6,8,10
   58:13,18 61:3 76:4,16
   79:1,4,5 80:19 82:12
   91:5 92:16 96:24
   97:24 98:21 101:24
   102:5,18,23 105:18
   110:7 111:4 112:24
   113:17 115:14,22
   141:12 146:4 154:10
   154:23 155:19 160:10
   162:20 163:5 164:16
   165:6 166:2,7 170:4,5
   170:8,21,22 171:18
   173:4,9 178:2,3,12,20
   178:25 182:12 183:20
   183:23 184:7 185:12
   196:25 198:14,15
   199:19 214:12,15,15
   214:21,25 218:8
   219:18 221:7 231:8
   231:13 237:6 240:25
   242:3
**businesses** 98:8 185:15
   187:5 192:6
**buy** 71:9,12,12,13,13
   71:22 72:2,9,20 73:7
   81:23 82:6 103:13,15
   103:18 105:15 110:1
   110:2,11,15 111:3
   115:10 116:17 119:25
   141:24 158:2,2,8,13
   162:25 169:19 171:6
   171:17 190:4 213:9
   244:24,25,25 245:15
   245:17
**buys** 82:9

———— **C** ————
**C** 7:1 252:1,1
**CA** 251:2
**cable** 173:8
**Cabletron** 173:11
   203:20 204:4
**calendar** 155:2,7
**California** 1:3 2:8 3:5
   7:13
**California's** 1:15
**call** 48:3 102:10,19
   103:10,13 110:4,5
   132:14 160:17,19,24
   160:25 161:6,7,9,12
   161:19,22 182:13
   210:7 224:20 225:1,2
   225:6,12 237:13,15
   **called** 1:13 8:7 31:6

40:11 107:9 117:17
184:13 220:11
calling 161:17
calls 102:8,12,13,14,15
102:20,24 103:2,11
103:16,25
camp 133:6
candid 60:14,19
cap 63:9,14,23 65:21
161:14
capacity 31:10,15
37:12,19,20 39:22
73:9
capital 35:10 76:14
183:20,22 221:11,15
240:16 241:2
capitalist 158:10
capitalized 99:23
Caprock 243:12
caps 141:20 143:8
career 28:2 46:22
carefully 213:3
Carl 202:5
carried 110:12
carrier 221:10 231:1
231:10,19 242:19
244:2
arriers 149:8 152:12
159:20 160:7 182:6
182:18 183:16 186:2
217:24 218:8 220:6
221:3,16 222:2
231:22 232:1 242:10
Carter 42:20 124:15
134:12,25 135:3,7
139:25 140:6 147:18
175:25 176:21 224:23
225:1,12
case 20:4 43:22 238:23
cases 97:23 150:20
158:16
cash 96:12,14,14 97:20
99:19 146:2 158:8,14
158:25 214:9 215:24
216:8,11
cassette 100:12,16
168:18 169:3 222:18
222:22 249:16
catch 114:10 147:1
categorize 201:3 237:9
Catherine 1:16 252:4
252:16
Cathy 7:15
caught 93:15 157:4
203:21
AZ 251:2

Celex 217:24 237:25
238:12,18,22,25
240:12,14 241:1
central 243:4
CEO 144:25 244:19
Cerent 140:11,15,16,17
140:18 141:13,23
144:18,25 145:16
147:19 148:7 150:5
151:4,8,15 158:16
231:12 232:14,15
certain 10:22 66:15
71:8 98:21 101:10
108:1 112:22 130:21
203:20 218:7 220:3
220:18 248:8
CERTIFICATION
252:20
certifications 220:4,8
certified 1:17 219:24
252:4,17
certify 252:9,11
CERTIFYING 252:22
CFOs 135:10
chain 82:23 83:8 84:3
153:11 171:21,22,24
172:7,13
challenge 60:18,22
Chambers 42:18 45:11
45:24 47:3,15 48:14
49:10,13,17,25 50:13
50:17 51:17,24 52:4,7
101:14 176:21 177:12
186:20 189:9,10,24
191:3,8 194:4 195:3
196:8
chance 43:25 79:3
134:14
Chances 143:13
change 21:3,12 26:21
26:22 34:13 35:16
47:24 48:1,10 87:10
111:13 175:5 193:7
206:14 219:11 251:4
251:9,10,11,12,13,14
251:15,16,17
changed 53:10 85:7
155:21 185:4
changes 30:20 87:1
195:18 250:15 251:20
characterization 88:5
charge 58:5 226:6,11
Charlie 57:9,10 61:19
61:20,22
chart 237:3
chasing 183:12

Chauncy 7:6
check 91:7,8 123:16
167:15 210:5
checked 167:13
checking 91:11 167:16
chief 59:18 135:12
chip 172:2,18
choose 30:17
Chris 74:6 124:7 200:4
Christin 124:20
chronologically 229:2
chunk 90:3
circuit 221:18
circulated 28:21 30:9
40:14,23 207:1
Cisco 1:7 3:7 4:23 7:10
7:23 20:22 22:6,8,10
31:7,11,13 32:4,5,18
36:8 37:13,17,21
39:14,15,17,21 40:23
41:17,19,23 42:5
43:20,21 44:3,10,21
45:23 46:25 49:5
51:6,19 52:14,20,24
53:4,20,23 56:2 57:5
58:6,14 60:23 65:2,8
66:1 67:20 68:1,3,12
68:23 69:6 70:5 74:1
75:15,20 76:5,5,19,22
77:6,6,8,19,23 78:3
78:10,19,23 79:17,20
80:2,13,18 81:1,4,19
81:22 82:25 83:1,13
83:18,19 84:2,10,13
84:16,19,22,23 85:12
87:2,11,15 88:19 89:1
89:5,16 90:5,7,11,15
91:10,20 93:8,21
94:15 95:8,11,11
97:12,15,18 98:11,11
98:25 99:13,16 100:5
100:20 101:1,10,15
101:23,24 102:2,6,8
102:10 104:16,20,25
105:7 106:1,7,14
107:1,8,13,22 108:18
109:4,5,10,22 115:1
116:11,23,25 119:4
119:19,24 121:4,10
121:11,14 122:23,25
123:2,3 125:11,15
126:7 127:15 128:21
130:16 131:23 132:20
133:5 134:11 135:17
136:7,20 137:18
138:2,13 141:3,7,8,22

145:1,16 147:23
148:20 149:23 150:6
152:5,12 155:8 157:5
158:1 159:25 160:20
161:23 164:14 165:13
166:12,16,24 167:7
168:8 169:13,24
171:3,8,19 172:3,4,9
173:5,10,19,25,25
174:6,13 175:4,7,17
177:12 179:8,21
180:19,24 181:7
182:3 183:25 184:4
184:20,24 185:6
186:5 187:2 188:20
193:5 195:4 196:7,10
196:16,19 198:9,14
198:20,22 199:12
200:4 202:25 203:10
204:5 205:12,21
206:18,21 208:10,10
210:9,14,16 211:10
211:17 212:8,12
213:6 214:18 215:8,9
215:15,20 216:9,18
217:19,25 218:6,12
219:12,22 220:11,24
221:1,20 222:2,6
223:1,4,9,12,13 224:1
225:22 226:13 227:18
229:16 230:1,16,19
230:19 231:13,25
232:12 233:25 234:1
234:8,12,14,21
235:24 236:2,9,12,25
237:4,8,23 239:16,21
241:19 242:17,25
243:1,6,13,14,17,19
243:23 244:16,20
247:23
Cisco's 58:13,17 59:23
84:16 92:23 93:3
94:4 95:17 96:8,16
99:2,9 101:9 106:2,9
108:1,15 117:22
118:17 129:1 131:7
132:5 133:18 136:14
154:6 157:11,16
158:8 161:13 173:15
173:18 179:1 180:5
183:1 184:16 185:1
185:25 191:9,11
199:8 201:25 202:25
220:15,18,19 221:17
221:21 223:2 226:4
231:15 237:21 239:18

240:7,11
CIS-PPNPF-HC_001...
4:17 128:11
CIS-PPNPF-HC_001...
4:18
CIS-PPNPF-HC_001...
4:19 129:13
CIS-PPNPF-HC_001...
4:20
CIS-PPNPF-HC_001...
4:23 138:20
CIS-PPNPF-HC_001...
4:21 134:3
CIS-PPNPF-HC_001...
4:22
CIS-PPNPF-HC_001...
120:9
CIS-PPNPF-HC_001...
4:13
CIS-PPNPF-HC_093...
4:15
CIS-PPNPF-HC_093...
4:15
CIS-PPNPF-HC0938...
124:25
CIS-PPNPF-0091751
5:20 207:25
CIS-PPNPF-0091752
5:21
CIS-PPNPF-0100505
5:9 186:9
CIS-PPNPF-0100510
5:10
CIS-PPNPF-0100939
6:3 224:5
CIS-PPNPF-0100940
6:3
CIS-PPNPF-0102514
5:7 176:4
CIS-PPNPF-0102523
5:8
CIS-PPNPF-0103336
5:17 202:16
CIS-PPNPF-0103794
5:22 208:22
CIS-PPNPF-0103795
5:23
CIS-PPNPF-0996772
5:4 146:13
CIS-PPNPF-0996972
5:24 211:4
CIS-PPNPF-0996974
5:25
CIS-PPNPF-0998567
5:2
CIS-PPNPF-0998568

5:3
**CIS-PPNPF-1001449**
5:6 151:20
**CIS-PPNPF0998567**
139:7
**cited** 123:6
**Civil** 1:15
**claim** 193:9
**claimed** 170:13
**claiming** 169:19 170:17
**clarification** 24:2 63:13
63:25 65:20 89:11
98:17 113:23 229:22
231:3
**clarify** 23:5 26:23
67:18
**clarity** 52:22 117:24
**CLASS** 1:7
**classes** 246:17
**clear** 18:25 67:1 109:18
113:17 117:25 139:25
148:16 149:18 157:18
223:7 241:11
**clearly** 233:7,12 241:23
**client** 24:18,19,25 76:4
76:8,19 77:7 80:13
**clients** 24:16 25:3
27:12 69:20 72:8
76:18,19
**climate** 209:17
**climb** 217:14,17
**close** 14:6 113:1 114:2
116:1,6 162:8,24
163:3,13,24 170:10
170:13,17,20 174:14
183:22 194:13,17
**closed** 114:8 115:23,25
162:10,11 164:1,13
166:4 170:12 171:20
174:17,19 248:21
**closely** 121:22
**closer** 167:5 242:12
**closes** 112:11 114:12
**closing** 112:1,4,8,12,19
113:20 114:24 115:1
116:12,23 162:19,20
163:4 164:15 165:1,7
165:13 166:6,17
167:4,6,10 169:14,20
169:24 171:4 173:19
174:1,6,22 175:7,17
177:13 248:21
**code** 35:5 119:23
**colleagues** 65:19
**collect** 170:8
**collected** 50:8,14,21,23

50:23 51:24
**collection** 20:1
**Collectively** 169:18
**College** 23:18,20
**com** 182:9
**come** 20:5 30:22 31:19
34:23 36:16 48:15,23
53:3 56:7 144:2
145:12 156:8 164:4
164:11 200:8 214:23
215:12 226:4
**comes** 185:11 204:7
207:11
**coming** 53:4 114:6
138:6 182:22 185:5
215:7
**command** 127:24
**commencing** 1:22
**comment** 29:25 154:17
162:12 169:17 191:10
194:23 195:6 196:7,8
205:23 216:6 234:24
**commentary** 39:8
**comments** 194:19
197:19 239:7,8,11
**Commission** 252:18
**commitments** 226:25
**committee** 63:17
**commodities** 36:2
**common** 21:11 29:16
29:18 30:11,25 103:9
144:7 172:7 236:15
**Commonwealth** 1:18
252:2,7
**communicate** 29:22
41:1,4 47:24 247:22
**communication** 41:7,8
49:23 236:19
**communications** 4:14
19:4 32:23 39:9 40:3
40:13 43:19 90:20
98:22 125:1 233:15
**community** 43:17
115:6
**commuter** 8:17
**companies** 26:10,11
28:12,13,14,14,16
32:10,12 33:23 34:3
35:3,15,21 36:6 37:22
39:10 41:10,11 43:16
46:21,23 52:25 72:6
72:14 77:10,14 80:18
80:23 92:11 94:1
95:21 97:19,22 104:9
104:18 110:4,5,9
116:21 126:22,23,24

132:10 133:3,7,15
141:6,11 144:8
145:23 155:6 162:3
162:25 170:11,16,20
170:22 171:19 172:2
173:1 180:21 199:4
200:11 210:4 218:13
219:20 227:16 230:7
240:21 245:5 246:2
247:8
**company** 4:12 29:25
31:6 32:5 45:1 49:7
49:24 56:6,7,24 57:2
57:23 60:16,16 62:1,3
62:5,6 69:19 73:22
75:16 76:12 77:24
83:4,5,6,23 90:11,16
91:3,7 96:5 99:18,19
99:24 103:20 104:12
105:14,19,23,24
108:14 110:16 111:12
112:11,22,25 113:7
113:13 114:1,12
115:11 116:17,20
123:16 132:13,25
133:8 135:14,15
141:13 152:9 154:21
157:25 158:25 160:1
161:24 162:20 170:8
183:18 191:24,24
199:13 213:14,14
214:19 215:2,5
216:13 217:10 221:22
223:22 229:19 237:11
245:8 248:11
**company's** 165:5 203:5
**comparable** 195:25
196:21 197:2
**compared** 198:10
**compelling** 144:17
**compensated** 23:3 70:8
**compensation** 23:7,8
23:10,12 70:12,21
**compete** 149:12,13,14
158:18
**competencies** 149:16
149:17
**competency** 179:1
221:22 222:3
**competing** 84:11
149:20 179:15
**competition** 173:16
199:5 214:11
**competitive** 203:3,11
245:6
**competitively** 204:5

**competitor** 149:23
173:25 232:20 233:1
237:23
**competitors** 32:18 83:8
84:11,16 173:18,22
181:4,6,23,25 198:10
202:4
**complacent** 61:4
**complete** 119:7
**completed** 250:7,20
**completely** 84:7 231:6
**compliance** 220:25
**compliant** 111:16,21,22
113:4 219:24 220:16
220:20
**complies** 120:22 154:3
**component** 96:10
**components** 83:1 95:22
214:25
**Compound** 108:20
**computer** 8:19 12:19
**concept** 107:21
**concern** 72:5 133:19
144:20
**concerned** 106:13,19
180:9 214:17 220:25
**concerning** 187:23
202:24
**concerns** 92:23 97:11
99:8 147:18 154:9
155:18 181:21 212:11
**conclude** 88:14 167:22
175:6,16 211:16
**concluded** 249:15
**concludes** 248:11
**conclusion** 150:12
175:1 206:20,21
**conclusions** 91:4
114:16 205:10 239:25
**conditions** 113:16
**conference** 43:19,23
47:8,18,19 52:13,23
54:11 56:20 102:8,10
102:12,19,20,24
103:2,11,16,25
125:15,20,22 127:25
128:2,7,23 130:6
160:17,19 161:6,7,9
187:3 197:16 207:5
**conferences** 43:16
52:22 78:17,23
127:19 128:3
**confidence** 34:7 146:4
206:16
**confident** 205:14
206:11

**confirm** 174:19
**confirmation** 174:16
178:15
**conflict** 69:16,18 72:5
72:13 109:6
**confusion** 181:14
**Congrats** 140:10
**conservative** 123:23
**consider** 18:5,6 77:13
**considerable** 135:19
**considered** 31:22 32:9
127:23 182:16
**considering** 18:21
142:17 164:16
**consistency** 239:16
**consistent** 122:1,7
125:20 126:5 129:2
132:1,2 152:18,20
197:13,23,24
**consistently** 87:22
**constant** 197:22
**constitutes** 20:2
**constrain** 110:6
**construction** 90:1
**consultant** 26:3
**consultants** 84:8 174:8
**contact** 42:8 44:24
73:25 74:3 82:22
84:5 91:13 123:24
124:3 125:11 173:13
**contacts** 83:17,22 84:4
123:17,20 171:14
172:23 173:12
**contained** 16:15 50:20
50:22 167:25 168:3
**contended** 220:19
**content** 82:9 135:1
200:14
**context** 60:24 163:8
190:1 248:7
**continue** 36:8 37:13
60:17 159:11 174:21
217:14,17 248:22
**continued** 4:24 5:1 6:1
159:12 174:13 223:3
**continues** 87:25 150:19
**contract** 172:1,2,6,20
**contractual** 226:13
**contrary** 20:6
**contributions** 71:8
**contributors** 40:1
**CONTROL** 252:21
**convention** 230:6
**conventional** 143:25
**conventionally** 145:11
**convergence** 233:13

84:12 99:1 109:20
165:12 166:11 215:8
copies 188:12
copy 30:9 117:7 120:17
199:23 250:7
cordage 242:7,8
core 149:16,16 179:1
221:21 222:3 237:11
242:10,14,15
corner 117:16 232:17
corporate 199:1 236:4
236:6 247:4
correct 23:11,19,22
36:21 58:18 62:23
69:21 72:20 78:18
96:5 100:21 109:7
111:19 119:5 125:13
127:9 136:17,18
156:17 169:25 190:7
191:4 239:9
correction 9:17 251:5
corrections 250:14
251:20
correctly 57:24 61:25
74:4 106:25 140:24
150:21 151:6 157:10
178:10
correspondence 88:6
orvus 232:14,25
233:1
cost 111:24 247:2
costs 184:14,15,25
Coughlin 2:4 7:20
counsel 2:19 7:16 8:14
8:22 15:21 17:1,3,24
18:2,3,8,11,22 19:4
19:11 20:13 22:22
117:8,14 190:15
couple 41:9 47:11
116:7 171:1,3 172:22
210:5 245:1
course 9:14 11:12
24:21 25:8 28:2
46:21 59:20 86:1
118:15 186:14 247:14
248:11
courses 246:11,17,23
court 1:3 7:5,12,15,17
10:2,23 88:15
cover 9:24 23:14
coverage 159:25
covered 44:10 189:5
covering 95:11 101:23
212:8
Coyne 2:18 7:25,25
17:9,14 212:20

Craig 230:21 231:4
created 107:13,15
213:5
creates 236:20
creation 201:2
credit 181:9
cross 4:2 232:15 243:23
248:23
crossing 182:8
crowding 203:6
CS 244:15
currencies 232:16
currency 145:25,25
current 9:6 14:21
52:14 63:1,7 113:24
114:7 142:16 143:8
145:5 218:1,16
226:25
currently 25:6 26:24
50:5,6 64:4,5,22
65:25 66:22 67:21
curriculum 246:22
curve 92:13
customary 21:16 27:25
211:18
customer 96:1 152:10
152:16,22,24 159:18
172:9 184:9 232:20
234:9,10 243:5
customers 35:7 83:9,9
83:12 97:22 98:3
107:14 108:2,5,9,16
113:16 141:16 151:9
154:24 172:13,24
181:3,18 182:15,19
182:23 183:1,4
184:17,21 185:1,6
214:21 218:12 220:19
220:21,24 230:11
240:8,12 243:13,17
243:19 244:2
Cutler 1:20 2:12 8:4
17:6
cut-throat 76:16
CX 237:22
cycle 209:24
cyclical 36:3
C-01-20418-JW 251:2
C-01-20418-JW(PVT)
1:6

——————————
D

D 4:1 7:1
daily 29:23
Dan 21:23 51:9
Dartmouth 24:1

data 16:16 28:16 31:23
32:9 34:17 60:10
98:21 122:6 174:24
175:5 192:1 221:15
221:22,24 222:3
233:13 236:16 237:7
237:11 243:22
date 7:7 12:6 21:4,6
44:9 56:3 59:13
94:10 139:4 163:15
163:23,25 167:5
177:1 228:10,13,17
228:22 251:1,6
dated 11:16 136:25
137:8 162:16 241:7
Dave 163:13
David 1:12 4:3 7:9 8:6
9:5 11:5,16 100:17
134:10,13 169:4,6
222:23 251:1,23
252:5
day 10:19 113:1,8
115:16,19 134:11
252:3,14
days 116:7 188:21
DC 203:22
dead 126:12
deaf 8:14
deal 25:3 46:20 144:18
232:16
dealing 107:5
debate 40:11
decelerating 97:10
213:16
December 188:22
208:11 209:9,14
decide 30:17
decided 31:25 136:10
136:20
decides 113:7
decision 33:21 89:7
136:12
decisions 30:19 88:22
245:14,16
decline 209:24 217:15
217:17
declined 8:24 86:23
declining 89:13
decrease 85:16
decreased 85:19 86:5
87:8 89:5
deduct 138:13
Defendant 3:6
defendants 7:24 122:21
deferrals 154:11
define 13:1 25:10 31:12

33:9 36:9 44:12
53:15 74:15 89:21
107:11 109:23 117:3
158:22
defined 25:11 53:16
219:5
definitely 55:2 244:5
definition 32:11
definitively 175:17
degree 180:18 218:7
degrees 73:16 75:6
delay 236:12,20
delays 236:12,24
delegated 148:4
deliberately 51:23
delivered 250:5,8,9,11
deliveries 226:12
delivering 233:10
Dells 220:6
demand 214:24
DeNuccio 43:6 55:11
55:20 56:10,22
129:24 130:12 238:8
239:21
DeNuccio's 239:8
department 26:9 38:14
40:11,15,17 41:5 42:9
204:19
depend 79:24 80:8
101:3 136:9
depending 13:7 99:20
245:20
depends 29:4 69:23
70:3 79:21 80:1,5
82:22 98:3 101:2,11
108:21 111:22 117:3
136:8 156:21 175:2
187:15
deploying 234:5,5
deployment 242:6
deponent 2:15,24
122:19 250:7,13
DEPONENT'S 250:1
deposed 9:20,22
deposes 8:11
deposition 1:12 4:2,7
7:9,14 8:19 9:15 11:4
11:7,16 17:11,19,23
18:2,12 19:12 20:10
23:4 25:8,13 88:10,13
100:17 169:4 222:23
248:21 249:15,18
250:11,14 251:1,4
depositions 118:2
Depoy 74:6 200:4
describe 12:21,25

13:14 19:5,10 190:12
Description 4:6 5:1 6:1
designated 94:25 95:2
detail 92:17,20 175:13
details 46:5 130:1
141:1 148:1 188:7
Detata 42:12 153:12,17
160:15 163:12 165:9
176:18 186:18 201:23
202:23 209:6 224:18
Detata's 155:17 156:4
deteriorated 215:25
216:9,18
deteriorating 97:4
216:19 218:10
deterioration 216:12
216:15
determination 123:24
136:4 167:20
determine 136:6 235:8
determining 226:5
detractors 40:1
develop 35:18 130:22
205:15 245:11
developing 35:10
206:13
development 219:13
developments 203:19
deviates 248:11
dial 161:21
difference 76:7
different 20:23 34:2,17
36:3 37:18,20 38:22
67:9 72:10,10 75:19
89:25,25 90:1,5 91:5
100:2 109:9 110:23
111:6 136:16 155:19
181:16 205:21 214:4
242:13 247:18 248:10
differentiated 245:12
differently 219:22
247:20
difficult 103:12,25
114:7,10 209:16
232:16
difficulties 219:10
digest 219:21
digital 237:21
dinner 138:25 139:2
208:9,12
direct 4:2 9:1 101:18
125:5 134:7 169:7
188:23 252:21
DIRECTION 252:21
director 31:24
directors 73:22

directory 201:1
disagreement 248:19
disappointed 105:19
disappoints 223:22
disclose 19:19 67:22
disclosed 16:14
discourse 154:22
discovery 19:24
discretion 30:23
discuss 20:21 21:24
  39:9,25 44:2 46:24
  47:22 59:19 79:4,5
  88:22 140:20 157:9
  165:23 166:6 178:12
  216:14
discussed 18:23 19:10
  21:10 40:4 44:3 46:4
  47:17 52:14 58:4,8,21
  59:14 62:10,17 65:1
  73:17 75:16 83:17,25
  84:16 99:6 115:5
  130:10 157:11 174:4
  178:6 230:22
discusses 238:11
discussing 80:14
  108:24 111:3 130:15
  131:7,9 194:8 197:18
  225:11 230:10 233:11
  233:12
discussion 19:23 37:2
  67:12 79:13 97:16
  116:14,18,19,22
  131:22 236:21 238:7
  240:7 243:23
discussions 19:20 20:12
  20:15 22:5 79:2
  82:15 115:7 116:16
  144:22 180:24
Disgusted 232:24
dispute 88:4
disruption 35:2
distinction 218:23
  219:1
distributed 39:20
distribution 251:8
District 1:3,3 7:12,12
diverse 184:9
diversification 90:3,4
division 1:4 7:13 73:12
  231:14
document 1:8 5:15,16
  14:11 19:16 20:25
  117:5,14 120:8,10
  122:20 124:24 128:10
  129:12 134:2 138:1
  138:19,21 139:6,8

146:12 151:19,21
  153:3 160:14 176:3
  186:8,10 192:20
  199:21 201:15,17
  202:15,17 204:10
  205:1 207:24 208:1
  208:21,23 211:3,5,14
  213:4 224:4,6 225:4
  227:4,6 244:10
documents 4:10,12,14
  4:16 5:2,4,5,7,9,11,13
  5:20,22,24 6:2,4 12:9
  12:16,22 13:2,4,11,14
  13:17 14:7,8 15:17,23
  16:1,9,17 18:5,10,14
  18:17 19:1,3,5,7,10
  20:2 21:18 22:13
  87:25 117:15 118:3
  125:2 128:12 129:14
  134:4 146:14 176:5
  188:9,13 199:24
doing 30:19 38:16 40:9
  46:5 98:20 102:19
  109:2 146:5 149:3
  159:2 160:9 162:4
  178:1,21 179:8,18,25
  185:13 209:25 233:24
  240:25
dollar 66:15,17 70:9
  141:20 225:22
dollars 66:23 130:24
  133:9
dominating 204:6
Don 127:14,19,23
  128:8 176:20 177:8
Dorr 1:20 2:12 8:5 17:5
dots 174:24
dot-com 143:6
doubt 49:24
drafted 29:17
dramatically 143:25
draw 114:16,20 206:21
drawing 91:4 150:11
  204:19
drawn 174:17
drew 127:6
drive 9:8 72:12,16
  239:23,25
driven 179:6 191:15,18
  191:18
driver 222:1
driver's 8:9 252:6
dropping 203:20
drops 242:5
DSO 167:7,8,13,15,17
  167:21

DSOs 164:19,22 166:15
  166:21
DSO's 164:23 165:5
duly 8:10 252:8
duties 25:25 63:7
  247:14,21 248:2
DVD 192:1
dynamics 194:22

_____ E _____

E 2:3 4:1,5 5:1 6:1 7:1
  7:1 169:1,1 250:10
  252:1,1
earlier 51:3 53:16
  56:23 81:21 83:17
  96:3,7,23 100:19
  148:20 151:7 162:19
  164:13,24 201:5
  214:22 218:6
early 21:5 112:1,4,15
  112:19 113:1,20
  114:8,13,24 115:2
  116:2,6,12,24 159:24
  160:24 161:17,22
  162:9,11,21 163:3,4
  164:15 165:1,7,14
  166:4,17 167:6
  169:14,20,25 170:10
  170:12,13,17,20
  171:4,20 173:19
  174:1,7,14,17,19,23
  175:7,17 177:13
  209:17
earning 161:6,7
earnings 102:20 109:22
  109:23,25 110:19,20
  110:23 111:6,9,10,12
  111:20 112:2,5
  113:19
easier 66:16 215:1
easily 141:19,19
easy 141:19
economic 107:3 191:9
  191:11,12 209:23
economy 48:2 191:16
  193:7,16
edge 242:11,12,15,17
education 245:17
educational 23:14
effectively 149:13
effort 200:15
either 64:25 77:17
  93:25 97:9 113:25
  137:20 141:2,17
  164:9 196:23 207:18
  207:19 238:22 244:1

elaborate 108:22
electronic 12:18 13:13
  30:5
elements 71:2
emerging 63:11,22 65:7
  65:14 66:2,13,20
  86:25 198:17 217:24
  218:8
eminae 157:5
employee 247:14
employees 116:7
  208:10
employment 23:15
enable 194:23 245:15
enabled 144:24
enables 35:7
encompassed 26:8,10
encompasses 28:11
endeavor 63:11,22
ended 246:3
endowments 71:15
ends 159:6 160:14
energy 28:11 36:2
engineers 229:17
ensuing 210:10,15
entail 38:20
Enterprise 131:10
  154:10,24 155:18
  179:2 192:7 198:14
  214:12
entertainment 26:11
enthusiasm 110:7
entire 53:3 160:23
  187:14 235:1,3,7
entirely 34:1
entitled 19:2,25 190:17
entry 183:19 191:22
  245:7
EPS 104:8 105:16
equals 127:2
equation 160:3 165:4
  167:1
equipment 28:14,15
  31:24 32:9 33:2 34:5
  36:10 131:3 142:18
  143:4,14 149:5 160:6
  182:5,11 184:24
  186:1 220:5,9 238:24
  243:14
equity 26:9 40:16,16
  41:5 63:17 108:2,5,16
  127:1,7 207:9
Erdmann 222:7
Eric 65:18,22
Erickson 179:18
errata 250:1,4,6,15,20

251:3,6,7
especially 199:14
Esq 250:5,10
essentially 206:1
established 179:19
estimate 14:8 41:21
  68:6
estimates 156:7,24
Estrin 57:9 59:6,23
  61:7,11 134:14
  233:10
evaluate 71:4 75:17
evaluation 30:21 247:3
evaluations 142:5
event 218:13
events 88:5 102:25
everybody 113:8 116:4
  164:12
everyday 110:1
evidence 252:6
exact 12:6 13:23,25
  21:4,5 44:9 56:3
  59:12 163:15
exactly 13:1 14:23
  43:12 53:11 57:12
  78:21 79:1 97:3
  122:15 129:6 148:13
  163:19 172:16 177:1?
  178:2,18 193:25
  202:7 232:10,18
  234:3 238:2
examination 9:1 169:7
  248:18
examine 88:10
example 29:12 36:1
  111:20 115:16 141:13
examples 29:12,13
  172:22
exceeding 105:14
Excel 13:16,19 14:12
  14:12 91:2
excellent 164:16
excess 184:24
excising 51:16
excuse 9:21 16:16
  23:16 29:7 33:11
  44:20 48:6,20 60:8
  63:16 71:2 80:7
  246:25
exec 187:15
executive 45:1
executives 49:5 58:15
  61:9 187:4 193:5
  239:16
executive's 131:25
exhaustive 171:15

hibit 11:4,8,10,11,14
11:18,21 12:1,3,10
117:4,9,11,20 118:6
118:11 119:3 120:4,7
120:11,21 121:8
122:6 123:11 124:24
125:3,6,18 126:1
128:10,13,15,25
129:11,15 134:1,5
135:16 136:24 137:6
137:7 138:18,22,24
139:5,9,13,21 140:3,4
146:11,15,17,21
147:14 151:18,22
152:1 153:4,8 169:12
176:3,6,8,17,19
185:19 186:7,11,17
188:8,14,17 193:24
199:20,25 200:12,17
201:14,15,18,20
202:14,18,20 204:9
204:13,15 205:11
206:25 207:23 208:2
208:4,13,20,24 209:1
209:2,4,5 210:24
211:6,8,14 212:10
222:4 224:3,7,9,17
225:16 227:3,7,9
228:3
exhibits 10:22 212:21
212:24
exist 64:22 154:9
expect 88:6 111:4
156:24 216:22 230:25
231:10,19
expectations 104:3,7,8
104:17,21 105:14
110:5,9,15,21 111:2,7
209:18 210:3,6
expected 104:9
expensive 145:13
experience 35:25 36:6
72:20 73:6,8,10 81:12
103:23 106:10 170:19
171:18 246:5,7
experienced 196:1,22
expert 87:19 123:5
247:9
expertise 33:5,9,12,15
33:18 53:13,15,21
86:20 240:9 245:3
experts 37:25
expiration 28:12
Expires 252:18
plain 15:2 51:21 60:7
69:14 70:20 137:21

219:3
explanation 95:18
explore 19:2
exposure 218:1,11
expressed 61:7
expression 104:2
expressly 101:9
extend 113:15
extended 183:21
extends 214:20
extent 77:23 99:20
108:21 133:2,5 159:2
184:12 185:9 193:17
204:25 247:19
external 41:15
externally 77:17
extra 113:8
extraordinarily 112:24
115:15
extraordinary 143:23
219:19
extrapolate 114:4
Extreme 244:19
extremely 142:20
e-companies 245:12
e-mail 5:2,4,5 13:18
14:13,22,24 15:1,3,5
15:9,16,22 16:1,3
41:1,4,7,12,22 42:4
42:14,16,18,20 43:10
43:11 103:9 139:8,24
139:25 140:5,7 145:9
146:14,22 151:21
152:4,14 153:14,23
153:24 156:12 159:21
162:15 165:10 166:20
174:21 176:5 186:10
200:22,23 201:4,17
201:23 202:17,23
208:23 224:12,15,17
224:20 248:1,8
e-mailed 41:17,19 42:5
43:1
e-mails 14:15,20 15:13
15:14 41:25 153:11
156:8 176:18 186:18
209:6,7 247:11,12,16
248:4,16

F

F 169:1 252:1
face 106:20
fact 8:13 19:25 107:20
120:4 171:8,17
216:17 234:25
factor 144:17 180:4

factors 70:23
facts 60:2,3,5 169:22
174:20 175:5
failing 98:23
fall 31:18 32:13 44:16
48:12 64:25 122:12
154:19 236:19
familiar 31:6 71:9,17
107:16,20 202:6
225:18,20,24
Fane 231:4
far 15:14 44:5 133:3
161:25 232:14
fashion 39:15 104:6
fast 34:13 35:16 89:13
191:6
faster 35:12 180:1
favorable 59:24 77:5
81:8,16 113:15
favorably 58:17 79:19
Fax 4:21 134:4
February 94:12,13
105:4 106:13 211:11
212:12 223:6,10
feed 8:17
feedback 100:20,24
101:1,9,13 154:25
feel 121:20
fees 76:15
Fegin 42:11
fell 32:10 240:10
felt 141:22 149:12
158:17
fences 240:21,23
Fenwick 3:2 7:23
fewer 54:22
fiber 230:5
fiduciary 69:10 109:9
109:11
field 28:13 232:1 240:9
245:24 246:5,8,9,18
246:20
fields 27:13
figure 148:14 209:15
figured 185:17
figuring 155:23
files 12:19 13:17,19
21:18 22:13 51:4
62:22 84:19
fill 229:8
filled 229:4
finance 175:25 218:16
218:22 219:2,5
financed 182:6 185:6
financial 85:15 91:3
96:4 97:21,23 105:23

106:9 111:14 112:22
113:14 114:5 135:12
182:23 183:17 195:4
245:7,21,23,25 246:2
246:4,5,23 247:2,3,4
financially 102:18
106:2 135:13 184:10
financials 245:20 246:1
financing 80:15 97:12
97:15 98:4 99:3,8,14
99:17,21 100:6
106:19 107:4 108:17
184:16,20,25 214:10
217:21,25 218:7
227:1
find 13:19 14:15 16:2,9
163:10
fine 19:19 56:14 231:4
firm 21:21 118:19
firms 76:11
first 8:10 12:5 26:6
31:17 33:16 51:6
82:2 87:22 96:23
108:24 115:23 123:22
124:9 135:3 136:25
142:21 145:21 150:11
160:13 161:5 176:11
176:14 188:24 193:2
200:17 207:11 210:7
212:14 228:9 229:23
238:17 245:2
Fiscal 244:12
Fishman 65:18
fit 31:25
five 17:22 18:3,4,8
45:16 55:5,8 100:8
129:18 133:10 161:19
191:13,18,25
fixed 29:14
flanked 243:4
flawless 236:22,23
flight 211:23
flip 228:4
floor 229:15
floors 243:1
flop 206:10
flow 96:15 214:9
215:24 216:8,11
fluctuated 85:4
focal 102:17
focus 40:1 54:2 105:16
107:4 162:4 177:25
179:24 186:2 203:4
241:19,20,24,25
242:3
focused 53:24 54:2

91:22,25 92:3 178:24
213:18,20,22 214:5,7
focusing 176:10 241:21
fold 41:6 229:12,12
folder 200:22,23,25
folders 200:18
follow 31:13 32:5,6,12
32:18 33:2 36:8,9
37:13 103:14 142:12
followed 27:23 28:10
28:10 35:25
following 4:24 37:18
74:1 99:9 103:10
112:12 122:23 123:2
137:20 172:25 175:4
205:21 223:2 245:4
follows 8:11 156:18
force 108:1,7
foregoing 251:19
252:20
foremost 33:16
forest 34:8
forever 82:6,7
forget 56:6
form 29:15 31:4 39:16
40:4 41:7 43:9,10
90:25 252:6
formal 36:19 187:6,9
forms 16:24 29:9 31:3
111:11
forth 154:22 212:10
225:16 252:8,12
Fortune 157:4
forward 25:13 60:17
61:5 64:15 111:5
113:16 146:6 190:10
197:3
found 12:22 14:9 16:13
130:21 243:6
foundation 75:23
118:25
foundations 24:15
four 191:17 193:3
205:24 232:2
Fourteen 246:9
fourth 155:2,7
frame 25:11 30:22
32:19 44:17 48:21
49:1 85:4 87:3,4,5
116:15 135:24 136:19
141:10 155:6 162:22
234:6 246:12
framework 131:23
247:7
Francisco 2:8 3:5
Fraser 241:9,15

**Fred** 233:22
**free** 240:18
**frequently** 128:1
  200:10
**Friday** 1:21
**front** 8:17 9:11 78:25
  97:10 138:14 162:4
  190:3 211:23
**fruitless** 177:23
**full** 134:11
**function** 82:12 91:15
  96:13,14 158:3
  179:20 182:6
**functions** 33:13
**fund** 27:8,10,11,15
  28:6 37:10 38:14
  40:7,8 44:25 45:2
  63:10 64:2,4,17 65:14
  65:22,24 66:4,12 67:2
  67:20,25 68:4,12,17
  71:4 85:6 86:25
  88:21,24 95:3,7 98:14
  118:20,23 119:2,21
  119:23 120:1,3 124:8
  161:15 163:8 211:21
**fundamental** 30:20
  64:17 76:7 101:5
  105:22
**fundamentals** 218:10
**funds** 63:19,24 65:12,18
  65:25 68:15,18,20,23
  71:8 117:22 119:5
  120:4,5 127:8
**further** 252:11
**future** 107:14 203:16
  219:12 226:12 233:15
**futures** 107:9,11,21,23

_____ **G** _____
**G** 7:1
**gain** 77:8 148:6 179:21
  199:2
**gained** 204:3
**gaining** 141:14,15
  180:3
**gains** 203:2
**gap** 111:15,17,21,22
  113:3,6
**gardener** 174:9
**gathering** 243:22
**gauge** 105:17 163:2
**gauging** 105:22
**Geller** 2:5 7:20
**general** 2:19 105:7
  122:7 126:5 132:12
  169:17 173:11

**generalization** 144:6
  144:11 169:21
**generally** 58:9 85:11
  95:20 96:19 99:5
  111:17 129:2 175:15
  223:12
**generate** 111:24 123:15
**generated** 211:15
**generating** 151:8
**generic** 61:12
**getting** 66:18 148:2
  154:25 174:18 242:12
**Giancarlo** 57:10 61:18
  61:19,20,22
**Gigabit** 198:16
**gist** 241:15
**give** 32:14 46:7 92:15
  116:6 117:15 139:18
  152:15,23 164:11
  205:20 212:15
**given** 26:6 42:3 70:11
  102:15 139:3 156:5
  156:16,23 158:8
  161:11
**gives** 113:8
**giving** 163:23
**glad** 142:22
**gleaning** 206:22
**global** 182:8
**GM** 241:10
**go** 23:23,25 36:23 39:4
  60:25 67:7 69:24
  72:22 79:9 82:2 84:1
  107:18 124:3 125:24
  131:16,20 141:17,23
  148:16 165:24 168:5
  168:15 173:2 182:12
  183:8,22 202:4
  212:17 214:2 217:11
  222:15 228:20 232:17
  238:7,13 242:19
  243:7 249:2,4,13
**goal** 245:11
**goals** 191:24
**goes** 15:15 44:4 79:8
  97:6 140:24 164:9
**going** 19:19 20:24 22:4
  25:9,10,13,14 52:21
  60:17 64:10 68:16
  69:12 81:15 84:2
  85:6 92:22 93:6
  96:24 99:25 105:16
  106:17,18,24,25
  107:3 111:5 112:24
  115:13,17,20,21,22
  141:11 146:5,6,7

148:13,16 149:9
  152:25 153:1 154:13
  157:3 160:11 163:3,7
  165:6 166:2,3 167:11
  167:12 170:4,8,21,23
  171:18 173:4,9
  178:13,15,17 179:5
  179:15 189:12 190:10
  196:17,19 197:3
  210:22 215:7 217:11
  221:25 223:3 228:7
  237:22 238:25 239:18
  242:2
**Goldman** 4:14 138:25
**good** 7:2 53:5 56:13
  58:12,14,15 77:16
  81:23 83:13 97:20
  110:16 111:14 114:15
  115:15 116:8 141:16
  148:2 158:16,23
  163:5 165:6 168:14
  210:2 214:15 232:15
  247:6 249:13
**Goodman** 125:1
**Goodmanson** 134:13
**Goodwinson** 124:15
**Gordon** 244:18
**gotten** 142:2 196:3
**grab** 76:18 165:25
**graduated** 24:4
**grain** 82:19 193:20
**Grant** 241:9,15
**granularity** 92:17
  175:13 183:10
**great** 33:18 166:3
**gross** 114:22,23 216:15
  217:6
**grossly** 126:12
**ground** 9:24 20:10
  183:17
**grounds** 20:11 131:18
  150:9 193:11
**group** 45:25 47:6 54:2
  84:9,9 201:2 204:18
  205:20 206:4
**groups** 174:9
**grow** 91:6 110:13
  130:17 150:20 206:12
  206:17
**growing** 132:25 179:23
  180:1 197:1 205:16
**grows** 191:16
**growth** 63:10,12,22,23
  64:17 65:7,14,21 66:2
  66:13,20 86:25 89:15
  89:24 91:22 93:17

111:5 119:1 123:25
  124:7 150:21 161:13
  179:22 180:8 185:14
  191:9,11,12 196:1,5
  196:22,25 197:2,13
  197:21 198:2,18
  210:15 214:10 216:18
  216:19 219:20 240:15
**guaranteed** 98:9
**guess** 16:24 22:3 33:24
  34:7 44:10 69:9
  86:14,15,17,18 124:1
  134:8,19 147:7
  159:11 163:2 164:18
  166:20 202:11 232:24
  239:22
**guessing** 64:10 79:7
  244:3
**guidance** 154:6 155:10
  156:5,16,23 210:9,21
**guided** 210:14
**gun** 240:17,19
**guy** 57:10 165:25
  234:25
**guys** 50:7 240:20
**G&M** 7:5

_____ **H** _____
**H** 4:5 5:1 6:1
**Hale** 1:20 2:12 8:4 17:5
**half** 13:4 45:10 62:18
  160:24 161:21 225:21
  230:8
**halls** 114:5
**hampers** 236:19
**hand** 10:23,24 30:13,14
  30:15 252:14
**handout** 168:9
**handouts** 31:2
**hands** 200:16
**handwriting** 190:25
  192:21 197:9 198:7
**handwritten** 227:12
**happen** 34:12,12 35:2
  44:23 107:7 113:13
  148:7,14 150:19
  203:14
**happened** 50:3 82:7
  107:6 144:23 145:1
  183:23 217:18 225:3
  226:21
**happening** 83:11 92:14
  97:3 114:6,9,21
  135:13 141:9 150:18
  160:6 162:2 178:3
  225:24

**happens** 116:9 132:16
  217:6 229:3
**hard** 30:9 80:10 94:2
  113:7 114:20 123:16
  142:10 150:13 183:14
  210:2
**haul** 219:11 241:23
**head** 63:14 173:23
  234:19
**headed** 97:2
**health** 105:22,23 106:2
  106:9 182:23
**healthy** 61:2 105:17
**hear** 56:9 93:12,14
  161:16
**heard** 93:10 144:24
  161:11 164:14 166:4
  169:13 171:2 205:12
**hearing** 42:3 162:9
  220:14 225:10
**heck** 164:13
**held** 37:3 67:13 68:4,12
  68:23 78:17 79:2,14
  108:16
**help** 97:23 228:8 235:1
  235:8 238:4
**hereinbefore** 252:7,12
**hereunto** 252:14
**hey** 53:5 173:2
**Hiding** 111:24
**high** 64:1,3 76:19
  143:13,22 144:2
  146:8 182:16 209:18
  216:21
**higher** 198:18 218:9
  242:3,15
**highest** 161:14
**highlights** 213:16
**highly** 142:20
**historical** 15:14
**historically** 179:2
**history** 143:20
**hit** 112:25 113:14
**hits** 214:14
**hold** 65:2 66:1 69:18
  70:4 72:15 73:16,19
  74:22 223:4
**holding** 68:19 86:2
  123:3 126:2 143:20
  160:20
**holdings** 39:4 63:18
  64:1,3,18,19,20 65:10
  66:1,3 67:2,20,22,25
  68:12,22 85:3,10 95:3
  95:8 117:22 119:4,18
  119:20 121:9,11,12

121:14,24 122:25
123:15 126:6 136:7
222:25 223:9,23
**holds** 65:8 66:22 67:20
210:9
**home** 242:12,16
**hope** 210:8
**hopefully** 30:4
**horizon** 154:24
**hour** 46:10 62:18
160:24 161:21 230:8
230:8
**hours** 17:18,22 18:1
140:22
**housekeeping** 120:14
**huge** 234:16
**Huh** 44:7,13 237:14
239:3
**Hum** 52:20
**Hunafy** 134:13
**hundred** 37:22 47:11
133:9 190:4
**hundreds** 46:21 59:10
**hurdle** 237:10

_____
**I**

**Ian** 134:12
**BM** 147:2
**ZG** 243:12
**idea** 42:1 122:13,16
158:23
**identification** 11:9 12:2
117:10 120:12 125:4
128:14 129:16 134:6
138:23 139:10 146:16
151:23 176:7 186:12
188:15 200:1 201:19
202:19 204:14 208:3
208:25 211:7 224:8
227:8 252:6
**identified** 8:8
**identify** 118:2 237:5
**II** 180:13,15,21 181:1,2
181:5,10,22 182:11
**III** 180:13,15,21 181:1
181:2,6,10,22 182:12
**IMC** 235:17
**immense** 210:11
**immune** 164:14
**impact** 193:16 221:20
**impairment** 42:4
**imparticular** 140:16
**implication** 191:16
196:24 210:20
    **vlied** 180:3
    **plore** 99:22

**important** 10:1 104:16
104:18 105:21 124:4
124:5,6 180:4 185:8
185:21 193:16 195:23
196:18,20 198:22
218:23
**improvement** 216:22
217:8
**improvements** 191:15
191:19
**improving** 97:1,4
**inaccurate** 122:17,22
123:21
**incentive** 70:12,20 77:5
**include** 12:19 51:23
246:24 247:1
**included** 50:12 52:3
153:18
**Incorporated** 1:7 3:7
**incorrect** 123:18,19
148:25 149:1
**incorrectly** 164:10
**increase** 85:16 92:23
94:9 123:3
**increased** 86:1 93:4
94:5
**incremental** 23:8 179:3
239:25
**independent** 98:4
157:20
**indicate** 194:10 250:14
**indicated** 88:6 225:5
**indicating** 188:10
190:23 197:5
**indication** 92:15
115:18,22
**indications** 115:16
**indicator** 96:1
**indicators** 179:7
**individual** 69:13,19
109:16 213:17 233:22
**individually** 136:10
**individuals** 24:14 42:25
62:17 71:15 134:17
134:23 171:8 176:25
178:7 247:23
**industrial** 193:2,6,18
**industries** 21:12,12,14
26:12 28:2,3,8 36:1
95:1,2 209:19
**industry** 26:2,4,5,13,14
30:16,18 32:6,7,8,13
33:3,15 36:2,4,11,17
36:19 37:11,25 45:9
47:11 55:16 61:2
75:5,7,9,11,13 80:17

82:17,23 86:20 94:22
97:18 149:10 171:19
173:13 179:10 182:4
196:17 198:12 200:13
207:20 210:18 236:6
245:2,3
**inference** 174:22
**influence** 79:19 136:13
**info** 83:3,4
**informal** 83:18 187:11
**information** 39:5 82:18
82:21 83:13,23
101:10 115:12 136:15
155:20,24 156:19
160:16 161:9 165:2
167:24 168:2 173:19
174:4,6 175:16,18
206:23 238:8
**informed** 107:22
**infrastructure** 241:22
**infrequently** 49:4
**initially** 143:22
**initiative** 163:10
**innovate** 60:17
**input** 167:12
**inquire** 205:1
**inquiry** 162:18
**insert** 227:20
**inserted** 190:16
**inside** 177:25
**institutions** 24:14
**instruct** 189:12 205:2
**instructing** 19:13
**instructions** 250:2,13
251:4,8
**Instrument** 173:11
**instrumental** 60:3
**integrated** 240:16,18
**intellectual** 35:4,6,8
36:5 103:19 199:17
**Intellent** 126:23
**intelligence** 242:4
**intended** 87:18 222:5
**intense** 116:14
**intensify** 162:23
**intensive** 183:20
**intent** 145:18
**intention** 248:8
**intentional** 111:11
**interact** 41:9,11
**interaction** 41:13 43:9
241:9
**interchangeably** 86:16
**interest** 31:11,12 69:16
69:18 72:5,14 77:25
108:2,5,16 109:7

121:18 141:5 225:5,9
225:9
**interested** 20:24 76:3,5
141:3 148:20 149:4,9
162:1 252:10
**interesting** 97:13 114:1
**interim** 181:7
**intermediary** 97:21
**internal** 29:21,23 38:13
40:3,22 41:15 71:3
77:11
**internally** 28:22,23
**international** 28:12
**internet** 47:23 48:1,3,7
60:4,5,11,12 142:17
143:4,14 144:7 193:6
194:22 198:17 233:12
**internet's** 193:14
**Interop** 51:1 59:9
229:4 233:8,9 236:1
244:4
**interpret** 163:18,21
**interpretation** 167:23
**interpreted** 156:25
163:19 164:10
**interrupt** 10:5,6
**intricately** 37:21
**intuition** 160:8
**inventories** 92:2,4,14
217:14
**inventory** 92:12,24
93:4,9 94:1,4,8,10
95:12,21,25 96:4
114:15,19 216:21
217:5,11 226:22
**invest** 69:12 89:15,17
210:4
**invested** 158:14
**investing** 11:25 37:22
38:15 39:7 71:14
72:11,15 108:25
109:2 209:16
**investment** 2:16,20,25
4:9 11:23 12:16
20:16 24:12 27:22
29:1 30:19 34:19
40:15,19 43:17 46:22
47:6 63:15,16,23
71:14 73:12 75:17
84:23 85:12 115:5
120:23 170:19 204:19
207:7 226:23 245:24
**investments** 40:10
69:20 158:11 247:3
**investor** 33:17,22 42:9
53:1 91:12,18 92:12

93:17 94:8 102:16
141:8 145:8 148:4
152:5 241:13
**investors** 48:16 49:7
78:25 118:24 132:12
161:10 171:7 190:4
223:21 225:23 229:20
**invests** 27:12 77:10
119:1
**involve** 111:12
**involved** 22:3 37:21
163:1 188:1
**involves** 165:21
**IP** 221:11,18 236:9,12
**IPO** 142:2,16 144:9
**IPOs** 143:14,19 144:1,4
144:7
**IR** 42:16
**isolated** 99:12
**ISP** 241:1
**ISPs** 240:12,14
**issue** 109:4 142:4 203:3
214:16
**issued** 252:6
**issues** 91:24 107:5
213:20 214:7 225:15
225:18 236:16
**items** 111:23,24 213:17
**itinerary** 208:8
**i.e** 76:4 99:24

_____
**J**

**Jabber** 193:2
**Jabel** 172:21
**Jack** 9:8
**January** 45:22 57:24
125:12 134:19 155:8
163:14 177:2,7 178:7
**Jensen** 3:1 7:22,22
75:22 78:5,13 80:21
92:25 98:15 107:19
108:19 109:14 112:3
120:13,17 122:9
127:12 137:3 144:10
164:2 185:7 215:11
248:24 249:4,11
**job** 26:20,22 82:24
207:2 248:2,6
**jobs** 119:12
**jockey** 186:5
**John** 42:18 45:11,24
46:2,8 47:2,9,15,22
48:13,15 49:9,13,16
49:24,25 50:13,17
51:2,17,23 52:4,7

262

101:14,18 102:21
124:8 134:14 176:20
177:7,12 186:20
189:9,10,23 191:8
194:7 195:3 196:8
207:18
**John's** 127:23
**join** 24:4 107:19
**joining** 72:25
**Jones** 2:11 8:2,3,12
13:22 14:10 15:24
16:5 17:4,14 18:18
19:8,15 20:1,7 51:20
56:12 69:22,25 72:21
74:12 75:2,24 78:6
84:24 86:10,13 87:16
88:12,20 89:18 93:1
93:22 98:16 106:4
107:17 109:13 118:7
122:3 123:4 126:8
127:11 131:15,17
132:8,23 137:9,19
139:15,22 140:22
145:17 150:8 152:19
154:1 155:15,22
156:1 157:13,18
158:21 166:18 168:13
175:8 179:11 185:16
186:15 189:11,16
190:9,14,22 193:10
194:1 201:10 203:8
204:24 206:3 207:3
210:19 211:1 212:13
212:23 213:21 214:1
222:10 223:15,17
226:7 235:11 250:5
**Jose** 1:4 7:13
**Judith** 57:9 59:7,22
60:3,9 61:6,11
**Judy** 59:6 134:14 177:9
233:10
**July** 159:9 163:15
216:23 217:9,19
**jump** 32:25 38:17
**jumps** 47:7 52:18
**June** 1:22 7:8 55:17,18
55:18,19 64:25
129:24 136:25 137:2
137:8,12,17,22 138:3
138:7 139:1 204:21
244:12 252:3,14
**junior** 57:15 165:22,24
**Juniper** 32:24
**justify** 143:9,11 146:6

──────── **K** ────────

**Kate** 20:16,18,19,22
21:1,1,10,19,20,24
22:9,13 51:8,12 62:23
207:19,19 212:9
224:12,18 225:15
**keep** 61:4 160:10
227:16 229:7
**keeping** 213:13
**Ken** 20:17 42:24
**Kennedy** 43:3 55:24
57:9,21 177:9 178:11
197:17,20
**Kestrel** 232:17
**Kevin** 42:24 43:3,6
55:10,20,24 56:2,9,21
57:9,20,22 58:5
129:24 130:12 177:9
178:10 197:17,20
238:8 239:8,14,20
240:7
**Kevin's** 239:7
**key** 45:24 123:17,20,24
124:2 179:14 198:13
**keynote** 47:9 51:2 59:8
61:14 229:13,14
233:8,10
**keynotes** 50:25
**kind** 8:15 38:4,5 97:21
118:1 158:9 167:24
206:25 218:11 237:2
238:8
**kinds** 38:8 179:7
**KMCCLOSKEY@...**
224:15
**knew** 22:2 53:19 93:17
163:6
**know** 14:23 15:14,16
15:19 16:22 17:4
20:6 21:4,5,8 22:18
22:23 23:1 25:5,22
34:21 37:23 39:6,12
40:20,22 48:4 49:4
50:3 52:12 53:4,10
54:12 56:25 57:3
60:11 61:23 62:6,14
63:5 64:10 68:16
74:22 79:1,7 82:5,13
84:3,20 85:6 94:11
110:12 113:6 119:6,8
119:9,14 123:14,23
126:9 129:6 133:11
133:12,14 138:12,15
141:8 142:7,12 151:2
151:24 152:10,15,25
154:5 163:8 164:11
165:20,24 166:7

172:10,15,15 173:2,5
173:6,8 174:8,10,13
177:8 182:21 183:10
183:17,19 185:2,3,9
189:2,4,9 193:18
200:24 201:6,11,12
201:14 202:12 204:2
204:4 205:22 214:13
218:20 219:4 220:2
221:5 222:13,14
224:1,10 225:2 226:3
226:9,10,24 227:2
229:7 230:12,22
231:5,24 232:10,18
232:25 234:18,20,22
234:22 235:14 236:3
238:2,10,11 239:2,4
239:22 241:13 243:8
243:22 244:17,19
247:4
**knowledge** 11:19 26:4
51:11,14 53:9,14
56:11 75:8,9,11,13
76:20,23 77:2,15
78:10 80:17 82:17
85:17 95:9,17 101:20
103:19 108:13 118:4
139:14 151:16 161:10
162:16 203:10 211:12
219:16 223:8 245:3
245:20,22 252:13
**knowledgeable** 53:23
**known** 83:1 101:7
104:10 108:14 114:13
145:11
**knows** 89:6 109:3
146:9 175:24

──────── **L** ────────

**L** 1:16 252:16
**lacks** 75:22 234:15
**land** 204:3
**Landi** 124:14 134:12
**laptop** 8:17
**large** 124:7 229:6 243:3
**larger** 25:22 32:6
130:25 198:16
**largest** 24:16 129:1
198:16
**Larry** 42:20 134:12,24
135:3,7 139:25 140:5
140:8 147:18,21
148:3,3 175:25
176:21 177:7 224:21
224:23 225:1,12
**latency** 237:6

**launching** 60:4
**Laura** 2:18 7:25 17:9
17:14
**Law** 1:19 18:25
**Lawson** 252:4
**layer** 198:15 243:9
**lead** 65:18,21 191:3
214:8,16,20,23 215:1
215:4,6 217:8
**leader** 191:25
**leaders** 182:10
**leadership** 87:1,9
**leaps** 150:20
**learn** 75:16 161:16
226:4,11,16
**learned** 77:14 243:18
**learning** 154:20
**lease** 219:2,2,5
**leases** 218:17
**leave** 73:14
**led** 175:6,16,18
**left** 56:2,4,10 62:5
100:9
**legacy** 221:17,21
**legal** 7:4
**Lehman** 43:23 52:13
52:23 54:10 72:24
73:10,14 74:5 78:16
246:6
**Lerach** 2:4 7:20
**Lesley** 2:3 7:19 250:10
**lessor** 182:20
**letter** 242:13
**letters** 38:25
**let's** 23:14 29:5 36:23
52:23 54:17 79:9
110:12 112:6 118:5
130:20 143:1 173:6
**level** 37:23 165:22,22
165:24 167:8,8,21
175:13 182:8 242:10
**levels** 167:13,15,17
216:21 217:5
**leverage** 77:15 96:13
222:3
**liberally** 159:4
**license** 8:9 252:6,18
**licenses** 73:19
**life** 35:18
**lightened** 135:18
**lightening** 135:22
**likewise** 92:21
**limited** 7:5 69:13 91:15
**line** 111:25 192:3
198:17 203:19 215:6
221:7 232:13 237:22

251:9
**lines** 198:16
**liquidated** 64:24
**Lisa** 123:22
**list** 4:23 39:3,18 40:9
118:16 148:19 171:16
225:15,18,20
**listed** 120:3 121:4
125:8 226:2
**listening** 103:6 160:23
**lists** 124:20
**Listwin** 127:14,20
176:20
**litigation** 1:8 7:11
20:13 21:24 22:6,11
**little** 38:22 51:7 72:9
116:2 117:15 135:18
155:9 184:10 214:24
239:14 248:13
**Liu** 3:1
**Live** 8:16
**LLP** 2:5 3:2
**loaded** 85:22,23
**location** 195:2 201:8
**logistics** 160:16 161:7
**long** 45:3,4,8 68:16
73:2 93:6 140:25
143:19 158:7,18
178:2 187:13 188:4
219:11 221:21 241:23
**longer** 21:21 34:19
36:18 116:11 150:17
214:22
**long-standing** 72:4
221:14
**look** 66:16 81:13 82:3
92:5 110:8 117:20
118:14 120:3 122:1,7
182:13,19 183:15
188:16 210:3,6
211:14,25 228:9
235:2 238:4,15
244:13,17 248:25
**looked** 33:16,17,22
35:3 166:15 179:8
212:1
**looking** 11:14 51:6
89:14 101:4 123:17
124:9 136:24 176:14
182:3,4,10 185:19
216:13 222:4 228:3
229:21 239:24
**looks** 34:1,3 111:15
117:23 118:13,16
138:14 146:22 197:6
198:18 200:22 202:1

208:7 211:13 213:9
218:21 222:11 224:14
224:19 230:6,13,18
230:23 231:6 233:7
233:21 234:4 235:23
235:25 244:1,14
**loop** 171:13
**loose-leaf** 227:19
**lose** 98:12,13 143:15
144:4,8 199:15
**loss** 236:13,24 237:7
**losses** 199:13
**lost** 212:25 231:13
236:18,19
**lot** 14:20 34:16 35:9
49:7 61:1,9 72:6,10
93:16 94:1 95:22
96:24 98:5 106:21
108:25 132:9 140:15
141:10 142:9,11
143:4 145:9 154:20
154:22,25 155:1,5
158:11 159:1 160:7
161:25 162:3,24,25
165:20 170:6,19,22
172:5 175:23 179:24
182:4,7 183:12,12
203:1,2,15 204:3
213:12 214:8 216:13
218:7 221:9 233:14
239:17 241:18 242:17
243:16 244:2 246:23
**lots** 52:24 83:2 175:20
**lower** 84:9 117:16
191:7,20
**Lucent** 32:22 52:24
99:24 179:16 229:16
239:19
**Luke** 74:4
**lunch** 168:11,20
**luncheon** 186:20,23
**Lynch** 4:16 74:7
128:12

**M**

**machine** 157:5
**magnitude** 226:6
**maintain** 84:18 87:25
198:22 199:1
**maintained** 51:18
62:22 87:21 139:24
229:1,1
**major** 231:1,10,19
**majority** 28:10 222:1
**making** 88:21 91:4
92:22 136:4 159:2

171:6 195:9,18
231:22 232:1
**manage** 63:19,24 65:21
66:13 90:2,6 110:5
111:20 112:1,4
**managed** 124:7
**management** 2:16,20
2:25 4:9,12 11:23,25
12:17 20:16 27:18
53:3 63:16,17 66:24
78:19 102:21 120:23
127:8 177:20
**manager** 24:12 27:1,7
27:15 28:5 36:7,15,16
37:8,9,14,15 38:3
39:13 40:5 41:2,14
45:3,8 49:22 63:3,9
63:10,11 65:14,18,24
70:18 71:3 81:14
85:7 86:24 88:24
89:2,6,9,10 94:21
123:23 136:10 161:15
163:9 230:25 231:7
247:15
**managers** 28:25 30:3
40:16,18 44:25 45:2
46:1 71:4,14 85:5
88:21 89:25 94:25
124:2,3 136:16
165:22,24 207:9
211:21 243:9 245:15
**manager's** 136:11
**manages** 25:6 111:12
**managing** 25:20 37:10
40:8 95:3,7 109:22,23
109:25 110:14,18,20
110:21,23 111:1,6,6,9
111:10 113:19
**manufacture** 172:3
**manufacturer** 82:25
**manufacturers** 84:5
172:1,3,6,20
**manufacturing** 172:5
**March** 25:12 27:5,23
44:16 49:19 69:5
85:14 97:6,7 105:3,3
128:21 228:17
**margin** 216:15
**marginal** 242:3
**margins** 214:9 216:18
216:19,25 217:7
**Mario** 57:11,13 62:12
134:13
**mark** 10:22 11:3,21
117:4 120:7 124:23
128:9 129:11 134:1

138:18 139:5 146:11
151:10,18 159:5
176:2 186:7 188:8
191:14 199:20 201:13
201:14,15 202:14
204:9 207:23 208:20
210:24 224:3 227:3
**marked** 11:7,25 117:9
120:10 125:2 128:12
129:14 134:5 138:21
139:8 146:14 151:21
153:4,6 176:5 186:10
188:13 199:24 201:17
202:17 204:12 208:1
208:23 211:5 224:6
227:6
**market** 76:14 84:10
85:25,25 89:13 99:16
100:3,5 107:2,6 109:1
130:15,18,19,21
131:9,12 132:5,15,21
133:15,16,18,24
141:20 143:8 149:15
149:18,21 158:5,6
161:14,15 179:4,19
179:20 180:3,4 192:7
198:9,13,22 199:2,8
199:13,15 203:2,19
204:3,6 209:22,22,24
232:17 238:15 245:13
**marketing** 40:21 230:9
**marketplace** 141:15
143:5 160:7
**markets** 27:11 102:23
131:2,8 183:22
203:20 205:16 206:13
214:13 240:16
**market's** 133:10
**marks** 250:16 251:6
**marriage** 252:10
**married** 21:4
**Martino** 21:23
**Mary** 42:11 146:22
152:4
**mask** 111:25 113:20
**Mason** 118:1
**Mass** 7:7
**Massachusetts** 1:19,21
2:14,23 9:8 252:2,7
**material** 77:22 190:12
**materials** 21:16 50:20
50:22 51:18 188:20
**math** 133:13
**matter** 7:10 81:12
120:13 252:9,10
**matters** 247:24

**Mazzola** 57:11,13
62:12 124:15 134:13
**MBA** 246:5,12,14,22
246:22
**MCF** 173:14
**McLosky** 21:1 212:9
224:12,18 225:16
**Meade** 20:16,17,20
**mean** 33:10,12 34:9,15
34:25 35:1 47:10
48:23 50:10 55:8
61:8 62:3 65:16
71:11,12 76:9 79:6
83:7 89:22 103:3,5
105:11 110:2 111:17
112:7,10,12,18,21
113:5,12 118:8,10,20
118:22 119:25 130:18
131:5 132:11 139:22
142:24 143:3,7 145:7
145:20,21 151:5
156:22 157:13 159:17
161:4 162:18 164:7
164:22 165:8 167:4
170:25 172:15 178:17
182:1 183:14 193:4
196:2,22 214:13
232:23 235:5 240:19
240:24 248:9
**Meaning** 16:3
**means** 71:12 74:18,22
104:3 109:24 112:22
113:10 165:5,6 189:2
206:14 214:20 252:21
**meant** 196:19 231:17
231:18
**measure** 110:16
**measures** 111:13
**media** 26:6,7,8,9,13,14
28:10
**meet** 17:10,13,15 43:16
45:13,23 48:16 49:6
49:23 55:20 77:25
104:9,16 135:10
177:5 210:21 220:5
222:5,6 227:16
**meeting** 18:11,22 43:21
44:6 45:1,11 47:12
52:19 53:8,14,19
55:10 57:4,20 58:1
59:2,5 61:11,17,21
62:12 75:15 77:20
78:3 80:11,12 105:14
127:14 128:20,23
129:23,25 130:2,4,11
130:12 134:22,24

135:7 137:17 138:11
177:11 186:20,23,25
187:1,13,17,20
189:23 190:2 194:12
194:16 195:3,7
211:24 213:6 222:13
229:18 239:20 243:25
**meetings** 19:11 43:11
43:13,14 45:19 47:2
47:14 48:13,18,22,25
49:9,12,15,21 50:12
50:17 51:17 52:6,11
52:16 55:13 56:21
57:18 59:3 61:13
62:16,19 134:17
135:2 138:2 211:17
229:11
**member** 47:6 63:15
73:21
**members** 108:1 208:10
**memo** 29:14,16,18 31:4
204:18 206:2,25
207:8 212:14 213:1
**Memorandum** 5:18
204:12
**memos** 16:18 31:2
167:25 168:3,6
187:19,25
**mention** 39:21 235:13
**mentioned** 39:13,15
40:23 52:12 60:21
61:14 76:21 129:25
162:19 235:18 242:7
**mergers** 73:13 76:13
**Merrill** 4:16 74:7
128:12
**message** 242:2
**met** 42:25 49:25 52:12
54:8,12,18 56:8 58:3
59:7 61:23 75:20
78:10 79:17 116:2
124:14 134:12 135:1
135:3 176:24 178:7
232:5 239:9
**methodology** 226:5
**methods** 110:18 111:1
247:8
**metrics** 215:24 216:8
**Metrocom** 220:22
**MFS** 2:16,20,25 4:9 8:1
8:3 11:22,25 12:16
14:22 15:13 17:9,17
20:16,23 21:11 23:1
24:4,11,12,18,19 25:6
25:20,25 26:25 27:4,7
27:9,11 28:1,17 29:9

31:11,15,16,21 33:14
36:1 45:22 46:1
48:24 49:16 57:23
63:9,10,11,14,22,22
63:22 64:1,3,17 65:7
65:14 66:13 70:8
72:25 77:9,20 87:17
87:25 95:15 101:23
117:9,18,22 119:4,12
120:4,23 121:9,12
122:24 125:8,11
126:2 129:1 135:16
135:22 136:20 177:6
186:24 190:2 207:10
207:11 209:25 211:10
211:15 212:3,11
213:5 214:7,17 216:7
222:5 223:1,3,9,12,24
224:13 226:1,9,22
247:15,23 248:2,6
**MFS's** 24:16 84:23
85:11 87:19 88:12,19
89:1,4 119:19 121:13
123:3 126:6 136:7
**MFS-CSCO00740** 5:13
199:22
**MFS-CSCO00754** 5:14
**MFS-CSCO00757** 5:18
204:11
**MFS-CSCO00758** 5:19
**MFS-CSCO00759** 6:5
227:5
**MFS-CSCO00788** 6:5
**MFS-CSCO00870**
117:6
**MFS-CSCO00870-...**
4:11
**MFS-CSCO01060** 5:11
188:11
**MFS-CSCO01220** 5:12
**Michael** 222:6
**Microsoft** 126:23 203:4
203:11
**mid** 63:9,14,23 65:21
**middle** 125:6 139:11
153:13 159:8 161:12
243:9
**mike** 42:22 43:24,25
52:10,17,19 53:4 54:6
54:25 61:18 176:21
177:8 222:7
**Mike's** 53:7,21
**million** 66:8,10,23 68:7
126:2 133:9,11
135:17
**millions** 68:8

**mind** 38:17 131:25
212:25
**nine** 227:12
**minute** 178:11 212:25
223:21
**minutes** 46:10 100:8
161:19 187:15 248:25
249:5
**misinformation** 170:6
**missed** 104:25 105:8,20
106:1,7
**missing** 112:15 223:13
**mix** 98:3 114:18 123:25
159:21,22 177:10
186:6 218:16 221:10
248:12
**MNA** 246:6
**model** 91:2,3 180:8
234:4
**modeling** 155:12
**models** 35:14 218:8
245:7
**modern** 97:22
**modest** 13:10 16:14
**moment** 15:3,10 16:8
16:25 139:16 147:14
153:5 169:12 176:12
188:16
**money** 71:14 72:11
98:13 131:1 140:15
142:9 160:8 182:7
183:12
**monies** 184:23
**monitor** 9:10 96:4,11
195:4
**monitored** 96:7
**Monterey** 140:11,16
147:19 150:23,24
151:9,12 205:13
206:6,9 232:14
241:25
**Monterey's** 206:17
**month** 12:7 115:23,24
116:1
**months** 143:16 144:5,9
161:8 216:1,10 231:2
231:12,21 232:3
**Morgan** 47:8,18 74:6
78:16 200:3 244:12
244:13
**morning** 7:2 30:2
**motion** 88:7
**move** 21:12,14 34:12
34:24 35:11 98:23
99:25 145:16,19
237:5

**moved** 34:20 143:25
**moves** 159:3
**moving** 48:11 61:5 92:7
92:10,16 102:18
114:15 145:3 172:9
**multi** 231:15
**multiple** 28:1,3 29:12
45:15 66:21,23 68:8
243:3
**multiplexing** 231:15
**multiplied** 143:11
**multi-service** 236:2
**Murray** 32:3
**mutual** 27:11

_____ **N** _____

**N** 4:1 7:1 169:1,1,1
**name** 7:3 9:3 21:3
24:16,18,19 57:12
62:14 74:7 119:22,24
124:12 128:16,18
129:19,20 139:11
143:10 202:6 207:11
207:16 230:21 231:4
231:5
**named** 21:1 57:10
81:21
**names** 43:8 57:16 120:3
172:12
**natural** 155:5
**nature** 132:19 190:17
**NEBS** 219:24 220:15
220:20,25
**necessarily** 118:21
126:22 145:19 165:8
171:5 235:5
**need** 10:15 97:23
113:23 114:17,18
116:3 140:21 146:8
149:14 175:13 185:17
194:19 222:15
**needed** 149:13 158:18
246:2
**needs** 39:6 146:1
234:16,16 236:22
**neighborhood** 14:5
**Neither** 22:2
**net** 231:14
**network** 84:4 148:21
148:23 149:2 171:13
180:6 181:8 242:11
242:14
**networking** 28:16
31:23 32:10 33:3
34:6 36:11 98:22
126:22,24 173:7

230:14,24 231:8
234:15 237:7,11
241:10
**networks** 32:22,24
149:6 180:17 182:8
186:3 244:19
**Networld** 233:8,8
235:25 244:4
**Networth** 59:9 229:4
**never** 101:19 174:16,18
**new** 27:6 35:10 56:7
63:10,22 76:18
107:10 131:21,24
137:1 158:15 183:19
184:18 214:13 220:13
239:25
**NHK** 84:9
**Nikos** 74:5,10,14,15
75:1,4,10
**ninth** 129:1,5,6
**nix** 152:10
**nods** 173:23
**noise** 161:1 170:6
**Nokias** 179:17
**non-party** 4:9 11:22,24
**non-responsive** 100:1
**normal** 144:1,4 164:18
166:23 167:4,8,11
184:7 247:21
**normalize** 185:15
**normally** 191:17
214:14 228:25
**Nortel** 32:22 52:24
84:1 149:21,23
201:25 219:17 229:16
239:19
**Nortels** 179:16
**Nortel's** 219:10
**Northern** 1:3 7:12
**Notary** 1:17 8:10 251:7
252:4,17
**notation** 192:17 195:9
195:13 196:21 201:1
232:9
**notations** 250:16 251:6
**note** 8:17,21 29:23 30:1
30:5 168:6,8 192:9
216:11 230:18 251:4
**notebook** 16:15,16,18
16:19,21,25 227:13
227:14,25 228:6,25
229:7 235:1,3,7
**Notebooks** 16:23
**noted** 251:20
**notes** 12:17 16:9,12
29:19,20,21,22 30:7

50:1,3,7,9,12,16,20
50:25 51:3,6,12,16,22
51:24 52:3 62:18,21
84:13,15,18 88:9
137:23 187:17 190:5
191:7 192:12 194:7,9
197:18 227:12,15,18
229:4,5,7,10,14,25
230:15 233:6,7,20
235:23 236:2 237:16
237:21,24 239:24
240:5,15 241:6,8,11
243:11 244:17,18
248:25 252:12
**notice** 4:7,8 11:4,6,15
11:22,24
**noting** 216:8
**November** 125:16
126:3
**NTO** 197:13
**number** 13:23,25 14:11
29:14 32:15,16 92:18
117:16 129:18 132:15
142:14 153:17 158:17
191:20 192:20 217:23
222:8 244:10
**numbered** 239:6
**numbers** 104:11 105:8
106:1,7,14 134:2
176:3 188:11 198:21
199:21 201:16 204:10
207:24 208:21 210:17
223:3,14 227:4
**numeral** 157:3
**Nurmi** 123:22

_____ **O** _____

**O** 7:1 169:1,1,1
**oath** 7:18 169:10
**Object** 13:24
**objection** 13:22 14:10
18:18 19:8 51:20
69:22 70:1 72:21
74:12 75:2,22,24 78:5
78:6,13 80:21 84:24
87:16,21 88:1,20
92:25 93:1,22 98:15
98:16 106:4 107:17
107:19 108:19 109:13
109:14 112:3 122:3,9
123:4 126:8 127:11
127:12 131:15,17
132:8,23 144:10
145:17 150:8 152:19
155:15 158:21 164:2
166:18 175:8 179:11

185:7 190:16 193:10
203:8 204:24 206:3
207:3 210:19 212:13
213:21 215:11 223:15
226:7
objections 112:25
objective 70:13,24,25
71:23 82:13 86:22
96:20 112:23 144:13
199:1
objectively 71:6 175:20
objectives 113:15
214:10
objects 87:18
obligation 226:13
observation 35:23,24
72:19 123:9
observer 89:7
obsolete 95:22
obtain 63:4 82:18 88:8
obviously 53:18 88:4
141:22 146:3 154:9
193:15 232:21
occasion 38:13 40:6,21
46:20 48:15 55:21
128:2
occasions 45:13,14
54:8,20
Ccur 31:17
occurred 167:14 187:9
222:13 225:25 233:9
238:3
October 163:14,16
OFC 230:5 232:17
offered 8:23
officer 59:18
officers 135:12
Offices 1:19
oh 38:9,21 42:19 54:21
57:9 67:4,4 68:16
70:25 97:13 110:22
117:2 125:19,19
137:4 150:13 164:4
209:11 211:20 219:3
223:25 230:4 237:22
238:6 240:20 245:19
oil 28:12,13
okay 9:13 11:2 13:8,12
16:7 20:9 23:17
25:16 31:5 42:2 45:7
46:20 49:3 51:10
52:2 54:1,14,16,24
55:3,9 56:1 61:15
62:25 66:12 68:9
82:4 89:7 94:13 95:6
101:12,21 107:4

108:10 109:17 110:2
112:16 118:5,9
122:12 124:19 125:25
126:11,25 128:24
129:7 130:8 133:23
134:21 136:3,23
137:21 138:5,8,17
139:20 140:1 142:21
144:14,15 146:10,20
146:24 147:13 148:10
148:17 149:7 150:17
151:25 153:2,7
154:15 155:25 156:11
157:2 160:12 162:6
168:10,10,11 171:12
174:12 175:22 176:2
181:12 182:1 183:24
185:18 186:16 188:3
188:6 189:7 190:8,12
190:13 193:22 195:8
195:19 196:14 202:8
202:10 204:1 205:6
207:22 208:17 212:7
212:18 213:1 215:14
217:12 219:7 221:4
222:12 223:17 225:8
228:2,16,24 229:21
232:8 233:4,21
244:21 248:17
once 92:18 107:15
ones 32:24 38:16 42:15
75:10 102:9
one-on-one 47:12,14
48:22,25 49:15 52:6
54:19 57:17 59:11
229:18
One-page 4:23
one-year 150:18
op 242:3
open 40:10 246:3
operates 95:15
operating 184:25
opinion 62:19 74:10,13
74:15,20,23,25 82:4
82:14 84:2 86:21
89:8,13 90:7 103:22
132:4
opinions 81:15 175:20
Oppenheimer 138:15
opportunistic 141:23
opportunities 80:14
131:10,13 132:6,22
133:16 238:10 242:4
245:6
opportunity 149:15
179:4 238:15

opposed 35:21 146:2
163:25 167:5 169:17
optical 141:2 148:21,23
149:2,6,10,21 185:20
186:1,3,4 219:11,18
221:11,19 230:5,24
231:8 232:15 234:15
241:10,18,22
option 141:17,19
order 88:15 120:14
172:9 214:22 215:10
215:16,21 220:9
228:5 235:7
orders 113:10
orientation 117:15
original 250:4,9,10
Osmond 219:24
Otophone 182:15
outcome 252:10
Outline 40:8
outlining 38:13
outside 18:9 42:16
49:22 54:15 83:3,5,6
83:22 89:8,14 138:16
178:18 246:3
outstanding 115:17,20
164:23 226:25
overall 242:2
overcome 236:25
overnight 141:21
overstating 193:19
overtakes 221:16
overwhelm 221:25
owned 39:17 64:11
66:9 68:18 122:13,15
owners 77:25
ownership 121:1,20
126:14 135:23
owning 143:9,11
owns 135:16
O&I 180:17

P

P 7:1
pace 98:24
page 4:6,24 5:1 6:1
120:21,24 122:6
123:20 124:9 125:5,7
128:15 129:18 134:7
136:25 137:4,7,15
138:14 139:11 153:15
156:9 159:6 160:13
188:24 189:6,8
190:19 191:2,20
192:22 193:23 194:1
194:10 195:20 197:4

198:4 200:17 205:11
219:8 228:9 229:23
230:16 232:7 233:16
234:11,13,23 235:6
235:13,20,22 237:18
237:20 238:4,10,14
238:17 239:6,12
240:1 241:1,3 242:21
242:21 243:11 244:9
244:11,15 250:19
251:7,9
pages 154:2 176:11,15
188:23 227:20,24
228:12
paid 76:15 140:15
Paleo's 208:9
paper 12:16,22 16:8,17
paragraph 219:25
paramount 158:1
paranoia 61:3
Pardon 12:24 93:13
130:3 177:16
park 129:9
part 32:5,7 57:22,22
73:12 77:24 92:5,8
98:21 123:18 144:11
160:2 165:3 179:5
182:2,9,24 185:2,24
194:4,10 207:1
209:17 211:20 227:17
247:21 248:1,5
partially 110:6
participants 161:11
participate 45:2
participated 103:4,5
participating 130:16
participation 239:19
particular 19:16 21:14
45:1 92:11 119:21
121:15 128:23 130:22
131:25 143:10 213:19
213:23 214:6 220:6
233:21 243:11,14
particularly 170:9
parties 17:20 170:7
252:9
partner 158:2,3 243:16
partnership 147:12
parts 91:5
party 20:7 123:14
187:2 250:8
pass 21:16 51:4
passed 21:20 62:23
pavilion 243:2,15,16,20
Pavilions 242:25
pay 141:25 184:25

paying 22:22,24 23:1
82:8 158:16
peak 85:24
peer 121:1 126:14
peers 71:3
pen 212:19
pending 10:18 113:23
penny 104:21 105:1,10
105:12
pension 118:25
pensions 24:14 71:15
people 43:8 45:24,25
57:15,25 59:10 61:1
71:14 76:3 77:20
89:14,24 93:16 96:24
104:11 108:11,25
123:25 127:25 148:5
154:25 162:1 163:1
165:21 169:19 177:24
187:16 199:14 206:23
229:15 231:14 242:18
243:8
percent 110:13 143:15
144:5,8 159:12
191:14,17,18 210:9
210:14
percentage 159:10
160:5
perform 14:13
performance 39:4 40:2
70:14 71:7 72:12,16
76:6 96:5
performed 12:15
performing 210:22
period 25:9,11,15,18
25:21 26:16,17 27:25
34:19 40:24 41:18
44:10,12,14,15 49:17
49:18 54:17 57:1
61:24 62:5 64:15
70:7 73:24 74:4
75:21 77:21 78:3,12
80:24 81:2,10,19,24
83:14 85:13 86:6
89:19,20 91:9,21 92:1
92:24 93:5 94:5
96:17,24 97:6 102:4
102:11 103:4,23
104:15,21 105:2
106:11,17,25 107:9
107:25 108:15,24
109:21 115:1,14
116:5,10,20 121:25
126:7 128:7 133:19
141:7 143:23 150:7
150:13,22 158:20,24

184:19 200:6 210:15
  219:19 223:5
periods 81:13 121:15
permanent 199:18
permanently 193:8
Perry 118:1
person 27:19 52:20
  53:1,5 82:6 131:24
  166:3 175:24 201:9
  252:7
personal 67:2,19,22,25
  68:11 69:11 82:14
  118:3 200:18,25
personality 33:25 34:2
personally 63:18 252:5
personnel 40:19 138:2
  207:7
perspective 173:21
  194:20 245:12
phenomenon 161:25
Philip 124:7,20
phrase 109:24 162:23
  184:13
Physically 49:4
pick 31:25 131:25
  171:10
picked 146:9 171:12
picker 71:7
Pickering 1:20 2:12 8:4
picking 75:9,12
picture 34:11,14
  111:14 245:7
pie 149:11
piece 165:2 239:22
pin 169:22
Pine 2:7 9:8
Pirelli 232:12,22
pitching 230:11
placard 237:7
placards 236:13,18,24
place 8:13 114:4 220:5
placements 76:14
places 190:10 243:7
plaintiffs 1:14 2:9 7:21
  8:7,15,22 19:25 88:4
Plaintiff's 11:8 12:1
  117:9 120:10 125:3
  128:13 129:15 134:5
  138:21 139:9 146:15
  151:22 176:6 186:11
  188:13 199:24 201:18
  202:18 204:12 208:1
  208:24 211:5 224:6
  227:6
plan 118:25 160:24
planning 219:22

plans 141:12
plaqued 236:23
platform 241:22
played 70:23
player 192:5
players 84:5 180:1,2,14
  180:15 181:1 183:6
  203:6
please 9:3,16 15:2,2
  23:5 26:22 29:8
  31:12 51:21 56:1
  58:22 74:16 89:21
  106:6 109:23 120:18
  122:5 146:18 151:24
  154:12 176:9 186:15
  188:16 190:11 195:12
  212:17 213:2 216:14
  223:5
PNC 172:18
point 10:15,19 21:1
  26:20 27:2 31:9
  43:23 44:24 53:24
  56:2,24 59:12,17 64:7
  64:11 76:2 94:18
  102:17,20 122:13
  127:8 142:3,5 149:25
  150:2 154:6 162:5
  172:7 200:5 205:22
  207:20 209:23 217:11
  220:14 235:12 240:22
points 20:23 34:17
  172:10 174:24 175:6
pool 66:13 130:25
  183:13
pops 114:3,4
popular 97:15
Portfol 118:21
portfolio 27:1,7,14 28:5
  28:25 30:3 36:7,14,16
  36:18 37:8,9,14,15,17
  37:17 38:2 39:3,13,18
  39:19 40:5,12,16,18
  41:2,14 44:18,21 45:3
  45:8 46:1 49:22 63:3
  63:9,10,11 70:18
  72:12 81:14 85:5
  86:24 87:9,10,10 90:1
  90:2 94:21,25 118:20
  118:24 119:1,22,23
  120:1 123:23 124:2,3
  130:20 136:9,11,16
  207:9 214:11 219:9
  242:8,19 245:14
  247:15
portfolios 76:6 118:16
  118:19 119:5 120:6

portion 140:3,4 172:5
  223:22
poses 109:6
position 24:7 26:20,22
  27:4,6 53:7,11 56:5
  59:16 63:1,2 85:7
  88:13 109:9 135:19
  158:8 175:4 185:25
  185:25 186:5 195:23
  205:15 206:17 216:5
positioning 206:12
positionings 157:25
positions 97:20
possess 34:4 50:5,6,16
possession 200:5,8
possible 39:24,25 40:25
  43:2,4 45:17 46:19
  49:20 55:8 83:20,21
  90:13,17 97:13 98:18
  99:18 101:17 105:6
  106:15 113:21,22
  115:3,4 119:6 123:8
  125:23 127:18 129:10
  136:1,2 138:4 146:8
  147:24 165:15,18,19
  170:1 174:9 195:16
  203:23 211:13,16
  213:7 223:18,19
  235:10
possibly 16:22 42:21,23
  64:11 69:3 96:2
  106:21 119:14 139:3
  171:9 200:24 201:6
  223:16 234:9
posturing 144:12
potential 35:20 69:15
  115:21 170:10 174:3
  234:9 245:9,10
potentially 108:8
  171:23 199:10,16
  203:2 217:9
power 35:9
powerful 193:14
practice 103:9 203:3
practices 111:23
preceding 156:9
predict 94:3
predicted 93:19,23
premium 240:17
preparation 18:6
  211:21 213:5,10
prepare 17:10,23 18:11
  38:2,8,10,12 119:10
  211:18 214:22
prepared 30:12 31:1
  38:5,19 39:13 207:1

prepares 119:8
preparing 17:19 18:2
  119:13
present 3:12 43:20
  89:20
presentation 189:21
  190:6 197:16 230:1,3
  230:6,14,17 232:5
  235:23 236:3,4
  241:11,13,14
presentations 187:6
  230:9 236:6
presenting 194:7
President 2:18 63:2
pressing 238:22
pressure 217:7
pretty 35:15,16 76:16
  89:13 98:25 99:22
  114:14 148:15 158:1
  165:6 171:13 193:14
  226:20 243:3 246:3
  247:6
previous 137:23
previously 153:4
price 143:20 146:7
  150:25 199:9
priced 142:20 143:5,7
  143:21,24 144:2
  238:25
pricing 133:14 238:18
  238:19
primarily 168:7 229:5
primary 12:17 28:17
  42:8,15 44:24 91:13
  94:17 124:2 125:10
principals 111:18
Printed 30:8
prior 19:11 27:23 28:4
  31:20,22 32:2 33:15
  33:20 72:24 89:10
  101:22 162:10 164:10
  171:1 238:10 239:12
privilege 18:24 19:21
  19:24 123:6
privy 20:8
proactive 110:16
proactively 203:14
probability 165:7
probably 29:18 54:2
  55:6,19 84:14 86:23
  94:17 95:9 97:9
  121:20 124:4 127:13
  135:5 147:24 148:11
  148:12 149:19 150:11
  161:20 163:7 189:22
  197:17 207:18 213:13

218:9
problem 99:14,17
  100:6 139:19 155:23
  199:17 203:11 236:9
  237:8,10,13,15 249:2
problems 9:15 151:12
  151:15 204:5 219:17
  236:12,15 237:1
Procedure 1:16
proceed 8:24 10:22
  88:15
proceedings 10:16
process 70:9,10 109:4
  163:1 183:11 226:5
  227:18
produce 15:22
produced 15:25 16:17
  117:14,18 188:9
product 18:19,24 20:3
  35:7 39:7 82:25 83:1
  87:19 89:10,12
  107:12,13,15 118:23
  123:5 130:20 131:19
  133:14 141:3,16
  148:18 149:4 150:9
  151:12,15 157:25
  158:4,6,17 175:10
  179:12 193:12 198:16
  198:17 199:17 205:1?
  206:6 214:10,11
  215:6 219:9,12
  220:11 230:10 231:23
  231:23 232:12 243:4
  243:19
production 8:9 28:13
  87:24
productively 35:12
productivity 191:15,19
products 35:18 66:18
  107:8 119:21 130:23
  130:24 131:4 149:5
  151:12,16 166:1
  198:13 214:25 219:24
  220:15,19 221:1
  226:12 230:9 243:9
  243:17
professional 31:10,15
  69:17 73:19 74:10,13
  74:15,17,23,25
professionals 29:1
  47:11
profile 76:19 142:10
profit 180:8
profitability 104:8
  111:25 143:9
profitable 36:5 91:6

142:8 179:23
.ogram 73:15
project 246:1
projecting 191:8
projections 84:10
prominent 161:24
promising 158:14
159:1 203:1
promote 72:7
properly 194:25
property 35:4,6,8 36:5
199:17
proprietary 35:4,6
36:4 77:14 245:11
prospects 245:5
prospectus 38:24 65:18
prosper 242:5
protected 18:23 19:20
19:23
protective 120:14
protocol 60:11
Prove 145:14
proved 252:5
provide 38:13 40:9
46:15,23 63:10
100:20 155:20 156:19
173:18
vovided 50:15 52:1
83:13,23 84:10 91:17
101:10 122:18,21
136:15 155:24 188:21
235:24 241:12
provider 131:3 160:10
178:12,20,24 179:3,9
179:14 180:6 183:4
192:8 195:23 196:5
196:17,25 197:21
198:2 214:12 221:7
234:7 238:15
providers 159:14,18
160:4 181:8 184:2,5
providing 8:16 98:4
99:21 184:20
provisions 1:15
provoked 201:25
public 1:18 8:11 76:25
77:3,9 102:22 141:11
141:18,18,24 142:2
148:16 161:10 251:7
252:5,17
publicly 26:10 155:11
publish 76:22 77:5,9,17
92:18 104:7
published 29:23 30:2,7
104:11 161:6 200:14
210:7 246:20

publishing 26:11
pull 113:10,16 145:10
pulled 235:6
pulling 166:12,14
203:21
purchase 150:25
184:24
purely 82:11
purpose 29:3,6 82:15
purposes 29:8 146:2
pursuant 1:14 11:18
12:9
pursued 158:1
push 221:24
pushing 114:2 163:9
put 30:1 33:24 38:1
60:24 70:1 82:4
87:17 89:18 174:25
177:21 198:20 235:16
237:6 245:25 248:15
248:19
puzzle 165:3 239:23
PVT 251:2
p.m 138:9 249:17

_____ Q _____
quality 180:9,13
182:13,17,20,21,25
183:3 185:5,11
215:10,16,21
quarter 92:18 104:12
104:22,23 105:1
112:11,12,23 114:2
114:17,21 131:5
155:2,7,8 159:9,21,23
162:8,24 163:4,15
164:18 166:4,23
167:15,17,22 178:3,4
197:22,22 216:23
217:9,19
quarterly 38:9,18,21
39:2 102:15,16 104:9
quarters 112:1,4,8,19
113:20 114:13 115:2
116:6,12,24 162:10
163:13 164:15 165:13
166:13,14 170:24
171:1,3 177:13
question 10:18 25:14
36:20 37:6 53:17
67:9,16 79:25 85:22
88:17 94:17 96:20
100:2 106:6 110:25
112:17 142:21,24
144:23 151:10 152:8
155:18,19 156:13

159:5 163:6,11
177:14,23 180:23
184:12 185:14,18
187:10,11 191:14
192:13 196:3,4
202:25 204:7 213:1
214:2 215:3,6 218:15
218:20,25 219:23
222:25 223:7 232:21
235:15 244:22 248:13
questionable 111:23
questions 10:25 46:11
46:15 54:5 87:18
92:20 103:7,10,10,13
103:16,17,25 153:24
178:20,22 180:12
187:8 201:24 202:2
205:4 226:2 249:12
queue-sip 119:23
quick 222:25
quickly 34:13,18,20,24
35:2 48:11
quite 207:12

_____ R _____
R 7:1 169:1 252:1
Ralph 3:12 7:4
ramifications 34:18
Randi 42:11,11
range 66:23 127:10
156:6,24
rapid 157:11 240:15
rapidly 132:25
Ratback 180:17
rate 91:22 142:8
rates 111:5 180:8
185:14 196:5 197:2
rationale 87:14 88:18
rationalize 143:22
Rbox 219:25 237:25
238:11
read 9:10 30:4 79:25
139:16,20 146:18
147:5 154:2 156:2
157:19 164:7 176:9
194:4 195:21 197:11
230:21 241:17 251:19
reading 195:25 250:14
251:4
ready 151:24
real 170:4
reality 210:5
realize 169:9
realized 183:11
really 22:2 31:3 51:7
60:3,4 70:13 72:15

82:8 83:10,10 84:6
85:6 89:24 111:15
116:8,19 119:14
131:4 133:24 142:16
143:21 144:25 150:12
150:17 156:25 166:9
167:22 174:17 175:21
175:24 176:14 179:15
183:18 186:2 211:16
226:20 234:23 237:2
238:11 240:21 241:18
245:22
realtime 194:25 195:5
reason 8:18 10:12
46:19 47:13 50:19
51:22 70:4 78:22
86:24 140:2 144:22
145:4 189:14 251:5
251:10,11,12,13,14
251:15,16,17,18
reasonable 127:10
reasons 79:22 221:23
250:15
recall 12:6 18:17 25:23
32:14 39:23 42:5,14
42:19 43:1,8,11,13,14
44:3,4,6 45:11,14
46:4,6,13,17,18,25
47:2,5,13,14,17,21
48:13,20,25 49:2,9,22
49:12,20 50:24 52:6
52:11,16 53:11,25
54:5,8,15 55:10,14,23
56:3,4,21,23 57:3,4
57:16,20,24 58:4,9,11
58:20,22 59:3,5,10,12
59:14,16,21 60:19
61:13,17,21,24,25
62:10,13 64:16 65:9
66:5,7 68:19,24 74:4
74:7,9 80:24 81:3,22
83:12,15,19,22 85:3
85:11,18 86:7,8 88:10
90:12 91:9,19 93:2,6
94:4,7,15,20 95:13,19
95:20 96:16,18,19,22
97:2,11 99:1,4,5,7,13
99:15,16 100:5,7
101:13,16 103:7,8
104:20 106:24 113:5
116:10,13 121:16,18
121:24 122:4,14
127:14,19,22 128:3
128:22 129:5 130:15
132:3 134:22,24
135:1,2,4,22,25 136:4

136:22 139:2 140:9
140:24 147:17,20,20
147:22,25 148:1
150:21 151:3,6,13,13
152:7,21 155:13
156:21 157:1,7,10
163:19 165:9,11,16
166:11,15 167:13,16
171:25 172:12 175:12
175:12,19 176:24
177:10 178:9,10,18
178:19,23 180:12
184:3,6 186:23
187:13,14 188:5
189:6,17,20 192:19
195:6,9,13 196:9,13
202:2,3,7,13 203:7
204:22 205:7,10
208:12 215:8,15
217:16,18,20 220:11
220:14,17 221:2
223:11,12 224:2
225:11 226:1,19
234:3 243:18,25
receivable 97:10
114:14
receivables 92:2 96:12
96:16 97:1 98:12
99:10
receive 112:25 175:15
175:18 200:13 226:14
248:1
received 87:22 100:24
101:1 155:14 181:1
184:1 217:25 220:9
226:24 246:12,14
248:5 250:21
receiving 23:6,10,12
101:13 165:16
recess 56:17 100:14
168:20 222:20 249:8
recognize 117:11 118:6
118:8 129:17 139:21
146:17,21 152:1
153:8 188:17 201:20
202:20 204:15 211:8
224:9,11 227:9
recollection 18:15 19:2
19:6,18 45:18,21
48:19 51:15 53:22
55:22 59:22 61:10,12
69:4 81:17 90:25
93:3,8,11 96:21 103:1
104:25 105:5,7,25
106:8,11 121:9,11
122:2,8,10 125:21

268

128:5,20 129:22
130:10 134:16 138:1
138:10,24 147:3
150:4 151:11 152:18
152:20 167:19 173:24
178:5 187:22,25
196:15 212:15 216:3
224:25 232:4
**reconmendation** 29:10
85:8
**record** 7:3 8:13,22 9:4
9:10 10:23 11:15
15:21,25 19:22 36:24
37:1,3,5 56:16,19
67:7,11,13,15 70:2
79:10,12,14,16 87:17
88:3 100:13,18
124:11 164:8 168:16
168:19 169:5 195:21
197:11 222:16,19,24
235:16 248:19 249:3
249:4,7,10,16 250:9
251:21
**recording** 7:3
**recovery** 227:18
**Recross** 4:2
**redacted** 188:25 189:14
190:11 192:15 195:10
**redaction** 192:10
**redactions** 235:12
**Redback** 181:5
**Redirect** 4:2
**refer** 15:3,5,9 25:9 48:9
71:19 104:5 126:20
137:23 159:14 185:23
194:6,18 200:21
206:5,13 224:23
233:20 235:22 236:14
237:20 238:20 241:6
242:24 244:16 251:7
**reference** 234:1,12
**referencing** 235:9
**referred** 15:15 157:15
164:24 181:9 207:8
**referring** 15:12 25:14
44:15,16 60:23,25
66:12 126:21 137:16
140:14 143:18 144:18
147:9 154:16,18
160:19 169:16 170:18
181:4,13 201:5
209:21 210:13 217:4
217:5 218:5,19
219:15 220:2 221:13
232:9 234:18
**refers** 71:13,20 125:18

126:18 127:5 137:1
137:12 177:4,6
186:24 204:2 216:17
221:6 224:20 225:4
235:17 243:11
**reflect** 145:24 164:25
191:8 198:9 206:18
206:19 229:25 239:8
240:5
**reflected** 100:25 101:8
**reflective** 179:22
**reflects** 119:19,20
125:10 153:24 196:7
**refresh** 18:14 19:1
121:8,11 129:22
134:16 138:1,24
**refreshed** 19:5
**refreshes** 19:18
**regard** 13:13 14:7
38:18 62:16 91:13
97:12 101:14 129:23
129:23 132:21 147:18
172:14 174:6 180:20
184:16 212:11 214:15
214:16,17 221:1
247:11 248:20
**regarding** 20:13 22:6
22:10 40:3 41:23
131:18 156:6 180:24
227:1
**regular** 23:9 102:14
**regularly** 207:1
**relate** 99:8 196:23
233:25 234:8 240:6
246:12
**related** 20:25 101:5
154:11 216:21 226:12
247:24 252:9
**relates** 1:8 225:21
239:12 244:20
**relating** 233:6 237:21
**relations** 42:9 53:1
91:12,18 94:8 148:4
152:5
**relationship** 80:1,5,8
101:24 102:1,5,6
109:11
**relative** 51:18
**relay** 234:6
**relevant** 25:9,11,15,18
33:15,18 40:24 41:18
49:17,18 70:7 73:24
75:21 77:21 78:3,11
80:24 81:2,23 83:14
85:12 86:5 87:3,4,5
89:20 91:9,20,25

92:24 93:4 94:5
96:17 101:6 102:4,10
103:23 104:15,20
105:2,21 107:9,25
108:15 109:21 115:1
116:10 128:6 150:6
158:20,24 184:19
200:6
**rely** 37:24 42:4 85:5
175:21
**relying** 174:20
**remain** 198:2
**remained** 150:22
**remaining** 197:22
**remains** 197:13
**remember** 43:23 57:11
58:1,2 62:15 88:21
106:17 115:13 131:9
140:25 159:24 168:5
171:9 193:20 241:1
**remove** 69:15
**reopen** 20:10
**rep** 74:8 251:2
**repeat** 37:6 106:6
112:17
**rephrase** 166:19
192:13
**REPLACE** 250:19
**replaced** 107:14
**replicates** 119:2
**reply** 209:13
**report** 30:11,25 38:11
88:24 89:2 100:25
119:15,18 200:3,14
**reporter** 1:17 7:15,17
10:3,24 24:2 63:13,25
65:20 89:11 98:17
229:22 231:3 252:4
252:17,22
**Reporters** 7:5
**reporting** 58:17
**reports** 28:19,21 29:3,5
29:9 38:2,6,8,9,11,11
38:13,18,23 39:3,12
39:20 40:22 76:22,25
77:5,9 79:19 80:23
81:1,4,9,18 90:15,19
90:19 92:19 100:20
100:22 101:8 119:8
119:10,13 167:25
168:3,6 187:19,23
200:10
**represent** 72:7 122:20
140:3,5,7 195:3
240:11
**representations** 180:19

**representative** 43:22
52:25
**representatives** 75:15
137:18
**represented** 17:1,8
59:23 138:13
**representing** 56:24
**represents** 117:21
**REPRODUCTION**
252:20
**request** 43:21
**require** 34:10
**required** 39:5 245:17
245:22 251:7
**requirement** 33:19
**requirements** 220:3,7
242:13
**research** 21:13 24:8
25:24 26:8,17,24 27:3
28:17,18 29:17,18,20
30:12 31:1,10,24
36:11 41:2,22 42:6
57:6 68:11,21 70:16
73:9 81:14 82:3
87:19 90:10 93:20
95:1 106:10 123:5
136:14 174:15 175:3
175:9 179:12 193:11
200:3,10 245:23
**resellers** 83:2 84:6
**reserves** 180:20,25
184:1,5,8,11
**residence** 9:6
**respective** 187:5 192:6
**respond** 50:21
**responded** 163:13
165:9
**responding** 156:13
**response** 117:19 147:17
147:21,22 152:14
155:14,16,17 156:5
156:18,18 160:22
163:18,22 164:6
165:16 196:10,16
203:7
**responses** 91:17 153:18
153:20
**responsibilities** 26:1
28:17 36:19 63:8
69:10 247:22
**responsibility** 37:11
**responsible** 21:13
36:17 37:9,16 136:12
**responsive** 12:22 13:20
14:9,25 15:1,17,23
16:10 22:14 43:19

50:9 51:25
**rest** 164:8 192:11
**restate** 53:17 223:7
**restructuring** 80:15
**result** 105:16 223:13
**results** 27:22 102:15,16
113:14 225:12
**Resumed** 169:7
**retail** 118:23,24 119:2
**retain** 76:18 77:6,8
103:20
**retaining** 76:4,8
**retirement** 25:2 118:25
**return** 16:25 88:14,17
**returning** 16:8 137:6,7
147:14 169:12
**revenue** 104:7 142:8
143:10 151:8 152:13
160:5 179:22,23
180:7 182:17 222:1
**revenues** 141:14 143:9
152:5,15,21,24
159:10,13 180:10,13
180:21,25 182:14,22
182:25 184:1 185:5
214:9
**revenue-wise** 179:25
**review** 11:11 18:10
40:12 50:24 71:3
153:5,23 176:12
186:13 211:22 212:16
212:17
**reviewed** 19:3 213:3
247:11,13,17 248:5
**reviews** 213:12
**revising** 195:18
**revision** 193:2,6,18
**rewards** 72:12
**richly** 143:5,7
**right** 18:8 36:12 44:19
44:22 50:13,17 51:13
52:4 54:11 61:20
67:6 70:16 72:2 74:9
77:1,17 78:15,20
82:18 86:18 94:22
96:1,8 98:14 100:9
103:3 107:23,24
111:18 114:9 117:1
120:6 121:2 128:9
130:2 133:20 137:25
140:23 144:24 145:22
148:22 149:24 150:3
156:9,13 159:3 164:1
166:24 167:2,6 171:4
173:22,22 175:1
177:2 181:24 190:6

190:22 194:11 195:25
206:2 209:7,10 228:5
228:10 229:11 233:2
237:13,16
**right-hand** 117:16
**rising** 217:6
**risk** 35:9 89:9 90:2 98:6
98:7,11,19 99:23
155:9 218:9
**riskier** 89:17,21,23
90:5 98:8 184:10
**risky** 97:25
**Robbins** 2:5 7:21
**Roberta** 42:12 153:12
153:17 155:17 156:4
160:15 163:12 165:9
176:18 186:18 201:23
202:23 209:6 224:18
**robust** 197:14
**role** 26:1
**room** 187:3
**rotate** 28:1,3,8 31:21
**rough** 25:5 32:15,16
41:24 44:17
**roughly** 12:21,25 13:6
13:14,19 18:1 32:12
41:21 187:15 240:13
**uter** 241:22
**uters** 236:17
**Rudman** 2:5 7:20
**rule** 10:17
**rules** 1:15 9:25
**ruling** 20:5,8
**rumors** 56:9
**run** 142:8
**Russo** 202:5

_____
S
_____
S 4:5 5:1 6:1 7:1 169:1
169:1,1
**Sachs** 4:14 125:1
138:25
**sad** 17:6
**Saint** 233:22
**salary** 23:9 70:11
**sales** 98:20 108:1,15
111:24 114:22,24
115:16,19 133:9
165:25 218:16,22
219:1,4
**salespeople** 108:7
109:2 166:5 229:17
239:17
**salesperson** 230:10
t 82:19 193:21
n 1:4 2:8 3:5 7:13

**Sanmina** 172:21
**satisfactorily** 8:8
**satisfactory** 252:6
**Saturdays** 163:14
**saw** 101:19 131:10
177:8,9 203:25
**saying** 9:16 10:4 58:12
100:3 122:11 146:3
148:16 156:22 161:17
164:11,12,17 169:18
170:3 173:25 207:17
210:16 225:5 241:16
**says** 8:11 121:1 124:14
126:14 127:1 128:25
134:10 135:16 138:6
140:10 146:25 166:20
191:24 194:11 200:18
205:12 206:5,8,11
215:24 216:14 217:21
217:23 230:16 234:5
236:8 238:17 241:23
242:25 244:15
**SC** 232:15
**scalability** 234:16
**scale** 34:2
**scales** 34:4
**schedule** 39:18 57:22
190:3 208:7,8
**school** 23:23 24:1,5
**science** 27:8,9,13,15,24
28:5 40:7 45:6,9
68:17 95:5 133:25
**Scientific** 173:10
**Scopa** 3:12 7:4
**search** 12:9,12,23
14:13,24 15:1,21
20:25 21:17 22:13
**searched** 15:17 16:4
51:12
**searches** 12:15
**searching** 18:5
**second** 12:18 16:23
115:24 118:14 120:20
120:24 122:6 125:5,7
127:23 139:18 161:23
169:13 180:22 185:2
193:2 194:10 205:11
**section** 153:13 243:23
**sector** 28:11 33:16 34:6
35:17 136:15
**sectors** 36:1
**securities** 1:7 65:2,8
69:12
**security** 7:11 119:24,24
**see** 12:5 19:17 34:7
45:25 114:1,13,18,18

120:23 121:1,4
124:12,14 125:8
126:1,4,14 127:1
128:2,16,25 129:19
132:1 134:10 135:16
135:20 136:25 137:7
138:7 139:11 140:10
142:15 143:2,13
144:16 145:2,3
146:25 152:14 153:13
153:17,23 154:5,17
156:4,15 157:3 159:8
160:15,22 161:2
162:7,13 163:12
164:4,19 166:16,20
167:14 174:25 175:5
176:19,23 185:19
186:19 188:24 191:20
192:15 194:11 195:25
197:2 200:16,17
203:18,24 205:12
208:13,14 209:15,20
210:8,12 215:24
216:14,20,22,24
217:2,21 218:3,15
219:9,18,23 220:1
221:6,9 224:20 225:4
225:15 228:12,17,22
234:11 236:8 238:1
238:17 242:6 248:11
248:14,25
**seeing** 140:24 167:17
**seek** 20:9
**seeking** 18:19 175:9
**seen** 11:10 12:3 35:5
119:15 123:13,25
127:25 131:22 133:3
176:8 208:4,15,16
209:1,4 212:14 218:9
**seg** 31:3
**segment** 31:4 130:21
159:10,18 160:2
219:11
**selected** 27:14 33:2
**selecting** 232:3
**selection** 231:23
**Selectron** 172:21
**sell** 71:17,20,23 72:6
73:4,7,8,25 75:7,20
76:2,10,15,17,21 77:4
78:4,11 79:18 80:4,19
80:22,25 81:3,21 82:3
82:5,7 83:16,24 84:12
103:17,24 104:6
110:11 111:3 115:6
115:10 116:17 119:25

128:3 138:15 141:17
145:1 169:19,23
171:2,5,16 173:7
190:4 206:8 220:9
223:4,22 229:20
242:20 245:16
**seller** 146:1,1
**selling** 107:23 149:21
**sells** 27:11 82:9
**semiconductor** 173:1
**semi-annual** 38:21
**semi-annually** 39:1
**send** 34:17 42:20
224:12 248:1
**sending** 155:3 206:1
**senior** 2:18 27:18 56:5
63:2 165:22 177:20
**sense** 142:11 172:8
173:9 215:3,5 217:12
218:11,21
**sent** 41:22 91:10 140:5
140:7 146:22 152:4
201:9 205:20 224:18
248:5
**sentence** 146:25 147:4
147:6 169:13 185:20
186:19 216:20,24
217:2 218:3 219:10
219:15 221:9
**separate** 57:17 227:20
**September** 126:15
**serve** 44:24
**service** 28:13 47:25
131:2 159:14,18
160:4,10 178:12,20
178:24 179:3,9,14
180:5 181:8 183:4
184:2,5 192:8 195:23
196:5,17,25 197:21
198:2 214:11 221:6
231:16 234:7 236:22
236:23 238:14
**services** 183:9
**session** 187:10,12 196:4
**set** 30:21 146:20 155:4
173:8 184:9 187:3
225:16 230:7 252:7
252:12,14
**sets** 212:10
**Sette-Ducati** 1:13 4:3
7:10 8:6,14 9:5 11:5
11:16 18:20 19:9,17
86:11 87:20 100:18
134:10 169:4,6,9
205:2 222:23 251:1
251:23 252:5

**Sette-Ducati's** 87:23
88:9,13
**Setting** 144:7
**set-up** 229:18
**Seven** 140:22
**shakes** 234:19
**shaky** 183:16
**share** 86:4 90:10,15,20
103:21 179:20 180:3
180:4 198:9,23 199:2
199:8,13,16 203:2
204:4
**shareholder** 38:25 39:6
39:9 77:23 129:2,4
**shareholders** 29:2
38:10,11,12,19 39:21
69:11 72:11,17 77:16
109:12
**shares** 69:6 86:2,23
126:3 133:15 135:17
198:13
**Sharon** 2:11 8:2 17:4
17:14 250:5
**sheet** 91:23,24 96:8,10
111:23 250:1,4,6,15
250:20 251:3,5,6,8
**sheets** 97:20 183:21
**She'll** 137:9
**shift** 193:15 221:10
**shifting** 221:17
**shifts** 30:21
**ship** 84:5
**shoot** 59:8
**shop** 223:21,25
**short** 44:10,14 56:17
100:14 150:18 222:20
249:8
**shorter** 35:18
**shortfall** 114:22,23
**Shorthand** 1:17 252:4
252:17
**short-term** 97:22
**shot** 149:19 152:25
**show** 19:17 39:17 55:16
92:6 153:3 204:20
205:9 206:24 207:5
227:13,14 230:5,13
243:1 244:5
**showed** 199:13 224:1
**shows** 43:17 119:25
227:15 229:6 236:7
**shrunk** 87:11
**shy** 199:23
**sick** 133:5
**side** 60:13 71:9,12,12
71:13,13,17,20,22,23

72:2,6,9,20 73:4,7,7,8
73:25 75:7,11,20 76:2
76:11,15,17,21 77:4
78:4,11 79:18 80:4,19
80:22,25 81:3,21 82:3
82:5 83:16,24 84:12
103:17,24 104:7
110:1,2,11,12 111:3,4
115:6 128:3 162:25
171:2 178:19 182:11
182:12 183:24 190:4
190:4 206:8 213:9
244:24,25 245:1,18
sider 105:15 138:15
siders 103:13,15,18
110:15 115:10,10
116:17,17 169:19,19
169:24 171:5,6,17,17
229:20
sides 59:25
Siemens 32:23
Sienna 180:17 181:4
231:14
Siennas 179:16
Sierra 172:19
sights 213:13
sign 125:23 208:18
250:16 251:6
signal 116:25 117:2
163:4 214:24
SIGNATURE 250:2
signed 120:15 250:7,20
significant 48:1 160:25
signing 151:8
silo 66:21
silos 66:21
similar 119:13,15 203:3
203:11
simple 104:6
Simpson 2:11 8:2,2,12
13:22 14:10 15:24
16:5 17:4,14 18:18
19:8,15 20:1,7 51:20
56:12 69:22,25 72:21
74:12 75:2,24 78:6
84:24 86:10,13 87:16
88:12,20 89:18 93:1
93:22 98:16 106:4
107:17 109:13 118:7
122:3 123:4 126:8
127:11 131:15,17
132:8,23 137:9,19
139:15,22 140:22
145:17 150:8 152:19
154:1 155:15,22
156:1 157:13,18

158:21 166:18 168:13
175:8 179:11 185:16
186:15 189:11,16
190:9,14,22 193:10
194:1 201:10 203:8
204:24 206:3 207:3
210:19 211:1 212:13
212:23 213:21 214:1
222:10 223:15,17
226:7 235:11 250:5
single 16:15 104:22
sit 43:25 71:22 163:21
205:7
situation 69:23 70:3
107:3
six 17:22 18:3,4,8 66:25
191:13,18 231:2,11
231:20 232:2
Six-page 4:7 11:6
size 13:7 87:11 94:2
133:13
sizes 130:16
skeptical 132:13,15,18
133:22 145:8,10,12
skill 252:13
skills 33:25
slash 200:18
slice 149:11
slide 198:20
slinger 240:19
slingers 240:17
slow 96:1 106:18,20
113:20,23,24 114:6,7
114:9,20 116:25
117:2 155:9 191:6
219:20
slowing 107:2 117:2
214:24
slows 98:24
small 52:24 63:14
141:11 158:11 183:13
smaller 25:22 180:16
182:17
smart 245:15
SMB 176:22
snapshot 142:16
Soft 184:13,15
software 35:5 133:8
170:20 179:9 192:7
sold 107:8,13 118:23
223:9,12
sole 165:3
solution 234:15 238:12
242:20
solutions 237:22,24
238:13 240:16,17,18

243:6
somebody 62:8 119:12
173:3 216:7 234:21
someplace 168:9 236:5
sorry 15:8 17:7 20:17
58:23,25 94:11
110:22 112:14 117:8
137:3,6,19 142:25
156:3 189:11 199:23
212:25
sort 147:11 234:7 241:9
sound 140:11 158:19
158:22
sounds 167:9 168:13
231:12
source 126:10 174:5,10
sourced 172:6
sources 164:17 171:16
174:3
SP 159:12,14
space 131:3 179:14
span 35:19
speak 176:20
speaker 47:10 51:2
speaking 106:3 175:15
234:20
special 23:10,12 102:1
102:25
specialist 7:4 26:4
specializing 73:13
specific 21:9 29:10
39:10 45:18 46:11
51:15,21 54:5 60:22
81:17 83:12 91:19,24
98:25 99:1 103:1
128:5,8 130:9 131:6
138:10 151:11 157:22
173:24 178:5 188:23
196:4 205:23 212:2,3
229:18 242:16 243:4
243:5
specifically 13:21 20:5
28:24 32:4,14 42:10
43:13,14 46:8 54:25
60:20 92:3 94:7,19
122:14 128:4 131:6
135:24 147:21 151:14
155:16 171:24 196:11
219:4 225:9 231:25
236:15
specifics 44:4 95:19,24
99:4,7 178:23 218:20
223:11 226:19,21
243:21
specified 57:1
speculation 108:20

speculative 221:3
speed 158:5
spend 18:1 155:1
216:12
spending 23:4 155:7
160:7 162:4 221:11
221:15,17
spent 17:18
spiral 16:19 227:21,22
spoke 172:16 173:15
spoken 172:13
sponsored 43:24
Sprint 152:6 182:14
230:25 231:7
SS 252:2
stable 97:1,3 213:15
215:7
stack 13:9,10,10 16:14
stage 151:7 209:25
stake 87:2,11,14 88:19
89:1,5
stamp 117:17 120:8
124:11,24 129:12
186:8 192:10,15
195:10
stamped 117:18
stamps 117:5
standard 95:23 131:22
150:21 152:11 212:1
215:3,5
Stanley 47:8,18 74:6
78:16 200:3 244:13
244:14
start 118:5 144:2 193:3
199:15 217:15,17
229:8 237:4
started 122:23 123:2
161:20 209:23 219:20
starting 171:10 209:24
starts 203:4
startup 141:1,4 182:18
233:1
startups 98:5,8,14,23
141:11 158:11 159:1
203:1
start-up 62:7
state 1:20 2:13 7:14,16
9:3,6 11:14 15:20,24
24:18,19 25:15 29:6,8
101:9 102:22,23
196:6
stated 148:20 167:9
197:1,21
statement 61:1 96:15
169:23 171:7
statements 109:15

251:21
states 1:3 126:2
static 35:15
statistically 166:9
stay 26:13,14 92:13
stayed 86:2
stenographic 252:12
step 217:10
steps 215:9,15,17,20
Stitt 244:18
stock 29:11 34:1 66:1
67:21 68:3,13,23 69:6
69:19,21 70:5 71:7
75:8,12 76:6 81:16,23
82:6,7 85:8 89:17
90:7 92:5,9 94:18
108:8 109:1,5 117:22
118:17 119:4,19
121:10,17,22 122:12
122:24 125:14 136:13
136:21 145:3,16,19
145:22,23,25 146:1,5
146:8 159:4 171:12
199:9 203:17 209:22
209:23 210:22 223:1
223:4,9,13 224:1
stocks 37:16 39:19
89:14,15,17 142:18
143:4 245:14
stock-wise 72:7
Stoia 2:4 7:20
stop 27:3
stopped 116:21,23
storage 54:4
stores 15:13
straight-forward 35:14
strategic 159:3 247:2
strategically 140:11
142:11,13
strategy 38:14 40:6
157:11,12,16,17
158:19 201:25 241:19
241:20 247:4
street 1:21 2:7,13,22
3:4 7:6,14 43:18
71:20 104:6 110:11
155:12 162:25 200:11
200:14,15 205:14
206:7,15 247:5,6
strength 99:19
strengthnesses 237:3
strengths 245:5
stretched 133:15 142:5
stretching 113:13
strike 25:3 59:21 72:18
78:7 90:8 100:1

108:12 112:6 121:6
129:17 130:11 136:5
140:9 201:14 213:19
214:6
**stringent** 220:7
**strong** 116:4 145:25
221:23 232:15 245:19
**stronger** 75:10
**structure** 243:4
**structured** 187:1
**struggle** 150:24 151:1
**stuck** 66:19 202:9
209:16
**stuff** 102:25 166:1
195:17 208:18 243:9
**styles** 89:25
**subjective** 70:13,25
71:2 96:20
**subpoena** 4:8 11:22,24
13:20 14:9,25 15:18
16:10 22:14 50:9,21
51:25 87:23 117:19
**subscribe** 251:20
**subscriber** 237:21
**subsequent** 137:16
**success** 33:21 179:4
180:5
**·ccessful** 27:22 141:4
158:12
**successfully** 149:19
**Sudbury** 9:8
**suggest** 116:5
**suite** 2:7 7:6
**Summa** 220:12,13
**summarizing** 30:24
**summary** 119:3 207:6
**Supercomm** 4:19 51:1
55:16,17 56:20 59:9
129:14 130:5,6 139:3
165:25 204:20 205:8
229:5 241:8,12 244:3
244:4
**supplied** 250:15
**suppliers** 83:9
**supply** 82:23 83:8 84:3
149:5 171:21,22,24
172:7,12
**support** 60:2 174:22
175:14
**supporting** 60:6 169:23
**supposed** 86:16
**supposedly** 141:6
144:21
**sure** 9:19 10:21 18:7
21:11 56:14 67:8,17
78:9 92:22 95:23

99:6,11 108:23
118:16 120:19 123:10
138:13 139:17 155:3
161:22 175:19 176:10
176:16 180:11 185:16
187:21 190:24 192:14
207:12 210:2 226:20
239:23
**surprised** 51:7
**survive** 98:10
**suspended** 249:18
**sustainable** 183:18
**swinging** 240:20,23
**switch** 198:15 221:18
**switches** 236:17
**switching** 54:4 141:2
198:14
**sworn** 8:10 252:8
**system** 29:21,24 30:1,5
30:5 168:6 192:6
**systematic** 109:3
**systems** 1:7 3:7 7:11,11
31:7 37:13 119:24
152:13 180:17 195:5
200:4 221:18
——————— **T** ———————
**T** 4:5 5:1 6:1 169:1
252:1,1
**table** 8:19 149:18
**tail** 31:22
**take** 10:17 16:23 27:19
29:14 31:2,11,12
33:13 34:16 40:4
49:25 52:23 56:13
62:18 82:3,19 84:13
84:15 100:9 111:10
139:15 152:24 153:4
154:2 155:10 173:20
176:10 184:7 187:17
188:16 193:20 194:7
196:2 210:2 212:17
248:7,10,24
**taken** 7:14 16:10 52:3
56:17 100:14 168:20
194:19 198:19,19
222:20 227:12 229:14
244:18 246:11 249:8
**talk** 10:2 29:5 44:1 48:2
53:6 66:20 110:1,3,10
110:14 128:1 131:1
173:3,6 193:5 215:2,4
221:10 243:8,10
**talked** 95:11 187:4
218:6 229:15,19
230:19 238:9 239:13

239:17 243:5
**talking** 67:1 82:24
85:24 87:3 107:1
110:21 131:23 141:6
165:21 166:1,12
169:24 174:24 176:1
181:15,18,19 206:23
231:24 232:13,19
233:14,21 235:14
238:7 239:14 243:17
**talks** 238:14
**TAM** 132:14
**tape** 100:9
**target** 167:7
**tasked** 119:12
**taught** 246:17
**tax** 146:2
**team** 53:3 63:15 91:12
102:21 108:16 175:25
186:21
**tear** 227:24
**tech** 209:16 210:10,18
210:22
**technically** 65:17,17,23
**technological** 35:1
193:15
**technologies** 32:22
35:11 158:15,15
186:4 221:19
**technology** 4:14 27:8,9
27:13,15,21,24 28:6
33:20 34:1,10,20,22
35:15,17 36:4 40:7
45:6,9 47:8,18,19
53:23 59:18,19,23
61:2,9 68:17 92:11
95:4,5 102:23 125:2
126:21 132:10 157:25
161:24 162:21 170:9
170:22 199:15 210:21
213:15 214:19 215:2
215:4 225:23 236:18
237:11 240:22 242:1
**telecom** 31:23 32:9
33:2 34:5 36:10 58:5
58:8,10,13,17 131:2
131:11 149:11 159:19
182:5 183:9,24 186:1
220:4 221:15,24
222:2 233:23 234:2
236:21 237:5 239:18
240:8
**telecommunications**
28:15 107:6
**Teleglobe** 243:12
**tell** 22:9 117:12,13

148:13 160:25 167:21
169:15 179:18 228:4
**telling** 99:13,16
**template** 212:2,3,4
**ten** 54:19,21,23 55:2,4
55:4 161:19
**tend** 35:13 41:10 98:8
132:12 143:19,21
199:14 229:3,6,16
**tended** 75:10 132:9
162:23
**tendency** 132:20,24
**tends** 34:10,22 55:17
92:19 145:24
**ten-fold** 143:11
**term** 15:9 71:9,17
107:11 143:19 158:18
178:2 221:21
**terms** 72:14 92:14
111:4 178:1 186:3
237:12 238:9 245:9
**terribly** 105:19
**Terry** 222:6
**test** 90:24 215:9,15,21
239:15
**tested** 91:20
**testified** 96:3,7 100:19
247:9
**testify** 10:9,13
**testimony** 87:24 109:10
250:15 251:5,19
252:7,11
**testing** 91:16
**text** 205:5
**Thank** 128:17 130:1
190:14 197:24 244:23
**theirs** 72:8
**thereabouts** 139:1
**therefor** 250:15 251:5
**thereof** 250:8
**thesis** 101:5
**Thesodopoulos** 74:5,11
**they'd** 141:19
**thing** 10:1 41:15 78:25
105:9 110:24 112:13
150:19 161:23 167:3
179:14 183:6 187:14
201:7 209:25 239:15
**things** 30:15 34:12,20
34:24 35:11 41:9
58:12,12,14,14,15
60:9,14,15,22 72:3
76:12 96:12 99:22
106:22,23 110:13
177:25 181:16 190:17
194:8 213:13,17,19

214:6 231:9 238:21
245:1
**think** 10:12 16:23
18:20 19:9 31:2,4
33:5,8,20 34:10,16,21
43:5 46:18 48:8 51:5
51:22 54:18 60:14
61:1,6 64:6 76:7 89:8
91:5 93:16,19 108:12
108:14 109:6 116:19
131:21 132:12,20,24
132:25 142:6,15
145:2,9,15,24 148:15
151:9 152:10 155:22
158:19,23 159:3
160:4,8 161:13
166:10 169:17 172:21
174:5,10 177:4,6,7
178:15 179:24 181:15
183:3,8,15 184:11
185:12 191:10 193:19
194:19 199:12 203:12
203:12,13 211:1
212:20,24 213:4,12
215:1 218:2 219:22
220:7 224:16 225:23
228:4 231:17 235:17
239:13 240:6 241:1
241:21 242:1,7,17
244:6 245:13
**thinking** 34:11,14
**thinks** 219:12
**third** 20:7 116:1 123:14
137:15 219:9 240:11
**third-party** 84:8
**thought** 27:18 75:4
81:22 115:24,25
134:20 155:13 221:14
248:16
**thoughts** 30:18,24
153:18,20 204:19,22
205:8 207:6
**thousands** 108:8
**three** 18:9 63:6 128:15
134:7 182:8 191:16
191:25 198:15 229:12
231:2,11,20 247:5
**thrown** 35:10 162:22
170:7 175:23
**throws** 132:13
**Thurber** 42:12 146:23
152:4
**Thursday** 129:24
**tidal** 48:4,7
**tie** 99:11
**tied** 121:23

**Tier** 180:13,13,15,15
  180:21,21 181:1,1,2,2
  181:5,6,10,10,21,22
  182:11,11
**tighter** 214:21
**Tim** 74:4
**time** 7:8 20:23 21:15,15
  23:3 25:11 26:16,17
  27:19,25 28:4 30:21
  32:19 33:6 34:4,19
  36:25 37:4 40:19
  44:11,14,17,22 46:2,7
  46:16 48:21 49:1
  50:16 53:2,7,13,22,25
  54:17 56:2,13,15,18
  56:25 57:1,5 59:12,17
  61:24 62:5 64:7,15
  67:10,14 68:10,21
  70:15 72:13 74:4
  76:2 78:1 79:11,15
  81:9,13,19 85:4,19
  87:3,4,5 89:1,19 90:9
  93:7 94:19,22 95:8,11
  99:6 100:11,15
  101:22 102:21 103:4
  105:25 106:7,12
  116:15 121:15,19,25
  122:13,23 123:13,13
  126:7 127:8 132:16
  133:17,19 135:3,24
  136:19 140:20,21
  141:7,10 142:3,5
  143:23 144:3,25
  149:13,25 150:2
  154:7 155:6 158:5
  162:9,11,15,22 167:5
  168:17 169:2 174:14
  175:3 176:10 177:24
  179:5 180:11,11
  183:19 188:4 189:21
  192:11 195:14 198:1
  203:13 205:22 207:21
  212:8,14,15,17 215:1
  215:2,4,4,6 216:13
  220:14 221:25 222:17
  222:21 223:5 234:16
  234:17 238:24 240:22
  246:11 249:6,9,14
**times** 46:22 48:16
  53:10 121:21 210:5
  214:9,16,20,23 236:5
**timing** 135:4 226:6
**timing-wise** 54:11
**tiresome** 84:20
**title** 63:2,4
**today** 8:20 10:10,13

11:18 17:1,11 22:22
  23:4,11,13 33:8 65:3
  65:4 66:9 71:22
  73:17 87:4,5 88:14
  116:9 144:17 145:4
  150:12 163:21 203:17
  205:7 246:9 247:12
  247:13,17 248:5,18
**Today's** 7:7
**told** 215:20 231:9
**top** 120:24 123:20
  130:24 133:3 154:13
  156:4 173:8 185:19
  191:2 192:21 194:4
  207:8 239:12 242:6
  242:25 244:11
**topic** 97:16 116:14,18
  116:19,22 162:23
  165:23
**topics** 46:24
**tornado** 48:3,5,7
**total** 66:24 68:22
  132:14 133:16
**tough** 126:9 228:7
**traction** 141:15 151:3,5
**trade** 43:16 55:16
  204:20 205:8 207:5
  227:13,14,15 229:6
  230:5,13 236:7 243:1
  244:5
**traded** 26:10
**traditional** 159:19
**traffic** 221:15,16,24,25
  236:16
**trafficking** 60:10
**trained** 132:18 133:21
  165:23
**transaction** 118:17
  147:2 148:7
**transcript** 250:11,16
  250:19 251:4,6,7,19
  251:20 252:20
**transcription** 10:3
  252:12
**transition** 195:24
  196:18,20
**translated** 142:1
**translator** 8:23
**Transmission** 4:21
  134:4
**transpiring** 229:11
**transport** 141:2 230:14
  231:15 241:24 242:13
**treasurer** 119:14
**trees** 34:8
**tremendous** 158:25

161:1
**trend** 85:11 92:19
  96:19 97:1 107:2
  114:14,15 115:17,20
  164:23 167:23 221:14
**trending** 165:5
**trends** 92:7,12 97:10
  105:22 116:5
**tricky** 53:17
**trip** 45:23 137:1,12,23
  137:24
**trough** 85:25
**true** 35:17 50:8 53:20
  78:17 80:18 113:19
  116:23 124:21 135:14
  173:16 185:14 223:24
  223:25 252:12
**truly** 144:13
**truthfully** 10:13
**try** 76:18 143:1 153:1
  161:16 163:10 172:10
  174:25 185:15 203:14
  203:15 248:15
**trying** 16:22 41:8 49:2
  58:7 72:16 92:13
  96:22 98:22 105:17
  123:14 145:10 152:11
  152:24 155:10 159:20
  159:22,25 161:21
  163:1 171:15 183:6
  185:24,25 186:5
  203:13 204:25 217:12
  218:21 219:18,21
  237:12 239:15 242:7
  242:18 243:22
**Tuck** 24:1
**turn** 120:20 188:23
  237:18
**turning** 92:21,21
  128:15 129:18 137:15
  159:6 160:13 190:19
  192:20 193:23 197:4
  198:4 205:11 219:8
  229:23 232:7 233:3
  233:16 234:11 235:20
  239:6 240:1 241:3
  242:21 244:9
**two** 12:15 17:5,20 18:9
  41:6 45:10 55:7
  59:25 60:9 63:6 68:6
  72:3 73:3 81:15
  108:7 113:2 134:8
  152:12 154:2 157:3
  162:10,10 176:11,14
  181:15 188:12 194:4
  194:10 195:24 199:19

220:8 225:21 228:12
  229:12 238:21 247:5
**two-year** 73:15
**type** 29:16 30:11,25
  100:4 119:25 218:16
  219:1,5
**typically** 103:24 210:1

— U —
**Uh-huh** 130:7 194:5
  228:11
**ultimately** 136:11
  156:25 158:13
**unable** 210:21 226:19
**unaware** 185:3
**unbated** 150:22
**uncommon** 35:13 43:15
  47:1,22 49:21 61:8
  82:5 96:25 97:19
  110:8 166:5 184:11
  195:16 200:10,12
  202:3 207:4 208:18
  223:20 243:15
**underneath** 192:2,17
  236:11
**undersigned** 252:4
**understand** 10:7,9,20
  11:1 15:13 23:6
  25:17 34:18 39:6
  74:17,20 77:22 88:16
  92:22 104:2 109:24
  112:7,18 142:13
  152:11 177:21,22
  180:22 190:1 214:2
  234:24 245:4,8
  248:22
**understanding** 9:16
  16:6 25:19 27:17
  33:1 71:21 75:14,19
  76:1 77:19 78:2,22
  79:17 82:20 86:4,19
  87:13 88:18 89:4,16
  92:6,9 95:14 102:17
  104:15 108:11 111:7
  113:3,9 114:25
  117:21 118:12,13
  121:6,13 122:24
  123:15 126:6,17
  127:4 129:3 135:6,13
  147:8 148:6 149:10
  150:1 157:20,21,23
  157:24 160:1 198:1
  217:3 231:18 233:5
  245:25 247:7
**understands** 38:15
**understood** 9:18

**Underwriting** 76:13
**unfavorable** 80:23 81:
  81:4,5,6,9,16,18
**unfortunately** 88:9
**unique** 47:23
**UNITED** 1:3
**unrealistic** 142:6
  143:12
**unusual** 116:22 154:21
**upcoming** 161:5
**update** 30:16
**urgency** 148:8
**use** 35:8 75:8,12,12
  111:22 200:25 215:1
  215:3
**user** 242:16
**usually** 39:25 52:25
  83:3,4 91:2,22 103:14
  114:12,23 148:2
  173:13 177:14 194:9
  200:25 217:7 229:3
  229:12
**utilities** 35:13,21
**utility** 34:3

— V —
**vacuum** 99:12 194:21
**vague** 112:3 141:12
**vaguely** 47:20
**valuation** 145:5
**value** 25:5,19 29:2 66:3
  66:17 67:4,19,25 68:3
  68:22 86:1 124:1
  143:15 144:5,9 242:1
  246:1 247:7
**values** 140:12
**variable** 165:4 166:25
**variables** 71:5
**variation** 236:12
**varied** 104:1
**variety** 16:23 29:9
  30:15 31:3 33:13
  35:25 45:23 47:10
  66:14 71:5 76:12
  111:10 183:23 247:8
**various** 170:7
**varying** 75:6
**VBS** 74:6
**vehicle** 27:12
**vendor** 97:12 99:2,8,13
  99:17,21 100:6
  106:19 107:4 182:14
  182:18 186:1 217:21
  218:7 220:4 227:1
  243:24
**vendors** 172:18 180:1

**181**:2,3,6,19,22,24,25
**186**:4 **237**:7
**venture** 158:10
**verbal** 41:12 43:10
**Verizon** 182:15
**versus** 218:22 219:5
  236:17 239:19 242:15
**Vice** 2:18 63:2
**video** 7:4 192:1 233:13
**Videographer** 3:12 7:2
  36:25 37:4 56:15,18
  67:10,14 79:11,15
  100:11,15 168:17
  169:2 222:17,21
  249:6,9,14
**VIDEOTAPED** 1:12
**view** 61:6 150:17
  217:13
**views** 78:24
**virtual** 194:12,12,12,16
  194:16,16,23,24
**visit** 177:6 211:10
**visited** 57:23 134:11
**voice** 192:1 221:16,25
  233:13
**voiceover** 234:6
**Volpi** 42:22 43:24
  52:10 176:21 222:7
  13:1,15 16:12 41:21
  41:24 65:9 133:14
  242:15 250:14,16
  251:6
**VP** 241:9

————————
**W**
————————
**wait** 180:22 185:17
  214:22
**Wall** 43:18 71:20 104:6
  162:25 200:11,13,15
  247:5,6
**want** 19:17 38:1 46:24
  60:7 77:15 86:18
  87:17 92:16,19
  103:20 145:1 156:2
  169:22 192:5 194:20
  199:4 218:11 247:19
  248:22,24 249:1
**wanted** 45:25 70:1 77:6
  131:24 135:10 147:1
  148:18 222:2 231:10
**Washington** 203:4
**wasn't** 47:12 82:8
  121:22 131:14,21
  142:8 183:10 189:25
  aste 53:2

**wave** 48:4,7 231:14
**way** 33:24 34:23 35:3
  38:1 53:16 91:7 96:4
  99:9 111:20 112:1,4
  118:1 140:25 149:1
  155:3 161:18 162:8
  177:22 183:15 199:11
  214:4 240:25 247:18
  248:15
**ways** 68:16 83:2 90:2,6
**weak** 232:13
**weaknesses** 237:3
  245:6
**Weaver** 2:3 4:4 7:19,19
  8:21 9:2 11:3,13,21
  15:20 16:3,7 18:25
  19:13,22 20:4,9 36:23
  56:14 78:7 79:9 88:3
  88:16 99:25 100:8
  112:14 115:19 117:4
  118:9 120:7,16,19
  124:10,23 128:9,17
  129:11 134:1 137:21
  138:18 139:5 146:11
  151:18 153:20 155:25
  156:3 157:15 168:10
  168:15 169:8 176:2
  186:7 188:8 199:20
  201:13 202:14 204:9
  207:23 208:20 210:24
  211:3 215:13 222:15
  224:3 227:3 248:17
  249:2,13 250:10
**week** 160:17
**weeks** 17:16 161:8
  162:10
**weighed** 33:21
**Wellington** 4:12
**well-connected** 75:5
**well-versed** 75:4
**went** 21:19 51:6 57:23
  86:3,25 141:18 187:2
  218:13
**weren't** 50:20 220:20
**West** 3:2 7:23
**we'll** 134:1 164:19
  166:20 207:23 209:15
  249:2,4
**we're** 10:4 37:5 41:8
  67:15 72:14,15 77:17
  77:18 85:24 106:17
  106:24,25 107:1
  108:24 115:13 132:15
  132:18 137:3 143:23
  155:22 156:12 161:12
  167:10 181:15 217:12

**219**:18 **231**:24 **249**:10
  **249**:13
**we've** 62:17 73:17
  77:13 88:5 164:14
  169:13,16 248:12
**WHEREOF** 252:14
**whirlwind** 48:10
**whomever's** 127:6
**wide** 156:6,24
**widely** 115:5 162:22
**Wilcom** 152:6
**Williams** 23:18,20
**willing** 141:25
**Wilmer** 1:19 2:12 8:4
  17:6
**win** 240:25
**window** 150:18
**wireless** 98:21 159:19
**wisdom** 144:1
**wish** 50:8
**witness** 1:13 8:1,3,7,23
  11:13 13:24 19:14
  36:22 69:24 86:12
  107:18 120:22 131:16
  139:17 154:3 173:23
  189:15 190:13 201:12
  205:6 212:19,22
  213:24 214:3 234:19
  235:19 249:12 252:14
**witness's** 19:1
**wonder** 199:14
**wondering** 174:8
**word** 13:17 14:7,12
  23:7 33:12 74:17,20
  86:15 89:23 100:3
  112:15 188:25 190:11
**work** 10:4 18:19,24
  20:2 26:2 72:24 73:2
  75:6 87:19 118:2
  123:5 131:18 150:9
  165:20 172:10 175:10
  179:12 193:11 200:12
  246:13,21
**worked** 28:15 113:7
  143:20 150:6
**working** 29:1 36:2,3
  41:12,16 52:15
  136:14 156:8 224:13
  245:19 247:5
**works** 150:17
**world** 160:23 161:15
  164:12 179:17 182:8
  236:21
**Worldnet** 51:1
**worry** 140:12 161:18
**wouldn't** 172:4 173:5

**194**:20 **237**:9
**wow** 64:10 140:20
  142:13 163:2
**wreck** 210:10
**write** 28:18 29:25 40:6
  80:22 94:1 95:21
  100:25 147:4,6
  162:13 164:20 168:7
  187:19 189:8 195:17
  197:15 201:24 205:18
  207:5 212:21,24
  227:15 232:11 234:14
**writes** 153:18
**write-off** 93:15,20,24
  93:24 94:2,10 95:12
  95:18
**writing** 80:25 81:4
  82:11 189:4,6 192:11
  195:17 207:15 219:6
  231:6 233:23
**written** 79:20 81:9,18
  90:20 91:1,10 101:15
  101:18,19 154:19
  171:9,11 189:13
  200:4,11,16 205:14
  206:6,8 226:16
**wrong** 62:4,8 67:5
  77:18 127:9 145:13
  145:14 175:2
**wrote** 90:16 93:8 101:8
  139:25 142:15 143:13
  144:16 145:2 147:7
  154:5,9 156:15 157:4
  159:8 160:23 162:7
  162:15 164:4,14
  170:24 174:21 189:10
  189:17,18,18 195:21
  196:6,16 197:11,19
  198:20 203:18,24
  204:18 209:7,11,13
  209:15 210:8 230:23
  231:8 232:12 234:15
  247:13,13,17

————————
**X**
————————
**X** 4:1,5 5:1 6:1

————————
**Y**
————————
**yeah** 17:9 18:4 39:25
  43:6 44:8,23 48:8
  57:14 58:25 59:20
  61:8 68:5 70:6 74:19
  74:21,24 75:18 77:2,8
  80:20 82:19 84:17
  85:20 90:14 96:22
  101:11 102:12 103:12

**105**:9 **109**:15,19
  **110**:23 **113**:5 **117**:23
  118:9,10 123:1,21
  127:21 137:14 138:6
  140:19 142:19 150:13
  156:14 160:21 164:3
  166:19 170:13 171:12
  173:20 177:2,4 180:7
  181:15,25 182:1
  183:2 184:8 195:16
  198:6 203:25 211:20
  211:20 212:5 214:3
  217:2,22 222:9
  223:25 227:23 228:1
  228:19,21 229:12
  233:18 235:4,19
  237:17 241:5 242:23
  247:19
**year** 21:7 41:25 45:10
  54:9 55:18 110:13,14
  134:12 155:2 171:11
  210:2,5 229:6 233:9
  244:6
**years** 45:10 63:6,6 73:3
  191:25 193:3 195:24
  199:19 246:7 247:5,6
**Yep** 124:16 125:9
  139:12 238:19
**yield** 64:1,3
**York** 137:1
**Y2K** 154:11,23 155:4
  161:24
**Y2K-related** 162:3

————————
**Z**
————————
**Zelinski** 1:16 7:16
  252:4,16
**zero** 226:17

————————
**$**
————————
**$100,000** 69:2
**$145** 25:7
**$2.5** 93:9,23
**$200,000** 68:25
**$40** 145:3,16 146:9
**$5** 66:8
**$500,000** 66:6
**$6.9** 142:7

————————
**0**
————————
**00** 156:23
**00766** 228:20
**00788** 227:5
**01** 209:17
**0101591** 5:15 201:16
**01071** 190:19

| | | | | |
|---|---|---|---|---|
| 01093 192:21 | 09:08:01 9:13,14 | 09:11:47 12:6 | 09:14:21 14:17 | 09:17:01 17:4 |
| 01115 197:4 | 09:08:03 9:15 | 09:11:48 12:7 | 09:14:24 14:18,19 | 09:17:08 17:5 |
| 01220 188:11 | 09:08:05 9:16 | 09:11:51 12:8 | 09:14:26 14:20 | 09:17:10 17:6 |
| 01776 9:9 | 09:08:08 9:17 | 09:11:54 12:9 | 09:14:33 14:21 | 09:17:13 17:7 |
| 02109 2:14 | 09:08:09 9:18 | 09:11:57 12:10 | 09:14:34 14:22 | 09:17:15 17:8 |
| 02111 7:7 | 09:08:10 9:19,20 | 09:11:59 12:11,12 | 09:14:38 14:23 | 09:17:17 17:9 |
| 02116-3741 2:23 | 09:08:12 9:21 | 09:12:01 12:13 | 09:14:40 14:24 | 09:17:20 17:10 |
| 06/17/05 251:1 | 09:08:13 9:22 | 09:12:02 12:14 | 09:14:44 14:25 | 09:17:22 17:11 |
| 09:05:50 7:3 | 09:08:15 9:23 | 09:12:04 12:15 | 09:14:47 15:1 | 09:17:23 17:12 |
| 09:05:52 7:4 | 09:08:16 9:24 | 09:12:09 12:16 | 09:14:52 15:2 | 09:17:24 17:13 |
| 09:05:55 7:5 | 09:08:19 9:25 10:1 | 09:12:12 12:17 | 09:14:54 15:3 | 09:17:25 17:14 |
| 09:05:58 7:6 | 09:08:21 10:2 | 09:12:16 12:18 | 09:14:57 15:4,5 | 09:17:27 17:15 |
| 09:06:00 7:7 | 09:08:25 10:3 | 09:12:18 12:19 | 09:15:00 15:6 | 09:17:28 17:16 |
| 09:06:04 7:8 | 09:08:27 10:4 | 09:12:21 12:20 | 09:15:01 15:7 | 09:17:34 17:17 |
| 09:06:09 7:9 | 09:08:31 10:5 | 09:12:23 12:21 | 09:15:02 15:8 | 09:17:35 17:18 |
| 09:06:11 7:10 | 09:08:35 10:6 | 09:12:25 12:22 | 09:15:03 15:9 | 09:17:38 17:19 |
| 09:06:14 7:11 | 09:08:36 10:7 | 09:12:28 12:23 | 09:15:05 15:10 | 09:17:39 17:20 |
| 09:06:19 7:12 | 09:08:37 10:8 | 09:12:29 12:24 | 09:15:06 15:11,12 | 09:17:43 17:21 |
| 09:06:20 7:13 | 09:08:38 10:9 | 09:12:33 12:25 | 09:15:09 15:13 | 09:17:45 17:22 |
| 09:06:23 7:15 | 09:08:41 10:10 | 09:12:39 13:1 | 09:15:13 15:14 | 09:17:49 17:23 |
| 09:06:25 7:16 | 09:08:43 10:11 | 09:12:41 13:2 | 09:15:18 15:15 | 09:17:51 17:24 |
| 09:06:27 7:17 | 09:08:45 10:12 | 09:12:43 13:3,4 | 09:15:20 15:16 | 09:17:53 17:25 |
| 09:06:28 7:18 | 09:08:47 10:13 | 09:12:48 13:5 | 09:15:22 15:17 | 09:17:55 18:1 |
| 09:06:30 7:19 | 09:08:48 10:14 | 09:12:49 13:6 | 09:15:25 15:18,19 | 09:17:57 18:2 |
| 09:06:31 7:21 | 09:08:51 10:15 | 09:12:50 13:7 | 09:15:28 15:20,21 | 09:17:59 18:3 |
| 09:06:36 7:22 | 09:08:54 10:16 | 09:12:53 13:8,9 | 09:15:31 15:22 | 09:18:03 18:4 |
| 09:06:39 7:23 | 09:08:57 10:17 | 09:12:56 13:10 | 09:15:33 15:23 | 09:18:06 18:5 |
| 09:06:40 7:24,25 | 09:08:59 10:18 | 09:12:58 13:11 | 09:15:35 15:24 | 09:18:09 18:6 |
| 09:06:43 8:1 | 09:09:02 10:19 | 09:12:59 13:12,13 | 09:15:36 15:25 | 09:18:11 18:7 |
| 09:06:44 8:2 | 09:09:04 10:20 | 09:13:01 13:14 | 09:15:40 16:1 | 09:18:12 18:8 |
| 09:06:46 8:3 | 09:09:06 10:21 | 09:13:03 13:15 | 09:15:42 16:2 | 09:18:15 18:9 |
| 09:06:48 8:4 | 09:09:10 10:22 | 09:13:08 13:16 | 09:15:45 16:3 | 09:18:17 18:10 |
| 09:06:51 8:5 | 09:09:12 10:23 | 09:13:14 13:17 | 09:15:47 16:4 | 09:18:20 18:11 |
| 09:07:09 8:11,12 | 09:09:15 10:24 | 09:13:19 13:18 | 09:15:49 16:5 | 09:18:24 18:12,13 |
| 09:07:10 8:13 | 09:09:17 10:25 | 09:13:23 13:19 | 09:15:50 16:6 | 09:18:25 18:14 |
| 09:07:11 8:14 | 09:09:18 11:1 | 09:13:28 13:20 | 09:15:53 16:7,8 | 09:18:28 18:15,16 |
| 09:07:16 8:15 | 09:09:19 11:2 | 09:13:29 13:21 | 09:15:57 16:9 | 09:18:29 18:17 |
| 09:07:18 8:16 | 09:09:20 11:3 | 09:13:33 13:22 | 09:15:59 16:10 | 09:18:31 18:18 |
| 09:07:20 8:17 | 09:09:21 11:4 | 09:13:34 13:23 | 09:16:01 16:11 | 09:18:33 18:19 |
| 09:07:23 8:18 | 09:09:25 11:5 | 09:13:36 13:24 | 09:16:02 16:12 | 09:18:36 18:20 |
| 09:07:24 8:19 | 09:09:53 11:9,10 | 09:13:37 13:25 | 09:16:04 16:13 | 09:18:39 18:21 |
| 09:07:26 8:20 | 09:09:57 11:11 | 09:13:40 14:1 | 09:16:06 16:14 | 09:18:41 18:22 |
| 09:07:28 8:21 | 09:10:20 11:12 | 09:13:42 14:2 | 09:16:09 16:15 | 09:18:44 18:23 |
| 09:07:31 8:22 | 09:10:46 11:13 | 09:13:43 14:3 | 09:16:12 16:16 | 09:18:46 18:24 |
| 09:07:33 8:23 | 09:10:47 11:14 | 09:13:48 14:4 | 09:16:16 16:17 | 09:18:50 18:25 |
| 09:07:35 8:24 | 09:10:49 11:15 | 09:13:49 14:5 | 09:16:19 16:18 | 09:18:51 19:1 |
| 09:07:40 9:2,3 | 09:10:52 11:16 | 09:13:53 14:6,7 | 09:16:21 16:19 | 09:18:53 19:2 |
| 09:07:43 9:4 | 09:10:53 11:17 | 09:13:55 14:8 | 09:16:23 16:20 | 09:18:55 19:3 |
| 09:07:44 9:5 | 09:10:54 11:18 | 09:13:57 14:9 | 09:16:24 16:21 | 09:18:57 19:4 |
| 09:07:46 9:6 | 09:10:57 11:19 | 09:13:59 14:10 | 09:16:33 16:22 | 09:19:00 19:5 |
| 09:07:49 9:7 | 09:10:59 11:20 | 09:14:01 14:11 | 09:16:41 16:23 | 09:19:02 19:6 |
| 09:07:50 9:8 | 09:11:02 11:21 | 09:14:05 14:12 | 09:16:45 16:24 | 09:19:03 19:7 |
| 09:07:55 9:9 | 09:11:04 11:22 | 09:14:12 14:13 | 09:16:47 16:25 | 09:19:07 19:8 |
| 09:07:57 9:10 | 09:11:08 11:23 | 09:14:16 14:14 | 09:16:55 17:1 | 09:19:08 19:9 |
| 09:07:59 9:11 | 09:11:41 12:3 | 09:14:17 14:15 | 09:16:59 17:2 | 09:19:10 19:10 |
| 09:08:00 9:12 | 09:11:43 12:4,5 | 09:14:20 14:16 | 09:17:00 17:3 | 09:19:14 19:11 |

| | | | | |
|---|---|---|---|---|
| 09:19:16 19:12 | 09:22:12 21:22 | 09:24:50 24:8 | 09:27:52 26:15 | 09:30:37 28:25 |
| 09:19:17 19:13 | 09:22:14 21:23 | 09:24:52 24:9 | 09:27:53 26:16 | 09:30:40 29:1 |
| 09:19:18 19:14 | 09:22:24 21:24 | 09:24:53 24:10 | 09:27:54 26:17 | 09:30:45 29:2 |
| 09:19:20 19:15 | 09:22:26 21:25 | 09:24:55 24:11 | 09:27:57 26:18 | 09:30:48 29:3 |
| 09:19:23 19:16 | 09:22:27 22:1 | 09:24:58 24:12 | 09:27:58 26:19,20 | 09:30:51 29:4 |
| 09:19:25 19:17 | 09:22:29 22:2 | 09:25:01 24:13 | 09:28:00 26:21 | 09:30:53 29:5 |
| 09:19:28 19:18 | 09:22:32 22:3 | 09:25:04 24:14 | 09:28:02 26:22 | 09:30:55 29:6 |
| 09:19:31 19:19 | 09:22:34 22:4 | 09:25:07 24:15 | 09:28:06 26:23 | 09:30:58 29:7 |
| 09:19:34 19:20 | 09:22:36 22:5 | 09:25:11 24:16 | 09:28:07 26:24 | 09:30:59 29:8 |
| 09:19:36 19:21 | 09:22:38 22:6 | 09:25:15 24:17 | 09:28:09 26:25 | 09:31:04 29:9 |
| 09:19:37 19:22 | 09:22:40 22:7 | 09:25:18 24:18 | 09:28:10 27:1 | 09:31:10 29:10 |
| 09:19:38 19:23 | 09:22:45 22:8 | 09:25:23 24:19 | 09:28:14 27:2,3 | 09:31:11 29:11 |
| 09:19:40 19:24 | 09:22:51 22:9 | 09:25:26 24:20,21 | 09:28:16 27:4 | 09:31:15 29:12 |
| 09:19:43 19:25 | 09:22:53 22:10 | 09:25:31 24:22 | 09:28:18 27:5 | 09:31:18 29:13 |
| 09:19:45 20:1 | 09:22:55 22:11 | 09:25:32 24:23 | 09:28:21 27:6 | 09:31:19 29:14 |
| 09:19:46 20:2 | 09:22:56 22:12 | 09:25:33 24:24 | 09:28:25 27:7 | 09:31:23 29:15 |
| 09:19:48 20:3,4 | 09:23:00 22:13 | 09:25:34 24:25 | 09:28:30 27:8 | 09:31:24 29:16 |
| 09:19:50 20:5 | 09:23:03 22:14 | 09:25:35 25:1 | 09:28:38 27:9 | 09:31:26 29:17 |
| 09:19:52 20:6 | 09:23:04 22:15 | 09:25:36 25:2 | 09:28:41 27:10,11 | 09:31:28 29:18 |
| 09:19:54 20:7 | 09:23:05 22:16 | 09:25:38 25:3 | 09:28:53 27:12 | 09:31:33 29:19 |
| 09:19:56 20:8 | 09:23:06 22:17 | 09:25:41 25:4 | 09:28:55 27:13 | 09:31:39 29:20 |
| 09:19:58 20:9 | 09:23:08 22:18 | 09:25:42 25:5 | 09:29:00 27:14 | 09:31:40 29:21 |
| 09:19:59 20:10 | 09:23:10 22:19 | 09:25:49 25:6 | 09:29:02 27:15 | 09:31:41 29:22,23 |
| 09:20:02 20:11 | 09:23:11 22:20 | 09:25:52 25:7 | 09:29:05 27:16 | 09:31:46 29:24 |
| 09:20:23 20:12 | 09:23:13 22:21 | 09:25:57 25:8 | 09:29:06 27:17 | 09:31:47 29:25 |
| 09:20:26 20:13 | 09:23:23 22:22 | 09:25:59 25:9 | 09:29:08 27:18 | 09:31:49 30:1 |
| 09:20:28 20:14,15 | 09:23:25 22:23 | 09:26:02 25:10 | 09:29:11 27:19 | 09:31:54 30:2 |
| 09:20:33 20:16 | 09:23:26 22:24 | 09:26:04 25:11 | 09:29:13 27:20 | 09:31:58 30:4 |
| 09:20:38 20:17 | 09:23:27 22:25 | 09:26:07 25:12 | 09:29:15 27:21 | 09:31:59 30:5 |
| 09:20:40 20:18 | 09:23:28 23:1 | 09:26:14 25:13 | 09:29:18 27:22 | 09:32:02 30:6 |
| 09:20:42 20:19 | 09:23:30 23:2 | 09:26:16 25:14 | 09:29:21 27:23 | 09:32:03 30:7 |
| 09:20:44 20:20,21 | 09:23:32 23:3 | 09:26:18 25:15 | 09:29:25 27:24 | 09:32:05 30:8 |
| 09:20:47 20:22 | 09:23:34 23:4 | 09:26:20 25:16 | 09:29:26 27:25 | 09:32:06 30:9 |
| 09:20:52 20:23 | 09:23:38 23:5 | 09:26:21 25:17 | 09:29:28 28:1 | 09:32:12 30:10 |
| 09:20:55 20:24 | 09:23:40 23:6 | 09:26:23 25:18 | 09:29:31 28:2 | 09:32:13 30:11 |
| 09:20:58 20:25 | 09:23:43 23:7 | 09:26:26 25:19 | 09:29:33 28:3 | 09:32:16 30:12 |
| 09:21:02 21:1 | 09:23:44 23:8 | 09:26:29 25:20 | 09:29:36 28:4 | 09:32:18 30:13 |
| 09:21:07 21:2 | 09:23:48 23:9 | 09:26:32 25:21 | 09:29:38 28:5 | 09:32:20 30:14 |
| 09:21:08 21:3 | 09:23:51 23:10 | 09:26:34 25:22 | 09:29:40 28:6 | 09:32:22 30:15 |
| 09:21:09 21:4 | 09:23:53 23:11 | 09:26:36 25:23 | 09:29:41 28:7 | 09:32:24 30:16 |
| 09:21:12 21:5 | 09:23:55 23:12 | 09:26:44 25:24 | 09:29:42 28:8 | 09:32:28 30:17 |
| 09:21:15 21:6,7 | 09:23:58 23:13 | 09:26:48 25:25 | 09:29:46 28:9 | 09:32:33 30:18 |
| 09:21:17 21:8 | 09:24:07 23:14 | 09:26:50 26:1 | 09:29:47 28:10 | 09:32:35 30:19 |
| 09:21:29 21:9 | 09:24:09 23:15 | 09:26:51 26:2 | 09:29:55 28:11 | 09:32:39 30:20 |
| 09:21:31 21:10 | 09:24:12 23:16 | 09:26:58 26:3 | 09:29:58 28:12 | 09:32:41 30:21 |
| 09:21:33 21:11 | 09:24:14 23:17,18 | 09:27:05 26:4 | 09:30:03 28:13 | 09:32:45 30:22 |
| 09:21:38 21:12 | 09:24:20 23:19,20 | 09:27:08 26:5 | 09:30:04 28:14 | 09:32:48 30:23 |
| 09:21:43 21:13 | 09:24:22 23:21,22 | 09:27:09 26:6 | 09:30:07 28:15 | 09:32:51 30:24 |
| 09:21:47 21:14 | 09:24:23 23:23 | 09:27:15 26:7 | 09:30:10 28:16 | 09:33:01 30:25 |
| 09:21:49 21:15 | 09:24:24 23:24 | 09:27:17 26:8 | 09:30:21 28:17 | 09:33:03 31:1 |
| 09:21:53 21:16 | 09:24:25 23:25 | 09:27:24 26:9 | 09:30:25 28:18 | 09:33:09 31:2 |
| 09:21:56 21:17 | 09:24:27 24:1 | 09:27:26 26:10 | 09:30:28 28:19,20 | 09:33:14 31:3 |
| 09:22:01 21:18 | 09:24:41 24:3 | 09:27:30 26:11 | 09:30:30 28:21 | 09:33:19 31:4 |
| 09:22:05 21:19 | 09:24:43 24:4 | 09:27:36 26:12 | 09:30:32 28:22 | 09:33:21 31:5 |
| 09:22:08 21:20 | 09:24:47 24:5,6 | 09:27:48 26:13 | 09:30:34 28:23 | 09:33:23 31:6 |
| 09:22:11 21:21 | 09:24:48 24:7 | 09:27:49 26:14 | 09:30:36 28:24 | 09:33:26 31:7 |

| | | | | |
|---|---|---|---|---|
| 09:33:28 31:8 | 09:36:19 33:19 | 09:39:14 35:25 | 09:43:15 38:13 | 09:46:21 40:22 |
| 09:33:29 31:9 | 09:36:21 33:20 | 09:39:16 36:1 | 09:43:18 38:14 | 09:46:25 40:23 |
| 09:33:32 31:10 | 09:36:25 33:21 | 09:39:20 36:2 | 09:43:23 38:15 | 09:46:28 40:24 |
| 09:33:35 31:11 | 09:36:28 33:22 | 09:39:24 36:3 | 09:43:25 38:16 | 09:46:30 40:25 |
| 09:33:38 31:12 | 09:36:31 33:23 | 09:39:27 36:4 | 09:43:28 38:17 | 09:46:33 41:1 |
| 09:33:40 31:13 | 09:36:33 33:24 | 09:39:34 36:6 | 09:43:29 38:18 | 09:46:39 41:2 |
| 09:33:41 31:14,15 | 09:36:38 33:25 | 09:39:40 36:7 | 09:43:31 38:19 | 09:46:42 41:3,4 |
| 09:33:47 31:16 | 09:36:41 34:1 | 09:39:43 36:8 | 09:43:35 38:20 | 09:46:48 41:5 |
| 09:33:49 31:17 | 09:36:45 34:2 | 09:39:47 36:9 | 09:43:38 38:21 | 09:46:52 41:6 |
| 09:33:51 31:18 | 09:36:47 34:3 | 09:39:50 36:10 | 09:43:45 38:22 | 09:46:56 41:7 |
| 09:33:57 31:19 | 09:36:49 34:4 | 09:39:53 36:11 | 09:43:48 38:23 | 09:46:59 41:8 |
| 09:34:01 31:20 | 09:36:51 34:5 | 09:39:55 36:12 | 09:43:53 38:24 | 09:47:03 41:9 |
| 09:34:08 31:21 | 09:36:53 34:6 | 09:39:56 36:13,14 | 09:43:57 38:25 | 09:47:06 41:10 |
| 09:34:09 31:22 | 09:36:56 34:7 | 09:39:59 36:15,16 | 09:44:01 39:1 | 09:47:08 41:11 |
| 09:34:14 31:23 | 09:36:59 34:8 | 09:40:02 36:17 | 09:44:04 39:2 | 09:47:10 41:12 |
| 09:34:19 31:24 | 09:37:01 34:9 | 09:40:03 36:18 | 09:44:06 39:3 | 09:47:13 41:13 |
| 09:34:21 31:25 | 09:37:02 34:10 | 09:40:07 36:19 | 09:44:08 39:4 | 09:47:14 41:14 |
| 09:34:23 32:1,2 | 09:37:06 34:11 | 09:40:10 36:20 | 09:44:11 39:5 | 09:47:16 41:15 |
| 09:34:25 32:3 | 09:37:09 34:12 | 09:40:14 36:21 | 09:44:17 39:6 | 09:47:19 41:16 |
| 09:34:29 32:4 | 09:37:11 34:13 | 09:40:17 36:22,23 | 09:44:20 39:7 | 09:47:23 41:17 |
| 09:34:32 32:5 | 09:37:15 34:14 | 09:40:18 36:24 | 09:44:23 39:8 | 09:47:27 41:18 |
| 09:34:34 32:6 | 09:37:17 34:15 | 09:40:23 36:25 | 09:44:24 39:9 | 09:47:33 41:19 |
| 09:34:36 32:7 | 09:37:21 34:16 | 09:40:24 37:1 | 09:44:31 39:10 | 09:47:41 41:20,21 |
| 09:34:37 32:8 | 09:37:23 34:17 | 09:41:39 37:2 | 09:44:32 39:11,12 | 09:47:44 41:22 |
| 09:34:39 32:9 | 09:37:25 34:18 | 09:41:45 37:3,4 | 09:44:33 39:13 | 09:47:46 41:23 |
| 09:34:43 32:10 | 09:37:28 34:19 | 09:41:47 37:5 | 09:44:36 39:14 | 09:47:49 41:24 |
| 09:34:49 32:11 | 09:37:30 34:20 | 09:41:54 37:6 | 09:44:38 39:15 | 09:47:51 41:25 |
| 09:34:50 32:12 | 09:37:33 34:21 | 09:41:56 37:7 | 09:44:41 39:16 | 09:47:54 42:1,2 |
| 09:34:52 32:13 | 09:37:39 34:22 | 09:41:57 37:8 | 09:44:43 39:17 | 09:47:56 42:3 |
| 09:34:56 32:14 | 09:37:43 34:23 | 09:41:58 37:9 | 09:44:46 39:18 | 09:48:02 42:4 |
| 09:34:58 32:15 | 09:37:45 34:24 | 09:42:01 37:10 | 09:44:49 39:19 | 09:48:08 42:5 |
| 09:34:59 32:16 | 09:37:47 34:25 | 09:42:04 37:11 | 09:44:50 39:20 | 09:48:12 42:6 |
| 09:35:00 32:17 | 09:37:51 35:1 | 09:42:08 37:12 | 09:44:54 39:21 | 09:48:15 42:7,8 |
| 09:35:06 32:18 | 09:38:00 35:2 | 09:42:09 37:13 | 09:44:56 39:22,23 | 09:48:19 42:9 |
| 09:35:08 32:19,20 | 09:38:02 35:3 | 09:42:11 37:14 | 09:44:57 39:24 | 09:48:22 42:10 |
| 09:35:09 32:21 | 09:38:04 35:4 | 09:42:13 37:15 | 09:44:59 39:25 | 09:48:26 42:11 |
| 09:35:11 32:22 | 09:38:10 35:5 | 09:42:16 37:16 | 09:45:08 40:1 | 09:48:38 42:12 |
| 09:35:18 32:23 | 09:38:14 35:6 | 09:42:18 37:17 | 09:45:12 40:2 | 09:48:41 42:13 |
| 09:35:24 32:24 | 09:38:17 35:7 | 09:42:22 37:18 | 09:45:14 40:3 | 09:48:46 42:14 |
| 09:35:28 32:25 | 09:38:19 35:8 | 09:42:24 37:19,20 | 09:45:16 40:4 | 09:48:50 42:15 |
| 09:35:34 33:1 | 09:38:22 35:9 | 09:42:27 37:21 | 09:45:21 40:5 | 09:48:52 42:16 |
| 09:35:38 33:2 | 09:38:24 35:10 | 09:42:33 37:22 | 09:45:27 40:6 | 09:48:55 42:17 |
| 09:35:40 33:3 | 09:38:27 35:11 | 09:42:37 37:23 | 09:45:31 40:7 | 09:48:56 42:18 |
| 09:35:41 33:4 | 09:38:29 35:12 | 09:42:41 37:24 | 09:45:33 40:8 | 09:48:59 42:19 |
| 09:35:42 33:5 | 09:38:33 35:13 | 09:42:44 37:25 | 09:45:37 40:9 | 09:49:03 42:20 |
| 09:35:48 33:6,7,8 | 09:38:37 35:14 | 09:42:48 38:1 | 09:45:42 40:10 | 09:49:06 42:21 |
| 09:35:49 33:9 | 09:38:41 35:15 | 09:42:51 38:2 | 09:45:45 40:11 | 09:49:07 42:22 |
| 09:35:50 33:10 | 09:38:43 35:16 | 09:42:54 38:3 | 09:45:48 40:12 | 09:49:09 42:23 |
| 09:35:52 33:11 | 09:38:44 35:17 | 09:42:56 38:4 | 09:45:52 40:13 | 09:49:12 42:24 |
| 09:35:53 33:12 | 09:38:47 35:18 | 09:42:57 38:5 | 09:45:53 40:14 | 09:49:13 42:25 |
| 09:35:55 33:13 | 09:38:50 35:19 | 09:43:01 38:6,7 | 09:45:57 40:15 | 09:49:15 43:1 |
| 09:35:58 33:14 | 09:39:00 35:20 | 09:43:02 38:8 | 09:46:01 40:16 | 09:49:19 43:2 |
| 09:36:03 33:15 | 09:39:02 35:21 | 09:43:03 38:9 | 09:46:04 40:17 | 09:49:21 43:3 |
| 09:36:09 33:16 | 09:39:04 35:22 | 09:43:06 38:10 | 09:46:09 40:18 | 09:49:22 43:4 |
| 09:36:14 33:17 | 09:39:06 35:23 | 09:43:09 38:11 | 09:46:12 40:19 | 09:49:23 43:5 |
| 09:36:16 33:18 | 09:39:11 35:24 | 09:43:13 38:12 | 09:46:16 40:21 | 09:49:30 43:6 |

| | | | | |
|---|---|---|---|---|
| 09:49:34 43:7 | 09:52:31 45:18 | 09:55:35 48:1 | 09:58:13 50:7 | 10:00:32 52:11 |
| 09:49:37 43:8 | 09:52:33 45:19 | 09:55:42 48:2 | 09:58:15 50:8 | 10:00:36 52:12 |
| 09:49:39 43:9 | 09:52:37 45:20 | 09:55:50 48:3 | 09:58:18 50:9 | 10:00:39 52:13 |
| 09:49:42 43:10 | 09:52:38 45:21 | 09:55:53 48:4 | 09:58:22 50:10 | 10:00:44 52:14 |
| 09:49:45 43:11 | 09:52:48 45:22 | 09:55:56 48:5 | 09:58:23 50:11,12 | 10:00:49 52:15 |
| 09:49:49 43:12,13 | 09:52:53 45:23 | 09:55:58 48:6 | 09:58:27 50:13 | 10:00:50 52:16 |
| 09:49:53 43:14 | 09:52:57 45:24 | 09:55:59 48:7 | 09:58:28 50:14 | 10:00:52 52:17 |
| 09:49:59 43:15 | 09:52:59 45:25 | 09:56:03 48:8 | 09:58:33 50:15 | 10:00:55 52:18 |
| 09:50:01 43:16 | 09:53:01 46:1 | 09:56:04 48:9 | 09:58:35 50:16 | 10:00:56 52:19 |
| 09:50:05 43:17 | 09:53:07 46:2 | 09:56:06 48:10 | 09:58:39 50:17 | 10:00:58 52:20 |
| 09:50:10 43:18 | 09:53:11 46:3 | 09:56:08 48:11 | 09:58:41 50:18 | 10:01:02 52:21 |
| 09:50:16 43:19 | 09:53:12 46:4 | 09:56:11 48:12 | 09:58:42 50:19 | 10:01:04 52:22 |
| 09:50:21 43:20 | 09:53:14 46:5 | 09:56:13 48:13 | 09:58:43 50:20 | 10:01:09 52:23 |
| 09:50:24 43:21 | 09:53:16 46:6 | 09:56:14 48:14 | 09:58:46 50:21 | 10:01:11 52:24 |
| 09:50:26 43:22 | 09:53:17 46:7 | 09:56:15 48:15 | 09:58:51 50:22 | 10:01:15 52:25 |
| 09:50:28 43:23 | 09:53:18 46:8 | 09:56:19 48:16 | 09:58:53 50:23 | 10:01:19 53:1 |
| 09:50:35 43:24 | 09:53:20 46:9,10 | 09:56:21 48:17 | 09:58:56 50:24 | 10:01:22 53:2 |
| 09:50:37 43:25 | 09:53:21 46:11 | 09:56:22 48:18 | 09:59:01 50:25 | 10:01:25 53:3 |
| 09:50:40 44:1,2 | 09:53:24 46:12 | 09:56:24 48:19 | 09:59:05 51:1 | 10:01:28 53:4 |
| 09:50:43 44:3 | 09:53:26 46:13 | 09:56:26 48:20 | 09:59:11 51:2 | 10:01:31 53:5 |
| 09:50:46 44:4 | 09:53:27 46:14,15 | 09:56:31 48:21 | 09:59:13 51:3 | 10:01:34 53:6,7 |
| 09:50:49 44:5,6 | 09:53:29 46:16 | 09:56:32 48:22 | 09:59:15 51:4 | 10:01:36 53:8 |
| 09:50:52 44:7 | 09:53:30 46:17 | 09:56:40 48:23 | 09:59:18 51:5 | 10:01:38 53:9,10 |
| 09:50:53 44:8 | 09:53:34 46:18 | 09:56:43 48:24 | 09:59:23 51:6 | 10:01:41 53:11 |
| 09:51:03 44:9 | 09:53:39 46:19 | 09:56:47 48:25 | 09:59:26 51:7 | 10:01:43 53:12,13 |
| 09:51:05 44:10 | 09:53:43 46:20 | 09:56:50 49:1 | 09:59:29 51:8 | 10:01:46 53:14 |
| 09:51:09 44:11 | 09:53:46 46:21 | 09:56:56 49:2 | 09:59:33 51:9,10,11 | 10:01:48 53:15 |
| 09:51:10 44:12 | 09:53:50 46:22 | 09:56:58 49:3 | 09:59:35 51:12 | 10:01:50 53:16 |
| 09:51:13 44:13 | 09:53:53 46:23 | 09:56:59 49:4 | 09:59:38 51:13,14 | 10:01:53 53:17 |
| 09:51:16 44:14 | 09:53:54 46:24 | 09:57:02 49:5 | 09:59:40 51:15 | 10:01:56 53:18 |
| 09:51:17 44:15 | 09:53:58 46:25 | 09:57:05 49:6 | 09:59:42 51:16 | 10:01:57 53:19 |
| 09:51:19 44:16 | 09:54:00 47:1 | 09:57:06 49:7 | 09:59:44 51:17 | 10:02:00 53:20 |
| 09:51:22 44:17 | 09:54:12 47:2 | 09:57:09 49:8 | 09:59:46 51:18 | 10:02:02 53:21 |
| 09:51:24 44:18 | 09:54:14 47:3 | 09:57:10 49:9 | 09:59:48 51:19 | 10:02:06 53:22 |
| 09:51:26 44:19 | 09:54:21 47:4 | 09:57:13 49:10 | 09:59:49 51:20 | 10:02:07 53:23 |
| 09:51:27 44:20 | 09:54:22 47:5 | 09:57:14 49:11 | 09:59:50 51:21 | 10:02:12 53:24 |
| 09:51:28 44:21 | 09:54:27 47:6 | 09:57:15 49:12 | 09:59:52 51:22 | 10:02:15 53:25 |
| 09:51:31 44:22 | 09:54:35 47:7 | 09:57:19 49:13 | 09:59:54 51:23 | 10:02:16 54:1,2 |
| 09:51:32 44:23 | 09:54:38 47:8 | 09:57:20 49:14 | 09:59:57 51:24 | 10:02:20 54:3 |
| 09:51:35 44:24 | 09:54:41 47:9 | 09:57:21 49:15 | 09:59:59 51:25 | 10:02:23 54:4 |
| 09:51:38 44:25 | 09:54:44 47:10 | 09:57:24 49:16 | | 10:02:27 54:5 |
| 09:51:42 45:1 | 09:54:47 47:11 | 09:57:28 49:17 | ————— 1 ————— | 10:02:28 54:6 |
| 09:51:46 45:2 | 09:54:49 47:12 | 09:57:32 49:18 | 1 25:12 49:19 69:5 | 10:02:29 54:7 |
| 09:51:49 45:3 | 09:54:53 47:13 | 09:57:37 49:19 | 85:13 100:12 192:5 | 10:02:33 54:8 |
| 09:51:52 45:4 | 09:54:54 47:14 | 09:57:42 49:20 | 1A 7:7 | 10:02:35 54:9 |
| 09:51:54 45:5 | 09:54:56 47:15 | 09:57:46 49:21 | 1:36 169:2 | 10:02:41 54:10 |
| 09:51:55 45:6 | 09:54:57 47:16 | 09:57:49 49:22 | 10th 129:24 | 10:02:44 54:11 |
| 09:51:57 45:7 | 09:54:58 47:17 | 09:57:53 49:23 | 10:00:01 52:1 | 10:02:49 54:12 |
| 09:51:58 45:8 | 09:55:00 47:18 | 09:57:57 49:24 | 10:00:03 52:2,3 | 10:02:54 54:13,14 |
| 09:52:00 45:9 | 09:55:02 47:19 | 09:58:00 49:25 | 10:00:05 52:4 | 10:02:55 54:15 |
| 09:52:08 45:10 | 09:55:08 47:20 | 09:58:02 50:1 | 10:00:07 52:5 | 10:02:56 54:16 |
| 09:52:17 45:11 | 09:55:09 47:21 | 09:58:03 50:2 | 10:00:19 52:6 | 10:02:57 54:17 |
| 09:52:20 45:12,13 | 09:55:13 47:22 | 09:58:04 50:3 | 10:00:26 52:7 | 10:02:59 54:18 |
| 09:52:23 45:14 | 09:55:18 47:23 | 09:58:06 50:4 | 10:00:28 52:8 | 10:03 56:16 |
| 09:52:26 45:15 | 09:55:26 47:24 | 09:58:07 50:5 | 10:00:29 52:9 | 10:03:01 54:19 |
| 09:52:30 45:16,17 | 09:55:31 47:25 | 09:58:09 50:6 | 10:00:30 52:10 | 10:03:04 54:20 |

278

| | | | | |
|---|---|---|---|---|
| 10:03:07 54:21 | 10:12:34 57:3 | 10:15:44 59:11 | 10:18:55 61:21 | 10:22:10 64:7 |
| 10:03:10 54:22 | 10:12:43 57:4 | 10:15:47 59:12 | 10:18:56 61:22 | 10:22:12 64:8 |
| 10:03:11 54:23 | 10:12:46 57:5 | 10:15:49 59:13,14 | 10:18:59 61:23 | 10:22:14 64:9 |
| 10:03:13 54:24 | 10:12:49 57:6 | 10:15:52 59:15 | 10:19:02 61:24 | 10:22:17 64:10 |
| 10:03:14 54:25 | 10:12:50 57:7 | 10:15:54 59:16 | 10:19:07 61:25 | 10:22:30 64:11 |
| 10:03:15 55:1 | 10:12:51 57:8 | 10:15:57 59:17 | 10:19:09 62:1 | 10:22:33 64:12 |
| 10:03:16 55:2 | 10:12:55 57:9 | 10:16:00 59:18 | 10:19:14 62:2 | 10:22:36 64:13 |
| 10:03:18 55:3,4 | 10:13:08 57:10 | 10:16:01 59:19 | 10:19:16 62:3 | 10:22:37 64:14 |
| 10:03:21 55:5 | 10:13:16 57:11 | 10:16:03 59:20 | 10:19:18 62:4 | 10:22:40 64:15 |
| 10:03:22 55:6 | 10:13:21 57:12 | 10:16:04 59:21 | 10:19:22 62:5 | 10:22:43 64:16 |
| 10:03:26 55:7 | 10:13:22 57:13 | 10:16:07 59:22 | 10:19:28 62:6 | 10:22:44 64:17 |
| 10:03:30 55:8 | 10:13:24 57:14 | 10:16:10 59:23 | 10:19:31 62:7 | 10:22:48 64:18 |
| 10:03:33 55:9 | 10:13:25 57:15 | 10:16:14 59:24 | 10:19:34 62:8 | 10:22:49 64:19 |
| 10:03:34 55:10 | 10:13:29 57:16,17 | 10:16:31 59:25 | 10:19:36 62:9 | 10:22:51 64:20 |
| 10:03:41 55:11 | 10:13:32 57:18 | 10:16:33 60:1 | 10:19:37 62:10 | 10:22:52 64:21 |
| 10:03:44 55:12,13 | 10:13:33 57:19 | 10:16:34 60:2 | 10:19:40 62:11 | 10:22:53 64:22 |
| 10:03:47 55:14 | 10:13:34 57:20 | 10:16:38 60:3 | 10:19:44 62:12 | 10:22:55 64:23 |
| 10:03:49 55:15 | 10:13:38 57:21 | 10:16:45 60:4 | 10:19:47 62:13 | 10:22:56 64:24 |
| 10:03:52 55:16 | 10:13:39 57:22 | 10:16:47 60:5 | 10:19:48 62:14 | 10:23:04 64:25 |
| 10:04:02 55:17 | 10:13:46 57:23 | 10:16:51 60:6,7 | 10:19:50 62:15 | 10:23:11 65:1 |
| 10:04:06 55:18 | 10:13:48 57:24 | 10:16:54 60:8 | 10:19:52 62:16 | 10:23:14 65:2 |
| 10:04:10 55:19 | 10:13:51 57:25 | 10:16:57 60:9 | 10:19:55 62:17 | 10:23:21 65:3 |
| 10:04:13 55:20 | 10:13:54 58:1 | 10:17:03 60:10 | 10:19:57 62:18 | 10:23:22 65:4 |
| 10:04:16 55:21 | 10:13:56 58:2 | 10:17:08 60:11 | 10:19:59 62:19 | 10:23:34 65:5 |
| 10:04:17 55:22 | 10:13:58 58:3 | 10:17:14 60:12 | 10:20:00 62:20 | 10:23:36 65:6 |
| 10:04:18 55:23 | 10:14:00 58:4 | 10:17:18 60:13 | 10:20:02 62:21 | 10:23:37 65:7 |
| 10:04:25 55:24 | 10:14:05 58:5 | 10:17:21 60:14 | 10:20:05 62:22 | 10:23:42 65:8 |
| 10:04:28 55:25 | 10:14:08 58:6 | 10:17:26 60:15 | 10:20:08 62:23 | 10:23:46 65:9 |
| 10:04:30 56:1 | 10:14:15 58:7 | 10:17:28 60:16 | 10:20:10 62:24 | 10:23:47 65:10 |
| 10:04:33 56:2 | 10:14:20 58:8 | 10:17:29 60:17 | 10:20:21 62:25 63:1 | 10:23:48 65:11 |
| 10:04:37 56:3 | 10:14:22 58:9 | 10:17:32 60:18 | 10:20:25 63:2 | 10:23:50 65:12 |
| 10:04:38 56:4 | 10:14:26 58:10 | 10:17:33 60:19 | 10:20:30 63:3 | 10:23:51 65:13 |
| 10:04:40 56:5 | 10:14:27 58:11 | 10:17:38 60:20 | 10:20:32 63:4 | 10:23:52 65:14 |
| 10:04:44 56:6 | 10:14:28 58:12 | 10:17:41 60:21 | 10:20:39 63:5 | 10:23:59 65:15,16 |
| 10:04:46 56:7 | 10:14:30 58:13 | 10:17:42 60:22 | 10:20:42 63:6 | 10:24 67:11 |
| 10:04:49 56:8 | 10:14:33 58:14 | 10:17:45 60:23 | 10:20:45 63:7 | 10:24:00 65:17 |
| 10:04:54 56:9 | 10:14:37 58:15 | 10:17:53 60:24 | 10:20:48 63:8 | 10:24:03 65:18 |
| 10:04:58 56:10 | 10:14:39 58:16 | 10:17:57 60:25 | 10:20:51 63:9 | 10:24:08 65:19 |
| 10:04:59 56:11 | 10:14:42 58:17 | 10:18:02 61:1 | 10:20:56 63:10 | 10:24:11 65:21 |
| 10:05:13 56:12 | 10:14:45 58:18,19 | 10:18:07 61:2 | 10:21:11 63:11 | 10:24:15 65:22 |
| 10:05:14 56:13 | 10:14:47 58:20 | 10:18:10 61:3 | 10:21:13 63:12 | 10:24:18 65:23 |
| 10:05:15 56:14 | 10:14:49 58:21 | 10:18:12 61:4 | 10:21:15 63:14 | 10:24:21 65:24 |
| 10:05:18 56:15 | 10:14:50 58:22 | 10:18:15 61:5,6 | 10:21:17 63:15 | 10:24:25 65:25 |
| 10:05:19 56:16 | 10:14:52 58:23 | 10:18:19 61:7 | 10:21:22 63:16 | 10:24:29 66:1 |
| 10:05:23 56:17 | 10:14:54 58:24 | 10:18:21 61:8 | 10:21:25 63:17 | 10:24:34 66:2 |
| 10:10 56:19 | 10:14:55 58:25 | 10:18:25 61:9 | 10:21:29 63:18 | 10:24:36 66:3 |
| 10:12:13 56:18 | 10:14:56 59:1 | 10:18:28 61:10 | 10:21:31 63:19 | 10:24:38 66:4,5 |
| 10:12:14 56:19 | 10:14:59 59:2 | 10:18:31 61:11 | 10:21:33 63:20,21 | 10:24:39 66:6 |
| 10:12:16 56:20 | 10:15:06 59:3 | 10:18:33 61:12 | 10:21:36 63:22 | 10:24:43 66:7 |
| 10:12:19 56:21 | 10:15:09 59:4 | 10:18:38 61:13 | 10:21:48 63:23 | 10:24:44 66:8 |
| 10:12:21 56:22 | 10:15:12 59:5 | 10:18:40 61:14 | 10:21:51 63:24 | 10:24:50 66:9 |
| 10:12:23 56:23 | 10:15:14 59:6 | 10:18:44 61:15,16 | 10:21:52 63:25 64:1 | 10:24:54 66:10 |
| 10:12:29 56:24 | 10:15:20 59:7 | 10:18:46 61:17 | 10:21:58 64:2,3 | 10:25 67:15 |
| 10:12:31 56:25 | 10:15:29 59:8 | 10:18:50 61:18 | 10:22:01 64:4 | 10:25:02 66:11 |
| 10:12:32 57:1 | 10:15:37 59:9 | 10:18:52 61:19 | 10:22:07 64:5 | 10:25:03 66:12 |
| 10:12:33 57:2 | 10:15:42 59:10 | 10:18:54 61:20 | 10:22:09 64:6 | 10:25:08 66:13 |

| | | | | |
|---|---|---|---|---|
| 25:11 66:14 | 10:28:10 68:24 | 10:31:12 71:8 | 10:34:14 73:18 | 10:37:38 76:3 |
| 25:15 66:15 | 10:28:11 68:25 | 10:31:24 71:9 | 10:34:18 73:19 | 10:37:41 76:4 |
| 10:25:16 66:16 | 10:28:15 69:1 | 10:31:26 71:10 | 10:34:20 73:20 | 10:37:46 76:5 |
| 10:25:20 66:17 | 10:28:16 69:2 | 10:31:27 71:11 | 10:34:28 73:21 | 10:37:50 76:6 |
| 10:25:23 66:18 | 10:28:21 69:3 | 10:31:29 71:12 | 10:34:30 73:22 | 10:37:54 76:7 |
| 10:25:26 66:19 | 10:28:23 69:4 | 10:31:32 71:13 | 10:34:32 73:23 | 10:38:00 76:8 |
| 10:25:27 66:20 | 10:28:32 69:5 | 10:31:36 71:14 | 10:34:45 73:24 | 10:38:02 76:9 |
| 10:25:30 66:21 | 10:28:38 69:6 | 10:31:40 71:15 | 10:34:47 73:25 | 10:38:03 76:10 |
| 10:25:36 66:22 | 10:28:40 69:7 | 10:31:44 71:16,17 | 10:34:50 74:1 | 10:38:09 76:11 |
| 10:25:38 66:23 | 10:28:41 69:8 | 10:31:47 71:18 | 10:34:51 74:2 | 10:38:14 76:12 |
| 10:25:41 66:24 | 10:28:45 69:9 | 10:31:48 71:19 | 10:34:52 74:3 | 10:38:17 76:13 |
| 10:25:43 66:25 | 10:28:55 69:10 | 10:31:49 71:20 | 10:34:58 74:4 | 10:38:19 76:14 |
| 10:25:45 67:1 | 10:28:58 69:11 | 10:31:52 71:21 | 10:35:06 74:5 | 10:38:25 76:15 |
| 10:25:47 67:2 | 10:29:01 69:12 | 10:31:56 71:22 | 10:35:13 74:6 | 10:38:31 76:16 |
| 10:25:52 67:3 | 10:29:03 69:13 | 10:31:58 71:23 | 10:35:24 74:7 | 10:38:35 76:17 |
| 10:25:56 67:4 | 10:29:06 69:14 | 10:32:02 71:24 | 10:35:27 74:8 | 10:38:38 76:18 |
| 10:25:58 67:5 | 10:29:09 69:15 | 10:32:03 71:25 | 10:35:31 74:9 | 10:38:41 76:19 |
| 10:26:00 67:6 | 10:29:13 69:16 | 10:32:05 72:1 | 10:35:32 74:10 | 10:38:44 76:20 |
| 10:26:01 67:7 | 10:29:14 69:17 | 10:32:10 72:2 | 10:35:38 74:11,12 | 10:38:52 76:21 |
| 10:26:05 67:8 | 10:29:17 69:18 | 10:32:15 72:3 | 10:35:44 74:13 | 10:38:56 76:22 |
| 10:26:06 67:9,10 | 10:29:20 69:19 | 10:32:17 72:4 | 10:35:48 74:14 | 10:38:59 76:23 |
| 10:26:08 67:11 | 10:29:24 69:20 | 10:32:20 72:5 | 10:35:49 74:15 | 10:39:00 76:24,25 |
| 10:26:33 67:12 | 10:29:27 69:21 | 10:32:22 72:6 | 10:35:53 74:16 | 10:39:04 77:1,2 |
| 10:26:38 67:13,14 | 10:29:28 69:22,23 | 10:32:25 72:7 | 10:35:55 74:17 | 10:39:07 77:3,4 |
| 10:26:39 67:15 | 10:29:29 69:24 | 10:32:32 72:8 | 10:35:58 74:18 | 10:39:11 77:5 |
| 10:26:41 67:16 | 10:29:30 69:25 | 10:32:34 72:9 | 10:35:59 74:19,20 | 10:39:14 77:6 |
| 10:26:43 67:17,18 | 10:29:32 70:1 | 10:32:37 72:10 | 10:36:03 74:21,22 | 10:39:16 77:7 |
| 10:26:45 67:19 | 10:29:33 70:2 | 10:32:39 72:11 | 10:36:06 74:23 | 10:39:19 77:8 |
| 10:26:47 67:20 | 10:29:35 70:3 | 10:32:43 72:12 | 10:36:07 74:24,25 | 10:39:30 77:9 |
| 10:26:51 67:21 | 10:29:37 70:4 | 10:32:47 72:13 | 10:36:09 75:1 | 10:39:36 77:10 |
| 10:26:52 67:22 | 10:29:39 70:5 | 10:32:50 72:14 | 10:36:10 75:2 | 10:39:37 77:11 |
| 10:26:58 67:23 | 10:29:40 70:6 | 10:32:52 72:15 | 10:36:13 75:3 | 10:39:39 77:12,13 |
| 10:26:59 67:24 | 10:30:00 70:7 | 10:32:58 72:16 | 10:36:14 75:4 | 10:39:45 77:14 |
| 10:27:02 67:25 | 10:30:02 70:8 | 10:33:01 72:17 | 10:36:22 75:5 | 10:39:48 77:15 |
| 10:27:07 68:1 | 10:30:10 70:9 | 10:33:06 72:18 | 10:36:27 75:6 | 10:39:51 77:16 |
| 10:27:09 68:2 | 10:30:14 70:10 | 10:33:10 72:19 | 10:36:31 75:7 | 10:39:54 77:17 |
| 10:27:11 68:3 | 10:30:17 70:11 | 10:33:14 72:20 | 10:36:33 75:8 | 10:39:59 77:18 |
| 10:27:15 68:4 | 10:30:24 70:12 | 10:33:17 72:21 | 10:36:35 75:9 | 10:40 79:12 |
| 10:27:18 68:5 | 10:30:26 70:13 | 10:33:19 72:22 | 10:36:37 75:10 | 10:40:00 77:19 |
| 10:27:19 68:6 | 10:30:29 70:14 | 10:33:20 72:23 | 10:36:39 75:11 | 10:40:04 77:20 |
| 10:27:22 68:7 | 10:30:31 70:15 | 10:33:27 72:24 | 10:36:52 75:12 | 10:40:08 77:21 |
| 10:27:23 68:8 | 10:30:33 70:16 | 10:33:30 72:25 | 10:36:54 75:13 | 10:40:09 77:22 |
| 10:27:28 68:9,10 | 10:30:35 70:17 | 10:33:31 73:1,2 | 10:37:03 75:14 | 10:40:14 77:23 |
| 10:27:30 68:11 | 10:30:36 70:18 | 10:33:33 73:3,4 | 10:37:08 75:15 | 10:40:21 77:24 |
| 10:27:33 68:12 | 10:30:38 70:19,20 | 10:33:41 73:5 | 10:37:10 75:16 | 10:40:24 77:25 |
| 10:27:35 68:13 | 10:30:41 70:21,22 | 10:33:43 73:6 | 10:37:12 75:17 | 10:40:40 78:1,2 |
| 10:27:36 68:14 | 10:30:42 70:23 | 10:33:45 73:7 | 10:37:17 75:18 | 10:40:42 78:3 |
| 10:27:37 68:15 | 10:30:44 70:24 | 10:33:48 73:8 | 10:37:19 75:19 | 10:40:46 78:4 |
| 10:27:41 68:16 | 10:30:46 70:25 | 10:33:54 73:9 | 10:37:23 75:20 | 10:40:49 78:5 |
| 10:27:48 68:17 | 10:30:49 71:1 | 10:33:55 73:10 | 10:37:25 75:21 | 10:40:50 78:6 |
| 10:27:57 68:18 | 10:30:50 71:2 | 10:33:58 73:11,12 | 10:37:28 75:22 | 10:40:52 78:7 |
| 10:28:00 68:19 | 10:30:56 71:3 | 10:34:01 73:13 | 10:37:29 75:23 | 10:40:55 78:8 |
| 10:28:02 68:20 | 10:31:01 71:4 | 10:34:03 73:14 | 10:37:30 75:24 | 10:40:56 78:9 |
| 10:28:03 68:21 | 10:31:04 71:5 | 10:34:05 73:15 | 10:37:31 75:25 | 10:40:57 78:10 |
| 28:06 68:22 | 10:31:07 71:6 | 10:34:08 73:16 | 10:37:32 76:1 | 10:41 79:16 |
| 28:08 68:23 | 10:31:09 71:7 | 10:34:13 73:17 | 10:37:35 76:2 | 10:41:00 78:11 |

280

| | | | | |
|---|---|---|---|---|
| **10:41:02** 78:12 | **10:44:11** 80:24 | **10:47:10** 83:13 | **10:50:42** 85:21 | **10:53:04** 88:9 |
| **10:41:03** 78:13,14 | **10:44:17** 80:25 | **10:47:13** 83:14 | **10:50:43** 85:22 | **10:53:08** 88:10 |
| **10:41:04** 78:15,16 | **10:44:22** 81:1 | **10:47:15** 83:15 | **10:50:45** 85:23 | **10:53:11** 88:11 |
| **10:41:07** 78:17 | **10:44:23** 81:5,6 | **10:47:19** 83:16 | **10:50:46** 85:24 | **10:53:12** 88:12 |
| **10:41:09** 78:18,19 | **10:44:26** 81:7,8 | **10:47:21** 83:17 | **10:50:48** 85:25 | **10:53:15** 88:13 |
| **10:41:11** 78:20,21 | **10:44:29** 81:9 | **10:47:24** 83:18 | **10:50:50** 86:1 | **10:53:18** 88:14 |
| **10:41:12** 78:22 | **10:44:31** 81:10,11 | **10:47:30** 83:19 | **10:50:52** 86:2 | **10:53:20** 88:15 |
| **10:41:15** 78:23 | **10:44:33** 81:12 | **10:47:33** 83:20 | **10:50:55** 86:3 | **10:53:21** 88:16 |
| **10:41:24** 78:24 | **10:44:36** 81:13 | **10:47:35** 83:21 | **10:50:59** 86:4 | **10:53:25** 88:17 |
| **10:41:26** 78:25 | **10:44:40** 81:14 | **10:47:37** 83:22 | **10:51:01** 86:5 | **10:53:28** 88:18 |
| **10:41:29** 79:1 | **10:44:43** 81:15 | **10:47:41** 83:23 | **10:51:03** 86:6,7 | **10:53:29** 88:19 |
| **10:41:34** 79:2 | **10:44:45** 81:16 | **10:47:44** 83:24 | **10:51:10** 86:8 | **10:53:32** 88:20 |
| **10:41:35** 79:3 | **10:44:47** 81:17 | **10:47:46** 83:25 | **10:51:11** 86:9 | **10:53:39** 88:21 |
| **10:41:38** 79:4 | **10:44:50** 81:18 | **10:47:47** 84:1 | **10:51:15** 86:10 | **10:53:42** 88:22 |
| **10:41:39** 79:5 | **10:44:52** 81:19 | **10:47:50** 84:2 | **10:51:16** 86:11 | **10:53:45** 88:23,24 |
| **10:41:41** 79:6 | **10:44:54** 81:20 | **10:47:53** 84:3 | **10:51:18** 86:12 | **10:53:48** 88:25 |
| **10:41:44** 79:7 | **10:44:56** 81:21 | **10:47:56** 84:4 | **10:51:19** 86:13,14 | **10:53:49** 89:1 |
| **10:41:46** 79:8 | **10:45:00** 81:22 | **10:47:59** 84:5 | **10:51:22** 86:15 | **10:53:53** 89:2 |
| **10:41:57** 79:9 | **10:45:04** 81:23 | **10:48:03** 84:6 | **10:51:25** 86:16 | **10:53:56** 89:3 |
| **10:41:58** 79:10 | **10:45:07** 81:24 | **10:48:09** 84:7 | **10:51:27** 86:17,18 | **10:53:59** 89:4 |
| **10:42:00** 79:11 | **10:45:09** 81:25 | **10:48:13** 84:8 | **10:51:29** 86:19 | **10:54:05** 89:5 |
| **10:42:01** 79:12 | **10:45:11** 82:1 | **10:48:18** 84:9 | **10:51:31** 86:20 | **10:54:07** 89:6 |
| **10:42:05** 79:13 | **10:45:17** 82:2 | **10:48:24** 84:10 | **10:51:32** 86:21 | **10:54:09** 89:7 |
| **10:42:08** 79:14 | **10:45:24** 82:3 | **10:48:27** 84:11 | **10:51:34** 86:22 | **10:54:11** 89:8 |
| **10:42:14** 79:15 | **10:45:27** 82:4 | **10:48:55** 84:12 | **10:51:39** 86:23 | **10:54:15** 89:9 |
| **10:42:30** 79:16 | **10:45:30** 82:5 | **10:48:59** 84:13 | **10:51:44** 86:24 | **10:54:28** 89:10 |
| **10:42:36** 79:17 | **10:45:32** 82:6 | **10:49:03** 84:14 | **10:51:46** 86:25 | **10:54:31** 89:12 |
| **10:42:39** 79:18 | **10:45:35** 82:7 | **10:49:05** 84:15 | **10:51:49** 87:1 | **10:54:33** 89:13 |
| **10:42:42** 79:19 | **10:45:38** 82:8 | **10:49:07** 84:16 | **10:51:53** 87:2 | **10:54:38** 89:14 |
| **10:42:44** 79:20 | **10:45:41** 82:9 | **10:49:11** 84:17 | **10:51:56** 87:3 | **10:54:41** 89:15 |
| **10:42:47** 79:21 | **10:45:43** 82:10 | **10:49:12** 84:18 | **10:51:58** 87:4 | **10:54:45** 89:16 |
| **10:42:48** 79:22 | **10:45:44** 82:11 | **10:49:15** 84:19 | **10:52:00** 87:5 | **10:54:47** 89:17 |
| **10:42:51** 79:23 | **10:45:55** 82:12 | **10:49:17** 84:20 | **10:52:03** 87:6,7 | **10:54:52** 89:18 |
| **10:42:53** 79:24 | **10:45:57** 82:13 | **10:49:21** 84:21 | **10:52:04** 87:8 | **10:54:53** 89:19 |
| **10:42:59** 79:25 | **10:46:01** 82:14,15 | **10:49:24** 84:22 | **10:52:07** 87:9 | **10:54:55** 89:20 |
| **10:43:08** 80:1 | **10:46:03** 82:16 | **10:49:31** 84:23 | **10:52:10** 87:10 | **10:55:00** 89:21 |
| **10:43:11** 80:2 | **10:46:05** 82:17 | **10:49:34** 84:24 | **10:52:16** 87:11 | **10:55:03** 89:22 |
| **10:43:12** 80:3 | **10:46:06** 82:18 | **10:49:43** 84:25 | **10:52:17** 87:12,13 | **10:55:05** 89:23 |
| **10:43:14** 80:4 | **10:46:09** 82:19 | **10:49:44** 85:1 | **10:52:19** 87:14 | **10:55:06** 89:24 |
| **10:43:16** 80:5 | **10:46:14** 82:20 | **10:49:45** 85:2 | **10:52:21** 87:15 | **10:55:12** 89:25 |
| **10:43:18** 80:6,7 | **10:46:16** 82:21 | **10:49:51** 85:3 | **10:52:22** 87:16,17 | **10:55:14** 90:1 |
| **10:43:19** 80:8 | **10:46:21** 82:22 | **10:49:53** 85:4 | **10:52:25** 87:18 | **10:55:19** 90:2 |
| **10:43:23** 80:9 | **10:46:25** 82:23 | **10:49:55** 85:5 | **10:52:27** 87:19 | **10:55:24** 90:3 |
| **10:43:24** 80:10 | **10:46:31** 82:24 | **10:50:00** 85:6 | **10:52:32** 87:20 | **10:55:27** 90:4 |
| **10:43:30** 80:11 | **10:46:35** 82:25 | **10:50:03** 85:7 | **10:52:35** 87:21 | **10:55:31** 90:5 |
| **10:43:34** 80:12 | **10:46:37** 83:1 | **10:50:08** 85:8 | **10:52:37** 87:22 | **10:55:35** 90:6 |
| **10:43:39** 80:13 | **10:46:41** 83:2 | **10:50:14** 85:9 | **10:52:41** 87:23 | **10:55:36** 90:7 |
| **10:43:43** 80:14 | **10:46:45** 83:3 | **10:50:18** 85:10 | **10:52:43** 87:24 | **10:55:40** 90:8,9 |
| **10:43:45** 80:15 | **10:46:48** 83:4 | **10:50:21** 85:11 | **10:52:45** 87:25 | **10:55:47** 90:10 |
| **10:43:49** 80:16 | **10:46:51** 83:5 | **10:50:25** 85:12 | **10:52:48** 88:1,2 | **10:55:49** 90:11 |
| **10:43:51** 80:17 | **10:46:52** 83:6 | **10:50:27** 85:13 | **10:52:50** 88:3 | **10:55:53** 90:12 |
| **10:43:53** 80:18 | **10:46:54** 83:7,8 | **10:50:30** 85:14 | **10:52:51** 88:4 | **10:55:54** 90:13 |
| **10:43:59** 80:19 | **10:46:59** 83:9 | **10:50:32** 85:15 | **10:52:53** 88:5 | **10:55:55** 90:14 |
| **10:44:02** 80:20 | **10:47:02** 83:10 | **10:50:33** 85:16 | **10:52:55** 88:6 | **10:55:59** 90:15 |
| **10:44:03** 80:21,22 | **10:47:06** 83:11 | **10:50:38** 85:17,18,19 | **10:52:59** 88:7 | **10:56:02** 90:16 |
| **10:44:09** 80:23 | **10:47:07** 83:12 | **10:50:41** 85:20 | **10:53:01** 88:8 | **10:56:03** 90:17 |

| | | | | |
|---|---|---|---|---|
| 56:05 90:18 | 10:58:39 93:3 | 11:01:09 95:8 | 11:04:15 97:15 | 11:07:26 99:24 |
| 56:08 90:19 | 10:58:41 93:4 | 11:01:12 95:9 | 11:04:18 97:16 | 11:07:32 99:25 |
| 10:56:10 90:20 | 10:58:44 93:5,6 | 11:01:20 95:10 | 11:04:19 97:17 | 11:07:33 100:1 |
| 10:56:12 90:21 | 10:58:47 93:7 | 11:01:23 95:11 | 11:04:21 97:18 | 11:07:35 100:2 |
| 10:56:14 90:22 | 10:58:48 93:8 | 11:01:26 95:12 | 11:04:24 97:19 | 11:07:39 100:3 |
| 10:56:15 90:23 | 10:58:53 93:9 | 11:01:34 95:13 | 11:04:32 97:20 | 11:07:43 100:4 |
| 10:56:16 90:24 | 10:58:57 93:10 | 11:01:36 95:14 | 11:04:36 97:21 | 11:07:45 100:5 |
| 10:56:18 90:25 | 10:58:58 93:11 | 11:01:39 95:15 | 11:04:42 97:22 | 11:07:47 100:6 |
| 10:56:22 91:1 | 10:58:59 93:12 | 11:01:41 95:16 | 11:04:45 97:23 | 11:07:50 100:7 |
| 10:56:25 91:2 | 10:59:00 93:13 | 11:01:46 95:17 | 11:04:47 97:24 | 11:07:57 100:8 |
| 10:56:28 91:3 | 10:59:01 93:14 | 11:01:49 95:18 | 11:04:48 97:25 | 11:07:58 100:9 |
| 10:56:30 91:4 | 10:59:04 93:15 | 11:01:53 95:19 | 11:04:51 98:1,2 | 11:08:01 100:10,11 |
| 10:56:34 91:5 | 10:59:07 93:16 | 11:01:55 95:20 | 11:04:55 98:3 | 11:08:03 100:12 |
| 10:56:36 91:6 | 10:59:09 93:17 | 11:01:56 95:21 | 11:05:01 98:4 | 11:08:06 100:13 |
| 10:56:39 91:7 | 10:59:12 93:18,19 | 11:02:02 95:22 | 11:05:04 98:5 | 11:08:11 100:14 |
| 10:56:41 91:8 | 10:59:14 93:20 | 11:02:07 95:23 | 11:05:07 98:6,7 | 11:13 100:16 |
| 10:56:43 91:9 | 10:59:17 93:21 | 11:02:10 95:24 | 11:05:10 98:8 | 11:14:28 100:15 |
| 10:56:46 91:10 | 10:59:18 93:22 | 11:02:13 95:25 | 11:05:14 98:9 | 11:14:34 100:16 |
| 10:56:53 91:11 | 10:59:20 93:23 | 11:02:16 96:1 | 11:05:16 98:10 | 11:14:38 100:17 |
| 10:56:56 91:12 | 10:59:33 93:24 | 11:02:18 96:2 | 11:05:18 98:11 | 11:14:41 100:18 |
| 10:56:58 91:13 | 10:59:36 93:25 | 11:02:19 96:3 | 11:05:21 98:12 | 11:14:52 100:19 |
| 10:57:00 91:15 | 10:59:38 94:1 | 11:02:21 96:4 | 11:05:23 98:13 | 11:14:54 100:20 |
| 10:57:05 91:16 | 10:59:41 94:2 | 11:02:24 96:5 | 11:05:34 98:14 | 11:14:59 100:21,22 |
| 10:57:08 91:17 | 10:59:44 94:3 | 11:02:26 96:6 | 11:05:36 98:15 | 11:15:02 100:23 |
| 10:57:11 91:18 | 10:59:55 94:4 | 11:02:27 96:7 | 11:05:37 98:16,17,18 | 11:15:04 100:24 |
| 10:57:14 91:19 | 10:59:57 94:5 | 11:02:34 96:8 | 11:05:39 98:19 | 11:15:06 100:25 |
| 10:57:17 91:20 | 10:59:59 94:6 | 11:02:37 96:9,10 | 11:05:42 98:20 | 11:15:09 101:1 |
| 10:57:19 91:21 | 100 2:7 14:1,17 | 11:02:40 96:11 | 11:05:45 98:21 | 11:15:11 101:2,3 |
| 10:57:21 91:22 | 1059 117:6 | 11:02:43 96:12 | 11:05:50 98:22 | 11:15:13 101:4 |
| 10:57:25 91:23 | 11 4:7,9 | 11:02:50 96:13 | 11:05:52 98:23 | 11:15:16 101:5 |
| 10:57:26 91:24 | 11th 137:8 | 11:02:55 96:14 | 11:05:56 98:24 | 11:15:22 101:6 |
| 10:57:29 91:25 | 11:00:01 94:7 | 11:02:56 96:15 | 11:06 100:12 | 11:15:23 101:7 |
| 10:57:31 92:1 | 11:00:04 94:8 | 11:02:59 96:16 | 11:06:01 98:25 | 11:15:24 101:8 |
| 10:57:32 92:2 | 11:00:07 94:9 | 11:03:02 96:17 | 11:06:13 99:1 | 11:15:28 101:9 |
| 10:57:35 92:3 | 11:00:08 94:10 | 11:03:03 96:18 | 11:06:14 99:2 | 11:15:31 101:10 |
| 10:57:38 92:4 | 11:00:11 94:11 | 11:03:05 96:19 | 11:06:17 99:3 | 11:15:44 101:11 |
| 10:57:40 92:5 | 11:00:12 94:12 | 11:03:15 96:20 | 11:06:18 99:4 | 11:15:48 101:12,13 |
| 10:57:44 92:6 | 11:00:18 94:13 | 11:03:19 96:21 | 11:06:20 99:5 | 11:15:50 101:14 |
| 10:57:48 92:7 | 11:00:21 94:14 | 11:03:20 96:22 | 11:06:22 99:6 | 11:15:52 101:15 |
| 10:57:50 92:8 | 11:00:23 94:15 | 11:03:22 96:23 | 11:06:26 99:7 | 11:15:54 101:16 |
| 10:57:52 92:9 | 11:00:27 94:16 | 11:03:26 96:24 | 11:06:29 99:8 | 11:15:57 101:17 |
| 10:57:55 92:10,11 | 11:00:33 94:17 | 11:03:29 96:25 | 11:06:33 99:9 | 11:15:59 101:18 |
| 10:57:59 92:12 | 11:00:36 94:18 | 11:03:31 97:1 | 11:06:35 99:10 | 11:16:06 101:19 |
| 10:58:04 92:13 | 11:00:39 94:19 | 11:03:38 97:2 | 11:06:44 99:11 | 11:16:09 101:20 |
| 10:58:06 92:14 | 11:00:41 94:20 | 11:03:40 97:3 | 11:06:51 99:12 | 11:16:20 101:21 |
| 10:58:08 92:15 | 11:00:46 94:21 | 11:03:43 97:4 | 11:06:53 99:13 | 11:16:21 101:22 |
| 10:58:10 92:16 | 11:00:51 94:22 | 11:03:46 97:5 | 11:06:56 99:14 | 11:16:22 101:23 |
| 10:58:14 92:17 | 11:00:52 94:23 | 11:03:47 97:6 | 11:06:58 99:15 | 11:16:25 101:24 |
| 10:58:16 92:18 | 11:00:53 94:24 | 11:03:50 97:7 | 11:07:00 99:16 | 11:16:28 101:25 |
| 10:58:18 92:19 | 11:00:54 94:25 | 11:03:52 97:8 | 11:07:03 99:17 | 11:16:29 102:1 |
| 10:58:23 92:20 | 11:00:57 95:1 | 11:03:54 97:9 | 11:07:05 99:18 | 11:16:31 102:2 |
| 10:58:30 92:22 | 11:00:59 95:2 | 11:03:59 97:10 | 11:07:08 99:19 | 11:16:33 102:3 |
| 10:58:31 92:23 | 11:01:01 95:3 | 11:04:01 97:11 | 11:07:14 99:20 | 11:16:35 102:4 |
| 10:58:33 92:24 | 11:01:04 95:4 | 11:04:03 97:12 | 11:07:17 99:21 | 11:16:38 102:5 |
| 10:58:36 92:25 | 11:01:05 95:5 | 11:04:08 97:13 | 11:07:21 99:22 | 11:16:40 102:6 |
| 10:58:38 93:1,2 | 11:01:07 95:6,7 | 11:04:12 97:14 | 11:07:23 99:23 | 11:16:42 102:7 |

| | | | | |
|---|---|---|---|---|
| 11:16:50 102:8 | 11:20:04 104:15 | 11:23:07 106:25 | 11:26:07 109:8 | 11:29:22 111:19,20 |
| 11:16:57 102:9 | 11:20:06 104:16 | 11:23:09 107:1 | 11:26:11 109:9 | 11:29:26 111:21 |
| 11:16:58 102:10 | 11:20:10 104:17 | 11:23:13 107:2 | 11:26:14 109:10 | 11:29:28 111:22 |
| 11:17:01 102:11,12 | 11:20:12 104:18 | 11:23:15 107:3 | 11:26:17 109:11 | 11:29:35 111:23 |
| 11:17:04 102:13 | 11:20:16 104:19 | 11:23:17 107:4 | 11:26:20 109:12 | 11:29:41 111:24 |
| 11:17:07 102:14 | 11:20:17 104:20 | 11:23:20 107:5 | 11:26:21 109:13,14 | 11:29:46 111:25 |
| 11:17:11 102:15 | 11:20:22 104:21 | 11:23:23 107:6 | 11:26:25 109:15 | 11:29:54 112:1 |
| 11:17:14 102:16 | 11:20:27 104:22 | 11:23:27 107:7 | 11:26:28 109:16 | 11:29:58 112:2,3 |
| 11:17:18 102:17 | 11:20:32 104:23,24,25 | 11:23:41 107:8 | 11:26:46 109:17 | 11:30:03 112:4 |
| 11:17:20 102:18 | 11:20:35 105:1 | 11:23:44 107:9 | 11:26:47 109:18,19 | 11:30:08 112:5,6 |
| 11:17:24 102:19 | 11:20:37 105:2 | 11:23:46 107:10 | 11:26:48 109:20 | 11:30:10 112:7 |
| 11:17:30 102:20 | 11:20:40 105:3 | 11:23:50 107:11 | 11:26:52 109:21 | 11:30:11 112:8 |
| 11:17:34 102:21 | 11:20:44 105:4 | 11:23:54 107:12 | 11:26:55 109:22 | 11:30:12 112:9 |
| 11:17:36 102:22 | 11:20:45 105:5 | 11:23:56 107:13 | 11:27:01 109:23 | 11:30:13 112:10 |
| 11:17:39 102:23 | 11:20:47 105:6 | 11:23:59 107:14 | 11:27:04 109:24 | 11:30:15 112:11 |
| 11:17:43 102:24 | 11:20:49 105:7 | 11:24:02 107:15 | 11:27:08 109:25 | 11:30:20 112:12 |
| 11:17:47 102:25 | 11:20:51 105:8 | 11:24:03 107:16 | 11:27:09 110:1 | 11:30:29 112:13,14 |
| 11:17:50 103:1 | 11:20:54 105:9 | 11:24:05 107:17 | 11:27:13 110:2 | 11:30:30 112:15 |
| 11:17:53 103:2 | 11:21:00 105:10 | 11:24:07 107:18,19 | 11:27:16 110:3 | 11:30:33 112:16,17 |
| 11:17:56 103:3 | 11:21:10 105:11 | 11:24:09 107:20 | 11:27:17 110:4 | 11:30:35 112:18 |
| 11:17:59 103:4 | 11:21:12 105:12 | 11:24:11 107:21 | 11:27:20 110:5 | 11:30:37 112:19 |
| 11:18:01 103:5 | 11:21:13 105:13 | 11:24:13 107:22 | 11:27:23 110:6 | 11:30:38 112:20,21 |
| 11:18:04 103:6 | 11:21:19 105:14 | 11:24:15 107:23 | 11:27:32 110:7 | 11:30:40 112:22 |
| 11:18:05 103:7 | 11:21:22 105:15 | 11:24:16 107:24 | 11:27:39 110:8 | 11:30:46 112:23 |
| 11:18:09 103:8 | 11:21:25 105:16 | 11:24:22 107:25 | 11:27:42 110:9 | 11:30:50 112:24 |
| 11:18:10 103:9 | 11:21:28 105:18 | 11:24:24 108:1 | 11:27:45 110:10 | 11:30:57 112:25 |
| 11:18:12 103:10 | 11:21:29 105:19 | 11:24:27 108:2 | 11:27:49 110:11 | 11:31:00 113:1 |
| 11:18:15 103:11 | 11:21:32 105:20 | 11:24:31 108:3 | 11:27:52 110:12 | 11:31:02 113:2,3 |
| 11:18:21 103:12 | 11:21:36 105:21 | 11:24:37 108:4 | 11:27:58 110:13 | 11:31:05 113:4 |
| 11:18:24 103:13 | 11:21:39 105:22 | 11:24:38 108:5 | 11:28:02 110:14 | 11:31:07 113:5 |
| 11:18:28 103:14 | 11:21:42 105:23 | 11:24:43 108:6 | 11:28:05 110:15 | 11:31:11 113:6 |
| 11:18:30 103:15 | 11:21:44 105:24 | 11:24:47 108:7 | 11:28:07 110:16 | 11:31:15 113:7 |
| 11:18:33 103:16 | 11:21:46 105:25 | 11:24:52 108:8 | 11:28:09 110:17 | 11:31:19 113:8 |
| 11:18:34 103:17 | 11:21:48 106:1 | 11:24:55 108:9 | 11:28:13 110:18 | 11:31:31 113:9 |
| 11:18:36 103:18 | 11:21:53 106:2 | 11:24:57 108:11 | 11:28:16 110:19 | 11:31:33 113:10 |
| 11:18:40 103:19 | 11:22:00 106:3 | 11:24:59 108:12 | 11:28:19 110:20 | 11:31:35 113:11,12 |
| 11:18:45 103:20 | 11:22:02 106:4 | 11:25:03 108:13 | 11:28:25 110:21 | 11:31:39 113:13 |
| 11:18:47 103:21 | 11:22:04 106:5 | 11:25:05 108:14 | 11:28:28 110:23 | 11:31:42 113:14 |
| 11:18:48 103:22 | 11:22:05 106:6 | 11:25:07 108:15 | 11:28:30 110:24,25 | 11:31:45 113:15 |
| 11:18:51 103:23 | 11:22:13 106:7 | 11:25:11 108:16 | 11:28:32 111:1 | 11:31:48 113:16 |
| 11:18:54 103:24 | 11:22:16 106:8 | 11:25:16 108:17 | 11:28:34 111:2,3 | 11:31:50 113:17 |
| 11:18:56 103:25 | 11:22:20 106:9 | 11:25:17 108:18 | 11:28:37 111:4 | 11:31:56 113:18 |
| 11:18:58 104:1 | 11:22:22 106:10 | 11:25:20 108:19 | 11:28:41 111:5 | 11:32:06 113:19 |
| 11:19:22 104:2 | 11:22:25 106:11 | 11:25:21 108:20 | 11:28:43 111:6 | 11:32:10 113:20 |
| 11:19:25 104:3 | 11:22:27 106:12 | 11:25:24 108:21 | 11:28:45 111:7 | 11:32:19 113:21 |
| 11:19:26 104:4 | 11:22:32 106:13 | 11:25:29 108:22 | 11:28:47 111:8 | 11:32:21 113:22 |
| 11:19:27 104:5 | 11:22:35 106:14 | 11:25:34 108:23 | 11:28:48 111:9 | 11:32:25 113:23 |
| 11:19:31 104:6 | 11:22:41 106:15 | 11:25:37 108:24 | 11:28:49 111:10 | 11:32:31 113:24 |
| 11:19:35 104:7 | 11:22:42 106:16 | 11:25:39 108:25 | 11:28:54 111:11 | 11:32:32 113:25 |
| 11:19:39 104:8 | 11:22:44 106:17 | 11:25:42 109:1 | 11:28:58 111:12 | 11:32:39 114:1 |
| 11:19:45 104:9 | 11:22:47 106:18 | 11:25:49 109:2 | 11:29:03 111:13 | 11:32:45 114:2 |
| 11:19:47 104:10 | 11:22:49 106:19 | 11:25:52 109:3 | 11:29:07 111:14 | 11:32:48 114:3 |
| 11:19:52 104:11 | 11:22:51 106:20 | 11:25:56 109:4 | 11:29:10 111:15 | 11:32:52 114:4 |
| 11:19:55 104:12 | 11:22:54 106:21 | 11:25:59 109:5 | 11:29:14 111:16 | 11:32:54 114:5 |
| 11:19:57 104:13 | 11:23:01 106:22,23 | 11:26:02 109:6 | 11:29:15 111:17 | 11:32:59 114:6 |
| 11:20:02 104:14 | 11:23:02 106:24 | 11:26:05 109:7 | 11:29:20 111:18 | 11:33:01 114:7 |

| | | | | |
|---|---|---|---|---|
| 11:33:04 114:8 | 11:35:31 116:19 | 11:39:34 119:7 | 11:43:14 121:20 | 11:46:15 124:5 |
| 11:33:07 114:9 | 11:35:34 116:20 | 11:39:35 119:8 | 11:43:16 121:21 | 11:46:16 124:6 |
| 11:33:08 114:10 | 11:35:38 116:21 | 11:39:38 119:9 | 11:43:19 121:22 | 11:46:18 124:7 |
| 11:33:09 114:11 | 11:35:40 116:22 | 11:39:41 119:10 | 11:43:22 121:23 | 11:46:23 124:8 |
| 11:33:11 114:12 | 11:35:42 116:23 | 11:39:43 119:11,12 | 11:43:25 121:24 | 11:46:24 124:9 |
| 11:33:13 114:13 | 11:35:45 116:24 | 11:39:47 119:13 | 11:43:27 121:25 | 11:46:27 124:11 |
| 11:33:19 114:14 | 11:35:48 116:25 | 11:39:49 119:14 | 11:43:28 122:1 | 11:46:30 124:12 |
| 11:33:21 114:15 | 11:35:50 117:1,2 | 11:39:51 119:15 | 11:43:30 122:2,3 | 11:46:31 124:13 |
| 11:33:24 114:16 | 11:35:55 117:3 | 11:39:54 119:16 | 11:43:31 122:4 | 11:46:33 124:14 |
| 11:33:28 114:17 | 11:36:17 117:4 | 11:39:55 119:17 | 11:43:35 122:5 | 11:46:36 124:15 |
| 11:33:30 114:18 | 11:36:22 117:5 | 11:39:56 119:18 | 11:43:37 122:6 | 11:46:38 124:16 |
| 11:33:33 114:19 | 11:36:28 117:6 | 11:39:59 119:19 | 11:43:43 122:7 | 11:46:40 124:17 |
| 11:33:36 114:20 | 11:36:56 117:10,11 | 11:40:03 119:20 | 11:43:45 122:8 | 11:46:41 124:18 |
| 11:33:38 114:21 | 11:37:05 117:12 | 11:40:10 119:21 | 11:43:46 122:9,10 | 11:46:46 124:19 |
| 11:33:41 114:22 | 11:37:07 117:13 | 11:40:12 119:22 | 11:43:48 122:11 | 11:46:47 124:20 |
| 11:33:44 114:23 | 11:37:10 117:14 | 11:40:15 119:23 | 11:43:51 122:12 | 11:46:50 124:21 |
| 11:33:47 114:24 | 11:37:13 117:15 | 11:40:22 119:24 | 11:43:55 122:13 | 11:46:51 124:22 |
| 11:33:52 114:25 | 11:37:15 117:16 | 11:40:25 119:25 | 11:43:57 122:14 | 11:46:54 124:23 |
| 11:33:54 115:1 | 11:37:17 117:17 | 11:40:31 120:1 | 11:44:02 122:15 | 11:46:55 124:24 |
| 11:33:57 115:2 | 11:37:20 117:18 | 11:40:34 120:2 | 11:44:03 122:16 | 11:47:00 124:25 |
| 11:33:59 115:3 | 11:37:23 117:19 | 11:40:35 120:3 | 11:44:06 122:17 | 11:47:28 125:4,5 |
| 11:34:00 115:4 | 11:37:27 117:20 | 11:40:38 120:4 | 11:44:07 122:18 | 11:47:31 125:6 |
| 11:34:01 115:5 | 11:37:32 117:21 | 11:40:44 120:5 | 11:44:09 122:19 | 11:47:41 125:7 |
| 11:34:04 115:6 | 11:37:34 117:22 | 11:40:47 120:6 | 11:44:14 122:20 | 11:47:45 125:8 |
| 11:34:05 115:7 | 11:37:38 117:23 | 11:40:54 120:7 | 11:44:15 122:21 | 11:47:48 125:9 |
| 11:34:07 115:8 | 11:37:41 117:24 | 11:40:56 120:8 | 11:44:17 122:22 | 11:47:49 125:10 |
| 11:34:08 115:9 | 11:37:43 117:25 | 11:41:04 120:9 | 11:44:19 122:23 | 11:47:51 125:11 |
| 11:34:11 115:10 | 11:37:44 118:1 | 11:41:32 120:12,13,14 | 11:44:23 122:24 | 11:47:57 125:12 |
| 11:34:14 115:11,12 | 11:37:48 118:2 | 11:41:35 120:15,16 | 11:44:25 122:25 | 11:48:01 125:13 |
| 11:34:17 115:13 | 11:37:50 118:3 | 11:41:36 120:17 | 11:44:26 123:1 | 11:48:04 125:14 |
| 11:34:21 115:14 | 11:37:52 118:4 | 11:41:37 120:18 | 11:44:28 123:2 | 11:48:05 125:15 |
| 11:34:24 115:15 | 11:37:53 118:5 | 11:41:38 120:19 | 11:44:31 123:3 | 11:48:07 125:16 |
| 11:34:26 115:16 | 11:37:56 118:6 | 11:41:43 120:20 | 11:44:34 123:4,5 | 11:48:11 125:17 |
| 11:34:30 115:17 | 11:38:00 118:7 | 11:41:45 120:21 | 11:44:41 123:6 | 11:48:13 125:18 |
| 11:34:32 115:21 | 11:38:01 118:8 | 11:41:48 120:23 | 11:44:44 123:7 | 11:48:16 125:19 |
| 11:34:34 115:22 | 11:38:03 118:9,10 | 11:41:52 120:24 | 11:44:47 123:8 | 11:48:17 125:20 |
| 11:34:36 115:23 | 11:38:04 118:11 | 11:41:53 120:25 | 11:45:13 123:9 | 11:48:21 125:21 |
| 11:34:40 115:24 | 11:38:06 118:12,13 | 11:41:54 121:1 | 11:45:14 123:11 | 11:48:22 125:22 |
| 11:34:42 115:25 | 11:38:09 118:14 | 11:42:01 121:2 | 11:45:16 123:12 | 11:48:23 125:23 |
| 11:34:44 116:1 | 11:38:10 118:15 | 11:42:04 121:3 | 11:45:18 123:13 | 11:48:26 125:24 |
| 11:34:46 116:2 | 11:38:33 118:16 | 11:42:05 121:4 | 11:45:21 123:14 | 11:48:27 125:25 126:1 |
| 11:34:50 116:3,4 | 11:38:36 118:17 | 11:42:10 121:5 | 11:45:23 123:15 | 11:48:30 126:2 |
| 11:34:52 116:5 | 11:38:40 118:18 | 11:42:11 121:6 | 11:45:25 123:16 | 11:48:35 126:3 |
| 11:34:56 116:6 | 11:38:49 118:19 | 11:42:14 121:7 | 11:45:27 123:17 | 11:48:42 126:4 |
| 11:34:58 116:7 | 11:38:52 118:20 | 11:42:15 121:8 | 11:45:31 123:18 | 11:48:44 126:5 |
| 11:35:00 116:8 | 11:38:57 118:21 | 11:42:16 121:9 | 11:45:33 123:19 | 11:48:45 126:6 |
| 11:35:03 116:9 | 11:39:00 118:22 | 11:42:20 121:10 | 11:45:40 123:20 | 11:48:49 126:7 |
| 11:35:05 116:10 | 11:39:03 118:23 | 11:42:35 121:11 | 11:45:45 123:21 | 11:48:52 126:8 |
| 11:35:08 116:11 | 11:39:08 118:24 | 11:42:38 121:12 | 11:45:48 123:22 | 11:48:53 126:9 |
| 11:35:11 116:12 | 11:39:11 118:25 | 11:42:50 121:13 | 11:45:54 123:23 | 11:48:56 126:10 |
| 11:35:13 116:13 | 11:39:14 119:1 | 11:42:52 121:14 | 11:45:57 123:24 | 11:48:57 126:12 |
| 11:35:16 116:14 | 11:39:18 119:2 | 11:42:57 121:15 | 11:45:59 123:25 | 11:49:01 126:13 |
| 11:35:19 116:15 | 11:39:20 119:3 | 11:42:59 121:16 | 11:46:02 124:1 | 11:49:05 126:14 |
| 11:35:20 116:16 | 11:39:25 119:4 | 11:43:02 121:17 | 11:46:05 124:2 | 11:49:08 126:15 |
| 11:35:22 116:17 | 11:39:30 119:5 | 11:43:04 121:18 | 11:46:08 124:3 | 11:49:12 126:16 |
| 11:35:27 116:18 | 11:39:31 119:6 | 11:43:10 121:19 | 11:46:12 124:4 | 11:49:13 126:17 |

| | | | | |
|---|---|---|---|---|
| 11:49:14 126:18 | 11:53:06 129:7,8 | 11:56:01 131:19,20 | 11:59:16 134:6,7 | 12:01:36 136:13 |
| 11:49:15 126:19 | 11:53:08 129:9 | 11:56:05 131:21 | 11:59:19 134:8 | 12:01:41 136:14 |
| 11:49:16 126:20 | 11:53:09 129:10 | 11:56:08 131:22 | 11:59:27 134:9 | 12:01:45 136:15 |
| 11:49:17 126:21 | 11:53:12 129:11 | 11:56:13 131:23 | 11:59:28 134:10 | 12:01:48 136:16 |
| 11:49:21 126:22 | 11:53:14 129:12 | 11:56:17 131:24 | 11:59:33 134:11 | 12:01:50 136:17,18 |
| 11:49:24 126:23 | 11:53:24 129:13 | 11:56:19 131:25 | 11:59:35 134:12 | 12:01:51 136:19 |
| 11:49:29 126:24 | 11:53:31 129:14 | 11:56:22 132:1 | 11:59:39 134:13 | 12:01:55 136:20 |
| 11:49:31 126:25 127:1 | 11:53:46 129:16,17 | 11:56:24 132:2 | 11:59:41 134:14 | 12:01:58 136:21 |
| 11:49:34 127:2 | 11:53:49 129:18 | 11:56:26 132:3 | 11:59:44 134:15,16 | 12:02:00 136:22 |
| 11:49:37 127:3,4 | 11:53:53 129:19 | 11:56:33 132:4 | 11:59:47 134:17 | 12:02:21 136:23,24 |
| 11:49:40 127:5 | 11:54:03 129:20 | 11:56:35 132:5 | 11:59:49 134:18 | 12:02:24 136:25 |
| 11:49:41 127:6 | 11:54:06 129:21 | 11:56:38 132:6 | 11:59:55 134:19 | 12:02:26 137:1 |
| 11:49:43 127:7 | 11:54:08 129:22 | 11:56:39 132:7 | 11:59:58 134:20 | 12:02:30 137:2 |
| 11:49:45 127:8 | 11:54:11 129:23 | 11:56:41 132:8 | 11:59:59 134:21 | 12:02:33 137:3 |
| 11:49:49 127:9 | 11:54:14 129:24 | 11:56:46 132:9 | 1110 193:23 | 12:02:35 137:4 |
| 11:49:50 127:10 | 11:54:18 129:25 | 11:56:50 132:10 | 1131 198:4 | 12:02:39 137:5,6 |
| 11:49:52 127:11,12 | 11:54:20 130:1 | 11:56:51 132:11 | 117 4:11 | 12:02:50 137:7 |
| 11:49:53 127:13 | 11:54:23 130:2 | 11:56:53 132:12 | 12 143:16 144:5,9 | 12:02:53 137:8 |
| 11:50:01 127:14 | 11:54:26 130:3,4 | 11:56:56 132:13 | 216:1,10 | 12:02:56 137:10,11 |
| 11:50:05 127:15 | 11:54:28 130:5 | 11:56:58 132:14 | 12/13/2000 209:13 | 12:02:57 137:12 |
| 11:50:07 127:16 | 11:54:30 130:6 | 11:57:01 132:15 | 12:00:00 134:22 | 12:03:01 137:13 |
| 11:50:09 127:17 | 11:54:32 130:7 | 11:57:05 132:16 | 12:00:02 134:23,24 | 12:03:03 137:14,15 |
| 11:50:13 127:18 | 11:54:33 130:8,9 | 11:57:06 132:17 | 12:00:04 134:25 | 12:03:07 137:16 |
| 11:50:15 127:19 | 11:54:36 130:10 | 11:57:07 132:18 | 12:00:06 135:1 | 12:03:10 137:17 |
| 11:50:20 127:20,21 | 11:54:39 130:11 | 11:57:11 132:19,20 | 12:00:10 135:2 | 12:03:12 137:18 |
| 11:50:21 127:22 | 11:54:41 130:12 | 11:57:24 132:21 | 12:00:12 135:3 | 12:03:24 137:19 |
| 11:50:24 127:23 | 11:54:43 130:13 | 11:57:28 132:22 | 12:00:14 135:4 | 12:03:26 137:20 |
| 11:50:29 127:24 | 11:54:44 130:14 | 11:57:31 132:23 | 12:00:16 135:5 | 12:03:29 137:21 |
| 11:50:35 127:25 | 11:54:45 130:15 | 11:57:35 132:24 | 12:00:19 135:6 | 12:03:31 137:22 |
| 11:50:41 128:1 | 11:54:49 130:16 | 11:57:39 132:25 | 12:00:21 135:7 | 12:03:33 137:23 |
| 11:50:43 128:2 | 11:54:54 130:17 | 11:57:41 133:1 | 12:00:23 135:8 | 12:03:36 137:24 |
| 11:50:46 128:3 | 11:54:57 130:18 | 11:57:43 133:2 | 12:00:26 135:9 | 12:03:37 137:25 138:1 |
| 11:50:49 128:4 | 11:54:59 130:19 | 11:57:46 133:3 | 12:00:29 135:10 | 12:03:39 138:2 |
| 11:50:52 128:5 | 11:55:02 130:20 | 11:57:49 133:4 | 12:00:32 135:11 | 12:03:43 138:3 |
| 11:50:54 128:6 | 11:55:09 130:21 | 11:57:53 133:5 | 12:00:33 135:12 | 12:03:45 138:4 |
| 11:50:56 128:7 | 11:55:11 130:22 | 11:57:56 133:6 | 12:00:35 135:13 | 12:03:47 138:5 |
| 11:50:58 128:8 | 11:55:15 130:23 | 11:57:58 133:7 | 12:00:37 135:14 | 12:03:48 138:6 |
| 11:51:12 128:9,10 | 11:55:18 130:24 | 11:57:59 133:8 | 12:00:39 135:15 | 12:03:51 138:7 |
| 11:51:18 128:11 | 11:55:21 130:25 | 11:58:01 133:9 | 12:00:40 135:16 | 12:03:53 138:8 |
| 11:51:24 128:12 | 11:55:24 131:1 | 11:58:04 133:10 | 12:00:46 135:17 | 12:03:54 138:9 |
| 11:51:54 128:14,15 | 11:55:26 131:2 | 11:58:07 133:11 | 12:00:48 135:18 | 12:03:55 138:10 |
| 11:52:04 128:16 | 11:55:28 131:3 | 11:58:10 133:12,13 | 12:00:51 135:19 | 12:04:00 138:11,12 |
| 11:52:07 128:17 | 11:55:32 131:4 | 11:58:12 133:14 | 12:00:52 135:20 | 12:04:04 138:13 |
| 11:52:08 128:18 | 11:55:33 131:5 | 11:58:15 133:15 | 12:00:53 135:21,22 | 12:04:10 138:14 |
| 11:52:19 128:19,20 | 11:55:38 131:6 | 11:58:18 133:16 | 12:00:57 135:23,24 | 12:04:15 138:15 |
| 11:52:21 128:21 | 11:55:41 131:7 | 11:58:20 133:17,18 | 12:00:59 135:25 136:1 | 12:04:24 138:16 |
| 11:52:36 128:22 | 11:55:44 131:8 | 11:58:24 133:19 | 12:01:01 136:2 | 12:04:31 138:17,18 |
| 11:52:38 128:23 | 11:55:45 131:9 | 11:58:26 133:20,21 | 12:01:07 136:3,4 | 12:04:32 138:19 |
| 11:52:40 128:24 | 11:55:47 131:10 | 11:58:28 133:22 | 12:01:11 136:5 | 12:04:36 138:20 |
| 11:52:41 128:25 | 11:55:49 131:11 | 11:58:29 133:23 | 12:01:12 136:6 | 12:05:10 138:23,24 |
| 11:52:46 129:1 | 11:55:50 131:12 | 11:58:30 133:24 | 12:01:16 136:7 | 12:05:13 138:25 |
| 11:52:49 129:2 | 11:55:54 131:13,14 | 11:58:34 133:25 | 12:01:23 136:8 | 12:05:21 139:1 |
| 11:52:52 129:3 | 11:55:55 131:15 | 11:58:41 134:1 | 12:01:24 136:9 | 12:05:28 139:2 |
| 11:52:55 129:4 | 11:55:56 131:16 | 11:58:43 134:2 | 12:01:28 136:10 | 12:05:32 139:3 |
| 11:52:56 129:5 | 11:55:58 131:17 | 11:58:52 134:3 | 12:01:30 136:11 | 12:05:35 139:4 |
| 11:53:03 129:6 | 11:55:59 131:18 | 11:59:07 134:4 | 12:01:34 136:12 | 12:05:46 139:5 |

| | | | | |
|---|---|---|---|---|
| 12:05:49 139:6 | 12:09:50 142:3 | 12:12:36 144:10 | 12:16:43 146:22 | 12:19:09 149:11 |
| 12:05:55 139:7 | 12:09:51 142:4 | 12:12:37 144:11 | 12:16:48 146:23 | 12:19:11 149:12 |
| 12:06:14 139:10,11 | 12:09:53 142:5 | 12:12:43 144:12 | 12:16:50 146:24,25 | 12:19:14 149:13 |
| 12:06:19 139:12 | 12:09:55 142:6 | 12:12:47 144:13 | 12:16:57 147:1 | 12:19:16 149:14 |
| 12:06:20 139:13 | 12:10:01 142:7 | 12:12:55 144:14,16 | 12:17:00 147:2 | 12:19:18 149:15 |
| 12:06:26 139:14,15 | 12:10:05 142:8 | 12:12:57 144:17 | 12:17:04 147:3 | 12:19:20 149:16 |
| 12:06:27 139:16 | 12:10:08 142:9 | 12:12:59 144:18 | 12:17:05 147:4 | 12:19:26 149:17 |
| 12:06:29 139:17,18 | 12:10:10 142:10 | 12:13:02 144:19 | 12:17:07 147:5 | 12:19:27 149:18 |
| 12:06:31 139:19 | 12:10:12 142:11 | 12:13:03 144:20 | 12:17:08 147:6 | 12:19:29 149:19 |
| 12:07:22 139:20 | 12:10:16 142:12 | 12:13:06 144:21 | 12:17:12 147:7 | 12:19:32 149:20 |
| 12:07:24 139:21 | 12:10:20 142:13 | 12:13:10 144:22 | 12:17:16 147:8 | 12:19:33 149:21 |
| 12:07:28 139:22,23 | 12:10:23 142:14 | 12:13:13 144:23 | 12:17:18 147:9,10 | 12:19:36 149:22 |
| 12:07:31 139:24 | 12:10:24 142:15 | 12:13:18 144:24 | 12:17:26 147:11 | 12:19:37 149:23 |
| 12:07:33 139:25 | 12:10:28 142:16 | 12:13:23 144:25 | 12:17:29 147:12 | 12:19:40 149:24,25 |
| 12:07:36 140:1,2 | 12:10:31 142:17 | 12:13:26 145:1 | 12:17:30 147:13,14 | 12:19:43 150:1 |
| 12:07:37 140:3 | 12:10:33 142:18 | 12:13:57 145:2 | 12:17:33 147:15 | 12:19:45 150:2 |
| 12:07:43 140:5 | 12:10:36 142:19 | 12:14:00 145:3 | 12:17:34 147:16,17 | 12:19:49 150:3 |
| 12:07:45 140:6,7 | 12:10:40 142:20 | 12:14:03 145:4 | 12:17:36 147:18 | 12:19:50 150:4 |
| 12:07:48 140:8,9 | 12:10:43 142:21 | 12:14:08 145:5 | 12:17:39 147:19 | 12:20:01 150:5 |
| 12:07:55 140:10 | 12:10:45 142:22 | 12:14:09 145:6,7 | 12:17:42 147:20 | 12:20:04 150:6 |
| 12:07:57 140:11 | 12:10:46 142:23 | 12:14:10 145:8 | 12:17:50 147:21 | 12:20:07 150:7 |
| 12:08:01 140:12 | 12:10:47 142:24 | 12:14:13 145:9 | 12:17:52 147:22 | 12:20:08 150:8 |
| 12:08:03 140:14 | 12:10:48 142:25 | 12:14:18 145:10 | 12:17:53 147:23 | 12:20:11 150:9 |
| 12:08:04 140:15 | 12:10:50 143:1 | 12:14:21 145:11 | 12:17:54 147:24 | 12:20:13 150:10 |
| 12:08:09 140:16 | 12:10:51 143:2 | 12:14:24 145:12 | 12:17:56 147:25 | 12:20:16 150:11 |
| 12:08:11 140:17 | 12:10:52 143:3 | 12:14:27 145:13 | 12:17:57 148:1 | 12:20:21 150:12 |
| 12:08:13 140:18,20 | 12:10:54 143:4 | 12:14:31 145:14 | 12:18:00 148:2 | 12:20:28 150:13 |
| 12:08:15 140:21 | 12:10:58 143:5 | 12:14:32 145:15 | 12:18:05 148:3 | 12:20:30 150:14,15 |
| 12:08:21 140:22 | 12:11:01 143:6 | 12:14:34 145:16 | 12:18:07 148:4 | 12:20:32 150:16 |
| 12:08:22 140:23,24 | 12:11:04 143:7 | 12:14:39 145:17 | 12:18:09 148:5 | 12:20:35 150:17 |
| 12:08:26 140:25 | 12:11:07 143:8 | 12:14:45 145:18 | 12:18:10 148:6 | 12:20:37 150:18 |
| 12:08:28 141:1 | 12:11:12 143:9 | 12:14:49 145:19 | 12:18:12 148:7 | 12:20:42 150:19 |
| 12:08:35 141:2 | 12:11:15 143:10 | 12:14:50 145:20 | 12:18:14 148:8 | 12:20:45 150:20 |
| 12:08:37 141:3 | 12:11:19 143:11 | 12:14:51 145:21 | 12:18:16 148:9 | 12:20:48 150:21 |
| 12:08:39 141:4 | 12:11:27 143:12 | 12:14:55 145:22 | 12:18:17 148:11 | 12:20:52 150:22 |
| 12:08:43 141:5 | 12:11:29 143:13 | 12:15:00 145:23 | 12:18:18 148:12 | 12:20:55 150:23 |
| 12:08:49 141:6 | 12:11:32 143:14 | 12:15:03 145:24 | 12:18:20 148:13 | 12:20:57 150:24 |
| 12:08:51 141:7 | 12:11:35 143:15 | 12:15:06 145:25 | 12:18:23 148:14 | 12:21:00 150:25 |
| 12:08:54 141:8 | 12:11:38 143:16 | 12:15:08 146:1 | 12:18:26 148:15 | 12:21:01 151:1 |
| 12:08:57 141:9 | 12:11:39 143:17 | 12:15:12 146:2 | 12:18:28 148:16 | 12:21:04 151:2 |
| 12:09:01 141:10 | 12:11:40 143:18 | 12:15:16 146:3 | 12:18:32 148:18 | 12:21:07 151:3 |
| 12:09:03 141:11 | 12:11:43 143:19 | 12:15:20 146:4 | 12:18:35 148:19,20 | 12:21:12 151:4 |
| 12:09:05 141:12 | 12:11:47 143:20 | 12:15:22 146:5 | 12:18:37 148:21 | 12:21:13 151:5 |
| 12:09:10 141:14,15 | 12:11:55 143:21 | 12:15:24 146:6 | 12:18:42 148:22,23 | 12:21:15 151:6 |
| 12:09:12 141:16 | 12:11:57 143:22 | 12:15:26 146:7 | 12:18:44 148:24 | 12:21:17 151:7 |
| 12:09:16 141:17 | 12:12:02 143:23 | 12:15:28 146:8 | 12:18:45 148:25 | 12:21:22 151:8 |
| 12:09:19 141:18 | 12:12:04 143:24 | 12:15:37 146:9 | 12:18:47 149:1 | 12:21:25 151:9 |
| 12:09:22 141:19 | 12:12:06 143:25 | 12:15:42 146:10 | 12:18:49 149:2 | 12:21:27 151:10 |
| 12:09:26 141:20 | 12:12:09 144:1 | 12:15:51 146:11 | 12:18:52 149:3 | 12:21:29 151:11 |
| 12:09:30 141:21 | 12:12:12 144:2 | 12:15:54 146:12 | 12:18:55 149:4 | 12:21:31 151:12 |
| 12:09:31 141:22 | 12:12:15 144:3,4 | 12:16:03 146:13 | 12:19:00 149:5 | 12:21:34 151:13 |
| 12:09:36 141:23 | 12:12:20 144:5 | 12:16:17 146:16,17 | 12:19:02 149:6 | 12:21:37 151:14 |
| 12:09:38 141:24 | 12:12:22 144:6 | 12:16:19 146:18 | 12:19:03 149:7 | 12:21:39 151:15 |
| 12:09:40 141:25 | 12:12:26 144:7 | 12:16:22 146:19 | 12:19:04 149:8 | 12:21:42 151:16 |
| 12:09:43 142:1 | 12:12:30 144:8 | 12:16:40 146:20 | 12:19:05 149:9 | 12:21:43 151:17 |
| 12:09:46 142:2 | 12:12:33 144:9 | 12:16:41 146:21 | 12:19:07 149:10 | 12:21:56 151:18 |

286

| | | | | |
|---|---|---|---|---|
| 12:21:58 151:19 | 12:26:15 154:10 | 12:29:18 156:19 | 12:31:56 159:3 | 12:34:47 161:13 |
| 12:22:10 151:20,21 | 12:26:17 154:11 | 12:29:20 156:20 | 12:31:59 159:4 | 12:34:51 161:14 |
| 12:22:16 151:23,24 | 12:26:23 154:12 | 12:29:24 156:21 | 12:32:02 159:5 | 12:34:53 161:15 |
| 12:22:31 151:25 152:1 | 12:26:24 154:13 | 12:29:27 156:22 | 12:32:09 159:6 | 12:34:55 161:16 |
| 12:22:33 152:2,3 | 12:26:28 154:14 | 12:29:30 156:23 | 12:32:13 159:7 | 12:34:57 161:17 |
| 12:22:34 152:4 | 12:26:29 154:15 | 12:29:35 156:24 | 12:32:16 159:8 | 12:35:01 161:18 |
| 12:22:38 152:5 | 12:26:30 154:16 | 12:29:37 156:25 | 12:32:19 159:9 | 12:35:03 161:19 |
| 12:22:41 152:6 | 12:26:35 154:17 | 12:29:40 157:1 | 12:32:21 159:10 | 12:35:06 161:20 |
| 12:22:43 152:7 | 12:26:37 154:18 | 12:29:42 157:2,3 | 12:32:24 159:11 | 12:35:08 161:21 |
| 12:22:47 152:8 | 12:26:39 154:19 | 12:29:45 157:4 | 12:32:26 159:12 | 12:35:12 161:22 |
| 12:22:54 152:9 | 12:26:45 154:20 | 12:29:48 157:5 | 12:32:30 159:13 | 12:35:15 161:23 |
| 12:22:55 152:10 | 12:26:49 154:21 | 12:29:50 157:6,7 | 12:32:31 159:14 | 12:35:19 161:24 |
| 12:22:58 152:11 | 12:26:52 154:22 | 12:29:51 157:8 | 12:32:34 159:15 | 12:35:24 161:25 |
| 12:23:01 152:12 | 12:26:55 154:23 | 12:29:52 157:9 | 12:32:35 159:16,17 | 12:35:26 162:1 |
| 12:23:03 152:13 | 12:27:02 154:24 | 12:29:54 157:10 | 12:32:38 159:18 | 12:35:27 162:2 |
| 12:23:04 152:14 | 12:27:06 154:25 | 12:29:59 157:11 | 12:32:41 159:19 | 12:35:31 162:3 |
| 12:23:07 152:15 | 12:27:09 155:1 | 12:30:04 157:12 | 12:32:46 159:20 | 12:35:33 162:4 |
| 12:23:11 152:16,17,18 | 12:27:11 155:2 | 12:30:10 157:13 | 12:32:49 159:21 | 12:35:36 162:5 |
| 12:23:14 152:19 | 12:27:13 155:3 | 12:30:11 157:14 | 12:32:54 159:22 | 12:35:37 162:6,7 |
| 12:23:20 152:20 | 12:27:16 155:4 | 12:30:15 157:15 | 12:32:56 159:23 | 12:35:39 162:8 |
| 12:23:22 152:21 | 12:27:18 155:5 | 12:30:16 157:16 | 12:32:57 159:24 | 12:35:41 162:9 |
| 12:23:24 152:22 | 12:27:20 155:6 | 12:30:20 157:17,18 | 12:33:00 159:25 | 12:35:43 162:10 |
| 12:23:25 152:23 | 12:27:22 155:7 | 12:30:21 157:19 | 12:33:03 160:1 | 12:35:46 162:11 |
| 12:23:28 152:24 | 12:27:24 155:8 | 12:30:24 157:20 | 12:33:06 160:2 | 12:35:49 162:13 |
| 12:23:30 152:25 | 12:27:27 155:9 | 12:30:26 157:21 | 12:33:09 160:3,4 | 12:35:51 162:14,15 |
| 12:23:33 153:1 | 12:27:29 155:10 | 12:30:27 157:22 | 12:33:12 160:5 | 12:35:56 162:16 |
| 12:23:36 153:2 | 12:27:34 155:11 | 12:30:29 157:23 | 12:33:15 160:6 | 12:35:59 162:17 |
| 12:23:50 153:3 | 12:27:38 155:12 | 12:30:30 157:24 | 12:33:17 160:7 | 12:36:00 162:18 |
| 12:23:52 153:4 | 12:27:39 155:13 | 12:30:32 157:25 | 12:33:21 160:8 | 12:36:10 162:19 |
| 12:24:00 153:5 | 12:27:42 155:14 | 12:30:35 158:1 | 12:33:23 160:9 | 12:36:13 162:20 |
| 12:24:14 153:6 | 12:27:47 155:15 | 12:30:43 158:2 | 12:33:25 160:10 | 12:36:14 162:21 |
| 12:24:35 153:7 | 12:28:08 155:16 | 12:30:49 158:3 | 12:33:31 160:11 | 12:36:19 162:22 |
| 12:24:36 153:8 | 12:28:10 155:17 | 12:30:52 158:4 | 12:33:32 160:12 | 12:36:22 162:23 |
| 12:24:38 153:9 | 12:28:16 155:18 | 12:30:53 158:5 | 12:33:33 160:13 | 12:36:27 162:24 |
| 12:24:39 153:10 | 12:28:21 155:19 | 12:30:55 158:6 | 12:33:34 160:14 | 12:36:33 162:25 |
| 12:24:40 153:11 | 12:28:30 155:20 | 12:30:58 158:7 | 12:33:38 160:15 | 12:36:35 163:1 |
| 12:24:42 153:12 | 12:28:31 155:21 | 12:31:00 158:8 | 12:33:42 160:16 | 12:36:38 163:2 |
| 12:24:48 153:13 | 12:28:36 155:22,23 | 12:31:03 158:9 | 12:33:44 160:17 | 12:36:41 163:3 |
| 12:24:50 153:14 | 12:28:38 155:24 | 12:31:06 158:10 | 12:33:50 160:18,19 | 12:36:44 163:4 |
| 12:24:51 153:15 | 12:28:39 155:25 | 12:31:09 158:11 | 12:33:54 160:20 | 12:36:46 163:5 |
| 12:24:52 153:16 | 12:28:40 156:1 | 12:31:11 158:12 | 12:33:56 160:21 | 12:36:48 163:6 |
| 12:24:57 153:17 | 12:28:41 156:2 | 12:31:14 158:13 | 12:34:01 160:22 | 12:36:52 163:7 |
| 12:25:04 153:18 | 12:28:42 156:3 | 12:31:15 158:14 | 12:34:05 160:23 | 12:36:54 163:8 |
| 12:25:21 153:19 | 12:28:43 156:4 | 12:31:19 158:15 | 12:34:07 160:24 | 12:36:57 163:9 |
| 12:25:25 153:21,22 | 12:28:46 156:5 | 12:31:21 158:16 | 12:34:10 160:25 | 12:37:00 163:10 |
| 12:25:26 153:23 | 12:28:53 156:6 | 12:31:25 158:17 | 12:34:12 161:1 | 12:37:03 163:11 |
| 12:25:29 153:24 | 12:28:55 156:7,8 | 12:31:28 158:18 | 12:34:15 161:2 | 12:37:04 163:12 |
| 12:25:32 153:25 | 12:29:00 156:9 | 12:31:30 158:19 | 12:34:16 161:3,4 | 12:37:08 163:13 |
| 12:25:40 154:1 | 12:29:02 156:10 | 12:31:35 158:20 | 12:34:19 161:5 | 12:37:09 163:14 |
| 12:25:41 154:2 | 12:29:03 156:11 | 12:31:37 158:21 | 12:34:23 161:6 | 12:37:12 163:15 |
| 12:25:44 154:3 | 12:29:06 156:12 | 12:31:41 158:22 | 12:34:25 161:7 | 12:37:14 163:16 |
| 12:25:57 154:4 | 12:29:08 156:13 | 12:31:43 158:23 | 12:34:29 161:8 | 12:37:16 163:17,18 |
| 12:25:59 154:5 | 12:29:10 156:14,15 | 12:31:46 158:24 | 12:34:34 161:9 | 12:37:19 163:19 |
| 12:26:01 154:6 | 12:29:13 156:16 | 12:31:47 158:25 | 12:34:37 161:10 | 12:37:22 163:20 |
| 12:26:04 154:7,8 | 12:29:15 156:17 | 12:31:50 159:1 | 12:34:40 161:11 | 12:37:23 163:21 |
| 12:26:11 154:9 | 12:29:16 156:18 | 12:31:53 159:2 | 12:34:43 161:12 | 12:37:26 163:22 |

| | | | | |
|---|---|---|---|---|
| 37:32 163:23 | 12:40:24 166:6 | 12:43:32 168:14,15 | 13:40:25 170:25 | 13:43:18 173:8 |
| 37:35 163:24,25 | 12:40:27 166:7 | 12:43:33 168:16 | 13:40:28 171:1 | 13:43:20 173:9 |
| 12:37:38 164:1 | 12:40:30 166:8 | 12:43:34 168:17 | 13:40:30 171:2 | 13:43:24 173:10 |
| 12:37:40 164:2 | 12:40:32 166:9 | 12:43:36 168:18 | 13:40:35 171:3 | 13:43:28 173:11 |
| 12:37:42 164:3 | 12:40:36 166:10 | 12:43:38 168:19 | 13:40:37 171:4 | 13:43:31 173:12 |
| 12:37:47 164:4 | 12:40:42 166:11 | 12:43:41 168:20 | 13:40:39 171:5 | 13:43:34 173:13 |
| 12:37:51 164:5,6 | 12:40:43 166:12 | 120 4:13 | 13:40:42 171:6 | 13:43:36 173:14 |
| 12:37:55 164:7 | 12:40:45 166:13 | 124 4:15 | 13:40:44 171:7 | 13:43:37 173:15 |
| 12:38:06 164:8 | 12:40:48 166:14 | 128 4:18 | 13:40:46 171:8 | 13:43:40 173:16 |
| 12:38:07 164:9 | 12:40:57 166:15 | 129 4:20 | 13:40:48 171:9 | 13:43:42 173:17 |
| 12:38:11 164:10 | 12:41:01 166:16 | 13 177:3 246:9 | 13:40:51 171:10 | 13:43:43 173:18 |
| 12:38:14 164:11 | 12:41:06 166:17 | 13:38:02 169:1 | 13:40:57 171:11 | 13:43:48 173:19 |
| 12:38:16 164:12 | 12:41:15 166:18 | 13:38:06 169:2 | 13:41:00 171:12 | 13:43:51 173:20 |
| 12:38:17 164:13 | 12:41:17 166:19 | 13:38:08 169:3 | 13:41:04 171:13 | 13:43:52 173:21 |
| 12:38:20 164:14 | 12:41:22 166:20 | 13:38:11 169:4 | 13:41:07 171:14 | 13:43:53 173:22 |
| 12:38:23 164:15 | 12:41:26 166:21,22 | 13:38:14 169:5 | 13:41:10 171:15 | 13:43:56 173:23 |
| 12:38:26 164:16 | 12:41:27 166:23 | 13:38:15 169:8,9 | 13:41:12 171:16 | 13:43:57 173:24 |
| 12:38:30 164:17 | 12:41:31 166:24 | 13:38:17 169:10 | 13:41:15 171:17 | 13:43:59 173:25 |
| 12:38:31 164:18 | 12:41:32 166:25 | 13:38:18 169:11 | 13:41:17 171:18 | 13:44:04 174:1 |
| 12:38:34 164:19 | 12:41:35 167:1,2 | 13:38:19 169:12 | 13:41:19 171:19 | 13:44:05 174:2,3 |
| 12:38:37 164:20 | 12:41:36 167:3 | 13:38:28 169:13 | 13:41:24 171:20 | 13:44:09 174:4 |
| 12:38:39 164:21 | 12:41:37 167:4 | 13:38:30 169:14 | 13:41:25 171:21 | 13:44:11 174:5 |
| 12:38:41 164:22 | 12:41:39 167:5 | 13:38:34 169:15 | 13:41:27 171:22 | 13:44:13 174:6 |
| 12:38:46 164:23 | 12:41:43 167:6 | 13:38:39 169:16 | 13:41:28 171:23 | 13:44:15 174:7 |
| 12:38:49 164:24 | 12:41:47 167:7 | 13:38:50 169:17 | 13:41:29 171:24 | 13:44:20 174:8 |
| 12:38:50 164:25 | 12:41:55 167:8 | 13:38:56 169:18 | 13:41:31 171:25 172:1 | 13:44:23 174:9 |
| 12:38:52 165:1 | 12:42 168:18 | 13:39:03 169:19 | 13:41:35 172:2 | 13:44:26 174:10 |
| 12:38:53 165:2 | 12:42:00 167:9 | 13:39:06 169:20 | 13:41:39 172:3 | 13:44:28 174:11 |
| 12:38:57 165:3 | 12:42:05 167:10 | 13:39:09 169:21 | 13:41:42 172:4 | 13:44:32 174:12,13 |
| 12:39:04 165:4 | 12:42:08 167:11 | 13:39:13 169:22 | 13:41:45 172:5 | 13:44:35 174:14 |
| 12:39:06 165:5 | 12:42:10 167:12 | 13:39:17 169:23 | 13:41:47 172:6 | 13:44:38 174:15 |
| 12:39:09 165:6 | 12:42:12 167:13 | 13:39:20 169:24 | 13:41:50 172:7 | 13:44:40 174:16 |
| 12:39:11 165:7 | 12:42:16 167:14 | 13:39:22 169:25 | 13:41:54 172:8 | 13:44:43 174:17 |
| 12:39:15 165:8 | 12:42:18 167:15 | 13:39:23 170:1 | 13:41:57 172:9 | 13:44:46 174:18 |
| 12:39:17 165:9 | 12:42:20 167:16 | 13:39:25 170:2 | 13:42:01 172:10 | 13:44:47 174:19 |
| 12:39:20 165:10 | 12:42:22 167:17 | 13:39:31 170:3,4 | 13:42:05 172:11 | 13:44:50 174:20 |
| 12:39:23 165:11 | 12:42:24 167:18 | 13:39:34 170:5 | 13:42:06 172:12 | 13:44:53 174:21 |
| 12:39:27 165:12 | 12:42:25 167:19 | 13:39:37 170:6 | 13:42:09 172:13 | 13:44:56 174:22 |
| 12:39:29 165:13 | 12:42:28 167:20 | 13:39:41 170:7 | 13:42:11 172:14 | 13:44:58 174:23 |
| 12:39:32 165:14 | 12:42:30 167:21 | 13:39:47 170:8 | 13:42:16 172:15 | 13:45:01 174:24 |
| 12:39:35 165:15 | 12:42:33 167:22 | 13:39:51 170:9 | 13:42:21 172:16 | 13:45:06 174:25 |
| 12:39:38 165:16 | 12:42:38 167:23 | 13:39:54 170:10 | 13:42:23 172:17,18 | 13:45:08 175:1 |
| 12:39:41 165:17 | 12:42:41 167:24 | 13:39:56 170:11 | 13:42:31 172:19 | 13:45:12 175:2 |
| 12:39:45 165:18 | 12:42:44 167:25 | 13:39:58 170:12 | 13:42:32 172:20 | 13:45:21 175:3 |
| 12:39:46 165:19 | 12:42:47 168:1 | 13:40:00 170:13 | 13:42:34 172:21 | 13:45:23 175:4 |
| 12:39:48 165:20 | 12:42:50 168:2 | 13:40:02 170:14 | 13:42:43 172:22 | 13:45:27 175:5 |
| 12:39:52 165:21 | 12:42:52 168:3 | 13:40:03 170:15 | 13:42:45 172:23 | 13:45:31 175:6 |
| 12:39:55 165:22 | 12:43:04 168:4 | 13:40:04 170:16 | 13:42:47 172:24 | 13:45:33 175:7 |
| 12:39:59 165:23 | 12:43:07 168:5 | 13:40:06 170:17 | 13:42:50 172:25 | 13:45:35 175:8 |
| 12:40:06 165:24 | 12:43:11 168:6 | 13:40:08 170:18 | 13:42:54 173:1 | 13:45:37 175:9 |
| 12:40:08 165:25 | 12:43:15 168:7 | 13:40:09 170:19 | 13:42:58 173:2 | 13:45:40 175:10 |
| 12:40:11 166:1 | 12:43:17 168:8 | 13:40:12 170:20 | 13:43:01 173:3 | 13:45:41 175:11 |
| 12:40:14 166:2 | 12:43:22 168:9 | 13:40:15 170:21 | 13:43:04 173:4 | 13:45:46 175:12 |
| 12:40:16 166:3 | 12:43:26 168:10 | 13:40:18 170:22 | 13:43:07 173:5 | 13:45:51 175:13 |
| 12:40:19 166:4 | 12:43:27 168:11 | 13:40:21 170:23 | 13:43:09 173:6 | 13:45:53 175:14,15 |
| 12:40:22 166:5 | 12:43:31 168:12,13 | 13:40:23 170:24 | 13:43:12 173:7 | 13:45:57 175:16 |

| | | | | |
|---|---|---|---|---|
| 13:45:59 175:17 | 13:51:16 178:3 | 13:54:09 180:11 | 13:57:10 182:18 | 134 4:22 |
| 13:46:07 175:18 | 13:51:18 178:4,5 | 13:54:12 180:12 | 13:57:13 182:19 | 138 4:23 |
| 13:46:09 175:19 | 13:51:20 178:6 | 13:54:14 180:13 | 13:57:16 182:20 | 139 5:3 |
| 13:46:11 175:20 | 13:51:22 178:7 | 13:54:18 180:14 | 13:57:21 182:21 | 14 137:12 209:9,14 |
| 13:46:14 175:21 | 13:51:29 178:8 | 13:54:19 180:15 | 13:57:23 182:22 | 246:10 |
| 13:46:18 175:23 | 13:51:30 178:9 | 13:54:22 180:16 | 13:57:25 182:23 | 14:00:00 184:24 |
| 13:46:21 175:24 | 13:51:34 178:10 | 13:54:28 180:17 | 13:57:28 182:24 | 14:00:04 184:25 |
| 13:46:25 175:25 | 13:51:37 178:11 | 13:54:39 180:18,19 | 13:57:30 182:25 | 14:00:09 185:1 |
| 13:46:28 176:1 | 13:51:39 178:12 | 13:54:42 180:20 | 13:57:33 183:1 | 14:00:11 185:2 |
| 13:46:36 176:2 | 13:51:42 178:13 | 13:54:44 180:21 | 13:57:37 183:2 | 14:00:14 185:3 |
| 13:46:39 176:3 | 13:51:44 178:14 | 13:54:53 180:22 | 13:57:38 183:3 | 14:00:17 185:4 |
| 13:46:48 176:4 | 13:51:45 178:15 | 13:54:57 180:23 | 13:57:40 183:4 | 14:00:22 185:5 |
| 13:47:10 176:7,8 | 13:51:49 178:16 | 13:54:59 180:24 | 13:57:42 183:5 | 14:00:23 185:6 |
| 13:47:18 176:9 | 13:51:51 178:17 | 13:55:04 180:25 | 13:57:48 183:6 | 14:00:24 185:7 |
| 13:47:19 176:10 | 13:51:57 178:18 | 13:55:07 181:1 | 13:57:51 183:7 | 14:00:26 185:8 |
| 13:47:39 176:11 | 13:52:00 178:19 | 13:55:10 181:2 | 13:57:52 183:8 | 14:00:27 185:9 |
| 13:49:07 176:12 | 13:52:04 178:20 | 13:55:13 181:3 | 13:57:55 183:9 | 14:00:29 185:10 |
| 13:49:09 176:13 | 13:52:06 178:21 | 13:55:15 181:4 | 13:58:03 183:10 | 14:00:31 185:11 |
| 13:49:10 176:14 | 13:52:07 178:22 | 13:55:20 181:5 | 13:58:05 183:11 | 14:00:33 185:12 |
| 13:49:12 176:15 | 13:52:08 178:23 | 13:55:24 181:6 | 13:58:08 183:12 | 14:00:37 185:13 |
| 13:49:13 176:16 | 13:52:10 178:24 | 13:55:25 181:7 | 13:58:13 183:13 | 14:00:40 185:14 |
| 13:49:17 176:17 | 13:52:13 178:25 179:1 | 13:55:29 181:8 | 13:58:18 183:14 | 14:00:43 185:15 |
| 13:49:20 176:18 | 13:52:19 179:2 | 13:55:34 181:9 | 13:58:24 183:15 | 14:00:52 185:16 |
| 13:49:23 176:19 | 13:52:23 179:3 | 13:55:36 181:10 | 13:58:27 183:16 | 14:00:54 185:17 |
| 13:49:30 176:20 | 13:52:25 179:4 | 13:55:38 181:11 | 13:58:29 183:17 | 14:00:56 185:18 |
| 13:49:33 176:21 | 13:52:27 179:5 | 13:55:40 181:12 | 13:58:32 183:18 | 14:01:00 185:19 |
| 13:49:37 176:22 | 13:52:33 179:6 | 13:55:41 181:13 | 13:58:35 183:19 | 14:01:07 185:20 |
| 13:49:43 176:23 | 13:52:47 179:7 | 13:55:42 181:14 | 13:58:39 183:20 | 14:01:09 185:21 |
| 13:49:45 176:24 | 13:52:49 179:8 | 13:55:43 181:15 | 13:58:43 183:21 | 14:01:14 185:22,23 |
| 13:49:47 176:25 | 13:52:52 179:9 | 13:55:45 181:16 | 13:58:45 183:22 | 14:01:18 185:24 |
| 13:49:55 177:1 | 13:52:54 179:10 | 13:55:46 181:17 | 13:58:47 183:23 | 14:01:22 185:25 |
| 13:49:56 177:2 | 13:52:55 179:11 | 13:55:48 181:18 | 13:58:49 183:24 | 14:01:25 186:1 |
| 13:50:00 177:3 | 13:52:56 179:12 | 13:55:51 181:19 | 13:58:55 183:25 | 14:01:30 186:2 |
| 13:50:04 177:4 | 13:52:58 179:13 | 13:55:52 181:20 | 13:58:58 184:1 | 14:01:36 186:3 |
| 13:50:08 177:5 | 13:53:04 179:14 | 13:55:59 181:21 | 13:59:01 184:2 | 14:01:40 186:4 |
| 13:50:11 177:6 | 13:53:09 179:15 | 13:56:02 181:22 | 13:59:02 184:3 | 14:01:44 186:5 |
| 13:50:15 177:7 | 13:53:10 179:16 | 13:56:06 181:23 | 13:59:03 184:4 | 14:01:51 186:6 |
| 13:50:20 177:8 | 13:53:16 179:17 | 13:56:07 181:24 | 13:59:06 184:5 | 14:02:15 186:7 |
| 13:50:23 177:9 | 13:53:21 179:18 | 13:56:12 181:25 | 13:59:09 184:6 | 14:02:18 186:8 |
| 13:50:26 177:10 | 13:53:23 179:19 | 13:56:14 182:1 | 13:59:15 184:7 | 14:02:28 186:9 |
| 13:50:28 177:11 | 13:53:25 179:20 | 13:56:15 182:2 | 13:59:20 184:8 | 14:02:31 186:10 |
| 13:50:31 177:12 | 13:53:27 179:21 | 13:56:17 182:3 | 13:59:24 184:9 | 14:03:04 186:12,13 |
| 13:50:35 177:13 | 13:53:29 179:22 | 13:56:19 182:4 | 13:59:27 184:10 | 14:03:06 186:14 |
| 13:50:39 177:14 | 13:53:32 179:23 | 13:56:23 182:5 | 13:59:30 184:11 | 14:03:08 186:15 |
| 13:50:41 177:15 | 13:53:34 179:24 | 13:56:28 182:6 | 13:59:33 184:12 | 14:03:29 186:16,17 |
| 13:50:43 177:16,17 | 13:53:38 179:25 | 13:56:31 182:7 | 13:59:38 184:13 | 14:03:34 186:18 |
| 13:50:44 177:18 | 13:53:41 180:1 | 13:56:35 182:8 | 13:59:41 184:14 | 14:03:39 186:19 |
| 13:50:46 177:19 | 13:53:46 180:2 | 13:56:40 182:9 | 13:59:43 184:15 | 14:03:41 186:20 |
| 13:50:47 177:20 | 13:53:48 180:3 | 13:56:44 182:10 | 13:59:44 184:16 | 14:03:45 186:21 |
| 13:50:50 177:21 | 13:53:50 180:4 | 13:56:47 182:11 | 13:59:47 184:17 | 14:03:46 186:22,23 |
| 13:50:56 177:22 | 13:53:53 180:5 | 13:56:50 182:12 | 13:59:48 184:18 | 14:03:49 186:24 |
| 13:51:00 177:23 | 13:53:55 180:6 | 13:56:52 182:13 | 13:59:49 184:19 | 14:03:52 186:25 |
| 13:51:02 177:24 | 13:53:56 180:7 | 13:56:54 182:14 | 13:59:51 184:20 | 14:03:54 187:1 |
| 13:51:04 177:25 | 13:54:00 180:8 | 13:57:02 182:15 | 13:59:55 184:21 | 14:04:04 187:2 |
| 13:51:10 178:1 | 13:54:02 180:9 | 13:57:06 182:16 | 13:59:56 184:22,23 | 14:04:06 187:3 |
| 13:51:13 178:2 | 13:54:04 180:10 | 13:57:07 182:17 | 133S 200:19 201:2 | 14:04:09 187:4 |

| | | | | |
|---|---|---|---|---|
| 04:12 187:5 | 14:07:38 189:17 | 14:10:30 192:1 | 14:13:16 194:10 | 14:16:15 196:21 |
| 04:14 187:6 | 14:07:40 189:18 | 14:10:32 192:2 | 14:13:18 194:11 | 14:16:21 196:22 |
| 14:04:17 187:7 | 14:07:42 189:19 | 14:10:34 192:3 | 14:13:21 194:12 | 14:16:24 196:23 |
| 14:04:21 187:8 | 14:07:43 189:20 | 14:10:35 192:4 | 14:13:26 194:13,14 | 14:16:26 196:24 |
| 14:04:23 187:9 | 14:07:44 189:21 | 14:10:36 192:5 | 14:13:27 194:15 | 14:16:30 196:25 |
| 14:04:25 187:10 | 14:07:47 189:22 | 14:10:39 192:6 | 14:13:33 194:16 | 14:16:33 197:1 |
| 14:04:26 187:11 | 14:07:48 189:23 | 14:10:42 192:7 | 14:13:37 194:17,18 | 14:16:34 197:2 |
| 14:04:29 187:12 | 14:07:50 189:24 | 14:10:46 192:8 | 14:13:39 194:19 | 14:16:37 197:3 |
| 14:04:30 187:13 | 14:07:53 189:25 | 14:10:50 192:9 | 14:13:42 194:20 | 14:16:51 197:4 |
| 14:04:33 187:14 | 14:07:56 190:1 | 14:10:52 192:10 | 14:13:44 194:21 | 14:16:55 197:5 |
| 14:04:42 187:15 | 14:07:57 190:2 | 14:10:55 192:11 | 14:13:47 194:22 | 14:17:05 197:6 |
| 14:04:48 187:16 | 14:08:02 190:3 | 14:10:57 192:12 | 14:13:50 194:23 | 14:17:06 197:7 |
| 14:04:49 187:17 | 14:08:04 190:4 | 14:11:11 192:13 | 14:13:54 194:24 | 14:17:14 197:8,9 |
| 14:04:51 187:18 | 14:08:07 190:5 | 14:11:13 192:14 | 14:13:57 194:25 | 14:17:16 197:10 |
| 14:04:52 187:19 | 14:08:10 190:6 | 14:11:14 192:15 | 14:13:59 195:1 | 14:17:17 197:11 |
| 14:04:56 187:20 | 14:08:12 190:7 | 14:11:15 192:16 | 14:14:00 195:2 | 14:17:19 197:12 |
| 14:04:57 187:21 | 14:08:16 190:8,9 | 14:11:16 192:17 | 14:14:01 195:3 | 14:17:21 197:13 |
| 14:05:03 187:22 | 14:08:17 190:10 | 14:11:19 192:18 | 14:14:03 195:4 | 14:17:27 197:14,15 |
| 14:05:05 187:23 | 14:08:18 190:11 | 14:11:20 192:19 | 14:14:06 195:5 | 14:17:33 197:16 |
| 14:05:08 187:24,25 | 14:08:21 190:12 | 14:11:36 192:20 | 14:14:09 195:6 | 14:17:36 197:17 |
| 14:05:10 188:1 | 14:08:25 190:13 | 14:11:41 192:21 | 14:14:16 195:7 | 14:17:39 197:18 |
| 14:05:18 188:2 | 14:08:27 190:14 | 14:11:50 192:22,23,24 | 14:14:20 195:8 | 14:17:45 197:19 |
| 14:05:21 188:3,4 | 14:08:29 190:15 | 14:11:53 192:25 | 14:14:21 195:9 | 14:17:48 197:20 |
| 14:05:23 188:5 | 14:08:33 190:16 | 14:11:54 193:1 | 14:14:25 195:10 | 14:17:51 197:21 |
| 14:05:24 188:7 | 14:08:35 190:17 | 14:11:56 193:2 | 14:14:27 195:11 | 14:17:54 197:22 |
| 14:05:32 188:8 | 14:08:38 190:18 | 14:12:02 193:3 | 14:14:29 195:12 | 14:17:58 197:23 |
| 14:05:34 188:9 | 14:08:41 190:19 | 14:12:03 193:4 | 14:14:30 195:13 | 14:17:59 197:24 |
| 14:05:39 188:10 | 14:08:53 190:20 | 14:12:04 193:5 | 14:14:33 195:14 | 14:18:02 197:25 |
| 14:05:41 188:11 | 14:08:54 190:21 | 14:12:07 193:6 | 14:14:34 195:15,16 | 14:18:16 198:1 |
| 14:06:14 188:12 | 14:08:55 190:22 | 14:12:10 193:7 | 14:14:40 195:17 | 14:18:21 198:2 |
| 14:06:16 188:13 | 14:08:56 190:23 | 14:12:14 193:8 | 14:14:44 195:18 | 14:18:24 198:3 |
| 14:06:19 188:15,16 | 14:08:57 190:24,25 | 14:12:15 193:9 | 14:14:45 195:19 | 14:18:29 198:4 |
| 14:06:25 188:17 | 14:08:59 191:1 | 14:12:18 193:10 | 14:14:46 195:20 | 14:18:34 198:5 |
| 14:06:27 188:18 | 14:09:01 191:2 | 14:12:19 193:11 | 14:14:48 195:21 | 14:18:36 198:6 |
| 14:06:28 188:19 | 14:09:04 191:3 | 14:12:23 193:12 | 14:14:50 195:22 | 14:18:44 198:7 |
| 14:06:29 188:20 | 14:09:06 191:4,5 | 14:12:24 193:13 | 14:14:56 195:23 | 14:18:46 198:8 |
| 14:06:35 188:21 | 14:09:11 191:6 | 14:12:26 193:14 | 14:14:59 195:24 | 14:18:47 198:9 |
| 14:06:40 188:22 | 14:09:17 191:7 | 14:12:30 193:15 | 14:15:08 195:25 | 14:18:51 198:10 |
| 14:06:42 188:23 | 14:09:20 191:8 | 14:12:32 193:16 | 14:15:12 196:1 | 14:18:54 198:11 |
| 14:06:45 188:24 | 14:09:23 191:9 | 14:12:36 193:17 | 14:15:14 196:2 | 14:18:55 198:12 |
| 14:06:52 188:25 | 14:09:33 191:10 | 14:12:37 193:18 | 14:15:18 196:3 | 14:19:01 198:13 |
| 14:06:53 189:1 | 14:09:37 191:11 | 14:12:39 193:19 | 14:15:21 196:4 | 14:19:06 198:14 |
| 14:06:54 189:2 | 14:09:39 191:12 | 14:12:41 193:20 | 14:15:23 196:5 | 14:19:11 198:15 |
| 14:06:55 189:3 | 14:09:41 191:13 | 14:12:44 193:21 | 14:15:27 196:6 | 14:19:15 198:16 |
| 14:06:58 189:4 | 14:09:45 191:14 | 14:12:45 193:22 | 14:15:30 196:7 | 14:19:19 198:17 |
| 14:07:00 189:5 | 14:09:47 191:15 | 14:12:46 193:23 | 14:15:32 196:8 | 14:19:24 198:18 |
| 14:07:15 189:6 | 14:09:51 191:16 | 14:12:55 193:24 | 14:15:35 196:9 | 14:19:28 198:19 |
| 14:07:17 189:7 | 14:09:54 191:17 | 14:12:57 193:25 | 14:15:36 196:10 | 14:19:31 198:20 |
| 14:07:18 189:8 | 14:09:57 191:18 | 14:12:59 194:1 | 14:15:41 196:11 | 14:19:33 198:21 |
| 14:07:23 189:9 | 14:09:59 191:19 | 14:13:00 194:2,3 | 14:15:42 196:12,13 | 14:19:34 198:22 |
| 14:07:26 189:10 | 14:10:08 191:20 | 14:13:01 194:4 | 14:15:44 196:14,15 | 14:19:37 198:23 |
| 14:07:28 189:11 | 14:10:13 191:21 | 14:13:04 194:5 | 14:15:47 196:16 | 14:19:40 198:24 |
| 14:07:29 189:12 | 14:10:14 191:22 | 14:13:08 194:6 | 14:16:01 196:17 | 14:19:41 198:25 |
| 14:07:33 189:13 | 14:10:19 191:23 | 14:13:09 194:7 | 14:16:04 196:18 | 14:19:44 199:1 |
| 14:07:35 189:14 | 14:10:20 191:24 | 14:13:11 194:8 | 14:16:11 196:19 | 14:19:50 199:2 |
| 14:07:37 189:16 | 14:10:26 191:25 | 14:13:14 194:9 | 14:16:13 196:20 | 14:19:52 199:3,4 |

| | | | | |
|---|---|---|---|---|
| 14:19:55 199:5 | 14:24:29 201:15 | 14:28:34 204:5 | 14:32:15 206:16 | 14:36:58 209:6 |
| 14:19:56 199:6 | 14:24:32 201:16 | 14:28:37 204:6 | 14:32:18 206:17 | 14:37:02 209:7 |
| 14:19:58 199:7 | 14:24:52 201:19,20 | 14:28:39 204:7 | 14:32:20 206:18 | 14:37:05 209:8 |
| 14:20:01 199:8 | 14:24:55 201:21 | 14:28:49 204:8 | 14:32:23 206:19 | 14:37:06 209:9 |
| 14:20:05 199:9,10 | 14:24:59 201:22 | 14:29:11 204:9 | 14:32:25 206:20 | 14:37:16 209:10,11 |
| 14:20:06 199:11 | 14:25:01 201:23 | 14:29:16 204:10 | 14:32:28 206:21 | 14:37:18 209:12 |
| 14:20:08 199:12 | 14:25:08 201:24 | 14:29:22 204:11 | 14:32:32 206:22 | 14:37:22 209:13 |
| 14:20:10 199:13 | 14:25:19 201:25 | 14:29:25 204:12 | 14:32:35 206:23 | 14:37:30 209:14 |
| 14:20:12 199:14 | 14:25:31 202:1 | 14:29:40 204:14,15 | 14:32:37 206:24 | 14:37:32 209:15 |
| 14:20:15 199:15 | 14:25:32 202:2 | 14:29:49 204:16,17 | 14:32:42 206:25 | 14:37:37 209:16 |
| 14:20:18 199:16 | 14:25:37 202:3 | 14:29:51 204:18 | 14:32:45 207:1 | 14:37:38 209:17,18 |
| 14:20:22 199:17 | 14:25:41 202:4 | 14:29:56 204:19 | 14:32:49 207:2 | 14:37:41 209:19,20 |
| 14:20:24 199:18 | 14:25:43 202:5 | 14:30:00 204:20 | 14:32:53 207:3 | 14:37:44 209:21 |
| 14:20:27 199:19 | 14:25:46 202:6 | 14:30:03 204:21 | 14:33:02 207:4 | 14:37:50 209:22 |
| 14:21:05 199:20 | 14:25:49 202:7 | 14:30:04 204:22 | 14:33:05 207:5 | 14:37:55 209:23 |
| 14:21:08 199:21 | 14:25:54 202:8 | 14:30:09 204:23 | 14:33:07 207:6,7 | 14:37:57 209:24 |
| 14:21:14 199:22 | 14:25:55 202:9 | 14:30:10 204:24 | 14:33:11 207:8 | 14:38:02 209:25 |
| 14:21:21 199:23 | 14:26:06 202:10,11 | 14:30:12 204:25 | 14:33:13 207:9 | 14:38:05 210:1 |
| 14:21:47 199:24 | 14:26:13 202:12 | 14:30:14 205:1 | 14:33:17 207:10 | 14:38:07 210:2 |
| 14:21:54 200:1,2 | 14:26:15 202:13 | 14:30:17 205:2 | 14:33:18 207:11 | 14:38:10 210:3 |
| 14:21:57 200:3 | 14:26:16 202:14 | 14:30:20 205:3 | 14:33:23 207:12 | 14:38:13 210:4 |
| 14:22:00 200:4 | 14:26:19 202:15 | 14:30:21 205:4 | 14:33:26 207:13 | 14:38:18 210:5 |
| 14:22:06 200:5 | 14:26:26 202:16 | 14:30:23 205:5 | 14:33:28 207:14 | 14:38:20 210:6 |
| 14:22:10 200:6 | 14:26:45 202:19,20 | 14:30:26 205:6,7 | 14:33:29 207:15 | 14:38:22 210:7 |
| 14:22:12 200:7 | 14:27:03 202:21 | 14:30:29 205:8 | 14:33:33 207:16 | 14:38:25 210:8 |
| 14:22:14 200:8 | 14:27:04 202:22 | 14:30:33 205:9 | 14:33:35 207:17 | 14:38:27 210:9 |
| 14:22:18 200:9 | 14:27:05 202:23 | 14:30:35 205:10 | 14:33:38 207:18 | 14:38:30 210:10 |
| 14:22:22 200:10 | 14:27:09 202:24 | 14:30:41 205:11 | 14:33:42 207:19 | 14:38:36 210:11,12 |
| 14:22:25 200:11 | 14:27:10 202:25 | 14:30:46 205:12 | 14:33:45 207:20 | 14:38:37 210:13 |
| 14:22:28 200:12 | 14:27:20 203:1 | 14:30:48 205:13 | 14:33:47 207:21 | 14:38:38 210:14 |
| 14:22:32 200:13 | 14:27:22 203:2 | 14:30:51 205:14 | 14:33:49 207:22 | 14:38:42 210:15 |
| 14:22:38 200:14 | 14:27:25 203:3 | 14:30:54 205:15 | 14:34:34 207:23 | 14:38:49 210:16 |
| 14:22:40 200:15 | 14:27:29 203:4 | 14:30:58 205:16 | 14:34:38 207:24 | 14:38:55 210:17 |
| 14:22:43 200:16 | 14:27:33 203:5 | 14:31:03 205:17 | 14:34:44 207:25 | 14:38:58 210:18 |
| 14:22:45 200:17 | 14:27:36 203:6 | 14:31:04 205:18 | 14:35:07 208:3,4 | 14:39:00 210:19 |
| 14:22:47 200:18 | 14:27:38 203:7 | 14:31:06 205:19 | 14:35:08 208:5 | 14:39:12 210:20 |
| 14:22:49 200:19 | 14:27:41 203:8 | 14:31:17 205:20 | 14:35:09 208:6 | 14:39:15 210:21 |
| 14:22:55 200:20 | 14:27:43 203:9 | 14:31:18 205:21 | 14:35:14 208:7 | 14:39:22 210:22 |
| 14:22:56 200:21 | 14:27:47 203:10 | 14:31:21 205:22 | 14:35:26 208:8,9 | 14:39:25 210:23 |
| 14:22:59 200:22 | 14:27:49 203:11 | 14:31:23 205:23 | 14:35:31 208:10 | 14:39:29 210:24 |
| 14:23:01 200:23 | 14:27:53 203:12 | 14:31:26 205:24 | 14:35:35 208:11 | 14:39:38 210:25 211:1 |
| 14:23:04 200:24 | 14:27:59 203:13 | 14:31:31 205:25 206:1 | 14:35:38 208:12 | 14:39:39 211:2 |
| 14:23:11 200:25 | 14:28:02 203:14 | 14:31:34 206:2 | 14:35:45 208:13 | 14:39:42 211:3 |
| 14:23:14 201:1 | 14:28:05 203:15 | 14:31:35 206:3 | 14:35:52 208:14 | 14:39:45 211:4 |
| 14:23:20 201:2 | 14:28:07 203:16 | 14:31:36 206:4 | 14:35:54 208:15 | 14:40:10 211:7 |
| 14:23:22 201:3 | 14:28:11 203:17,18 | 14:31:41 206:5 | 14:35:56 208:16 | 14:40:24 211:8 |
| 14:23:23 201:4 | 14:28:16 203:19,20 | 14:31:45 206:6 | 14:35:59 208:17 | 14:40:27 211:9 |
| 14:23:26 201:5 | 14:28:18 203:21 | 14:31:47 206:7 | 14:36:01 208:18 | 14:40:28 211:10 |
| 14:23:27 201:6 | 14:28:20 203:22 | 14:31:49 206:8 | 14:36:04 208:19 | 14:40:34 211:11 |
| 14:23:38 201:7 | 14:28:21 203:23 | 14:31:52 206:9 | 14:36:06 208:20 | 14:40:38 211:12,13 |
| 14:23:41 201:8 | 14:28:23 203:24 | 14:31:55 206:10 | 14:36:08 208:21 | 14:40:40 211:14 |
| 14:23:46 201:9 | 14:28:24 203:25 | 14:31:56 206:11 | 14:36:13 208:22 | 14:40:44 211:15 |
| 14:23:48 201:10,11 | 14:28:25 204:1 | 14:32:00 206:12 | 14:36:46 208:25 209:1 | 14:40:52 211:16 |
| 14:23:49 201:12 | 14:28:26 204:2 | 14:32:03 206:13 | 14:36:50 209:2 | 14:41:00 211:17 |
| 14:23:59 201:13 | 14:28:27 204:3 | 14:32:08 206:14 | 14:36:52 209:3,4 | 14:41:03 211:18 |
| 14:24:15 201:14 | 14:28:31 204:4 | 14:32:10 206:15 | 14:36:56 209:5 | 14:41:07 211:19 |

| | | | | |
|---|---|---|---|---|
| 14:41:13 211:20 | 14:46:04 214:8 | 14:48:43 216:20 | 14:51:04 219:4 | 14:53:59 221:15 |
| 14:41:17 211:21 | 14:46:06 214:9 | 14:48:46 216:21 | 14:51:08 219:5 | 14:54:07 221:16 |
| 14:41:21 211:22 | 14:46:10 214:10 | 14:48:48 216:22 | 14:51:12 219:6 | 14:54:10 221:17 |
| 14:41:24 211:23 | 14:46:13 214:11 | 14:48:51 216:23 | 14:51:14 219:7 | 14:54:13 221:18 |
| 14:41:26 211:24 | 14:46:16 214:12 | 14:48:55 216:24 | 14:51:15 219:8 | 14:54:17 221:19 |
| 14:41:27 211:25 | 14:46:19 214:13 | 14:48:58 216:25 | 14:51:19 219:9 | 14:54:19 221:20 |
| 14:41:31 212:1 | 14:46:22 214:14 | 14:48:59 217:1 | 14:51:23 219:10 | 14:54:20 221:21 |
| 14:41:36 212:2 | 14:46:26 214:15 | 14:49:04 217:2 | 14:51:27 219:11 | 14:54:27 221:22 |
| 14:41:39 212:3 | 14:46:28 214:16 | 14:49:06 217:3 | 14:51:30 219:12 | 14:54:29 221:23 |
| 14:41:42 212:4 | 14:46:31 214:17 | 14:49:08 217:4 | 14:51:32 219:13,14 | 14:54:31 221:24 |
| 14:41:44 212:5,6 | 14:46:34 214:18,19 | 14:49:10 217:5 | 14:51:33 219:15 | 14:54:34 221:25 |
| 14:41:45 212:7,8 | 14:46:37 214:20 | 14:49:12 217:6 | 14:51:36 219:16,17 | 14:54:36 222:1 |
| 14:41:49 212:9 | 14:46:39 214:21 | 14:49:15 217:7 | 14:51:39 219:18 | 14:54:38 222:2 |
| 14:41:58 212:10 | 14:46:41 214:22 | 14:49:16 217:8 | 14:51:43 219:19 | 14:54:40 222:3 |
| 14:42:10 212:11 | 14:46:46 214:23 | 14:49:19 217:9 | 14:51:48 219:20 | 14:54:49 222:4 |
| 14:42:12 212:12 | 14:46:48 214:24 | 14:49:20 217:10 | 14:51:50 219:21 | 14:54:56 222:5,6 |
| 14:42:15 212:13,14 | 14:46:51 214:25 | 14:49:23 217:11 | 14:51:52 219:22 | 14:54:59 222:7 |
| 14:42:17 212:15 | 14:46:54 215:1 | 14:49:26 217:12 | 14:51:54 219:23 | 14:55:03 222:8 |
| 14:42:20 212:16 | 14:46:57 215:2 | 14:49:29 217:13 | 14:51:57 219:24 | 14:55:15 222:10,11 |
| 14:42:21 212:17 | 14:47:00 215:3 | 14:49:31 217:14 | 14:52:02 219:25 | 14:55:16 222:12 |
| 14:42:24 212:18 | 14:47:02 215:4 | 14:49:34 217:15 | 14:52:06 220:1 | 14:55:17 222:13 |
| 14:42:32 212:19 | 14:47:03 215:6 | 14:49:36 217:16 | 14:52:12 220:2 | 14:55:19 222:14 |
| 14:42:34 212:20 | 14:47:05 215:7 | 14:49:37 217:17 | 14:52:13 220:3 | 14:55:21 222:15 |
| 14:42:36 212:21 | 14:47:06 215:8 | 14:49:39 217:18 | 14:52:16 220:4 | 14:55:22 222:16 |
| 14:42:38 212:22 | 14:47:07 215:9 | 14:49:41 217:19 | 14:52:19 220:5 | 14:55:23 222:17 |
| 14:42:40 212:23 | 14:47:09 215:10 | 14:49:43 217:20,21 | 14:52:21 220:6 | 14:55:26 222:18 |
| 14:42:41 212:24 | 14:47:12 215:11 | 14:49:46 217:22 | 14:52:25 220:7 | 14:55:28 222:19 |
| 14:42:50 212:25 | 14:47:18 215:12 | 14:49:47 217:23 | 14:52:31 220:8 | 14:55:31 222:20 |
| 14:44:39 213:1 | 14:47:25 215:13 | 14:49:50 217:24 | 14:52:33 220:9 | 145 25:23 |
| 14:44:41 213:2 | 14:47:27 215:14,15 | 14:49:53 217:25 | 14:52:35 220:10,11 | 14524 129:19 |
| 14:44:48 213:3 | 14:47:32 215:16 | 14:49:55 218:1 | 14:52:38 220:12 | 14578 124:11 |
| 14:44:50 213:4 | 14:47:37 215:17 | 14:49:58 218:2 | 14:52:40 220:13 | 146 5:4 |
| 14:44:53 213:5 | 14:47:38 215:18,19 | 14:49:59 218:3 | 14:52:44 220:14 | 147703 252:18 |
| 14:44:56 213:6 | 14:47:39 215:20 | 14:50:00 218:4,5 | 14:52:45 220:15 | 15th 138:7 |
| 14:44:57 213:7 | 14:47:42 215:21 | 14:50:02 218:6 | 14:52:48 220:16,17 | 15:04:06 222:21 |
| 14:44:59 213:8 | 14:47:44 215:22,23 | 14:50:05 218:7 | 14:52:50 220:18 | 15:04:09 222:22 |
| 14:45:01 213:9 | 14:47:48 215:24 | 14:50:08 218:8 | 14:52:52 220:19 | 15:04:12 222:23 |
| 14:45:03 213:10 | 14:47:51 215:25 | 14:50:16 218:9 | 14:52:56 220:20 | 15:04:15 222:24 |
| 14:45:04 213:11 | 14:47:55 216:1 | 14:50:19 218:10 | 14:52:59 220:21 | 15:04:16 222:25 |
| 14:45:05 213:12 | 14:47:56 216:2,3 | 14:50:24 218:11 | 14:53:01 220:22 | 15:04:18 223:1 |
| 14:45:08 213:13 | 14:47:59 216:4 | 14:50:25 218:12 | 14:53:04 220:23 | 15:04:24 223:2 |
| 14:45:12 213:14 | 14:48:02 216:5 | 14:50:27 218:13 | 14:53:07 220:24 | 15:04:27 223:3 |
| 14:45:17 213:15 | 14:48:06 216:6 | 14:50:28 218:14 | 14:53:11 220:25 | 15:04:31 223:4 |
| 14:45:21 213:16 | 14:48:07 216:7 | 14:50:29 218:15 | 14:53:17 221:1 | 15:04:39 223:5 |
| 14:45:24 213:17 | 14:48:10 216:8 | 14:50:31 218:16 | 14:53:18 221:2 | 15:04:43 223:6 |
| 14:45:26 213:18 | 14:48:13 216:9 | 14:50:33 218:17 | 14:53:21 221:3 | 15:04:48 223:7 |
| 14:45:27 213:19 | 14:48:15 216:10 | 14:50:36 218:18,19 | 14:53:23 221:4,5 | 15:04:50 223:8 |
| 14:45:29 213:20 | 14:48:18 216:11 | 14:50:41 218:20 | 14:53:42 221:6 | 15:04:53 223:9 |
| 14:45:35 213:21,22 | 14:48:20 216:12 | 14:50:44 218:21 | 14:53:45 221:7 | 15:04:58 223:10 |
| 14:45:39 213:23 | 14:48:22 216:13 | 14:50:46 218:22 | 14:53:46 221:8 | 15:05:00 223:11 |
| 14:45:44 213:24 | 14:48:25 216:14 | 14:50:48 218:23 | 14:53:47 221:9 | 15:05:02 223:12 |
| 14:45:46 213:25 | 14:48:28 216:15 | 14:50:51 218:24 | 14:53:49 221:10 | 15:05:06 223:13 |
| 14:45:47 214:1,2 | 14:48:31 216:16 | 14:50:53 218:25 | 14:53:51 221:11 | 15:05:10 223:14 |
| 14:45:55 214:3,4 | 14:48:32 216:17 | 14:50:56 219:1 | 14:53:54 221:12 | 15:05:11 223:15,16 |
| 14:45:56 214:5 | 14:48:35 216:18 | 14:50:58 219:2 | 14:53:55 221:13 | 15:05:15 223:17 |
| 14:45:58 214:6,7 | 14:48:40 216:19 | 14:51:00 219:3 | 14:53:56 221:14 | 15:05:16 223:18 |

| | | | | |
|---|---|---|---|---|
| 15:05:17 223:19 | 15:08:50 226:5 | 15:12:43 228:21,22 | 15:15:54 231:10 | 15:19:45 233:19 |
| 15:05:18 223:20 | 15:08:53 226:6 | 15:12:48 228:23,24 | 15:15:56 231:11 | 15:19:46 233:20 |
| 15:05:21 223:21 | 15:08:56 226:7 | 15:12:50 229:1 | 15:15:59 231:12 | 15:19:51 233:21 |
| 15:05:25 223:22 | 15:09:01 226:8 | 15:12:51 229:2 | 15:16:03 231:13 | 15:19:54 233:22 |
| 15:05:27 223:23,24 | 15:09:03 226:9 | 15:12:54 229:3 | 15:16:07 231:14 | 15:19:58 233:23 |
| 15:05:30 223:25 | 15:09:06 226:10 | 15:12:55 229:4 | 15:16:12 231:15 | 15:20:09 233:24 |
| 15:05:33 224:1 | 15:09:08 226:11 | 15:12:57 229:5 | 15:16:14 231:16 | 15:20:10 233:25 |
| 15:05:35 224:2 | 15:09:10 226:12 | 15:13:00 229:6 | 15:16:18 231:17 | 15:20:12 234:1 |
| 15:05:38 224:3 | 15:09:14 226:13 | 15:13:03 229:7 | 15:16:20 231:18 | 15:20:15 234:2 |
| 15:05:40 224:4 | 15:09:18 226:14,15,16 | 15:13:08 229:8 | 15:16:22 231:19 | 15:20:18 234:3 |
| 15:05:53 224:5 | 15:09:21 226:17 | 15:13:10 229:9,10 | 15:16:24 231:20 | 15:20:21 234:4 |
| 15:05:57 224:6 | 15:09:23 226:18 | 15:13:12 229:11 | 15:16:28 231:21,22 | 15:20:25 234:5 |
| 15:06:15 224:8,9 | 15:09:31 226:19 | 15:13:14 229:12 | 15:16:30 231:23 | 15:20:28 234:6 |
| 15:06:26 224:10 | 15:09:35 226:20 | 15:13:17 229:13 | 15:16:34 231:24 | 15:20:32 234:7 |
| 15:06:29 224:11 | 15:09:39 226:21 | 15:13:21 229:14 | 15:16:36 231:25 | 15:20:34 234:8 |
| 15:06:30 224:12 | 15:09:41 226:22 | 15:13:24 229:15 | 15:16:39 232:1 | 15:20:37 234:9 |
| 15:06:35 224:13 | 15:09:48 226:23 | 15:13:30 229:16 | 15:16:41 232:2 | 15:20:39 234:10 |
| 15:06:40 224:14,15 | 15:09:49 226:24 | 15:13:33 229:17 | 15:16:43 232:3 | 15:20:41 234:11 |
| 15:06:49 224:16 | 15:09:52 226:25 | 15:13:35 229:18 | 15:16:49 232:4 | 15:20:43 234:12 |
| 15:06:51 224:17 | 15:09:55 227:1 | 15:13:40 229:19 | 15:16:51 232:5 | 15:20:44 234:13 |
| 15:06:54 224:18 | 15:09:56 227:2 | 15:13:42 229:20 | 15:16:55 232:6 | 15:20:47 234:14 |
| 15:07:01 224:19 | 15:10:17 227:3 | 15:13:52 229:21 | 15:17:03 232:7 | 15:20:53 234:15 |
| 15:07:02 224:20 | 15:10:22 227:4 | 15:13:53 229:23 | 15:17:12 232:8,9 | 15:20:57 234:16 |
| 15:07:04 224:21 | 15:10:28 227:5 | 15:13:55 229:24 | 15:17:31 232:10 | 15:21:01 234:17 |
| 15:07:18 224:22 | 15:10:52 227:8,9 | 15:13:56 229:25 | 15:17:35 232:11 | 15:21:02 234:18 |
| 15:07:19 224:23 | 15:10:55 227:10 | 15:13:59 230:1 | 15:17:36 232:12 | 15:21:05 234:19 |
| 15:07:23 224:24 | 15:10:56 227:11 | 15:14:01 230:2 | 15:17:42 232:13 | 15:21:06 234:20 |
| 15:07:25 224:25 | 15:10:59 227:12 | 15:14:02 230:3 | 15:17:46 232:14 | 15:21:08 234:21 |
| 15:07:27 225:1 | 15:11:03 227:13 | 15:14:13 230:4 | 15:17:49 232:15 | 15:21:09 234:22 |
| 15:07:31 225:2 | 15:11:11 227:14 | 15:14:21 230:5 | 15:17:51 232:16 | 15:21:15 234:23 |
| 15:07:36 225:3,4 | 15:11:15 227:15 | 15:14:26 230:6 | 15:17:54 232:17 | 15:21:16 234:24 |
| 15:07:39 225:5 | 15:11:18 227:16 | 15:14:28 230:7 | 15:17:58 232:18 | 15:21:19 234:25 |
| 15:07:41 225:6 | 15:11:21 227:17 | 15:14:30 230:8 | 15:18:00 232:19 | 15:21:23 235:1 |
| 15:07:43 225:7 | 15:11:25 227:18 | 15:14:32 230:9 | 15:18:04 232:20 | 15:21:25 235:2 |
| 15:07:45 225:8 | 15:11:30 227:19 | 15:14:36 230:10 | 15:18:07 232:21 | 15:21:28 235:3 |
| 15:07:46 225:9 | 15:11:34 227:20 | 15:14:38 230:11 | 15:18:10 232:22 | 15:21:30 235:4 |
| 15:07:49 225:10 | 15:11:35 227:21 | 15:14:39 230:12 | 15:18:11 232:23 | 15:21:39 235:5 |
| 15:07:51 225:11 | 15:11:37 227:22,24 | 15:14:43 230:13 | 15:18:16 232:24 | 15:21:42 235:6 |
| 15:07:55 225:12 | 15:11:39 227:25 | 15:14:46 230:14 | 15:18:19 232:25 | 15:21:43 235:7 |
| 15:07:58 225:13 | 15:11:40 228:1 | 15:14:50 230:15 | 15:18:21 233:1 | 15:21:46 235:8 |
| 15:07:59 225:14 | 15:11:41 228:2,3 | 15:14:52 230:16 | 15:18:32 233:2,3 | 15:21:48 235:9 |
| 15:08:03 225:15 | 15:11:44 228:4 | 15:14:55 230:17 | 15:18:38 233:4 | 15:21:51 235:10 |
| 15:08:06 225:16 | 15:11:48 228:5 | 15:15:01 230:18 | 15:18:39 233:5 | 15:21:52 235:11 |
| 15:08:12 225:17 | 15:11:50 228:6 | 15:15:06 230:19 | 15:18:40 233:6 | 15:21:53 235:12 |
| 15:08:13 225:18 | 15:11:51 228:7 | 15:15:09 230:20 | 15:18:42 233:7 | 15:21:55 235:13 |
| 15:08:16 225:19 | 15:11:54 228:8 | 15:15:10 230:21 | 15:18:47 233:8 | 15:22:00 235:14 |
| 15:08:17 225:20 | 15:11:58 228:9 | 15:15:13 230:22 | 15:18:53 233:9 | 15:22:02 235:15 |
| 15:08:20 225:21 | 15:12:02 228:10 | 15:15:16 230:23 | 15:18:56 233:10 | 15:22:05 235:16 |
| 15:08:23 225:22 | 15:12:05 228:11,12 | 15:15:20 230:24 | 15:19:03 233:11 | 15:22:06 235:17 |
| 15:08:28 225:23 | 15:12:08 228:13 | 15:15:39 230:25 | 15:19:05 233:12 | 15:22:11 235:18 |
| 15:08:33 225:24 | 15:12:16 228:14 | 15:15:40 231:4 | 15:19:09 233:13 | 15:22:12 235:19 |
| 15:08:35 225:25 | 15:12:18 228:15 | 15:15:43 231:5 | 15:19:14 233:14 | 15:22:17 235:20 |
| 15:08:39 226:1 | 15:12:20 228:16 | 15:15:46 231:6 | 15:19:18 233:15 | 15:22:23 235:21 |
| 15:08:42 226:2 | 15:12:32 228:17 | 15:15:48 231:7 | 15:19:36 233:16 | 15:22:24 235:22 |
| 15:08:44 226:3 | 15:12:35 228:18 | 15:15:51 231:8 | 15:19:39 233:17 | 15:22:28 235:23 |
| 15:08:47 226:4 | 15:12:36 228:19,20 | 15:15:52 231:9 | 15:19:40 233:18 | 15:22:31 235:24 |

| | | | | |
|---|---|---|---|---|
| 22:35 235:25 | 15:25:49 238:9 | 15:28:54 240:17 | 15:33:06 242:23 | 15:36:43 245:7 |
| 22:38 236:1 | 15:25:51 238:10 | 15:28:59 240:18 | 15:33:11 242:24 | 15:36:46 245:8 |
| 15:22:42 236:2 | 15:25:56 238:11 | 15:29:01 240:19 | 15:33:13 242:25 | 15:36:49 245:9 |
| 15:22:48 236:3 | 15:25:58 238:12 | 15:29:05 240:20 | 15:33:17 243:1 | 15:36:54 245:10 |
| 15:22:50 236:4 | 15:26:02 238:13 | 15:29:08 240:21 | 15:33:20 243:2 | 15:36:55 245:11 |
| 15:22:52 236:5 | 15:26:04 238:14 | 15:29:13 240:22 | 15:33:24 243:3 | 15:36:59 245:12 |
| 15:22:56 236:6 | 15:26:06 238:15 | 15:29:16 240:23 | 15:33:28 243:4 | 15:37:02 245:13 |
| 15:22:58 236:7,8 | 15:26:09 238:16,17 | 15:29:17 240:24 | 15:33:33 243:5 | 15:37:07 245:14 |
| 15:23:00 236:9 | 15:26:13 238:18 | 15:29:19 240:25 | 15:33:35 243:6 | 15:37:10 245:15 |
| 15:23:02 236:10 | 15:26:18 238:19 | 15:29:31 241:1 | 15:33:39 243:7 | 15:37:15 245:16 |
| 15:23:03 236:11 | 15:26:20 238:20 | 15:29:33 241:2 | 15:33:41 243:8 | 15:37:19 245:17 |
| 15:23:06 236:12 | 15:26:24 238:21 | 15:29:41 241:3 | 15:33:46 243:9 | 15:37:24 245:18 |
| 15:23:13 236:13 | 15:26:26 238:22 | 15:29:46 241:4 | 15:33:48 243:10 | 15:37:25 245:19 |
| 15:23:14 236:14 | 15:26:29 238:23 | 15:29:47 241:5 | 15:33:52 243:11 | 15:37:28 245:20 |
| 15:23:15 236:15 | 15:26:30 238:24 | 15:29:51 241:6 | 15:33:58 243:12 | 15:37:35 245:21 |
| 15:23:19 236:16 | 15:26:32 238:25 | 15:29:54 241:7 | 15:34:02 243:13 | 15:37:43 245:22 |
| 15:23:21 236:17 | 15:26:36 239:1 | 15:30:00 241:8 | 15:34:05 243:14 | 15:37:46 245:23 |
| 15:23:26 236:18 | 15:26:39 239:2 | 15:30:04 241:9 | 15:34:09 243:15 | 15:37:49 245:24 |
| 15:23:29 236:19 | 15:26:41 239:3 | 15:30:09 241:10 | 15:34:11 243:16 | 15:37:51 245:25 |
| 15:23:33 236:20 | 15:26:43 239:4 | 15:30:15 241:11 | 15:34:14 243:17 | 15:37:53 246:1 |
| 15:23:38 236:21 | 15:26:48 239:5 | 15:30:19 241:12 | 15:34:16 243:18 | 15:37:56 246:2 |
| 15:23:43 236:22 | 15:26:54 239:6 | 15:30:23 241:13 | 15:34:18 243:19 | 15:38:00 246:3 |
| 15:23:46 236:23 | 15:27:01 239:7 | 15:30:25 241:14 | 15:34:23 243:20,21 | 15:38:03 246:4 |
| 15:23:50 236:24 | 15:27:05 239:8 | 15:30:26 241:15 | 15:34:26 243:22 | 15:38:05 246:5 |
| 15:23:53 236:25 | 15:27:12 239:9 | 15:30:30 241:16 | 15:34:28 243:23 | 15:38:12 246:6 |
| 15:23:54 237:1 | 15:27:13 239:10 | 15:30:32 241:17 | 15:34:31 243:24 | 15:38:13 246:7 |
| 15:23:58 237:2 | 15:27:14 239:11 | 15:30:55 241:18 | 15:34:33 243:25 | 15:38:15 246:8,9 |
| 15:24:02 237:3 | 15:27:15 239:12 | 15:31:01 241:19 | 15:34:35 244:1 | 15:38:25 246:10 |
| 15:24:03 237:4 | 15:27:17 239:13 | 15:31:05 241:20 | 15:34:42 244:2 | 15:38:26 246:11 |
| 15:24:06 237:5 | 15:27:20 239:14 | 15:31:12 241:21 | 15:34:44 244:3 | 15:38:29 246:12 |
| 15:24:09 237:6 | 15:27:22 239:15 | 15:31:21 241:22 | 15:34:48 244:4 | 15:38:31 246:13 |
| 15:24:14 237:7 | 15:27:24 239:16 | 15:31:25 241:23 | 15:34:52 244:5 | 15:38:32 246:14 |
| 15:24:16 237:8 | 15:27:29 239:17 | 15:31:28 241:24 | 15:34:53 244:6 | 15:38:35 246:15 |
| 15:24:22 237:9 | 15:27:32 239:18 | 15:31:31 241:25 | 15:34:56 244:7 | 15:38:36 246:16,17 |
| 15:24:25 237:10 | 15:27:40 239:19 | 15:31:37 242:1 | 15:35:00 244:8 | 15:38:38 246:18 |
| 15:24:28 237:11 | 15:27:46 239:20 | 15:31:41 242:2 | 15:35:01 244:9,10 | 15:38:39 246:19 |
| 15:24:32 237:12 | 15:27:50 239:21 | 15:31:44 242:3 | 15:35:07 244:11 | 15:38:43 246:20 |
| 15:24:33 237:13 | 15:27:53 239:22 | 15:31:49 242:4 | 15:35:17 244:12 | 15:38:46 246:21 |
| 15:24:35 237:14 | 15:27:56 239:23 | 15:31:51 242:5 | 15:35:30 244:13 | 15:38:48 246:22 |
| 15:24:36 237:15 | 15:28:00 239:24 | 15:31:57 242:6 | 15:35:33 244:14 | 15:38:53 246:23 |
| 15:24:39 237:16,17 | 15:28:03 239:25 | 15:32:11 242:7 | 15:35:34 244:15 | 15:38:55 246:24 |
| 15:24:40 237:18 | 15:28:11 240:1 | 15:32:15 242:8 | 15:35:37 244:16 | 15:38:57 246:25 |
| 15:24:46 237:19 | 15:28:14 240:2 | 15:32:21 242:9 | 15:35:40 244:17 | 15:38:58 247:1 |
| 15:24:47 237:20 | 15:28:16 240:3 | 15:32:24 242:10 | 15:35:44 244:18 | 15:39:00 247:2 |
| 15:24:59 237:21 | 15:28:17 240:4 | 15:32:28 242:11 | 15:35:48 244:19 | 15:39:05 247:3 |
| 15:25:07 237:22 | 15:28:18 240:5 | 15:32:31 242:12 | 15:35:51 244:20 | 15:39:09 247:4 |
| 15:25:11 237:23 | 15:28:20 240:6 | 15:32:34 242:13 | 15:35:57 244:22 | 15:39:11 247:5 |
| 15:25:15 237:24 | 15:28:23 240:7 | 15:32:37 242:14 | 15:35:58 244:23 | 15:39:14 247:6 |
| 15:25:16 237:25 | 15:28:26 240:8 | 15:32:39 242:15 | 15:36:09 244:24 | 15:39:18 247:7 |
| 15:25:23 238:2 | 15:28:28 240:9 | 15:32:44 242:16 | 15:36:12 244:25 | 15:39:21 247:8 |
| 15:25:26 238:3 | 15:28:33 240:10,11 | 15:32:49 242:17 | 15:36:17 245:1 | 15:39:24 247:9 |
| 15:25:32 238:4 | 15:28:37 240:12 | 15:32:51 242:18 | 15:36:22 245:2 | 15:39:27 247:10 |
| 15:25:35 238:5 | 15:28:41 240:13 | 15:32:53 242:19 | 15:36:28 245:3 | 15:39:48 247:11 |
| 15:25:42 238:6 | 15:28:43 240:14 | 15:32:57 242:20 | 15:36:31 245:4 | 15:39:51 247:12 |
| 15:25:43 238:7 | 15:28:48 240:15 | 15:32:59 242:21 | 15:36:34 245:5 | 15:39:58 247:13 |
| 15:25:45 238:8 | 15:28:51 240:16 | 15:33:04 242:22 | 15:36:37 245:6 | 15:40:02 247:14 |

294

**15:40:07** 247:15
**15:40:16** 247:16
**15:40:18** 247:17
**15:40:22** 247:18
**15:40:24** 247:19
**15:40:27** 247:20
**15:40:28** 247:21
**15:40:30** 247:22
**15:40:32** 247:23
**15:40:35** 247:24
**15:40:36** 247:25 248:1
**15:40:39** 248:2
**15:40:41** 248:3,4
**15:40:43** 248:5
**15:40:45** 248:6
**15:40:47** 248:7
**15:40:49** 248:8
**15:40:52** 248:9
**15:40:54** 248:10
**15:41:00** 248:11
**15:41:04** 248:12
**15:41:09** 248:13
**15:41:11** 248:14
**15:41:14** 248:15
**15:41:19** 248:16
**15:41:39** 248:17
**15:41:41** 248:18
**15:41:45** 248:19
**15:41:48** 248:20
**15:41:49** 248:21
**15:41:52** 248:22
**15:41:54** 248:23
**15:41:56** 248:24
**15:41:57** 248:25
**15:41:59** 249:1
**15:42:02** 249:2,3
**15:42:03** 249:4
**15:42:05** 249:5
**15:42:06** 249:6
**15:42:08** 249:7
**15:42:11** 249:8
**15:47:35** 249:9
**15:47:37** 249:10
**15:47:39** 249:11
**15:47:40** 249:12
**15:47:44** 249:13
**15:47:46** 249:14
**15:47:48** 249:15
**15:47:51** 249:16
**151** 5:6
**16** 137:13
**16th** 11:17
**17** 1:22 7:8
**17th** 252:3
**17-page** 4:8
**176** 5:8

**18** 135:17
**186** 5:10
**188** 5:12
**199** 5:14
**1995** 24:3,9 25:24
**1998** 31:18 32:13
  121:10,12,14,23
  125:16 126:3
**1999** 25:12 45:22 47:9
  54:9 59:2 64:15 69:5
  125:12 128:21 134:18
  137:1,2,8,13,17 138:3
  139:1 154:19 244:12

_____ **2** _____
**2** 100:17 156:23 168:18
  192:5 219:8
**2-0** 228:18
**2:54** 222:17
**20** 14:19 32:17 211:11
  212:12
**200** 14:5 110:13 156:6
  156:16
**200,000** 68:2
**2000** 21:5 27:5,23
  44:16 49:9,11 54:12
  55:19 97:2,6 105:3
  118:18 177:3 204:21
  208:11 209:9,14
**2001** 21:7 25:12 49:12
  49:19,20 56:7 64:12
  69:5 85:14 93:9
  94:12 97:7,8,9 105:3
  105:4,8 106:14 107:1
  118:18 211:11 212:12
  223:6,10 225:1,13
**2002** 56:8 64:11
**2003** 64:14
**2004** 64:25,25
**2005** 1:22 7:8 252:3,14
**2008** 252:18
**201** 5:15
**202** 5:17
**204** 5:19
**208** 5:21,23
**21** 126:2
**211** 5:25
**224** 6:3
**227** 6:5
**23** 128:21
**250** 133:11 251:7
**2600** 2:7
**27th** 252:14
**275** 3:4

_____ **3** _____

**3** 169:3 222:18
**3Com** 32:25 203:19
  204:4
**3/2/00** 228:13
**3/7/00** 228:10
**3:02** 222:21
**3:40** 249:6
**3:46** 249:9,14,17
**30** 126:3 143:15 144:4
  144:8
**30th** 163:16 244:12
**31** 25:12 49:19 69:5
  85:14 97:7 198:5
**379** 153:4,8 169:12

_____ **4** _____

**4** 220:12,13 222:22
  249:16
**400** 14:3
**4148** 160:14
**415.288.4545** 2:6
**415.875.2303** 3:3
**4150** 153:16 154:13
  159:6
**4151** 154:14
**42** 7:6 9:8
**45** 46:10 187:15
**47** 231:13

_____ **5** _____

**5/12/99** 228:22
**50** 143:15 144:4,8
**500** 2:22 41:25
**500K** 66:9
**509** 200:19
**510** 186:9 200:19
**523** 176:4
**527** 129:13
**541** 4:7 11:4,8,10,11,14
  11:19
**542** 4:8 11:22 12:1,3,10
**543** 4:10 117:5,10,11
  117:20 118:6,11
  119:3 120:4
**544** 4:12 120:8,11,21
  121:8 122:7
**545** 4:14 124:24 125:3
  125:6,18 126:1
  128:15 129:1
**546** 4:16 128:10,13,17
**547** 4:19 129:12,15
**548** 4:21 134:2,6 137:4
  137:7
**549** 4:23 138:19,22,24
**550** 5:2 139:6,9,13,21
  140:3,4 147:15

**551** 5:4 146:12,15,17
  146:21
**552** 5:5 151:19,22
  152:1
**553** 5:7 176:3,6,8,17,19
  185:19
**554** 5:9 186:8,11,17
**555** 5:11 188:9,14,17
**556** 5:13 199:21,25
  200:2
**557** 5:15 134:8 201:14
  201:15,18,20
**558** 5:16 202:15,18,20
**559** 5:18 134:3 136:24
  137:4 204:10,13,15
  205:11 206:25
**56** 127:2
**560** 5:20 207:24 208:2
  208:4,13
**561** 5:22 208:21,24
  209:1,5 210:25 211:2
**562** 5:24 211:3,6,8,14
  212:10 222:4
**563** 6:2 224:4,7,9,17
  225:16
**564** 6:4 227:4,7,9 228:3
**568** 139:7

_____ **6** _____

**6** 94:12 223:10
**6th** 94:13 223:6
**6.9** 141:25
**6/16/99** 241:7
**60** 1:20 2:13 7:14 210:8
  210:14
**61** 228:16
**617.954.5195** 2:21

_____ **7** _____

**70** 233:17
**71** 190:20
**74** 211:4
**752** 207:25
**754** 199:22
**758** 204:11
**759** 228:9
**761** 228:13,15
**764** 232:7
**766** 233:3
**770** 233:16
**772** 235:20
**774** 237:18
**777** 239:6
**779** 240:1
**782** 241:3
**785** 242:21,23

**788** 244:10
**79** 240:2
**795** 208:22

_____ **8** _____

**82** 241:4
**820** 124:25
**85** 242:22

_____ **9** _____

**9** 4:4 252:18
**9th** 208:11
**9:04** 1:22 7:8
**9:38** 36:25
**9:40** 37:4
**929** 128:11
**940** 224:5
**94111** 2:8 3:5
**98** 44:16 122:12 126:15
**99** 4:19 49:19 54:12
  55:18,19 57:24 85:13
  118:18 159:9 188:22
  236:1 241:8 244:7,8

1  TOWER C. SNOW, JR. (State Bar No. 58342)
   DEAN S. KRISTY (State Bar No. 157646)
2  KEVIN P. MUCK (State Bar No. 120918)
   FELIX S. LEE (State Bar No. 197084)
3  ALICE L. JENSEN (State Bar No. 203327)
   CLIFFORD CHANCE US LLP
4  One Market, Steuart Street Tower
   San Francisco, California 94105
5  Telephone:    (415) 778-4700
   Facsimile:    (415) 778-4701
6
   Attorneys for Defendants Cisco Systems, Inc.,
7  John T. Chambers, Larry R. Carter, Carol A. Bartz,
   Steven M. West, Edward R. Kozel, Donald T. Valentine,
8  Robert L. Puette, Judith L. Estrin, Gary J. Daichendt,
   Donald J. Listwin, Carl Redfield and Michelangelo Volpi
9

10              UNITED STATES DISTRICT COURT

11           NORTHERN DISTRICT OF CALIFORNIA

12                   SAN JOSE DIVISION

13

14  PLUMBERS & PIPEFITTERS NATIONAL      )   Case No. C-01-20418-JW (PVT)
    PENSION FUND, et al.,                )
15                                       )   CLASS ACTION
                 Plaintiffs,             )
16                                       )   [PROPOSED] PROTECTIVE ORDER
         vs.                             )   GOVERNING CONFIDENTIAL
17                                       )   MATERIAL
    CISCO SYSTEMS, INC., et al.,         )
18                                       )
                 Defendants.             )
19  ─────────────────────────────────── )
                                         )
20  In re CISCO SYSTEMS, INC. SECURITIES )
    LITIGATION                           )
21                                       )
                                         )
22  ─────────────────────────────────── )
                                         )
    This Document Relates To:            )
23                                       )
         ALL ACTIONS.                    )
24                                       )
                                         )
25                                       )
                                         )
26                                       )
                                         )
27  ───────────────────────────────────

28

CA 58411.1

## 1. PROTECTIVE ORDER

Upon consideration of the Motion of defendants Cisco Systems, Inc., John T. Chambers, Larry R. Carter, Carol A. Bartz, Steven M. West, Edward R. Kozel, Donald T. Valentine, Robert L. Puette, Judith L. Estrin, Gary J. Daichendt, Donald J. Listwin, Carl Redfield and Michelangelo Volpi (collectively, "defendants"), for Entry of a Protective Order Governing Confidential Material in the above-captioned action, which came on before the Court for hearing on July 29, 2003,

IT IS HEREBY ORDERED that this Order ("Protective Order") shall govern the use and dissemination of all material designated as confidential produced in discovery within this action.

## 2. PURPOSES AND LIMITATIONS

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation would be warranted. This Protective Order does not confer blanket protections on all disclosures or responses to discovery and the protection it affords extends only to the limited information or items that are entitled under the applicable legal principles to treatment as confidential. Further, as set forth in Section 11, below, this Protective Order creates no entitlement to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and reflects the standards that will be applied when a party seeks permission from the court to file material under seal.

## 3. DEFINITIONS

3.1     Party: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and outside counsel (and their support staff).

3.2     Disclosure or Discovery Material: all items or information, regardless of the medium or manner generated, stored, or maintained (including, among other things, testimony, transcripts, or tangible things) that are produced or generated in disclosures or responses to discovery in this matter.

3.3     "Confidential" Information or Items: information (regardless of how generated, stored or maintained) or tangible things that qualify for protection under standards developed under 10 F.R.Civ.P. 26(c).

-1-

CA 58411.1

1      3.4    Receiving Party: a Party that receives Disclosure or Discovery Material from a

2  Producing Party.

3      3.5    Producing Party: a Party or non-party that produces Disclosure or Discovery Material

4  in this action.

5      3.6.    Designating Party: a Party or non-party that designates information or items that it

6  produces in disclosures or in responses to discovery as "Confidential."

7      3.7    Protected Material: any Disclosure or Discovery Material that is designated as

8  "Confidential."

9      3.8    Outside Counsel: attorneys who are not employees of a Party but who are retained to

10  represent or advise a Party in this action.

11      3.9    House Counsel: attorneys who are employees of a Party.

12      3.10    Counsel (without qualifier): Outside Counsel and House Counsel (as well as their

13  support staffs).

14      3.11    Expert: a person with specialized knowledge or experience in a matter pertinent to

15  the litigation who has been retained by a Party or its Counsel to serve as an expert witness or as a

16  consultant in this action and who is not a past or a current employee of a Party or of a competitor of a

17  Party's and who, at the time of retention, is not anticipated to become an employee of a Party or a

18  competitor of a Party's. This definition includes a professional jury or trial consultant retained in

19  connection with this litigation.

20      3.12    Professional Vendors: persons or entities that provide litigation support services (e.g.,

21  photocopying; videotaping; translating; preparing exhibits or demonstrations; organizing, storing,

22  retrieving data in any form or medium; etc.) and their employees and subcontractors.

23      **4.  SCOPE**

24      The protections conferred by this Protective Order cover not only Protected Material (as

25  defined above), but also any information copied or extracted therefrom, as well as all copies,

26  excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by

27  parties or counsel to or in court or in other settings that might reveal Protected Material.

28

1    **5. DURATION**

2    Even after the termination of this litigation, the confidentiality obligations imposed by this

3    Protective Order shall remain in effect until a Designating Party agrees otherwise in writing or a

4    court order otherwise directs.

5    **6. DESIGNATING PROTECTED MATERIAL**

6    6.1    Exercise of Restraint and Care in Designating Material for Protection. Each Party or

7    non-party that designates information or items for protection under this Order must take care to limit

8    any such designation to specific material that qualifies under the appropriate standards. A

9    Designating Party must take care to designate for protection only those parts of material, documents,

10    items, or oral or written communications that qualify — so that other portions of the material,

11    documents, items, or communications for which protection is not warranted are not swept

12    unjustifiably within the ambit of this Order.

13    Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown

14    to be clearly unjustified, or that have been made for an improper purpose (e.g., to unnecessarily

15    encumber or retard the case development process, or to impose unnecessary expenses and burdens on

16    other parties), expose the Designating Party to sanctions.

17    If it comes to a Party's or a non-party's attention that information or items that it designated

18    for protection do not qualify for protection at all, or do not qualify for the level of protection initially

19    asserted, that Party or non-party must promptly notify all other parties that it is withdrawing the

20    mistaken designation.

21    6.2    Manner and Timing of Designations. Except as otherwise provided in this Order (see,

22    e.g., second paragraph of section 6.2(a), below), or as otherwise ordered, material that qualifies for

23    protection under this Order must be clearly so designated before the material is disclosed or

24    produced.

25    Designation in conformity with this Order requires:

26    (a) for information in documentary form (apart from transcripts of depositions or

27    other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" at

28    the top of each page that contains protected material. If only a portion or portions of the material on

-3-

1    a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s)

2    (e.g., by making appropriate markings in the margins).

3              A Party or non-party that makes original documents or materials available for

4    inspection need not designate them for protection until after the inspecting Party has indicated which

5    material it would like copied and produced. During the inspection and before the designation, all of

6    the material made available for inspection shall be deemed "CONFIDENTIAL." After the

7    inspecting Party has identified the documents it wants copied and produced, the Producing Party

8    must determine which documents, or portions thereof, qualify for protection under this Order, then,

9    before producing the specified documents, the Producing Party must affix "CONFIDENTIAL" at the

10   top of each page that contains Protected Material. If only a portion or portions of the material on a

11   page qualifies for protection, the Producing Party also must clearly identify the protected portion(s)

12   (e.g., by making appropriate markings in the margins).

13             (b) for testimony given in deposition or in other pretrial or trial proceedings, that the

14   Party or non-party offering or sponsoring the testimony identify on the record, before the close of the

15   deposition, hearing, or other proceeding, all protected testimony. When it is impractical to identify

16   separately each portion of testimony that is entitled to protection, and when it appears that substantial

17   portions of the testimony may qualify for protection, the Party or non-party that sponsors, offers, or

18   gives the testimony may invoke on the record (before the deposition or proceeding is concluded) a

19   right to have up to 20 days to identify the specific portions of the testimony as to which protection is

20   sought. Only those portions of the testimony that are appropriately designated for protection within

21   the 20 days shall be covered by the provisions of this Protective Order.

22             Transcript pages containing Protected Material must be separately bound by the court

23   reporter, who must affix to the top of each such page the legend "CONFIDENTIAL," as instructed

24   by the Party or non-party offering or sponsoring the witness or presenting the testimony.

25             (c) for information produced in some form other than documentary, and for any other

26   tangible items, that the Producing Party affix in a prominent place on the exterior of the container or

27   containers in which the information or item is stored the legend "CONFIDENTIAL." If only

28

-4-

1    portions of the information or item warrant protection, the Producing Party, to the extent practicable,
2    shall identify the protected portions.

3      6.3     Inadvertent Failures to Designate. If timely corrected, an inadvertent failure to
4    designate qualified information or items as "Confidential" does not, standing alone, waive the
5    Designating Party's right to secure protection under this Order for such material. If material is
6    appropriately designated as "Confidential" after the material was initially produced, the Receiving
7    Party, on timely notification of the designation, must make reasonable efforts to assure that the
8    material is treated in accordance with the provisions of this Order.

9                  **7. CHALLENGING CONFIDENTIALITY DESIGNATIONS**

10     7.1     Timing of Challenges. Unless a prompt challenge to a Designating Party's
11    confidentiality designation is necessary to avoid foreseeable substantial unfairness, unnecessary
12    economic burdens, or a later significant disruption or delay of the litigation, a Party does not waive
13    its right to challenge a confidentiality designation by electing not to mount a challenge promptly
14    after the original designation is disclosed.

15     7.2     Meet and Confer. A Party that elects to initiate a challenge to a Designating Party's
16    confidentiality designation must do so in good faith and must begin the process by conferring
17    directly (in voice to voice dialogue; other forms of communication are not sufficient) with Counsel
18    for the Designating Party. In conferring, the challenging Party must explain the basis for its belief
19    that the confidentiality designation was not proper and must give the Designating Party an
20    opportunity to review the designated material, to reconsider the circumstances, and, if no change in
21    designation is offered, to explain the basis for the chosen designation. A challenging Party may
22    proceed to the next stage of the challenge process only if it has engaged in this meet and confer
23    process first.

24     7.3     Judicial Intervention. A Party that elects to press a challenge to a confidentiality
25    designation after considering the justification offered by the Designating Party may file and serve a
26    motion under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) that
27    identifies the challenged material and sets forth in detail the basis for the challenge. Each such
28    motion must be accompanied by a competent declaration that affirms that the movant has complied

1    with the meet and confer requirements imposed in the preceding paragraph and that sets forth with

2    specificity the justification for the confidentiality designation that was given by the Designating

3    Party in the meet and confer dialogue.

4        The burden of persuasion in any such challenge proceeding shall be on the Designating Party.

5    Notwithstanding any challenge to the designation of material as Protected Material, all such

6    documents shall be treated as such and shall be subject to the provisions hereof unless and until one

7    of the following occurs: (a) the Party or non-party who claims that the material is Protected Material

8    withdraws such designation in writing; or (b) the Court rules the material is not Protected Material.

9                      **8.  ACCESS TO AND USE OF PROTECTED MATERIAL**

10       8.1     Basic Principles.  A Receiving Party may use Protected Material that is disclosed or

11   produced by another Party or by a non-party in connection with this case only for prosecuting,

12   defending, or attempting to settle this litigation.  Such Protected Material may be disclosed only to

13   the categories of persons and under the conditions described in this Protective Order.  When the

14   litigation has been terminated, a Receiving Party must comply with the provisions of section 12,

15   below (FINAL DISPOSITION).

16       Protected Material must be stored and maintained by a Receiving Party at a location and in a

17   secure manner that ensures that access is limited to the persons authorized under this Protective

18   Order.

19       8.2     Disclosure of "CONFIDENTIAL" Information or Items.  Unless otherwise ordered by

20   the court or permitted in writing by the Designating Party, a Receiving Party may disclose any

21   information or item designated "CONFIDENTIAL" only to:

22           (a) the Receiving Party's Outside Counsel of record in this action, as well as

23   employees of said Counsel to whom it is reasonably necessary to disclose the information for this

24   litigation and who have signed the "Acknowledgment and Agreement to Be Bound" by this

25   Protective Order that is attached hereto as Exhibit A;

26           (b) the officers, directors, and employees (including House Counsel) of the Receiving

27   Party to whom disclosure is reasonably necessary for this litigation and who have signed the

28   "Acknowledgment and Agreement to Be Bound" (Exhibit A);

-6-

1    (c) experts or consultants of the Receiving Party to whom disclosure is reasonably
2    necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be
3    Bound" (Exhibit A);

4    (d) the Court and its personnel;

5    (e) court reporters, their staffs, and professional vendors to whom disclosure is
6    reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement
7    to Be Bound" (Exhibit A);

8    (f) witnesses testifying at deposition or trial in the action (other than those described
9    in paragraph 8.2(g)) to whom disclosure is reasonably necessary and who have signed the
10   "Acknowledgment and Agreement to Be Bound" (Exhibit A). Pages of transcribed deposition
11   testimony or exhibits to depositions that reveal Protected Material must be separately bound by the
12   court reporter and may not be disclosed to anyone except as permitted under this Protective Order;

13   (g) the author of the document or the original source of the information; and

14   (h) any other person only upon order of the court or upon prior written consent of the
15   Producing Party.

16   **9.  PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED**
17   **IN OTHER LITIGATION.**

18   If a Receiving Party is served with a subpoena or an order issued in other litigation that
19   would compel disclosure of any information or items designated in this action as
20   "CONFIDENTIAL," the Receiving Party must so notify the Designating Party, in writing (by fax, if
21   possible) immediately and in no event more than three court days after receiving the subpoena or
22   order. Such notification must include a copy of the subpoena or court order.

23   The Receiving Party also must immediately inform in writing the Party who caused the
24   subpoena or order to issue in the other litigation that some or all the material covered by the
25   subpoena or order is the subject of this Protective Order. In addition, the Receiving Party must
26   deliver a copy of this Protective Order promptly to the Party in the other action that caused the
27   subpoena or order to issue.

28

-7-

CA 58411.1

1    The purpose of imposing these duties is to alert the interested parties to the existence of this

2    Protective Order and to afford the Designating Party in this case an opportunity to try to protect its

3    confidentiality interests in the court from which the subpoena or order issued. The Designating Party

4    shall bear the burdens and the expenses of seeking protection in that court of its confidential material

5    — and nothing in these provisions should be construed as authorizing or encouraging a Receiving

6    Party in this action to disobey a lawful directive from another court.

7    ### 10. UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

8    If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected

9    Material to any person or in any circumstance not authorized under this Protective Order, the

10   Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized

11   disclosures, (b) use its best efforts to retrieve all copies of the Protected Material, (c) inform the

12   person or persons to whom unauthorized disclosures were made of all the terms of this Protective

13   Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be

14   Bound" that is attached hereto as Exhibit A.

15   ### 11. FILING PROTECTED MATERIAL

16   Without written permission from the Designating Party or a court order secured after

17   appropriate notice to all interested persons, a Party may not file in the public record in this action any

18   Protected Material in any form, whether contained or summarized within the body of any document,

19   pleading, brief or writing, or attached thereto. A Party that seeks to file under seal any Protected

20   Material must comply with Civil Local Rule 79-5.

21   ### 12. FINAL DISPOSITION

22   Unless otherwise ordered or agreed in writing by the Producing Party, within sixty days after

23   the final termination of this action, each Receiving Party must return all Protected Material to the

24   Producing Party. As used in this subdivision, "all Protected Material" includes all copies, abstracts,

25   compilations, summaries or any other form of reproducing or capturing any of the Protected

26   Material. With permission in writing from the Designating Party, the Receiving Party may destroy

27   some or all of the Protected Material instead of returning it. Whether the Protected Material is

28   returned or destroyed, the Receiving Party must submit a written certification to the Producing Party

-8-

CA 58411.1

1   (and, if not the same person or entity, to the Designating Party) by the sixty day deadline that

2   identifies (by category, where appropriate) all the Protected Material that was returned or destroyed

3   and that affirms that the Receiving Party has not retained any copies, abstracts, compilations,

4   summaries or other forms of reproducing or capturing any of the Protected Material.

5   Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings,

6   motion papers, transcripts, legal memoranda, correspondence or attorney work product, even if such

7   materials contain Protected Material. Any such archival copies that contain or constitute Protected

8   Material remain subject to this Protective Order as set forth in Section 5 (DURATION), above.

9                   **13. MISCELLANEOUS**

10        13.1   Right to Further Relief. It is the present intention of the parties that the provisions of

11   this Protective Order shall govern discovery and other pretrial proceedings in this action.

12   Nonetheless, each of the parties or any other proper non-party shall be entitled to seek modification

13   of this Protective Order by application to the Court on notice to the other party hereto for good cause.

14        13.2   Right to Assert Other Objections. By stipulating to the entry of this Protective Order

15   no Party waives any right it otherwise would have to object to disclosing or producing any

16   information or item on any ground not addressed in this Protective Order. Similarly, no Party waives

17   any right to object on any ground to use in evidence of any of the material covered by this Protective

18   Order.

19        13.3   No Waiver. Entering into, agreeing to, and/or producing or receiving material

20   designated as "Confidential," or otherwise complying with the terms of this Confidentiality Order

21   shall not:

22            (a) operate as an admission by any party that any particular material designated as

23   "CONFIDENTIAL," contains or reflects trade secrets, proprietary or commercially sensitive

24   information, or any other type of confidential information;

25            (b) operate as an admission by any party that the restrictions and procedures set forth

26   herein constitute or do not constitute adequate protection for any particular information deemed by

27   any party to be "CONFIDENTIAL";

28

CA 58411.1

1       (c) prejudice in any way the rights of the parties to object to the production of
2    documents they consider not subject to discovery;

3       (d) prejudice in any way the rights of any party to object to the authenticity or
4    admissibility into evidence of any document, testimony, or other evidence subject to this Protective
5    Order;

6       (e) prejudice in any way the rights of a party to seek a determination by the Court
7    whether any information or material should be subject to the terms of this Protective Order;

8       (f) prejudice in any way the rights of a party to petition the Court for a further
9    protective order relating to any purportedly confidential information;

10       (g) prevent the parties to this Protective Order from agreeing in writing or on the
11    record during a deposition or hearing in this action to alter or waive the provisions or protections
12    provided for herein with respect to any particular information or material;

13       (h) limit a party's ability to grant non-parties access to its own documents and/or
14    information;

15       (i) be deemed to waive any applicable privilege or work product protection, or to
16    affect the ability of a party to seek relief for an inadvertent disclosure of material protected by
17    privilege or work product protection; and/or

18       (j) prevent a party or third party from objecting to discovery which it believes to be
19    improper, including objections based upon the privileged, confidential, or proprietary nature of the
20    Protected Material requested.

21    13.4    Subject to Jurisdiction. All persons who have access to information or material
22    designated as Protected Material under this Protective Order acknowledge that they are bound by
23    this Protective Order and submit to the jurisdiction of this court for the purposes of enforcing this
24    Protective Order. However, this Protective Order has no effect upon, and shall not apply to, a
25    Producing Party's use of its own Protected Material for any purpose.

26

27    DATED: __7/22/03__                    ___/s/ Patricia V. Trumbull___
                                          The Honorable Patricia V. Trumbull
28                                        Chief United States Magistrate Judge

-10-

1          EXHIBIT A

2     ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

3     I, _____ [print or type full name], of _____ [print or

4 type full address], declare under penalty of perjury that I have read in its entirety and understand the

5 Protective Order that was issued by the United States District Court for the Northern District of

6 California on _____ [date] in the case of *In re Cisco Systems, Inc., Securities Litigation*, Master

7 File NO. C-01-20418-JW (PVT). I agree to comply with and to be bound by all the terms of this

8 Protective Order and I understand and acknowledge that failure to so comply could expose me to

9 sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in

10 any manner any information or item that is subject to this Protective Order to any person or entity

11 except in strict compliance with the provisions of this Order.

12    I further agree to submit to the jurisdiction of the United States District Court for the

13 Northern District of California for the purpose of enforcing the terms of this Protective Order, even if

14 such enforcement proceedings occur after termination of this action.

15    I hereby appoint _____ [print or type full name] of

16 _____ [print or type full address and telephone

17 number] as my California agent for service of process in connection with this action or any

18 proceedings related to enforcement of this Protective Order.

19 Date: _____

20 City and State where sworn and signed: _____

21 Printed name: _____
22      [printed name]

23 Signature: _____
24     [signature]

25

26

27

28

CA 58411.1

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 401 B Street, Suite 1600, San Diego, California 92101.

2.     That on July 5, 2005, declarant served the AFFIDAVIT OF LESLEY E. WEAVER IN SUPPORT OF PENSION FUND PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS PURSUANT TO SUBPOENA BY THIRD PARTY MASSACHUSETTS FINANCIAL SERVICES INVESTMENT MANAGEMENT by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of July, 2005, at San Diego, California.

JUNE P. ITO

CISCO (FEDERAL-LEAD)
Service List - 7/1/2005    (201-110-1)
Page 1 of 2

## Counsel For Defendant(s)

Dean S. Kristy
Kevin P. Muck
Felix Lee
Fenwick & West LLP
275 Battery Street, Suite 1500
San Francisco, CA  94111
  415/875-2300
  415/281-1350 (Fax)

Norman J. Blears
Daniel T. Rockey
Heller Ehrman LLP
275 Middlefield Road
Menlo Park, CA  94025
  650/324-7000
  650/324-0638 (Fax)

Carol Lynn Thompson
Heller Ehrman LLP
333 Bush Street, Suite 3100
San Francisco, CA  94104-2878
  415/772-6000
  415/772-6268 (Fax)

Theodore P. Senger
PricewaterhouseCoopers LLP
333 Market Street
San Francisco, CA  94104
  415/498-5000
  415/498-7135 (Fax)

Dan K. Webb
Robert Y. Sperling
Robert L. Michels
Winston & Strawn LLP
35 West Wacker Drive, Suite 4200
Chicago, IL  60601-9703
  312/558-5600
  312/558-5700 (Fax)

## Counsel For Plaintiff(s)

J. Nixon Daniel, III
David L. McGee
Terri L. Didier
Beggs & Lane
501 Commendencia Street, P.O. Box 12950
Pensacola, FL  32591
  850/432-2451
  850/469-3330 (Fax)

Scot Bernstein
Law Office of Scot Bernstein
10510 Superfortress Avenue, Suite C
Mather Field, CA  95655
  916/447-0100
  916/933-5533 (Fax)

CISCO (FEDERAL-LEAD)
Service List - 7/1/2005    (201-110-1)
Page 2 of 2

Darren J. Robbins
Spencer A. Burkholz
Daniel S. Drosman
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
401 B Street, Suite 1600
San Diego, CA 92101-4297
  619/231-1058
  619/231-7423 (Fax)

Timothy M. O'Brien
Levin, Papantonio, Thomas, Mitchell, Echsner &
Proctor, P.A.
316 South Baylen St., Suite 600
Pensacola, FL 32501
  850/435-7000
  850/436-6084 (Fax)

Patrick J. Coughlin
Lesley E. Weaver
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111-5238
  415/288-4545
  415/288-4534 (Fax)

**Counsel for Massachusetts Financial Services
Investment Management**

Sharon Simpson Jones
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109
  617-526-6887
  617-526-5000 (fax)